# EXHIBIT A-39

*Filed and Attested by the*
*Office of Judicial Records*
*15 JUN 2023 06:50 pm*
*C. PERRY*

GINA WIEGER, on her own behalf and
as Parent and Natural Guardian of
S.P., a Minor

                         Plaintiff,

    v.

MEAD JOHNSON & COMPANY, LLC,
et al.,

                        Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

**PHILADELPHIA COUNTY COURT OF
COMMON PLEAS**

**MARCH TERM, 2022
No. 220302601**

## ORDER

    **AND NOW**, this          day of          2023, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson

Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs'

Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections

are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson &

Company, LLC and Mead Johnson Nutrition Company are hereby DISMISSED with prejudice.

                         **BY THE COURT:**

                                               J.

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor** | :     **PHILADELPHIA COUNTY COURT OF COMMON PLEAS** |
| Plaintiff, | : |
| v. | :     **MARCH TERM, 2022** |
| | :     **No. 220302601** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

## <u>ORDER</u>

**AND NOW**, this _____ day of _____ 2023, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson

Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs'

Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary

Objections are **SUSTAINED**. It is further **ORDERED** that:

1. Count I of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2. Count II of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3. Count III of Plaintiffs' Complaint is **DISMISSED** with prejudice;

4. Count IV of Plaintiffs' Complaint is **DISMISSED** with prejudice;

5. Count V of Plaintiffs' Complaint is **DISMISSED** with prejudice;

6. Plaintiffs' Complaint is **STRICKEN** for lack of specificity;

7. Plaintiffs' claims for punitive damages as to Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

8. Plaintiff Gina Wieger's claims in her own right are **DISMISSED** with prejudice; and

Case ID: 220302601
Control No.: 23063371

9.    Plaintiffs' Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                              J.

Case ID: 220302601
Control No.: 23063371

**To Plaintiff:** You are hereby notified to
file a written response to the enclosed
Preliminary Objections within twenty
(20) days from service hereof or a
judgement may be entered against you.

**/s/ Kenneth A. Murphy__**
**Attorney for Defendants, Mead**
**Johnson & Company, LLC and Mead**
**Johnson Nutrition Company**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS**
**MEAD JOHNSON & COMPANY, LLC,**
**AND MEAD JOHNSON NUTRITION**
**COMPANY**

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor** | : : : |
| Plaintiff, | : **PHILADELPHIA COUNTY COURT OF** : **COMMON PLEAS** : |
| v. | : **MARCH TERM, 2022** : **No. 220302601** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : : : |
| Defendants. | : : |

**PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY,**
**LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFFS' COMPLAINT**

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition

Company (hereinafter "Moving Defendants" or "Mead Johnson") hereby preliminarily

object to Plaintiffs' Complaint, and, in support thereof, aver as follows:

**I.** **INTRODUCTION**

1.     The case before the Court involves speculative and unsupported allegations by Plaintiffs that the minor Plaintiff, S.P., developed a condition known as necrotizing enterocolitis ("NEC") following her alleged ingestion of Similac and/or Enfamil cow's milk-based infant formula manufactured and sold by Moving Defendants and/or defendant Abbott Laboratories ("Abbott"). Plaintiffs fail to identify the particular product that S.P. purportedly ingested, and the entirety of Plaintiffs' claims rest on their unsubstantiated conclusion that the formula consumed by S.P. is an unreasonably dangerous product. Plaintiffs acknowledge that premature infants such as S.P. have an inherent high risk of developing NEC. However, to support their theory of causation, Plaintiffs cite to certain literature that compares cow's milk-based products to breast milk.  None of the literature upon which Plaintiffs rely concludes that cow's milk-based formula causes NEC.  In fact, the articles carefully avoid that conclusion, saying only that breast milk may be protective against NEC.  The Complaint is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused S.P. to develop NEC.  Plaintiffs allege only that S.P. was born on a certain date; *may* have been provided one of Defendants' infant formula products; and, at some point, developed NEC.  But, Plaintiffs have failed to identify which Mead Johnson product the infant received; whether the infant received mother's own milk; whether the infant received donor milk; how the infant came to receive Mead Johnson's product; when S.P. ingested the product; when S.P. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury S.P. allegedly sustained. Plaintiffs nowhere allege how cow's milk purportedly *causes* NEC, or how the facts of S.P.'s case relate to the scientific evidence Plaintiffs cite.  Pennsylvania's procedural rules do not

2

allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs' Complaint should be dismissed.

2.      Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022, against Moving Defendants as well as Co-Defendant Abbott, The Pennsylvania Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania ("HUP"). *See* Plaintiffs' Complaint, attached as Exhibit "A."

3.      Plaintiffs have filed nearly 30 essentially identical lawsuits against Moving Defendants, Abbott, HUP, and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.

4.      Plaintiffs allege that "upon information and belief" the Plaintiff-minors, including S.P., developed NEC, a gastrointestinal disorder that occurs in premature infants. *See* Plaintiffs' Complaint, attached as Exhibit "A," ¶ 13. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.

5.      In addition to asserting product liability claims against Moving Defendants and Abbott, as the infant formula manufacturers, Plaintiffs have brought claims against The Pennsylvania Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania alleging liability on theories of failure to warn and corporate liability.

6.      The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Complaint.

Case ID: 220302601
Control No.: 23063371

7.    Plaintiffs aver that S.P. was born prematurely December 13, 2013 and that "[u]pon information and belief S.P. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12.

8.    Plaintiffs further allege that "upon information and belief" S.P. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

9.    Plaintiffs generally allege that S.P. "was forced to undergo surgery and has continued to suffer long term health effects," with no specific description of those alleged injuries or long-term health effects. *Id.*, ¶ 14.

10.   Moving Defendants Preliminarily Object to Plaintiffs' Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.    ARGUMENT

### A.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

11.   Plaintiffs allege in Counts I and II of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products.

12.   Plaintiffs allege in Count III (Negligence) of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm.

Case ID: 220302601
Control No.: 23063371

13.     Plaintiffs allege in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to provide truthful, accurate, fulsome information about their cow's milk-based products.

14.     Counts I, II, III, IV, and V are based upon Plaintiffs' theory against Moving Defendants that Moving Defendants' cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

15.     In support of their theories and claims, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit "A," ¶¶ 17-23.

16.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for defective design and failed to state a claim for failure-to-warn, due to an absence of proof of that the products are indeed unreasonably dangerous.

17.     As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United State Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants.

18.     The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Thus, Plaintiffs' contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

5

19.     "The law governing strict products liability actions in Pennsylvania has been developed based upon the principles outlined in Section 402A of the Second Restatement of Torts." *High v. Pennsy Supply, Inc.,* 154 A.3d 341 (Pa. Super. 2017). Section 402(A) provides:

> (1)     One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> > (a)     the seller is engaged in the business of selling such a product, and
> >
> > (b)     it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2)     The rule stated in Subsection (1) applies although
>
> > (a)     the seller has exercised all possible care in the preparation and sale of his product, and
> >
> > (b)     the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402(A).

20.     To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

21.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective

6

Case ID: 220302601
Control No.: 23063371

when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

22.     Based on the foregoing, the threshold Plaintiffs must cross as to Counts I, II, III, IV, and V, is that Plaintiffs must aver sufficient facts demonstrating the Moving Defendants' products are unreasonably dangerous for their intended use, triggering the duties set forth in Plaintiffs' Complaint at Counts I, II, III, IV, and V.

23.     Although Plaintiffs cite in their Complaint to research studies relating to the purported risks of cow's milk-based products in premature infants, the studies demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

24.     At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

25.     Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id*. However, the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

26.     The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies

Case ID: 220302601
Control No.: 23063371

than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk." *Id*. at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.  Indeed, the study itself[1] explains that the difference in NEC incidence may be mediated by the protective effects of immunoglobulin in breast milk, which, when added to formula, also protected against NEC:  "We suggest, in the light of the finding that oral immunoglobulin in formula fed babies was prophylactic, that breast milk may protect against necrotizing enterocolitis by providing IgA in the gut lumen." Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519, 1522 (1990). The article goes on to *recommend* the concomitant use of bovine formulas to meet the increased nutritional needs of premature infants. *Id*.

27.     As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products." *Id*. at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet**. Thus, Plaintiffs'

---

[1] For the Court's convenience, Moving Defendants have attached as Exhibit "B" a copy of A. Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519-1523 (1990), which is the first study that Plaintiffs quote from, and rely on, in their Complaint, but have failed to attach.  Where a plaintiff has averred the existence of certain written documents and premised a cause of action upon those documents, it is proper in Pennsylvania for a defendant to attach those documents in support of a demurrer.  *See Richardson v. Wetzel*, 74 A.3d 353, 358 n.4 (Pa. Commw. Ct. 2013).  As Plaintiffs in the instant matter rely extensively on this and other studies to prove their theory of causation, Moving Defendants have properly attached them here for the Court's consideration.

8

Case ID: 220302601
Control No.: 23063371

second study likewise does not state that cow's milk-based feeding products cause NEC. To the contrary, it too posits that breast milk is simply protective: "These data suggest that exclusive human diets may exert protective, rather than threshold, effects with respect to NEC." Sandra Sullivan, et al., *An Exclusively Human Milk-Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products,* 4 J. PEDIAT. 562, 566 (2010), a true and correct copy of which is attached hereto as Exhibit "C."

28. The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier." *Id*. at ¶ 19. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

29. The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id*. at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

9

Case ID: 220302601
Control No.: 23063371

30.     According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id*. at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id*. This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC.  Instead, as quoted by Plaintiffs, the statement touts the potent protective effects of breastmilk.

31.     The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id*. at ¶¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

32.     Thus, all of the studies identified and quoted by Plaintiffs undercut Plaintiffs' allegations that cow's milk-based products cause NEC and do not support Plaintiffs' contention that such products are unreasonably dangerous.

33.     The numerous studies and reports cited by Plaintiffs in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's

10

Case ID: 220302601
Control No.: 23063371

milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet.

34.     All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be protective against the risk of NEC, not that cow's milk-based alternatives affirmatively cause NEC. This proposition does not make the Moving Defendants' cow's milk-based alternatives unreasonably dangerous within the meaning of § 402(A) of the Restatement (Second) of Torts.

35.     Thus, Plaintiffs' Complaint fails to aver sufficient facts to demonstrate that Moving Defendants' products are indeed unreasonably dangerous.  Consequently, Plaintiffs' Complaint should be stricken at Counts I, II, III, IV, and V for failure to state a claim.

**B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

36.     Counts IV and V of Plaintiffs' Complaint allege intentional and negligent misrepresentation, respectively, against Moving Defendants.  Plaintiffs cannot maintain misrepresentation claims because they fail to allege that they received any specific representation from Moving Defendants on which they relied.  In fact, as they have not even alleged that S.P. received a Mead Johnson product, they cannot claim that misrepresentations by Mead Johnson caused reliance or their purported injury.

37.     The elements of a claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bilt-Rite Contractors v. Architectural Studio*, 866 A.2d 270, 277 (Pa.

Case ID: 220302601
Control No.: 23063371

2005) (quoting <u>Bortz v. Noon</u>, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999)). Negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz*, 729 A.2d at 561.

38. The elements of an intentional misrepresentation claim require: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 499 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (1994), citing, Restatement (Second) of Torts § 525 (1977)).

39. Here, Plaintiffs' claims fail to allege that they received any specific representation from Moving Defendants, intentional or otherwise. Plaintiffs further fail to allege that they relied on a specific representation of the Moving Defendants.

40. Because of these omissions from Plaintiffs' Complaint, Plaintiffs have failed to articulate a viable claim for intentional and negligent misrepresentation. *See, e.g., Cruz v. Roberts*, No. CI-04-01947, 2005 Pa. Dist. & Cnty. Dec. LEXIS 186, 70 Pa. D. & C.4th 225 (Pa. CCP Jan. 26, 2005) (dismissing negligent and intentional misrepresentation claims for insufficient pleading); *see also Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257 (Pa. Super. Nov. 25, 2015) (dismissing fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Case ID: 220302601
Control No.: 23063371

41.     Thus, Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must be dismissed.

**C.      MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

42.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

43.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

44.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

13

Case ID: 220302601
Control No.: 23063371

45.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

46.     Plaintiffs' Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.[2]

47.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14.

48.     Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

---

[2] Access to the relevant medical records **before** filing suit would have allowed Plaintiffs to comport themselves consistently with Rule 1019(a).  Given that minor plaintiff's purported claims are tolled until age of majority, no good reason exists for Plaintiffs' failure to support their complaint with required facts.

Case ID: 220302601
Control No.: 23063371

49. Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 37-38.

50. Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

51. The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

52. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

53. These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

**D.** **MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES**

54. In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 22, 25, 28, and 31.

55. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

56. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based infant formula following birth, absent any context to

15

Case ID: 220302601
Control No.: 23063371

indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth.

57.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

58.     Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

59.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

60.     Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

61.     Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

62.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish

Case ID: 220302601
Control No.: 23063371

that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

63.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

64.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson*, *supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id*. at 772.

65.     Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id*.

Case ID: 220302601
Control No.: 23063371

66.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Case ID: 220302601
Control No.: 23063371

67. Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g., Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

68. All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case.

Case ID: 220302601
Control No.: 23063371

69.     The facts underlying Plaintiffs' bare assertions of oppressive, reckless, malicious and fraudulent conduct do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Without any factual support, the conclusory allegation that Moving Defendants was reckless is insufficiently pled and must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

70.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P.

71.     Plaintiffs' Complaint includes allegations in each count against Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 75, 83, 92, 102 and 112.

72.     However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

73.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Case ID: 220302601
Control No.: 23063371

74.     Accordingly, it is improper for Plaintiffs to plead in a single count their claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the instant Complaint. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

75.     Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Fanscali ex rel. Fanscali v. Univ. Health Center of Pittsburgh, 563 Pa. 439 (2000); Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

76.     Plaintiffs allege that S.P. was born on December 13, 2013, was fed Similac and/or Enfamil cow's milk-based products shortly after her birth at Pennsylvania Hospital, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.

77.     Thus, because Plaintiffs filed the Complaint at issue on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations and must be dismissed.

**F.      MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

78.     Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

Case ID: 220302601
Control No.: 23063371

79.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

80.     In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A."

81.     Accordingly, the Complaint should be stricken for lack of an appropriate verification.

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  June 15, 2023

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

Case ID: 220302601
Control No.: 23063371

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather  R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor** : : : | |
| Plaintiff, : : | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS** |
| v. : : | **MARCH TERM, 2022** |
| : | **No. 220302601** |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, : : : : | |
| Defendants. : | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF
DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON
NUTRITION COMPANY TO PLAINTIFFS' COMPLAINT**

## I.    MATTER BEFORE THE COURT

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead

Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to

Plaintiffs' Complaint.

The case before the Court involves speculative and unsupported allegations by

Plaintiffs that the minor Plaintiff, S.P., developed a condition known as necrotizing

enterocolitis ("NEC") following her alleged ingestion of Similac and/or Enfamil cow's

milk-based infant formula manufactured and sold by Moving Defendants and/or

defendant Abbott Laboratories ("Abbott"). Plaintiffs fail to identify the particular product

that S.P. purportedly ingested, and the entirety of Plaintiffs' claims rest on their

1

unsubstantiated conclusion that the formula consumed by S.P. is an unreasonably dangerous product. Plaintiffs acknowledge that premature infants such as S.P. have an inherent high risk of developing NEC. However, to support their theory of causation, Plaintiffs cite to certain literature that compares cow's milk-based products to breast milk. None of the literature upon which Plaintiffs rely concludes that cow's milk-based formula causes NEC. In fact, the articles carefully avoid that conclusion, saying only that breast milk may be protective against NEC. The Complaint is otherwise devoid of factual support for Plaintiffs' claim that Mead Johnson's product caused S.P. to develop NEC. Plaintiffs allege only that S.P. was born on a certain date; *may* have been provided one of Defendants' infant formula products; and, at some point, developed NEC. But, Plaintiffs have failed to identify which Mead Johnson product the infant received; whether the infant received mother's own milk; whether the infant received donor milk; how the infant came to receive Mead Johnson's product; when S.P. ingested the product; when S.P. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury S.P. allegedly sustained. Plaintiffs nowhere allege how cow's milk purportedly *causes* NEC, or how the facts of S.P.'s case relate to the scientific evidence Plaintiffs cite. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiffs' Complaint should be dismissed.

## II.    STATEMENT OF QUESTIONS PRESENTED

1.    Whether this Honorable Court should dismiss Count I of Plaintiffs' Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are

Case ID: 220302601
Control No.: 23063371

unreasonably dangerous, and Moving Defendants cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.    Whether this Honorable Court should dismiss Count II of Plaintiffs' Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are unreasonable dangerous, and Moving Defendants cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.    Whether this Honorable Court should dismiss Count III of Plaintiffs' Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.    Whether this Honorable Court should dismiss Count IV of Plaintiffs' Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

*Suggested Answer in the affirmative.*

5.    Whether this Honorable Court should dismiss Count V of Plaintiffs' Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiffs?

*Suggested Answer in the affirmative.*

Case ID: 220302601
Control No.: 23063371

6.      Whether this Honorable Court should strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiffs' Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested Answer in the affirmative.*

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

Plaintiffs have filed nearly 30 essentially identical lawsuits against Moving Defendants and Abbott in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including S.P., developed NEC, a gastrointestinal disorder that occurs in premature infants. *See* Plaintiffs' Complaint, attached as Exhibit "A" at ¶ 13. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors actually received infant formula, and that they developed NEC shortly after being fed with infant formula.

---

[1] Lawsuits involving identical claims have been filed against Pennsylvania Hospital, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302601
Control No.: 23063371

In addition to asserting product liability claims against Moving Defendants and Co-Defendant, Abbott, Plaintiffs have alleged that the Pennsylvania Hospital of the University of Pennsylvania and the Trustees of the University of Pennsylvania ("HUP") are liable based on claims of failure to warn and corporate liability. *See* Plaintiffs' Complaint at Counts VI and VII. As is discussed in detail below Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Although Plaintiffs aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Complaint to research studies and reports that, as alleged by Plaintiffs, indicate only that NEC is more common in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. *See* Exhibit "A" at ¶¶ 17-23. As discussed in detail, *infra*, assuming the truth of the factual allegations stated in Plaintiffs' Complaint, the research studies cited by Plaintiffs do not support the conclusion that cow's milk-based formula causes NEC. In fact, the authorities they cite avoid that conclusion. As such, there is no basis to contend that cow's milk-based products are unreasonably dangerous for premature infants.

Plaintiffs' Complaint provides scant information regarding S.P.'s own circumstances. Plaintiffs aver that S.P. was born prematurely on December 13, 2013 and that "[u]pon information and belief S.P. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital shortly after her birth." *Id.* at ¶ 12. Plaintiffs further allege that "upon information and belief" S.P. developed NEC shortly after first ingesting the Moving Defendants and Co-Defendant Abbott's products. *Id.*, ¶ 13. Plaintiffs provide no details regarding the extent of S.P.'s prematurity, her birth weight, or her condition following birth other than that she developed NEC on an

Case ID: 220302601
Control No.: 23063371

unidentified date. Further, Plaintiffs allege no facts as to whether Plaintiff-parent provided breast milk to S.P., whether she had the opportunity to use donor milk, and if S.P. actually received a cow's milk product, what it was, how much, and for how long.[2] Finally, the Complaint is silent as to the nature and extent of S.P.'s alleged injuries other than a vague reference to "surgery" and "long term health effects." *Id*. ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at HUP regarding the allegations that S.P. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs conceded in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id*. ¶ 41. However, Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at HUP related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiffs plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

Plaintiffs also do not explain how cow's milk could be an unreasonably unsafe product. The US FDA regulates both cow's milk and infant formula, and places no restriction on the use of cow's milk-based products for premature infants. FDA's statutory mandate is to prevent the sale of adulterated foods, which are defined as those that may be injurious to human health. 21 U.S.C. §342(a). Far from deeming milk injurious, but in order to "promote honesty and fair dealing in the interest of

---

[2] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id., ¶¶* 37-38.

Case ID: 220302601
Control No.: 23063371

consumers" (21 U.S.C. §341), FDA has created a standard of identity for cow's milk. See 21 C.F.R. 131.110 (standard of identity for milk.)  It has elsewhere said: "First, of all foods, none surpasses milk as a single source of those dietary elements needed for the maintenance of proper health, especially in children and older citizens. For this reason, the USPHS has for many years promoted increased milk consumption…"  U.S. Dep't. of Health and Human Serv. Public Health Serv. FDA, *Grade "A" Pasteurized Milk Ordinance (Grade "A" PMO)*, (2019 Revision), *available at* https://www.fda.gov/media/140394/download.

As for formula, the federal Infant Formula Act of 1980 ("IFA") was enacted to "assure the safety and nutrition of infant formulas." Pub. L. No. 96-359,94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages, 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. (Exhibit "A" ¶¶ 37-38); 21 C.F.R § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA; and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures

Case ID: 220302601
Control No.: 23063371

apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for instant formulas intended for use by an infant with a low birth weight.

In short, since (1) the scientific authorities cited by Plaintiffs do not say that cow's milk formula *causes* NEC, (2) the Plaintiffs have provided virtually no information about S.P.'s medical or nutritional circumstances (such as the use of mother's own milk or the availability of donor milk), (3) FDA recognizes cow's milk and infant formulas as safe, and (4) since Plaintiffs have not even alleged a probability that S.P. received a Mead Johnson product, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

## IV.    ARGUMENT

### A.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this

8

case, Counts I, II, III, IV, and V of Plaintiffs' Complaint should be stricken pursuant to this Rule, as Plaintiffs have failed to plead certain core facts with sufficient detail to survive the pleading stage. For the reasons set forth, *supra*, where Plaintiffs' fail to demonstrate Moving Defendants' cow's milk-based product was unreasonably dangerous, Plaintiffs fail to state a cause of action upon which relief can be granted at Counts I, II, III, IV, and V.

Plaintiffs allege in Counts I and II of the Complaint that Moving Defendants, "as the manufacturers and/or sellers of the products at issue in this litigation" owed Plaintiffs and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Counts I and II are based upon Plaintiffs' theory against Moving Defendants that Moving Defendants' cow's milk-based products are unreasonably dangerous, and therefore defective, for strict liability purposes, under claims of design defect and failure-to-warn. In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for defective design and failed to state a claim for failure-to-warn, due to an absence of proof of that the products are indeed unreasonably dangerous.

"The law governing strict products liability actions in Pennsylvania has been developed based upon the principles outlined in Section 402A of the Second Restatement of Torts." *High v. Pennsy Supply, Inc.,* 154 A.3d 341 (Pa. Super. 2017). Section 402(A) provides:

Case ID: 220302601
Control No.: 23063371

(1)  One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

    (a)  the seller is engaged in the business of selling such a product, and

    (b)  it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2)  The rule stated in Subsection (1) applies although

    (a)  the seller has exercised all possible care in the preparation and sale of his product, and

    (b)  the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402(A).

To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.*

10

Case ID: 220302601
Control No.: 23063371

Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Moving Defendants' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn. The only factual reference Plaintiffs make with regard to intended use is to marketing campaigns, where Defendant Manufacturers advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit "A" at ¶ 43. They have not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose, as the studies and reports they cite in their Complaint do not say or support – based on the very allegations in the Complaint – what Plaintiffs claim they do. These studies and reports are the sole factual support that the products in question "cause" NEC, and are the foundation for their strict products liability claims of design defect and failure-to-warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products <u>cause</u> NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk." *Id.* at ¶ 17 (emphasis added). To

11

say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based products cause NEC.  Indeed, the study itself[3] explains that the difference in NEC incidence may be mediated by the protective effects of immunoglobulin in breast milk, which, when added to formula, also protected against NEC:  "We suggest, in the light of the finding that oral immunoglobulin in formula fed babies was prophylactic, that breast milk may protect against necrotizing enterocolitis by providing IgA in the gut lumen."  Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519, 1522 (1990). The article goes on to *recommend* the concomitant use of bovine formulas to meet the increased nutritional needs of premature infants. *Id.*

As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products." *Id.* at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet**. Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.  To the contrary, it too posits that breast milk is simply protective: "These data suggest that

---

[3]  For the Court's convenience, Moving Defendants have attached as Exhibit "B" a copy of A. Lucas, et al., *Breast Milk and Neonatal Necrotizing Enterocolitis,* 336 LANCET 1519-1523 (1990), which is the first study that Plaintiffs quote from, and rely on, in their Complaint, but have failed to attach.  Where a plaintiff has averred the existence of certain written documents and premised a cause of action upon those documents, it is proper in Pennsylvania for a defendant to attach those documents in support of a demurrer.  *See Richardson v. Wetzel*, 74 A.3d 353, 358 n.4 (Pa. Commw. Ct. 2013).  As Plaintiffs in the instant matter rely extensively on this and other studies to prove their theory of causation, Moving Defendants have properly attached them here for the Court's consideration.

Case ID: 220302601
Control No.: 23063371

exclusive human milk diets may exert protective, rather than threshold, effects with respect to NEC."  Sandra Sullivan, et al., *An Exclusively Human Milk-Based Diet is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products,* 4 J. PEDIAT. 562, 566 (2010), a true and correct copy of which is attached hereto as Exhibit "C."

The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier." *Id*. at ¶ 19. As Plaintiffs admitted in the Complaint, preterm and low-weight-birth infants are especially susceptible to NEC. Put another way, **these infants are already at an increased risk of NEC regardless of their diet.** This study, as described in Plaintiffs' Complaint, reflects this in explaining different rates of risk of developing NEC when using cow's milk-based or breast milk-based fortifiers. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id*. at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC

Case ID: 220302601
Control No.: 23063371

occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id*. at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id*. This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC. Instead, as quoted by Plaintiffs, the statement touts the "potent protective effects of breastmilk." *Id*.

The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id*. at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

Ultimately, Plaintiffs' claim that Moving Defendants' cow's milk-based feeding products "cause" NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. The numerous studies and reports cited by Plaintiffs

14

Case ID: 220302601
Control No.: 23063371

in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet. All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be protective against the risk of NEC, not that cow's milk-based alternatives affirmatively cause NEC. This proposition does not make the Moving Defendants' cow's milk-based alternatives unreasonably dangerous within the meaning of § 402(A) of the Restatement (Second) of Torts. Thus, Plaintiffs' Complaint fails to aver sufficient facts to demonstrate that Moving Defendants' products are indeed unreasonably dangerous and maintain a cause of action sounding in strict products liability. Consequently, Plaintiffs' Complaint should be stricken at Counts I, II, III, IV, and V for failure to state a claim.

### B. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V

Counts IV and V of Plaintiffs' Complaint allege intentional and negligent misrepresentation, respectively, against Moving Defendants. Plaintiffs cannot maintain misrepresentation claims because they fail to allege that they received any specific representation from Moving Defendants on which they relied. In fact, as they have not even alleged that S.P. received a Mead Johnson product, they cannot claim that misrepresentations by Mead Johnson caused reliance or their purported injury.

The elements of a claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the

15

Case ID: 220302601
Control No.: 23063371

misrepresentation." *Bilt-Rite Contractors v. Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005) (quoting <u>Bortz v. Noon</u>, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999)). Negligent misrepresentation differs from intentional misrepresentation "in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Bortz*, 729 A.2d at 561.

The elements of an intentional misrepresentation claim require: "(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 499 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (1994), citing, Restatement (Second) of Torts § 525 (1977)).

Here, Plaintiffs' claims fail to allege that they received any specific representation from Moving Defendants, intentional or otherwise. Plaintiffs further fail to allege that they relied on a specific representation of the Moving Defendants. Because of these omissions from Plaintiffs' Complaint, Plaintiffs have failed to articulate a viable claim for intentional and negligent misrepresentation. *See, e.g., Cruz v. Roberts*, No. CI-04-01947, 2005 Pa. Dist. & Cnty. Dec. LEXIS 186, 70 Pa. D. & C.4th 225 (Pa. CCP Jan. 26, 2005) (dismissing negligent and intentional misrepresentation claims for insufficient pleading); *see also Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257 (Pa. Super. Nov. 25, 2015) (dismissing fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

16

Case ID: 220302601
Control No.: 23063371

Thus, Plaintiffs' intentional and negligent misrepresentation claims against Moving Defendants must be dismissed.

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

17

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.[4] Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiffs have failed to identify which of

---

[4] Plaintiffs' complaint violates the most basic pleading rules. It is procedurally deficient and bereft of relevant substantive support. Relying upon vague place-holder pleading conventions (e.g., "upon information and belief," "and/or") and citation to inapposite scientific studies, Plaintiffs' complaint is replete with supposition, leaps in logic and unsubstantiated innuendo. The Court should not countenance such flouting of the rules.

18

the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 37-38. Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiffs' Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

### D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 22, 25, 28, and 31. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to

Case ID: 220302601
Control No.: 23063371

discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

20

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson*, *supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id*. at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an

21

award of punitive damages was warranted.") (emphasis added); *Wagner, supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g., Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from

Case ID: 220302601
Control No.: 23063371

neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Without any factual support, the conclusory allegation that Moving Defendants were reckless is insufficiently pled and must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P. Her claims should be dismissed for the reasons set forth below.

23

Plaintiffs' Complaint includes allegations in each count against Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 75, 83, 92, 102 and 112. However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged conduct of Moving Defendants.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count their claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the instant Complaint. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Fanscali ex rel. Fanscali v. Univ. Health Center of Pittsburgh, 563 Pa. 439 (2000); Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

Case ID: 220302601
Control No.: 23063371

Plaintiffs allege that S.P. was born on December 13, 2013, was fed Similac and/or Enfamil cow's milk-based products shortly after her birth at Pennsylvania Hospital, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.  Thus, because Plaintiffs filed the Complaint at issue on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations and must be dismissed.

### F.  MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, Plaintiffs' counsel signed the verification for the Complaint, in violation of Rule 1024. *See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate verification.

### V.  REQUESTED RELIEF

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

Respectfully submitted,

Case ID: 220302601
Control No.: 23063371

**TUCKER LAW GROUP, LLC**

Dated: June 15, 2023

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

26

## **CERTIFICATE OF SERVICE**

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiffs' Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**

Case ID: 220302601
Control No.: 23063371

Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

By:     /s/ Kenneth A. Murphy
          Kenneth A. Murphy, Esquire

Dated: June 15, 2023

2

# EXHIBIT "A"

Case ID: 220302601
Control No.: 23063371

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**MARCH 2022**

E-Filing Number: 2203054860

**002601**

| PLAINTIFF'S NAME<br>GINA WIEGER | DEFENDANT'S NAME<br>MEAD JOHNSON & COMPANY, LLC |
|---|---|
| PLAINTIFF'S ADDRESS<br>214 GIBBS AVE<br>TRENTON NJ 08611-3218 | DEFENDANT'S ADDRESS<br>ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD IL 62703 |
| PLAINTIFF'S NAME<br>S P | DEFENDANT'S NAME<br>MEAD JOHNSON NUTRITION COMPANY |
| PLAINTIFF'S ADDRESS<br>214 GIBBS AVE<br>TRENTON NJ 08611-3218 | DEFENDANT'S ADDRESS<br>ILLINOIS CORPORATION SERVICE C 801 ADLAI<br>STEVENSON DRIVE<br>SPRINGFIELD IL 62703 |
| PLAINTIFF'S NAME<br>ABBOTT LABORATORIES | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>CT CORPORATION SYSTEM 208 SO. LASALLE STREET<br>SUITE 814<br>CHICAGO IL 60604 |

| TOTAL NUMBER OF PLAINTIFFS<br>2 | TOTAL NUMBER OF DEFENDANTS<br>5 | COMMENCEMENT OF ACTION |
|---|---|---|

- [X] Complaint
- [ ] Petition Action
- [ ] Notice of Appeal
- [ ] Writ of Summons
- [ ] Transfer From Other Jurisdictions

| AMOUNT IN CONTROVERSY | COURT PROGRAMS |
|---|---|

- [ ] $50,000.00 or less
- [X] More than $50,000.00

- [ ] Arbitration
- [X] Jury
- [ ] Non-Jury
- [ ] Other:

- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition

- [ ] Commerce
- [ ] Minor Court Appeal
- [ ] Statutory Appeals

- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

CASE TYPE AND CODE
2P - PRODUCT LIABILITY

STATUTORY BASIS FOR CAUSE OF ACTION

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | **FILED**<br>**PRO PROTHY**<br><br>MAR **24** 2022<br><br>**S. RICE** | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES    NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: <u>GINA WIEGER , S P</u>

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>TRACY A. FINKEN | ADDRESS<br>ONE LOGAN SQUARE<br>130 N. 18TH ST.<br>SUITE 1600<br>PHILADELPHIA PA 19103 |
|---|---|
| PHONE NUMBER<br>(215)735-0773 | FAX NUMBER<br>(215)875-7731 | |
| SUPREME COURT IDENTIFICATION NO.<br>82258 | E-MAIL ADDRESS<br>tfinken@anapolweiss.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*TRACY FINKEN* | DATE SUBMITTED<br>Thursday, March 24, 2022, 03:16 pm |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. MEAD JOHNSON & COMPANY, LLC
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
2. MEAD JOHNSON NUTRITION COMPANY
   ILLINOIS CORPORATION SERVICE C 801 ADLAI STEVENSON DRIVE
   SPRINGFIELD  IL 62703
3. ABBOTT LABORATORIES
   CT CORPORATION SYSTEM  208 SO. LASALLE STREET  SUITE 814
   CHICAGO  IL 60604
4. THE PA HOSPITAL OF THE UNIVERSITY OF PA HEALTH SYSTEM
   ALIAS: PENNSYLVANIA HOSPITAL
   3400 CIVIC CENTER BLVD
   PHILADELPHIA  PA 19104
5. THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA
   ALIAS: PENN MEDICINE
   133 SOUTH 36TH STREET
   PHILADELPHIA  PA 19104

Case ID: 220302601
Control No.: 23063371

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
**Identification Number: 82258**
**One Logan Square**
**130 N. 18th Street, Suite 1600**
**Philadelphia, PA 19103**
**(215) 735-0773**
**Email: tfinken@anapolweiss.com**

**Keller Lenkner LLC**
**BY: Ashley Keller (pro hac vice forthcoming)**
**150 N. Riverside Plaza, Suite 4100**
**Chicago, Illinois 60606**
**Telephone: (312) 741-5220**
**Fax: (312) 971-3502**
**Email: ack@kellerlenkner.com**

**Walsh Law PLLC**
**BY: Alex Walsh (pro hac vice forthcoming)**
**1050 Connecticut Ave, NW, Suite 500**
**Washington, D.C. 20036**
**Telephone: (202) 780-4127**
**Fax: (202) 780-3678**
**Email: awalsh@alexwalshlaw.com**

Filed and Attested by the
Office of Judicial Records
24 MAR 2022 03:16 pm
S. RICE

**ATTORNEY FOR PLAINTIFFS**

**ATTORNEY FOR PLAINTIFFS**

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **GINA WIEGER, on her own behalf and** | : | **COURT OF COMMON PLEAS** |
| **as Parent and Natural Guardian of S.P.,** | : | **PHILADELPHIA COUNTY** |
| **a Minor** | : | |
| **214 Gibbs Ave** | : | |
| **Trenton, NJ 08611-3218** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | **NO.** |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

1

CT Corporation System             :
208 So. Lasalle Street, Suite 814    :
Chicago, IL 60604                :
                                      :

**THE PENNSYLVANIA HOSPITAL OF**  :
**THE UNIVERSITY OF PENNSYLVANIA**  :
**HEALTH SYSTEM d/b/a PENNSYLVANIA**  :
**HOSPITAL**                         :
3400 Civic Center Blvd.           :
Philadelphia, PA 19104         :
                                      :

**THE TRUSTEES OF THE UNIVERSITY OF**  :
**PENNSYLVANIA d/b/a PENN MEDICINE**  :
133 South 36th Street           :
Philadelphia, PA 19104         :
                                      :

          **Defendants**       :     **JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

**ANAPOL WEISS**
**BY: TRACY FINKEN, ESQUIRE**
**IDENTIFICATION NUMBER: 82258**
**ONE LOGAN SQUARE**
**130 N. 18TH STREET, SUITE 1600**
**PHILADELPHIA, PA 19103**
**(215) 735-0773**
**EMAIL: TFINKEN@ANAPOLWEISS.COM**                    **ATTORNEY FOR PLAINTIFFS**

**KELLER LENKNER LLC**
**BY: ASHLEY KELLER (PRO HAC VICE FORTHCOMING)**
**150 N. RIVERSIDE PLAZA, SUITE 4100**
**CHICAGO, ILLINOIS 60606**
**TELEPHONE: (312) 741-5220**
**FAX: (312) 971-3502**
**EMAIL: ACK@KELLERLENKNER.COM**                    **ATTORNEY FOR PLAINTIFFS**

**WALSH LAW PLLC**
**BY: ALEX WALSH (PRO HAC VICE FORTHCOMING)**
**1050 CONNECTICUT AVE, NW, SUITE 500**
**WASHINGTON, D.C. 20036**
**TELEPHONE: (202) 780-4127**
**FAX: (202) 780-3678**
**EMAIL: AWALSH@ALEXWALSHLAW.COM**                    **ATTORNEY FOR PLAINTIFFS**

| | |
|---|---|
| **GINA WIEGER,** ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF S.P., A MINOR<br>**214 GIBBS AVE**<br>**TRENTON, NJ 08611-3218**<br> **PLAINTIFFS** <br>**v.** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| **MEAD JOHNSON & COMPANY, LLC**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>**SPRINGFIELD, IL 62703** | **CIVIL ACTION**<br><br>**NO.** |
| **MEAD JOHNSON NUTRITION COMPANY**<br>ILLINOIS CORPORATION SERVICE CO.<br>**801 ADLAI STEVENSON DRIVE**<br>**SPRINGFIELD, IL 62703** | |
| **ABBOTT LABORATORIES**<br>CT CORPORATION SYSTEM<br>**208 SO. LASALLE STREET, SUITE 814**<br>**CHICAGO, IL 60604** | |
| **THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM** D/B/A **PENNSYLVANIA** | |

3

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

| HOSPITAL | : |
|---|---|
| 3400 CIVIC CENTER BLVD. | : |
| PHILADELPHIA, PA 19104 | : |
| | : |
| | : |
| THE TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA D/B/A PENN MEDICINE | : |
| 133 SOUTH 36TH STREET | : |
| PHILADELPHIA, PA 19104 | : |
| | : |
| DEFENDANTS | : JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I. INTRODUCTION

1.      This action arises out of the injuries suffered by premature infants (the "Injured Infants") who were given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infants and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infants to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

the Injured Infants were seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infants' consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infants at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey. Ms. Wieger is the parent and Natural Guardian of S.P., a minor. Ms. Weiger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

6

Case ID: 220302601

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### S.P.'s NEC Diagnosis

11.     S.P. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 13, 2013.

12.     Upon information and belief S.P. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth.

13.     Upon information and belief shortly after S.P. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     S.P. was forced to undergo surgery and has continued to suffer long term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

7

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis."  The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

22.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products.  The babies given exclusively breast milk products suffered NEC 5% of the time.  The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.  For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.  For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet.  This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infants were fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products

30.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infants' birth.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

31.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder).  In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use.  For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks.  Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk."  The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

13

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

40.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.  One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product.  The packaging appears as:

14

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371



43.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infants.

15

*The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online.  No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

16

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

51.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

56.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those

17

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured

Infants, Penn Medicine has continued to source, distribute, and supply the Defendant

Manufacturers' products in its hospitals without any adequate warning.

57.     To that end, Penn Medicine has participated in studies designed to increase the use of donor

milk while, at the same time, reducing formula feeding in neonates.   The University of

Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research

into the risks associated with feeding formula to premature infants.  It recently partnered with the

National Institute of Nursing Research to publish clinical determinations based on its experience

"changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of
> necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral
> feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the

incidence and severity of . . . necrotizing enterocolitis (NEC)."

58.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital

Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in

preterm infants by encouraging implementation of exclusive breast milk diets among new mothers.

Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has

not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks

associated with providing the Defendant Manufacturers' cow's milk-based products to premature

infant patients instead of breast milk-based nutrition.  In an internal newsletter from 2012 touting

donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet,

quoting a staff lactation consultant:

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infants were fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

*Safer Alternative Designs*

63. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
### COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
#### (Against Abbott and Mead)

66. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68. Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

20

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

69.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infants and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.     The Injured Infants ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infants outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
#### (Against Abbott and Mead)

76.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

22

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.  By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.  The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infants, and that their products might cause the Injured Infants to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.  Among other risks, the Defendant Manufacturers:

      a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infants; and/or

      b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or

      c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

Case ID: 220302601

d. Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81.     As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82.     The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infants those products. Had the

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

Plaintiff Parent known of the significant risks of feeding the Injured Infants cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infants.

83.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.     At all times relevant to this action, the Injured Infants' healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

     a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infants; and/or

     b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89.  In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

90.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

92.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

   a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

   c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

   d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

   e.   For interest as permitted by law;

   f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94.     At all times relevant to this action, the Injured Infants consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96.     Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

29

Case ID: 220302601

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98.  Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99.  The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their infant products to babies, including the Injured Infants.

100.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infants would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

103.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.   At all times relevant to this action, the Injured Infants consumed the products at issue in their intended manner and for their intended purpose.

105.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.   In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.   Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.  Abbott and Mead were negligent or careless in not determining those representations to be false.

109.  The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their products to babies, including the Injured Infants.

110.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

Case ID: 220302601

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

111. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

113.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.   Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117.   Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119.    Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

      a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

      b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

125. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126. As a further direct and proximate result of Penn Medicine and Pennsylvania failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, reckless, and/or malicious conduct, as permitted by law;

Case ID: 220302601

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
(Against Penn Medicine and Pennsylvania Hospital)

127.   Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128.   At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.  Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.  Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129.   Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

39

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

131.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.  These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132.   Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134.   Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly  and breached its duty by:

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

41

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

42

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a.  Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.  Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c.  Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d.  Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.   Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.   Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.   Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143.   A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

144.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

45

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

**DEMAND FOR JURY TRIAL**

148.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: March 24, 2022

Respectfully submitted,

**ANAPOL WEISS**

Tracy Finken
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Email: tfinken@anapolweiss.com

**KELLER LENKNER LLC**
Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606

46

Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiff*

47

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

_____
Tracy Finken

Case ID: 220302601

Case ID: 220302601
Control No.: 23063371

DocuSign Envelope ID: C3C5A6A4-474B-42E2-9C88-07441826A3A3

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**

Gina Wieger
          **PLAINTIFF,**    :

        **V.**             :
                      :

Mead Johnson & Company, LLC, et al.  :   **CIVIL DIVISION**
                      :

        **DEFENDANT.**    :   **JURY TRIAL DEMANDED**

## <u>VERIFICATION</u>

I, _____Gina Wieger_____, hereby verify that I am the plaintiff in the foregoing action; that the

attached Complaint in Civil Action is based upon information which I have furnished to counsel,

and information which has been gathered by counsel in the preparation of the lawsuit. The

language of the Complaint is that of counsel and not mine. I have read the Complaint, and to the

extent the statements therein are based upon information I have given counsel, they are true and

correct to the best of my knowledge, information and belief. To the extent the contents of the

Complaint are that of counsel, I have relied upon counsel in making this Verification. I understand

that if false statements were made herein, I would be subject to the penalties of 18 Pa. C.S.A.

§4904 relating to unsworn falsification to authorities. I am authorizing my counsel to file this

Complaint based on my representation agreement with them.

By: _____
             DocuSigned by:
             3A2A155EA84B437...

DATE: ___3/22/2022___

Case ID: 220302601

# EXHIBIT "B"

Case ID: 220302601
Control No.: 23063371

# MEDICAL SCIENCE

## Breast milk and neonatal necrotising enterocolitis

A. LUCAS     T. J. COLE

In a prospective multicentre study on 926 preterm infants formally assigned to their early diet, necrotising enterocolitis developed in 51 (5·5%). Mortality was 26% in stringently confirmed cases. In exclusively formula-fed babies confirmed disease was 6–10 times more common than in those fed breast milk alone and 3 times more common than in those who received formula plus breast milk. Pasteurised donor milk seemed to be as protective as raw maternal milk. Among babies born at more than 30 weeks' gestation confirmed necrotising enterocolitis was rare in those whose diet included breast milk; it was 20 times more common in those fed formula only. Other risk factors included very low gestational age, respiratory disease, umbilical artery catheterisation, and polycythaemia. In formula-fed but not breast-milk-fed infants, delayed enteral feeding was associated with a lower frequency of necrotising enterocolitis. With the fall in the use of breast milk in British neonatal units, exclusive formula feeding could account for an estimated 500 extra cases of necrotising enterocolitis each year. About 100 of these infants would die.

*Lancet* 1990; **336**: 1519–23.

## Introduction

Necrotising enterocolitis is the most common serious gastrointestinal disease seen in neonatal intensive care units, with a reported mortality in well-established cases of 20–40%.[1] The causes have been elusive. Prematurity or low birthweight are the most consistently reported associated factors,[2] but up to 10% of cases occur in term babies.[3] Some studies suggest a strong relation between necrotising enterocolitis and factors that could cause gut ischaemia or hypoxia;[4-6] others fail to find these associations.[1,2,7] An infective aetiology has been suggested by case clustering, the presence of a predominant organism in outbreaks, the effectiveness of standard infectious disease control methods in epidemics,[8,9] and the apparent prophylactic value of oral immunoglobulin.[10] Nevertheless, no single organism has proved to be the cause[11] and most of the microorganisms identified are present in normal gut flora. The importance of enteral feeding as a risk factor has been emphasised,[3,12-14] but 5–10% of cases occur in babies who have never been enterally fed.[1,3] Further suggested factors related to feeding include early initiation of enteral feeds,[14] rapid escalation of feed volumes,[13] and hyperosmolar feeding,[15,16] but others doubt their importance.[4,17] Several small studies and anecdotal observations[18-20] have suggested that breast milk is protective. This idea is supported by findings in a rat model that live milk leucocytes are prophylactic.[21,22] Nevertheless, necrotising enterocolitis can occur in infants fed exclusively on fresh, frozen, or pasteurised breast milk.[4,14,23]

It seems that no single aetiological factor explains necrotising enterocolitis and that the mucosal lesion can be provoked in several ways. An important question, however, is whether there are any important risk factors that can be avoided readily in clinical practice. Feeding policy is the factor most amenable to manipulation. In our prospective, randomised, multicentre study of dietary management in 926 infants,[24] we have re-explored the relation between early diet or feeding practice and the frequency of necrotising enterocolitis.

## Subjects and methods

926 infants with birthweights below 1850 g (mean 1370 [SD 320] g; mean gestation 31 [3] weeks) were recruited in five centres, to test whether early diet, randomly assigned, affected short-term morbidity and long-term outcome. Necrotising enterocolitis was identified as a major short-term outcome response.

There were two parallel studies. In three centres (study A) infants were randomly assigned to pasteurised banked donated breast milk or a nutrient-enriched preterm formula ('Osterprem', Farley Health Products Ltd, Nottingham, UK). The randomisation was stratified according to whether the mother provided breast milk for her own infant. Thus, donor milk and preterm formula could be compared as sole diets (in infants whose mothers did not provide their own milk) or as supplements to breast milk. In two further centres (study B) the same randomisation procedure was used to compare infants fed a standard "term" formula ('Ostermilk', Farley Health Products Ltd) or the preterm formula, again as sole diets or as supplements to mother's milk. When the trial diets (donor milk, term formula, or preterm formula) were used as a supplement to maternal breast milk, the median intake of mother's milk was 48% (interquartile range 10–86%) with no difference between diet groups. Randomisation is described elsewhere;[24] it took place within 48 h of birth, independently in each

ADDRESS: University Department of Paediatrics and MRC Dunn Nutrition Unit, Cambridge, UK (A. Lucas, MRCP, T. J. Cole, PhD). Correspondence to Dr A. Lucas, MRC Dunn Nutrition Unit, Downhams Lane, Milton Road, Cambridge CB4 1XJ, UK.

Case ID: 220302601
Control No.: 23063371

THE LANCET

centre, and assignments were based on permuted blocks of variable length.

Detailed composition of the formulas is available from the manufacturers. Briefly, for each 100 ml the standard formula contained 1·45 g protein and 286 kJ (68 kcal), and the preterm formula 2·0 g protein and 336 kJ (80 kcal). The preterm formula was also enriched in sodium, calcium, phosphorus, copper, zinc, vitamins D, E, and K, water-soluble vitamins, carnitine, and taurine. The osmolality of both formulas was 300 mosmol/kg. Donor breast milk was pasteurised and frozen. Mother's milk was not pasteurised and was fed untreated or after a period of refrigeration or, occasionally, freezing.

Various classifications have been proposed for necrotising enterocolitis.[25,26] We have used the British Association for Perinatal Pediatrics classification based on features of the disease in 165 cases in 54 British centres.[26] Grade 1 cases had at least two of the following features: pneumatosis intestinalis on abdominal radiograph; abdominal distension or an abdominal radiograph showing gaseous distension or frothy appearance of bowel lumen (or both); blood in the stool; lethargy, hypotonia, or apnoeic episodes, or a combination of the three. Grade 2 cases had, as well as grade 1 features, one or more of: abdominal tenderness or rigidity; tissue (mucosa) in stool; abnormal bleeding with trauma; spontaneous bleeding; peripheral white blood cell count below $6 \times 10^9/l$ at the time of illness; peripheral platelet count below $100 \times 10^9/l$ at the time of illness; or an abdominal radiograph showing gas in the portal vein or free air in the abdomen. The cases were further divided into confirmed cases (with classic radiological features [pneumatosis intestinalis, gas in the portal venous system, or free air in the abdomen] or with necrotising enterocolitis established surgically or at necropsy) and unconfirmed cases.

The frequency of necrotising enterocolitis was examined among the randomised diet groups. In the main analysis, however, necrotising enterocolitis was examined in three non-randomised enteral feed groups—human milk only (donor or donor plus mother's milk), formula (term or preterm) as a supplement to mother's milk, and formula only. Extensive logistic regression analyses were used—to adjust for potential confounding factors in the comparison between non-randomised feed groups; to quantify other risk factors for necrotising enterocolitis; and to identify interactions between diet and non-dietary factors. For most analyses, data are presented for all cases of necrotising enterocolitis and for confirmed cases only.

## Results

Clinical features of necrotising enterocolitis developed in 51 of the 926 infants studied, and the diagnosis was more stringently "confirmed" in 31 (table I). All the infants who required surgery or who died had grade 2 confirmed disease. Of the confirmed cases, 35% needed surgery, and necrotising enterocolitis was considered the principal cause of death in 26%. All infants in whom necrotising enterocolitis developed had received enteral feeds.

The clinical characteristics of the study population and the higher frequency of necrotising enterocolitis at low gestation and with respiratory disease are shown in table II.

The only formal randomised comparison of human milk and formula feeding on the incidence of necrotising enterocolitis was that of infants fed exclusively on donor breast milk or on preterm formula. Among the 86 infants exclusively fed on donor milk there were 3 (4%) cases (1 [1%] confirmed cases) and among the 76 fed exclusively on preterm formula there were 6 (8%) cases (4 [5%] confirmed); the odds ratios were 2·4 (95% CI 0·6–9·8) for all cases and 4·7 (0·5–43) for confirmed cases. However, the sample size was not large enough to detect a difference smaller than ten-fold in frequency of necrotising enterocolitis between these groups with adequate power. In study A as a whole there were 11 (43%) cases among the 253 infants who received donor milk alone or with maternal milk

### TABLE I—OCCURRENCE AND OUTCOME OF NECROTISING ENTEROCOLITIS

| — | No of babies (% of total) | No (% of group) who required surgery | No (% of group) who died |
|---|---|---|---|
| *Grade 1* | | | |
| Unconfirmed | 16 (1·7%) | 0 | 0 |
| Confirmed | 9 (1·0%) | 0 | 0 |
| *Grade 2* | | | |
| Unconfirmed | 4 (0·4%) | 0 | 0 |
| Confirmed | 22 (2·4%) | 11 (50%) | 8 (36%) |
| *Total cases* | 51 (5·5%) | 11 (22%) | 8 (16%) |
| *Confirmed cases* | 31 (3·3%) | 11 (35%) | 8 (26%) |

(3 [1·2%] confirmed) and 12 (4·8%) cases among the 249 who received preterm formula as a sole diet or with maternal milk (9 [3·6%] confirmed). The odds ratios were 1·1 (0·5–2·6) for all cases and 3·1 (0·8–11·7) for confirmed cases; however, the 3-fold difference was not significant (p = 0·07). In study B the incidence of necrotising enterocolitis was similar in infants fed preterm or term formula either as sole diets (6/81 cases *vs* 11/79 cases) or as supplements to mother's milk (12/213 cases *vs* 16/211 cases).

The 253 subjects fed only human milk ranged from those fed exclusively pasteurised donor milk to those fed almost entirely raw maternal milk. More detailed data modelling (not shown here) confirmed the findings above, that the incidence of necrotising enterocolitis in this subgroup was not affected by the type of breast milk consumed.

Since the occurrence of necrotising enterocolitis was the same in infants fed on different types of breast milk and in infants fed on the two types of formula, we were able to divide the whole population into three large diet groups for comparison—formula only (n = 236), formula plus breast milk (n = 437), and human milk only (n = 253). The formula only group was at a significantly higher risk of necrotising enterocolitis than the other groups (table III). The odds ratio (95% CI) for the comparison of formula only and formula plus mother's milk was 3·0 (1·5–5·7; p < 0·005) for all cases and 3·0 (1·4–6·5; p < 0·005) for confirmed cases. For the comparison of formula only and breast milk only the odds ratios were 2·5 (1·2–5·2; p < 0·02) for all cases and 6·5 (1·9–22; p < 0·001) for confirmed cases.

This comparison might have been confounded by the fact that the infants exclusively fed human milk were contributed by only three centres (study A), whereas the formula-fed infants were contributed by all five centres (studies A and B). The frequency of necrotising enterocolitis in preterm formula-fed babies did not, however, differ significantly between studies A and B (7·9 *vs* 7·4%).

### TABLE II—CHARACTERISTICS OF STUDY POPULATION

| | All cases | Confirmed cases |
|---|---|---|
| *No (%) with gestation of:* | | |
| 25–27 wk (n = 118) | 20 (16·9%) | 12 (10·2%) |
| 28–30 wk (n = 314) | 18 (5·7%) | 11 (3·5%) |
| < 30 wk (n = 494) | 13 (2·6%) | 8 (1·6%) |
| *No (%) with birthweight of:* | | |
| < 1000 g (n = 144) | 18 (12·5%) | 11 (7·6%) |
| 1000–1500 g (n = 403) | 23 (5·7%) | 15 (3·7%) |
| > 1500 g (n = 379) | 10 (2·6%) | 5 (1·3%) |
| *No (%) of cases with concomitant respiratory disease*[*1] | 36/51 (71%) | 21/31 (68%) |
| *Median (IQR) enteral feed volume before NEC* | 410 (140–1160) | 390 (160–990) |
| *Median (IQR) day of onset* | 12 (7–18) | 11 (7–18) |

NEC = necrotising enterocolitis, IQR = interquartile range.
*338 (39%) of the 875 infants without NEC had concomitant respiratory disease
†Ventilated for > 24 h in the first 72 h

TABLE III—NECROTISING ENTEROCOLITIS BY FEED GROUP

| — | n | No (%) of cases | |
|---|---|---|---|
| | | All cases | Confirmed cases |
| Formula only | 236 | 24 (10·2%) | 17 (7·2%) |
| Formula plus mother's milk | 437 | 16 (3·7%) | 11 (2·5%) |
| Human milk only | 253 | 11 (4·3%) | 3 (1·2%) |

TABLE IV—LOGISTIC REGRESSION MODELS FOR FACTORS SIGNIFICANTLY RELATED TO FREQUENCY OF NECROTISING ENTEROCOLITIS

| — | All cases | | Confirmed cases | |
|---|---|---|---|---|
| | t | Odds ratio (95% CI) | t | Odds ratio (95% CI) |
| Formula only vs breast milk + formula | 3·37 (p < 0·001) | 3·3 (1·6–6·8) | 3·05 (p < 0·01) | 3·5 (1·5–8·1) |
| Formula only vs breast milk only | 3·06 (p < 0·001) | 3·5 (1·5–8·1) | 3·74 (p < 0·001) | 10·6 (3·0–37·3) |
| Gestation* | 3·06 (p < 0·01) | 1·2 (1·1–1·4) | 2·43 (p < 0·05) | 1·2 (1·0–1·5) |
| Days of umbilical artery catheterisation† | 2·97 (p < 0·01) | 1·2 (1·1–1·3) | 3·04 (p < 0·01) | 1·2 (1·1–1·4) |
| Day of first feed‡ | 2·60 (p < 0·01) | 1·2 (1·0–1·4) | 2·23 (p < 0·05) | 1·2 (1·0–1·4) |
| Haemoglobin 200 g/l | 2·39 (p < 0·05) | 2·4 (1·2–5·1) | | |
| Respiratory distress§ | 2·31 (p < 0·05) | 2·6 (1·1–6·2) | | |

*Odds ratio is for each week shorter.
†Odds ratio is for each day in first 10
‡Odds ratio is for each day earlier.
§Requiring > 24 h ventilation

Logistic regression was used to adjust for any differences between groups in factors that have been associated previously with necrotising enterocolitis. The large differences between diet groups were seen even after adjustment for length of gestation, birthweight, sex, birth asphyxia, previous blood transfusions, use of theophylline and frusemide, polycythaemia, respiratory disease, duration of umbilical artery catheterisation, age at first enteral feed, rate of incrementation of early feed volumes, and maternal steroid treatment. One centre in study B had a slightly higher incidence of necrotising enterocolitis than the others. However, adjustment for any centre effects did not reduce the significance of the dietary findings.

In logistic regression models for all cases of necrotising enterocolitis and for confirmed cases (table IV), the independent variables were those of the factors above that were significantly related to the occurrence of necrotising enterocolitis. Length of gestation, duration of umbilical artery catheterisation, and age at first enteral feed were signficant factors in both models, but in both the type of diet was the factor most strongly related to necrotising enterocolitis. For all cases of necrotising enterocolitis, a high haemoglobin concentration and respiratory distress were also significant factors.

TABLE V—RELATION BETWEEN FREQUENCY OF NECROTISING ENTEROCOLITIS AND GESTATION IN BABIES RECEIVING HUMAN MILK AND IN THOSE FED SOLELY ON FORMULA

| — | All cases | | Confirmed cases | |
|---|---|---|---|---|
| | Formula only | Human milk* | Formula only | Human milk* |
| Gestation | | | | |
| 25–27 wk | 7/35 (20%) | 13/83 (16%) | 5/35 (14%) | 7/83 (8%) |
| 28–30 wk | 7/83 (8%) | 11/231 (5%) | 5/83 (6%) | 6/231 (3%) |
| 31–33 wk | 6/75 (8%) | 3/263 (1%) | 3/75 (4%) | 1/263 (0·4%) |
| 34–36 wk | 4/43 (9%) | 0/113 | 4/43 (9%) | 0/113 |

*Breast milk alone or in combination with formula

The effect of length of gestation on the occurrence of necrotising enterocolitis differed significantly (p < 0·02) between infants fed formula only and those fed breast milk (either alone or in combination with formula). Thus, infants fed on formula only had little overall decline in the frequency of necrotising enterocolitis over the range of gestations studied (25–36 weeks) and no decline beyond 27 weeks. In contrast there was a sharp fall in the frequency of necrotising enterocolitis with length of gestation in infants receiving breast milk (table V); for example, by logistic regression the odds ratio for necrotising enterocolitis at 26 weeks compared with 32 weeks was 11·3 (p < 0·001). In the group of babies born at more than 30 weeks' gestation, there were only 3 (0·8%) cases among the 376 fed on human milk (1 confirmed) compared with 10 (8·5%) among the 118 fed on formula only (7 confirmed); the odds ratio was 11·5 (3·1–43; p < 0·0001) for all cases and 23·6 (2·9–194; p < 0·0001) for confirmed cases.

There was also interaction between diet and the day of first feeding (p = 0·05). In formula-fed babies delay in onset of the first feed was associated with a significantly lower incidence of necrotising enterocolitis, whereas in infants fed breast milk (alone or with formula) there was no such relation.

## Discussion

During the past 15 years breast milk has been promoted for the feeding of preterm infants on the grounds that it may protect against necrotising enterocolitis. The few data to support this assertion are not, however, widely accepted.[4,14,23] Indeed, a failure to establish clear benefits for breast milk in neonatal intensive care may be one of the reasons for a loss of enthusiasm for its use. In this large, prospective, multicentre study, the choice of early diet was the major factor associated with necrotising enterocolitis. Confirmed necrotising enterocolitis was 6 times as common in babies fed formula only than in those fed breast milk only; it was 10 times as common after adjustment for a wide range of factors associated previously with the disease. Furthermore, the risk of necrotising enterocolitis was 3·5 times higher in exclusively formula-fed infants than in those fed breast milk and formula combined, which suggests that breast milk can have an important protective role even when used as a supplement to formula feeding.

26% of our infants with confirmed necrotising enterocolitis died. Prognosis may be improving,[27] though an optimistic estimate for mortality in necrotising enterocolitis is 15–25%. If the frequency of cases in infants fed human milk either alone or in conjunction with formula is taken as a baseline, the excess frequency in babies who received no breast milk was 5–6 per 100 under 1850 g birthweight. Over the past 8 years the proportion of mothers in Cambridge providing any breast milk for their low birthweight infants has fallen from 75% to 55% (unpublished). Our enquiries suggest that in major parts of the UK the proportion providing any breast milk is likely to be lower. Furthermore, most British human milk banks have been closed. Probably about 50% of babies in neonatal intensive care receive no breast milk at all. If our data can be taken as representative and reflect causality, necrotising enterocolitis could occur in about 500 infants each year in the UK solely on account of exclusive formula feeding—more than 150 of them would require major abdominal surgery and about 100 would die.

The type of human milk given did not seem to affect the incidence of necrotising enterocolitis, despite theoretical predictions, from animal models, that only raw milk is

Case ID: 220302601
Control No.: 23063371

protective. We suggest, in the light of the finding that oral immunoglobulin in formula-fed babies was prophylactic,[10] that breast milk may protect against necrotising enterocolitis by providing IgA in the gut lumen. Most IgA remains intact after milk pasteurisation.[28] Thus when mother's milk is unavailable, the use of pasteurised breast milk could have a valuable place in the initial establishment of enteral feeding in preterm infants.

An important factor in the widespread closure of milk banks has been concern over the possibility of transmission by way of breast milk of human immunodeficiency virus (HIV), though some investigators have suggested that routine pasteurisation of breast milk would destroy HIV,[31] and HIV transmission has never been reported in a preterm infant fed pasteurised donor milk. This theoretical risk should be set against our finding of greater morbidity in premature babies who receive no human milk.

It is likely that a relation between diet and necrotising enterocolitis could have been missed in many previous studies that have had inadequate sample size and power, or inadequate control and monitoring of dietary intake. Our multicentre study was prospective, dietary assignment was strictly applied, and dietary management was carefully recorded and regulated; necrotising enterocolitis was a predetermined outcome response and extensive data were collected concomitantly that allowed adjustment for potential confounding factors. The diagnostic criteria we used for necrotising enterocolitis were those proposed after a large British multicentre study[26] rather than the similar criteria suggested by Bell[25] and most used in North America. Our cases all strictly met the criteria for grade 1 or 2 disease, and all the affected infants were treated with intravenous antibiotics and complete cessation of enteral feeding. Those confirmed by the most stringent criteria were presented separately, since they would be generally accepted as unequivocal cases.

As expected, length of gestation was a significant factor for necrotising enterocolitis. Nevertheless, over the whole range of gestation studied (25–36 weeks) the overall fall in confirmed necrotising enterocolitis risk was slightly smaller than the difference between groups fed exclusively on formula and on human milk. Although hypoxia and ischaemia have not been shown by some investigators to be risk factors for necrotising enterocolitis,[1,2,7] we found, as others have,[4-6] that respiratory distress, duration of use of an umbilical artery catheter (which might impede mesenteric flow, since most units used "high" catheter positioning), and polycythaemia (which could cause hyperviscosity and impair gut blood flow) were independently related to a higher incidence of the disease. These factors were not as strongly linked as diet.

In babies fed breast milk (alone or with formula) there was a sharp decline in incidence of necrotising enterocolitis with length of gestation; beyond 30 weeks' there was only 1 confirmed case among 376 babies. In contrast, there was no decline in necrotising enterocolitis incidence among formula-fed infants from 28 to 36 weeks' gestation; indeed beyond 30 weeks' gestation the overall incidence of confirmed disease was 20 times that in infants who received some breast milk. We suggest that early introduction of breast milk into the diets of preterm infants could make necrotising enterocolitis beyond 30 weeks' gestation a rarity.

In infants fed breast milk timing of the first feed was not related to frequency of necrotising enterocolitis, but in formula-fed infants, delay in starting feeds was associated

with a significant reduction—if enteral feeds were started on, for example day 9 rather than day 2, the risk of necrotising enterocolitis was reduced threefold. These data suggest that units offering only formula might reduce the frequency of necrotising enterocolitis by a more cautious approach to early feeding than would be needed if human milk was available.

In view of this strong link between diet and necrotising enterocolitis, feeding policies in neonatal units may need reappraisal. Active encouragement of mothers to provide at least some breast milk for their preterm infants, especially during the early weeks, seems justified. We recognise that such infants have increased nutritional requirements,[29,30] but these can be met by concomitant use of preterm formulas and by human milk fortification. Furthermore, we consider it valuable for a major neonatal referral unit to support a human milk bank, despite the difficulties of donor screening for HIV.

We thank Dr M. Bamford, Dr P. Crowle, Dr J. Dossetor, Dr R. Pearse, Dr A. Boon, and the staff of neonatal units in Cambridge, Ipswich, King's Lynn, Norwich, and Sheffield for their help and collaboration; Farley Health Products Limited for collaboration, supply of trial diets, and continuing financial assistance; and Dr O. Brooke for advice in preparing the paper.

## REFERENCES

1. Stoll BJ, Kano WP, Glass RI, Nahmias AJ, Brannon AW. Epidemiology of necrotizing enterocolitis: a case-control study. *J Pediatr* 1980; **96**: 447–51.
2. Kliegman RM, Hack M, Jones P, Fanaroff AA. Epidemiological study of necrotizing enterocolitis among low-birthweight infants. *J Pediatr* 1982; **100**: 440–44.
3. Kliegman RM, Fanaroff AA. Neonatal necrotizing enterocolitis: a nine-year experience. I. Epidemiology and uncommon observations. *Am J Dis Child* 1981; **135**: 603–07.
4. Bunton GL, Durbin GM, McIntosh N, et al. Necrotizing enterocolitis: controlled study of 3 years' experience in a neonatal intensive care unit. *Arch Dis Child* 1977; **52**: 772–77.
5. Palmer SR, Thomas SJ, Cooke RWI, et al. Birthweight-specific risk factors for necrotising enterocolitis. *Common Health* 1987; **41**: 210–14.
6. Smith MF, Borriello SP, Clayden GS, Casewell MW. Clinical and bacterial findings in necrotising enterocolitis: a controlled study. *J Infect* 1980; **2**: 23–31.
7. Yu VYH, Joseph R, Bajuk B, Orgill A, Astbury J. Perinatal risk factors for necrotising enterocolitis. *Arch Dis Child* 1984; **59**: 430–34.
8. Kleigman RM. Neonatal necrotizing enterocolitis: implications for an infectious disease. *Pediatr Clin North Am* 1979; **26**: 327–44.
9. Book LS, Overall JUC, Herbst JJ, Britt MR, Epstein B, Jung AL. Clustering of necrotizing enterocolitis: interruption by infection-control measures. *N Engl J Med* 1977; **297**: 984–86.
10. Eibl MM, Wolf HM, Furnkranz H, Rosenkranz A. Prevention of necrotizing enterocolitis in low-birth-weight infants by IgA-IgG feeding. *N Engl J Med* 1988; **319**: 1–7.
11. Anderson C, Collin M, OKeefe J. A widespread epidemic of mild necrotizing enterocolitis of unknown cause. *Am J Dis Child* 1984; **138**: 979.
12. Santulli TV, Schullinger JN, Heird WC, et al. Acute necrotizing enterocolitis in infancy: a review of 64 cases. *Pediatrics* 1975; **55**: 376–87.
13. Goldman HI. Feeding and necrotizing enterocolitis. *Am J Dis Child* 1980; **134**: 553–55.
14. Eyal F, Sagi E, Arad I, Avital A. Necrotizing enterocolitis in the very low birthweight infant: expressed breast milk feeding compared with parenteral feeding. *Arch Dis Child* 1982; **57**: 274–76.
15. Book LS, Herbert JJ, Atherton SO, Jung AL. Nectrotizing enterocolitis in low-birth-weight infants fed an elemental formula. *J Pediatr* 1975; **87**: 602–05.
16. Willis DM, Chabot J, Radde IC, Chance GW. Unsuspected hyperosmolality of oral solutions contributing to necrotizing enterocolitis in very-low-birthweight infants. *Pediatrics* 1977; **60**: 535–38.
17. LaGamma EF, Ostertag SG, Birenbaum H. Failure of delayed oral feedings to prevent necrotizing enterocolitis. Results of studying very-low birth-weight neonates. *Am J Dis Child* 1985; **139**: 385–89.
18. De Curtis M, Paone C, Vetrano G, Romano G, Paludetto R, Ciccimarra F. A case control study of necrotizing enterocolitis occurring over 8 years in a neonatal intensive care unit. *Eur J Pediatr* 1987; **146**: 398–400.

Case ID: 220302601
Control No.: 23063371

19. Kligman RM, Pittard WB, Fanaroff AA. Necrotizing enterocolitis in neonates fed human milk. *J Pediatr* 1979; **95:** 450–53.

20. Kosloske AM. Pathogenesis and prevention of necrotizing enterocolitis: a hypothesis based on personal observation. *Pediatrics* 1984; **74:** 1086–92.

21. Barlow B, Santulli TV, Heird WC, Pitt J, Blanc WC, Schullinger JN. An experimental study of acute neonatal enterocolitis—the importance of breast milk. *J Pediatr Surg* 1974; **9:** 587–95.

22. Pitt J, Barlow B, Heird WC. Protection against experimental necrotizing enterocolitis by maternal milk. I. Role of milk leukocytes. *Pediatr Res* 1977; **11:** 906–09.

23. Moriartey RR, Finer NN, Cox SF, et al. Necrotizing enterocolitis and human milk. *J Pediatr* 1979; **94:** 295–96.

24. Lucas A, Gore SM, Cole TJ, et al. Multicentre trial on feeding low birthweight infants: effects of diet on early growth. *Arch Dis Child* 1984; **59:** 722–30.

25. Bell MJ, Ternberg JL, Feigin RD, et al. Neonatal necrotizing

enterocolitis: therapeutic decisions based upon clinical staging. *Ann Surg* 1978; **187:** 1–7.

26. British Association for Perinatal Paediatrics and the Public Health Laboratory Service Communicable Disease Surveillance Centre. Surveillance of necrotising enterocolitis, 1981–82. *Br Med J* 1983; **287:** 824–26.

27. Black TL, Carr MG, Korones SB. Necrotizing enterocolitis: improving survival within a single facility. *South Med J* 1989; **82:** 1103–07.

28. Evans TJ, Ryley JC, Neale LM. Effect of storage and heat on antimicrobial proteins in human milk. *Arch Dis Child* 1978; **53:** 239–41.

29. Lucas A, Brooke OG, Baker BA, Bishop N, Morley R. High alkaline phosphatase activity and growth in preterm neonates. *Arch Dis Child* 1989; **64:** 902–09.

30. Lucas A, Morley R, Cole TJ. Early diet in preterm babies and developmental status at 18 months. *Lancet* 1990; **335:** 1477–81.

31. Eglin RP, Wilkinson AR. HIV infection and pasteurisation of breast milk. *Lancet* 1987; i: 1093.

# Direct diagnosis of carriers of Duchenne and Becker muscular dystrophy by amplification of lymphocyte RNA

Roland G. Roberts    David R. Bentley    Teresa F. M. Barby
Elizabeth Manners    Martin Bobrow

**Rapid detection of deletion and duplication mutations that cause Duchenne and Becker muscular dystrophy was achieved in patients and carriers after amplification of small amounts of mRNA from peripheral blood lymphocytes. The entire coding region of the dystrophin mRNA was amplified in 10 sections by reverse transcription and nested polymerase chain reaction, and the products were directly visualised on acrylamide minigels with ethidium staining. Major structural gene mutations were identified by the appearance of a band of different size to that of the wild type. The altered band was readily detected in all patients and heterozygous relatives. This non-radioactive test of venous blood samples can be used for unambiguous and rapid identification of virtually all carriers of deletions or insertions within the dystrophin gene.**

*Lancet* 1990; **336:** 1523–26.

## Introduction

Duchenne and Becker muscular dystrophies (DMD, BMD) are X-linked diseases which together affect about 1 in 3000 live male births. The dystrophin gene is very large and has an unusually high mutation rate; mutations in unrelated families are likely to be of independent origin and a third of all cases arise from new mutations.[1] About two-thirds of all affected infants have no family history of DMD or BMD; for such sporadic cases segregation analysis is usually uninformative and the carrier risk for related women is difficult to estimate.[2,3] Analysis of serum creatinine phosphokinase (CPK) concentrations[4] relies on the heterozygote's phenotypic expression and can give variable results; in conjunction with family data these yield Bayesian probabilities rather than definitive diagnosis.

In 65% of patients with DMD or BMD the disease-causing mutation consists of deletion or duplication of exons within the gene.[5] Such deletions are readily identified in patients by the absence of bands from Southern blots,[6,7] or

by failure of amplification of individual reactions in multiplex polymerase chain reactions (PCRs).[8,9] However, diagnosis is complicated in carrier women by the presence of the normal chromosome, which masks the result from the defective chromosome. Carrier diagnosis (and duplication detection in patients) therefore requires dosage analysis by Southern blot[10] or PCR (Abbs S, et al, unpublished observations) in which the intensities of specific bands in different samples are compared. However, band intensity is dependent on various experimental factors, and carries a degree of uncertainty which many laboratories find unacceptable in clinical practice.

In 17% of patients with exon duplication or deletion the breakpoint is sufficiently close to a non-deleted exon that it lies within the restriction fragment detected by a cDNA probe on a Southern blot;[5] such a band of altered mobility can be detected in carrier women. The frequency of detection of such diagnostic junction fragments—which provide unequivocal identification of the mutation in carriers—can be greatly increased by the use of pulsed-field gel electrophoresis.[5,11] Such junction fragments may also be detected in mRNA: most deletion and duplication breakpoints lie within introns, which constitute over 99% of the dystrophin gene, so it is likely that transcription and transcript splicing are unaffected by the mutation. Thus a transcript from a defective gene would probably differ from the normal transcript only in that it bears a duplication or deletion of a number of exons. Amplification across the region of the mRNA which is duplicated or deleted should enable generation of a PCR product of anomalous size which is diagnostic of the presence of the defective gene.

Dystrophin mRNA is mainly expressed in muscle and brain, but Chelly et al[12] have shown that the dystrophin transcript is present in other tissues at about one copy per

ADDRESS: **Paediatric Research Unit, Division of Medical and Molecular Genetics, UMDS, Guy's Hospital, London SE1 9RT, UK** (R G Roberts, BA, D R Bentley, DPhil, T F M Barby, BSc, E Manners, BA, Prof M Bobrow, DSc) Correspondence to Mr R G. Roberts

Case ID: 220302601
Control No.: 23063371

# EXHIBIT "C"

Case ID: 220302601
Control No.: 23063371

www.jpeds.com • THE JOURNAL OF PEDIATRICS

# ORIGINAL ARTICLES

# An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products

Sandra Sullivan, MD, Richard J. Schanler, MD, Jae H. Kim, MD, PhD, Aloka L. Patel, MD, Rudolf Trawöger, MD, Ursula Kiechl-Kohlendorfer, MD, Gary M. Chan, MD, Cynthia L. Blanco, MD, Steven Abrams, MD, C. Michael Cotten, MD, MHS, Nirupama Laroia, MD, Richard A. Ehrenkranz, MD, Golde Dudell, MD, Elizabeth A. Cristofalo, MD, MPH, Paula Meier, PhD, Martin L. Lee, PhD, David J. Rechtman, MD, and Alan Lucas, MD

**Objective** To evaluate the health benefits of an exclusively human milk–based diet compared with a diet of both human milk and bovine milk–based products in extremely premature infants.

**Study design** Infants fed their own mothers' milk were randomized to 1 of 3 study groups. Groups HM100 and HM40 received pasteurized donor human milk–based human milk fortifier when the enteral intake was 100 and 40 mL/kg/d, respectively, and both groups received pasteurized donor human milk if no mother's milk was available. Group BOV received bovine milk–based human milk fortifier when the enteral intake was 100 mL/kg/d and preterm formula if no mother's milk was available. Outcomes included duration of parenteral nutrition, morbidity, and growth.

**Results** The 3 groups (total n = 207 infants) had similar baseline demographic variables, duration of parenteral nutrition, rates of late-onset sepsis, and growth. The groups receiving an exclusively human milk diet had significantly lower rates of necrotizing enterocolitis (NEC; *P* = .02) and NEC requiring surgical intervention (*P* = .007).

**Conclusions** For extremely premature infants, an exclusively human milk–based diet is associated with significantly lower rates of NEC and surgical NEC when compared with a mother's milk–based diet that also includes bovine milk–based products. *(J Pediatr 2010;156:562-7).*

The health benefits of human milk for all infants, including those born extremely premature, have been increasingly recognized.[1] When compared with a diet of preterm formula, premature infants have improved feeding tolerance and a lower incidence of late-onset sepsis and necrotizing enterocolitis (NEC) when fed their mothers' milk.[2] It is a challenge for mothers of extremely premature infants, however, to provide sufficient milk to meet their infants' needs. In a recent study, only 30% of such mothers were able to supply 100% of their extremely premature infants' needs.[3] Pasteurized donor human milk would be an attractive proxy for mother's own milk, and donor milk banks have made milk available.[4] Indeed, a review of studies conducted in the 1980s, comparing donor human milk and formula, suggested that donor milk was associated with a significantly lower incidence of NEC.[5] Those studies, however, did not include a large proportion of extremely premature infants, and their nutritional protocols did not evaluate human milk fortifiers (HMF) or contemporary preterm formula.

A randomized trial compared fortified pasteurized donor human milk with preterm formula, both used as supplements when mother's own milk was not available.[3] That study did not find a protective effect of donor human milk on the combined incidence of late-onset sepsis and NEC but did note a significant

From the Department of Pediatrics, University of Florida (S.S.), Gainesville, FL; Department of Pediatrics, Schneider Children's Hospital at North Shore (R.S.), Manhasset, NY; Albert Einstein College of Medicine (R.S.), Bronx, NY; Department of Pediatrics, University of Rochester, Golisano Children's Hospital at Strong (N.L.), Rochester, NY; Department of Pediatrics, University of California, San Diego Medical Center (J.K.), San Diego, CA; Children's Hospital and Research Center (G.D.), Oakland, CA; Prolacta Bioscience (M.L., D.R.), Monrovia, CA; Pediatrics, Rush University Medical Center (A.P.), Chicago, IL; Department of Pediatrics, University of Utah Medical Center (G.C., P.M.), Salt Lake City, UT; Department of Pediatrics, University of Texas Health Science Center (C.B.), San Antonio, TX; Department of Pediatrics, Baylor College of Medicine (S.A.), Houston, TX; Department of Pediatrics, Duke University Medical Center (C.C.), Durham, NC; Pediatrics, Yale University School of Medicine (R.E.), New Haven, CT; Department of Pediatrics, Johns Hopkins School of Medicine (E.C.), Baltimore, MD; Department of Pediatrics, Innsbruck Medical University (R.T., U.K.), Innsbruck, Austria; and the MRC Child Nutrition Research Center, Institute of Child Health (A.L.), London, United Kingdom

S.S., R.J.S., J.H.K., A.L.P., R.T., U.K.-K., G.M.C., C.L.B., S.A., C.M.C., N.L., R.A.E., G.D., and E.A.C. received financial support from Prolacta Bioscience. The authors were responsible for the conduct of the study and collection of the data. M.L.L. and D.J.R. are employees of Prolacta Bioscience. A.L. is a paid Consultant of Prolacta Bioscience. P.M. received no support or payment. S.A., C.L.B., E.A.C., R.A.E., M.L.L., A.L., P.M., D.J.R., and R.J.S. were responsible for the design of the study. M.L.L. was responsible for the data analyses. R.J.S. wrote the draft of this manuscript. All of the authors were responsible for review and interpretation of the data and review of the manuscript.

Clinicaltrials.gov reg. # NCT00506584

0022-3476/$ - see front matter. Copyright © 2010 Mosby Inc. All rights reserved. 10.1016/j.jpeds.2009.10.040

| | |
|---|---|
| BOV | Bovine milk-based human milk fortifier |
| HMF | Human milk fortifier |
| HM40 | Human milk-based HMF added once feeding volume reached 40 mL/kg/day, and pasteurized donor milk used if no mother's own milk available. |
| HM100 | Human milk-based HMF added once feeding volume reached 100 mL/kg/day and pasteurized donor milk used if no mother's own milk available. |
| NEC | Necrotizing enterocolitis |
| PN | Parenteral nutrition |
| SD | Standard deviation |

Case ID: 220302601
Control No.: 23063371

protective effect of mother's own milk. The protocol in that study differed from previous studies in that the pasteurized donor human milk was fortified with bovine milk–based products, and some of the infants in the donor milk group were given preterm formula because of slower rates of growth. Thus no contemporary trial has investigated the effects of an exclusively human milk diet in extremely premature infants.

The technology now exists to collect, pasteurize, and process large quantities of screened donor human milk, labeled with its basic nutrient contents, and prepared as either a HMF or a donor milk alternative to mother's own milk.[6] This technology has prompted a randomized controlled trial in extremely premature infants to evaluate an exclusive human milk–based diet (that includes a human milk–based HMF and donor human milk if no mother's milk is available) compared with the usual feeding protocol comprising a mother's milk diet (that includes a bovine milk–based HMF and preterm formula if no mother's milk is available). We hypothesized that the health benefits (reduced duration of parenteral nutrition [PN], late-onset sepsis, and NEC) of an exclusively human milk–based diet would exceed those of the usual diet containing bovine milk–based products without detrimental effects on growth.

## Methods

Infants were recruited from 12 neonatal intensive care units, 11 in the United States and 1 in Austria. Eligibility criteria were as follow: birth weight 500 to 1250 g, intention to receive mother's milk, and ability to adhere to a feeding protocol on the basis of the use of mother's own milk, initiation of enteral feeding before 21 days after birth, and initiation of PN within 48 hours of birth. Infants were excluded if there were major congenital malformations or a high likelihood of transfer to a non-study institution during the study period.

Randomization was performed in blocks of 4 on strata defined by birth weight (500 to 750 g, 751 to 1000 g, and 1001 to 1250 g), and whether the infant was appropriate- or small-for-gestational-age (defined as 2 standard deviations below the mean weight for gestational age on the basis of intrauterine growth charts[7]). Separate block randomization schemes were prepared for each of the strata and performed centrally. The investigators were not aware of the block size. The need to ensure proper handling of mother's own milk precluded true blinding of the infants' caregivers.

Sample size calculation was based on the primary outcome of duration of PN, a surrogate of feeding tolerance and neonatal morbidity. The mean duration of PN in extremely premature infants fed their mother's fortified milk was 18 ± 11 days (Meier and Blanco, personal communication). To demonstrate a 40% reduction in PN days in either study group, a sample size of 62 infants per group was needed for a 2-sided alpha error of 2.5% and power of 90%. To account for 2 interim analyses by the independent Data Safety Monitoring Board, and an estimated proportion of protocol non-

adherence of 5%, the final sample was 69 infants per group. The study was approved by the institutional review boards of each center and written informed consent was obtained from the parents or legal guardians of all subjects before enrollment. Registered with Clinicaltrials.gov reg. # NCT00506584.

Infants were enrolled if their mothers intended to provide their own milk. When enteral nutrition was initiated, all study infants received their own mothers' milk but differed, as randomized, by the type of HMF they received and the type of milk they were given if no mother's own milk was available. Groups HM100 and HM40 received pasteurized donor human milk–based HMF (Prolact+ H²MF; Prolacta Bioscience, Monrovia, California) when the enteral intake was 100 mL/kg/d and 40 mL/kg/d, respectively, and both groups received pasteurized and standardized 20 kcal/oz donor human milk (Neo20 Prolacta Bioscience) if no mother's milk was available. Group BOV received the usual feeding protocol of bovine milk–based HMF when the enteral intake was 100 mL/kg/d and preterm formula if no mother's own milk was available.

The duration of study participation was the earliest of the following milestones: 91 days of age, discharge from hospital, or attainment of 50% oral feedings (ie, 4 complete oral feedings per day). PN was initiated within 48 hours after birth. Trophic feedings were initiated 1 to 4 days after birth and were continued at 10 to 20 mL/kg/d as tolerated for up to 5 days. Subsequently, milk intake was increased by 10 to 20 mL/kg/d. Donor human milk–based HMF was added in the HM40 group when milk intake reached 40 mL/kg/d and in the HM100 group at 100 mL/kg/day. Bovine milk-based HMF (Enfamil HMF; Mead Johnson, Evansville, Indiana; or Similac HMF; Abbott Laboratories, Columbus, Ohio) was added in the BOV group when milk intake reached 100 mL/kg/d. After the HMF was added, milk intake was increased daily by 10 to 20 mL/kg to a maximum of 160 mL/kg/d. The nutritional content of the fortified milks used in the study is described in Table I (available at www.jpeds.com).

Daily body weight and weekly recumbent length and head circumference were recorded. Bronchopulmonary dysplasia was defined as the use of supplemental oxygen at 36 weeks postmenstrual age. Late-onset sepsis was defined as clinical signs and symptoms consistent with sepsis occurring more than 5 days after birth in association with the isolation of a causative organism from a blood culture.[3] In cases of coagulase-negative Staphylococcus, at least 2 separate positive cultures were required. NEC was defined as Bell Stage II disease or greater, and abdominal radiographs were read by radiologists unaware of study group assignment.[8] At the conclusion of the study, all cases of NEC were reviewed in a blinded fashion by a panel of 8 of the study investigators. Feeding intolerance was defined as gastric residuals greater than 50% of the prior feeding or more than 2 mL/kg, bile- or blood-stained gastric residuals, emesis, abdominal distention or tenderness, changes in stool pattern or consistency, presence of blood in the stool. Feeding intolerance was quantitated by

Case ID: 220302601
Control No.: 23063371

the number of days that feedings were withheld for ≥12 hours.

## Statistical Analyses

The 3 study groups were compared by use of an intent-to-treat paradigm, any randomized infant remained in their group for the final analyses. Kaplan-Meier[9] estimates for the distribution of PN days were compared among study groups with the log-rank test. The Wilcoxon rank-sum test was used for 2-way comparisons. Three-way comparisons used either the 1-way analysis of variance for normally distributed data or the Kruskal-Wallis test for nonnormal data. Categorical data were compared by use of the $\chi^2$ test with the P value determined by an exact procedure (StatXact 7; Cytel Software Corporation, Cambridge, Massachusetts).

## Results

During the 14 months of the study, 334 infants were screened, and 207 were enrolled (**Figure 1**). The baseline characteristics of infants among the 3 study groups were similar (**Table II**). The ages of attainment of first enteral feeding (15, 11, and 16 days) and full (140 mL/kg/d) enteral feeding (21, 23, and 22 days) were similar among HM100, HM40, and BOV groups, respectively. There were no significant differences among study groups for the duration of PN, length of hospital stay, late-onset sepsis, or growth (**Table III**). The number of infants below the third percentile[7] at birth and at discharge was similar among groups.



**Figure 1.** Distribution of study subjects.

Because there were no differences between HM100 and HM40, the exclusive HM group (HM100 + HM40) was compared with the BOV group. This analysis revealed similarities in baseline data and most outcomes, with the exception that there were fewer black infants in the BOV group compared with the combined HM100 + HM40 groups, 14% versus 27%, $P = .046$, and that the rate of weight gain was greater in the BOV group compared with the HM100 + HM40 groups, $16.0 \pm 7.8$ vs $14.3 \pm 3.8$ g/kg/d, $P = .051$.

Significant differences, however, were observed among study groups for the incidence of NEC (**Figure 2**). When compared with the BOV group, there were fewer cases of NEC in the HM100 and HM40 groups and the combined exclusive human milk–based diet groups (HM100 + HM40). A significant difference among groups was observed for the combined outcome of NEC or death in HM100 (6%), HM40 (8.5%), and BOV (20%), respectively, $P = .02$. The onset of NEC was similar among groups, $35 \pm 18$, $41 \pm 18$, $28 \pm 12$ postnatal days and $31 \pm 1$, $32 \pm 3$, and $31 \pm 2$ weeks postmenstrual age, in Groups HM100, HM40, and BOV, respectively. The number of cases of NEC requiring surgical intervention was significantly lower in the HM100 and HM40 groups compared with BOV group (**Figure 2**). All cases of surgical NEC occurred in infants who received bovine milk-based milk products (either HMF or preterm formula) at some time before the onset of NEC (**Table IV**; available at www.jpeds.com). Seven of these infants were randomized to the BOV group, but 2 of these infants were in the HM100/HM40 groups who had received bovine milk-based HMF or formula in violation of the protocol.

The 19 cases of NEC were distributed as 1 to 4 cases per site among 9 of the study sites. When rates of NEC were tabulated for only infants who completed the study without any protocol violations, the same distribution of cases was observed: 1.7%, 3.2%, and 15.3%, in HM100, HM40, and BOV groups, respectively; $P = .006$. A multivariate logistic regression that controlled for confounding variables known to affect the incidence of NEC (5-minute APGAR score, quantity of mother's own milk received, gestational age, receipt of prenatal and postnatal steroids, black race, bronchopulmonary dysplasia[10,11]) found an odds ratio for NEC with an exclusive human milk diet of 0.23 (95% confidence interval = 0.08, 0.66), $P = .007$, or a 77% reduction in the odds of developing NEC while receiving an exclusive human milk diet. None of the other variables reached statistical significance.

Infants in all 3 groups received a large volume and proportion of their enteral intake as their own mother's milk (**Table III**). The BOV group received significantly more own mother's milk because the fortifier was a powdered preparation whereas a liquid fortification regimen was used in the exclusive human milk groups.

## Discussion

We conducted a randomized controlled multicenter trial to evaluate the potential health benefits of an exclusively human milk diet in extremely premature infants, 500 to

Case ID: 220302601
Control No.: 23063371

Case: 1:24-cv-11763 Document #: 1-3 Filed: 10/31/24 Page 117 of 213 PageID #:612

**Table II.** Characteristics of study infants

| Parameter | HM100 (n = 67) | HM40 (n = 71) | BOV (n = 69) | P value |
|---|---|---|---|---|
| Birth weight, g | 945 ± 202* | 909 ± 193 | 922 ± 197 | .56 |
| Gestational age, wk | 27.2 ± 2.2 | 27.1 ± 2.3 | 27.3 ± 2.0 | .93 |
| Male/Female, n (%) | 32/35 (48/52) | 25/46 (35/65) | 36/33 (52/48) | .11 |
| Small-for-gestational age, n (%) | 6 (9) | 6 (8) | 8 (12) | .80 |
| APGAR Score < 6, n (%) | 9 (13) | 4 (6) | 8 (12) | .28 |
| Black race n (%) | 20 (30) | 17 (24) | 10 (14) | .10 |
| Antenatal steroids, n (%) | 56 (83) | 51 (72) | 53 (77) | .26 |
| Mechanical ventilation at study entry, n (%) | 49 (73) | 56 (79) | 53 (77) | .73 |

*Mean ± SD.

1250 g birth weight. This study was unique for its use of human milk–based human milk fortification. We were unable to demonstrate significant differences among the groups for the primary health outcome, PN days, a surrogate measure for feeding tolerance and early morbidity. Furthermore, we did not find significant differences in several other clinical outcomes. We speculate that the lack of differences is a direct result of the overall high intake of mother's own milk, which comprised more than 70% of enteral nutrition across all study groups. The high human milk intake reflects contemporary trends of improved lactation support and caregiver awareness and is consistent with the impact of human milk studies on this measure.[2,12,13]

Surprisingly, the rates of NEC and NEC requiring surgery were markedly lower in the groups fed human milk exclusively (HM100 and HM40) compared with the BOV group. We found a reduction in NEC of 50% and surgical NEC of almost 90% in infants fed an exclusive human milk–based diet compared with a diet containing bovine milk–based products. We estimate that the number of infants needed to treat with an exclusively human milk–based diet to prevent 1 case of NEC is 10. The number needed to treat to prevent 1 case of surgical NEC or death is 8. No other intervention has been shown to have such a marked effect on the incidence of NEC.[14] The mean incidence of NEC in the Vermont-Oxford Database (2007), approximately 7% to 10%, is in the range observed in this study. A 50% reduction in NEC would

prevent between 1300 to 1850 cases annually, with each case leading to a high risk of death and long-term morbidity, and a hospitalization cost estimated at $138 000 to $238 000 per case.[4,15]

The lower incidence and severity of NEC in infants fed an exclusively human milk diet seen in our study are consistent with earlier reports. In 1990, Lucas and Cole[16] reported a reduction in the incidence of NEC among infants who received only human milk when compared with infants who received all bovine milk–based formula. Those infants who received a mixture of formula and human milk had an intermediate level of protection. Lucas[17] also reported a lower incidence of surgical NEC in infants fed unfortified compared with bovine milk-based fortified human milk. Lastly, 3 published meta-analyses concluded that donor human milk feeding was associated with less NEC.[5,18,19]

Our data contrast those reported in 2005,[3] which failed to find a protective effect of donor human milk on the combined incidence of sepsis and NEC, but reported that mother's own milk with bovine milk–based HMF was protective. That study, which also was analyzed on the intent-to-treat principle, included infants randomized to receive donor milk who were given formula because of poor growth, and all infants received a bovine milk–based fortifier. In 1984 Narayanan[20] reported a greater number of infections in premature infants fed pasteurized donor milk when they were also exposed to bovine milk-based formula. She concluded that pasteurized

**Table III.** Study outcomes

| Outcome | HM100 (n = 67) | HM40 (n = 71) | BOV (n = 69) | P value |
|---|---|---|---|---|
| Parenteral nutrition, days | 20* (14, 35) | 20 (12, 33) | 22 (14, 34) | .71 |
| Length of stay, days | 74 (61, 107) | 79 (64, 110) | 78 (67, 99) | .90 |
| Mother's own milk, mL per study | 4048 (841, 7479) | 4544 (627, 8012) | 5676 (1064, 8309) | .71 |
| Mother's own milk, % enteral intake | 73 (16, 82) | 70 (18, 80) | 82 (38, 100) | .002 |
| Late-onset sepsis (LOS), n (%) | 19 (28) | 15 (21) | 13 (19) | .39 |
| LOS and/or NEC, n (%) | 22 (33) | 20 (28) | 21 (30) | .84 |
| Retinopathy of prematurity, n (%) | 31 (46) | 25 (35) | 27 (39) | .41 |
| Ventilator, days | 25 (6, 54) | 25 (12, 50) | 34 (10, 58) | .54 |
| Oxygen therapy, days | 41 (24, 63) | 48 (12, 78) | 45 (19, 74) | .92 |
| Central line, days | 21 (15, 36) | 22 (14, 30) | 22 (16, 30) | .82 |
| Bronchopulmonary dysplasia, n (%) | 22 (33) | 26 (37) | 27 (39) | .74 |
| Weight gain, (g/kg/day) | 14.2 (11.9, 15.8) | 14.2 (12.3, 16.3) | 15.1 (12.8, 17.0) | .13 |
| Length increment, (cm/wk) | 0.86 (0.72, 1.08) | 0.88 (0.70, 1.03) | 0.94 (0.72, 1.16) | .35 |
| Head circumference increment, cm/wk | 0.76 (0.62, 0.85) | 0.75 (0.61, 0.88) | 0.75 (0.62, 0.86) | .99 |

*Median (25th, 75th percentile).

An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Diet of Human Milk and Bovine Milk-Based Products

Case ID: 220302601
Control No.: 23063371

Case: 1:24-cv-11763 Document #: 1-3 Filed: 10/31/24 Page 118 of 213 PageID #:613



**Figure 2.** NEC and NEC surgery in study infants. There were significant differences in NEC among the 3 groups ($P = .05$), *$P = .04$ vs BOV, **$P = .09$ vs BOV, ***$P = .02$ vs BOV. There were significant differences in NEC requiring surgical intervention among the 3 groups ($P = .02$), †$P = .03$ vs BOV, ††$P = .007$ vs BOV. [ ] refers to number of infants.

donor milk was effective only if it was fed as the total source of enteral nutrition.[21] These data suggest that exclusive human milk diets may exert protective, rather than threshold, effects with respect to NEC. The feeding of a species-specific diet may be important for this protection. However, we cannot exclude the possibility that the protective effect primarily was due to the avoidance of non human milk–based protein. Indeed, an animal model for NEC requires intraluminal bovine casein to produce the enterocolitis.[22]

This study also introduced an earlier fortification strategy with human milk–based human milk fortifier (HM40) to assess, secondarily, if such early fortification could be tolerated without introducing added morbidity. The 71 infants receiving the early fortification strategy appeared to tolerate the feeding well and did not differ significantly in feeding tolerance or other outcomes from the HM100 group. These are encouraging data that suggest the possibility of earlier introduction of human milk–based fortification compared with the usual practice of adding HMF at an enteral intake of 100 mL/kg/d.

The strengths of this study include a randomization and stratification scheme that achieved a balance of patient characteristics across the study groups and good adherence to the protocol as evidenced by a very small number of protocol violations. The control group correctly mimicked how extremely premature infants are fed, by use of combinations of mother's own milk and bovine-based products (HMF and formula). Limitations include the lack of complete blinding, which was not possible because of the obvious physical differences in human milk and formula and the limited power to look at subgroups, including those defined by sex and birth weight.

We conclude that for extremely premature infants, an exclusively human milk–based diet is associated with a significant reduction in the rates of NEC and surgical NEC compared with dietary exposure to bovine milk–based products. The similarities in other outcomes and the lower rate of NEC among study groups add support to the use of an exclusively human milk–based diet. The newer technology that enables an exclusively human milk diet with human milk–based fortification is now available to assist the ongoing efforts of neonatologists in their advocacy of human milk to reduce neonatal morbidity rates. ■

Submitted for publication Apr 8, 2009; last revision received Sep 16, 2009; accepted Oct 29, 2009.

Reprint requests: Richard J. Schanler, MD, Division of Neonatal-Perinatal Medicine, North Shore University Hospital, 300 Community Dr, Manhasset, New York 11030. E-mail: schanler@nshs.edu.

## References

1. American Academy of Pediatrics. Section on Breastfeeding. Breastfeeding and the use of human milk. Pediatrics 2005;115:496-506.
2. Schanler RJ, Shulman RJ, Lau C. Feeding strategies for premature infants: Beneficial outcomes of feeding fortified human milk vs preterm formula. Pediatrics 1999;103:1150-7.
3. Schanler RJ, Lau C, Hurst NM, Smith EO. Randomized trial of donor human milk versus preterm formula as substitutes for mothers' own milk in the feeding of extremely premature infants. Pediatrics 2005; 116:400-6.
4. Arnold LDW. The cost-effectiveness of using banked donor milk in the neonatal intensive care unit: Prevention of necrotizing enterocolitis. J Hum Lact 2002;18:172-7.
5. Boyd CA, Quigley MA, Brocklehurst P. Donor breast milk versus infant formula for preterm infants: a systematic review and meta-analysis. Arch Dis Child Fetal Neonatal Ed 2007;92:F169-75.
6. Wojcik KY, Rechtman DJ, Lee ML, Montoya A, Medo ET. Macronutrient analysis of a nationwide sample of donor breast milk. J Am Diet Assoc 2009;109:137-40.
7. Alexander GR, Himes JH, Kaufman RB. A United States national reference for fetal growth. Obstet Gynecol 1996;87:163-8.
8. Walsh MC, Kliegman RM. Necrotizing enterocolitis: treatment based on staging criteria. Pediatr Clin North Am 1986;33:179-201.
9. Kaplan EL, Meier P. Nonparametric estimation from incomplete observations. J Am Stat Assoc 1958;53:457-81.
10. Guthrie SO, Gordon PV, Thomas V, Throp JA, Peabody J, Clark RH. Necrotizing enterocolitis among neonates in the United States. J Perinatology 2003;23:278-85.
11. Uauy RD, Fanaroff AA, Korones SB, Phillips EA, Phillips JB, Wright LL. Necrotizing enterocolitis in very low birth weight infants: Biodemographic and clinical correlates. J Pediatr 1991;119:630-8.
12. Furman L, Taylor G, Minich N, Hack M. The effect of maternal milk on neonatal morbidity of very low-birth-weight infants. Arch Pediatr Adolesc Med 2003;157:66-71.
13. Meinzen-Derr J, Poindexter B, Wrage L, Morrow AL, Stoll B, Donovan EF. Role of human milk in extremely low birth weight infants' risk of necrotizing enterocolitis or death. J Perinatol 2009;29:57-62.
14. Bell EF. Preventing necrotizing enterocolitis: what works and how safe? Pediatrics 2005;115:173-4.
15. Bisquera JA, Cooper TR, Berseth CL. Impact of necrotizing enterocolitis on length of stay and hospital charges in very low birth weight infants. Pediatrics 2002;109:423-8.
16. Lucas A, Cole TJ. Breast milk and neonatal necrotizing enterocolitis. Lancet 1990;336:1519-23.
17. Lucas A, Fewtrell MS, Morley R, Lucas PJ, Baker BA, Lister G, et al. Randomized outcome trial of human milk fortification and developmental outcome in preterm infants. Am J Clin Nutr 1996;64:142-51.
18. McGuire W, Anthony MY. Donor human milk versus formula for preventing necrotising enterocolitis in preterm infants: systematic review. Arch Dis Child Fetal Neonatal Ed 2003;88:F11-4.

Case ID: 220302601
Control No.: 23063371

19. Quigley MA, Henderson G, Anthony MY, McGuire W. Formula milk versus donor breast milk for feeding preterm or low birth weight infants (review). Cochrane Database of Systematic Reviews 2007;1-41.

20. Narayanan I, Prakash K, Murthy NS, Gujral VV. Randomised controlled trial of effect of raw and holder pasteurised human milk and of formula supplements on incidence of neonatal infection. Lancet 1984;ii:1111-3.

21. Narayanan I, Gupta J. Human milk and neonatal infections. Acta Paediatr Scand Suppl 1989;351:126-30.

22. Koivusalo A, Kauppinen H, Anttila A, Rautelin H, Jusufovic J, Lindahl H, et al. Intraluminal casein model of necrotizing enterocolitis for assessment of mucosal destruction, bacterial translocation, and the effects of allopurinol and N-acetycysteine. Pediatr Surg Int 2002;18:712-7.

Case ID: 220302601
Control No.: 23063371

**Table I.** Computed energy and macronutrient contents of milks (per dL)

| Component | Mother's own milk* | Mother's own milk fortified with Prolacta fortifier[†] | Mother's own milk fortified with Similac HMF* | Mother's own milk fortified with Enfamil HMF[‡] |
|---|---|---|---|---|
| Energy (kcal) | 67 | 83 | 79 | 81 |
| Protein (g) | 1.4 | 2.3 | 2.3 | 2.5 |
| Carbohydrate (g) | 6.6 | 7.3 | 8.2 | 7 |
| Fat (g) | 3.9 | 4.9 | 4.1 | 4.9 |
| Calcium (mg) | 25 | 110 | 138 | 115 |
| Phosphorus (mg) | 13 | 59 | 78 | 63 |
| Osmolality[§] (mOsm/kg $H_2O$) | 290 | < 360 | est 385 | 325 |

*Abbott Nutrition, Columbus, Ohio. Product Description. 2009.
†Prolacta Bioscience, Monrovia, California. Product Description. 2009.
‡Mead Johnson Nutritionals, Evansville, Indiana. Product Description. 2009.
§NEOFAX 2009. Thomson Reuters, Montvale, New Jersey, pages 321-4.

**Table IV.** Characteristics of the NEC cases

| Study group | Birth weight (g) | Gestational age (wk) | First day enteral feeding (day) | First day bovine milk-based HMF or formula (day) | First day human milk-based fortifier (day) | NEC onset (day) | Comment |
|---|---|---|---|---|---|---|---|
| HM100 | 720 | 25 | 5 | | 32 | 35 | |
| HM100 | 560 | 25 | 4 | 47* | 20 | 53 | NEC surgery |
| HM100 | 1105 | 28 | 3 | | 9 | 18 | |
| HM40 | 530 | 22 | 3 | | 26 | 58 | |
| HM40 | 740 | 25 | 9 | | 17 | 38 | |
| HM40 | 990 | 27 | 1 | 1* | 7 | 22 | NEC surgery[†] |
| HM40 | 785 | 28 | 1 | 77 | 3 | 60 | |
| HM40 | 970 | 29 | 2 | 2* | 5 | 25 | |
| BOV | 670 | 25 | 18 | 24 | | 46 | NEC surgery |
| BOV | 690 | 25 | 1 | 1 | | 17 | NEC surgery |
| BOV | 1170 | 26 | 1 | 11 | | 25 | NEC surgery |
| BOV | 870 | 26 | 10 | 45 | 12[‡] | 51 | NEC surgery[†] |
| BOV | 1136 | 27 | 1 | 13 | | 18 | NEC surgery |
| BOV | 775 | 27 | 3 | 11 | | 16 | NEC surgery[†] |
| BOV | 1120 | 28 | 5 | 16 | | 38 | |
| BOV | 840 | 28 | 8 | 10 | | 29 | |
| BOV | 1230 | 29 | 2 | 2 | | 23 | |
| BOV | 1100 | 29 | 3 | 30 | | 14 | |
| BOV | 817 | 29 | 2 | 12 | | 26 | NEC surgery |

*Erroneously received formula or bovine milk-based HMF in violation of protocol.
†Died.
‡Erroneously received human milk-based HMF in violation of protocol.

Case ID: 220302601
Control No.: 23063371

# EXHIBIT A-40

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.          Attorney for Plaintiffs



*Filed and Attested by the
Office of Judicial Records
03 JUL 2023 02:38 pm
F. HEWITT*

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302583<br>:<br>:<br>: |
| HOLLI CARTER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302588<br>:<br>:<br>: |
| SHONDERA DRAYTON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302594<br>:<br>:<br>: |
| BRANDY GOODMOND, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400208<br>:<br>:<br>: |

1

| | |
|---|---|
| BRANDY GOODMOND, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400212<br>:<br>: |
| TONYA GRAY, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400216<br>:<br>: |
| JANEE HENDERSON, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400127<br>:<br>: |
| DELQUAN HINES, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400136<br>:<br>: |
| SHEMIKA JOHNSON, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400162<br>:<br>: |
| KRISTEN KAJUFFA, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　MARCH TERM, 2022<br>:　No. 220302978<br>:<br>: |
| NAFEESAH MAYS, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　MARCH TERM, 2022<br>:　No. 220302963<br>:<br>: |
| CATHERINE McMILLIAN, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:　APRIL TERM, 2022<br>:　No. 220400140<br>:<br>: |
| DAMEKA MOMENT, et al.,<br>　　　　　Plaintiff, | :<br>:　APRIL TERM, 2022 |

2

Case ID: 220302601<br>Control No.: 23062558

|  |  |
|---|---|
| v. | :   No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ERICA PADILLA, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302969 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| NYDIA PARKER, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ALEXANDRIA ROSS, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |

Case ID: 220302601
Control No.: 23062558

|  |  |  |
|---|---|---|
| Defendants. | : | |
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220400156 |
| JEANNATE WATSON, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302967 |
| ROBERT WHITFIELD, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400145 |
| GINA WIEGER, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302614 |
| GINA WIEGER, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302601 |
| SHANITA WIGGINS, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302986 |
| MELVENIA WILLIAMS, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400141 |
| IVYANN WITHERSPOON, et al.,<br>　　　　　Plaintiff,<br>　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400138 |

4

## **STIPULATION**

TO THE Prothonotary:

The parties stipulate that plaintiffs have until August 7, 2023 to reply to defendants' Preliminary Objections in the above-captioned matters, with defendants' reply briefs to be filed by August 17th.

July 3, 2023

Respectfully submitted,

| TROUTMAN PEPPER HAMILTON SANDERS LLP | KLINE & SPECTER, P.C. |
|---|---|
| */s/ Ronnie E. Fuchs*<br>Sean P. Fahey, Esquire<br>3000 Two Logan Square<br>Philadelphia, PA 19103<br>Tel: (215) 981-4296<br><br>Ronni E. Fuchs<br>301 Carnegie Center, Suite 400<br>Princeton, NJ 08540<br>Tel: (609) 951-4183<br><br>Kimberly A. Brown<br>JONES DAY<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA 15219<br>Tel: (412) 394-7995<br><br>*Attorneys for Defendant Abbott Laboratories* | */s/ Timothy A. Burke*<br>Thomas R. Kline, Esquire<br>Tobias Millrood, Esquire<br>Elizabeth Crawford, Esquire<br>Melissa Merk, Esquire<br>Timothy A. Burke, Esquire<br>1525 Locust Street<br>Philadelphia, PA 19102<br>1525 Locust Street<br>Philadelphia, PA 19102<br>Tel: (215) 772-1000<br><br>*Attorneys for Plaintiff* |
| BURNS WHITE LLC | TUCKER LAW GROUP, LLC |
| */s/ Richard S. Margulies*<br>James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL | */s/ Kenneth A. Murphy*<br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103 |

Case ID: 220302601
Control No.: 23062558

| | |
|---|---|
| Philadelphia, PA 19103<br>Tel: (215) 587-1625<br><br>*Attorneys for Defendant University of Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and University of Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Penn Medicine* | WELSH & RECKER, P.C.<br>Catherine M. Recker<br>Amy B. Carver<br>Richard D. Walk, III<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br><br>*Attorneys for Defendant Mead Johnson & Company LLC and* Mead Johnson Nutrition Company |
| BURNS WHITE LLC<br><br>*/s/ Richard S. Margulies*<br>James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625<br><br>*Attorneys for Defendant, Temple University Health System, Inc., d/b/a Temple University Hospital* | |

6

Case ID: 220302601<br>Control No.: 23062558

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 3, 2023, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


Dated: July 3, 2023                    /s/ Timothy A. Burke
                                       Timothy A. Burke

Case ID: 220302601
Control No.: 23062558

# EXHIBIT A-41

PHILADELPHIA COURT OF COMMON PLEAS
# PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 23072530 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

**FOR COURT USE ONLY**

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
| --- | --- |
| | 08/07/2023 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response.*
*Status may be obtained online at http://courts.phila.gov*

March _____ Term, 2022
*Month* 02601 *Year*
No. _____

Name of Filing Party:
GINA WIEGER-PLF
S P-PLF

WIEGER ETAL VS MEAD JOHNSON & COMPANY,
LLC ETAL

**INDICATE NATURE OF DOCUMENT FILED:**

☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

Has another petition/motion been decided in this case? ☒ Yes ☐ No
Is another petition/motion pending? ☒ Yes ☐ No
*If the answer to either question is yes, you must identify the judge(s):*
CARPENTER

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I. CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER
Applicable Petition/Motion Deadline: 07/06/2023
Has deadline been previously extended by the Court: N/A

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1880 JOHN F. KENNEDY
  BOULEVARD 10TH FLOOR , PHILADELPHIA
  PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____   July 14, 2023   TOBIAS L. MILLROOD _____
*(Attorney Signature/Unrepresented Party)*   *(Date)*   *(Print Name)*   *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2307027860
17-JUL-23 09:59:33

```
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114
ERICA L GERSON
  STEPTOE & JOHNSON, LLP 1330
  CONNECTICUT AVE NW , WASHINGTON DC
  20036
```

FILED
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

**KLINE AND SPECTER, P.C.**
By:   TOBIAS L. MILLROOD, ESQUIRE
      ELIZABETH A. CRAWFORD, ESQUIRE
      JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@Klinespecter.com
Jack.Oneill@klinespecter.com

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>     *Plaintiff,*<br><br>  v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE,<br><br>     *Defendants.* | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>MARCH TERM 2022<br>NO. 2601 |

### PLAINTIFF GINA WIEGER'S MOTION FOR ADMISSION *PRO HAC VICE* OF BENJAMIN WHITING

     Plaintiff Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, through the undersigned sponsoring counsel, moves this Court to admit Benjamin Whiting *pro hac vice* as co-counsel on behalf of Plaintiff for all purposes allowed by law in the above captioned matter. In support of this motion, Ms. Wieger states as follows:

     1.    This is a civil action about the development of necrotizing enterocolitis ("NEC"), and related injuries, by a premature infant due to the use of the Defendant Manufacturers' cow's

Case ID: 220302601
Control No.: 23072530

milk-based preterm infant feeding products at the Defendant Hospital. Plaintiff Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, is represented in this action by the undersigned counsel who is admitted to the Bar of this Commonwealth to practice law.

2.     The general rule for admission *pro hac vice* in the Commonwealth is stated in Pa. B.A.R. 301(a):

> An attorney, barrister or advocate who is qualified to practice in the courts of another state or of a foreign jurisdiction may be specially admitted to the bar of this Commonwealth for purposes limited to a particular case. An attorney, barrister or advocate admitted pro hac vice in a case shall not thereby be authorized to act as attorney of record in the case.

3.     Mr. Whiting satisfies the requirements of Pa. B.A.R. 301(a). As set forth in the candidate verification pursuant to Pa. R.C.P. 1012.1(c), attached as **Exhibit A**, and incorporated herein, Mr. Whiting is an attorney with the law firm Keller Postman LLC, located at 150 N Riverside Plaza, Suite 4100, Chicago, Illinois 60606. Mr. Whiting was admitted to the practice of law in the State of Illinois and in the State of New York in 2011. Mr. Whiting has been and remains a member in good standing with the Bar.

4.     Mr. Whiting has not been the subject of disciplinary action in any court or before any Bar.

5.     Ms. Wieger has retained the services of Mr. Whiting and his firm in regard to the above captioned lawsuit. This matter is a complex product liability lawsuit and Mr. Whiting has extensive and specialized knowledge of this type of case.

6.     Mr. Whiting seeks admission *pro hac vice* under Rule 301 of the Pennsylvania Bar Admission Rules for the purpose of participating with the undersigned counsel in further proceedings and trial in the above captioned matter.

Case ID: 220302601
Control No.: 23072530

7.      All fees required by 204 Pa. Code § 81.505 have been paid and the Pennsylvania IOLTA Board's acknowledgement letter is attached as **Exhibit B**.  Mr. Whiting's law firm will pay any city business and wage taxes required.

8.      Mr. Whiting's good reputation and competence is attested to in the sponsor verification attached pursuant to Pa. R.C.P. 1012.1(d)(2) as **Exhibit C**, and incorporated herein.

9.      As set forth in the motion and the exhibits incorporated herein, there exists no good cause for denial of Ms. Wieger's Motion for Admission *Pro Hac Vice* of Benjamin Whiting.  No party will be prejudiced by Mr. Whiting's admission *pro hac vice*.

WHEREFORE, Plaintiff Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, respectfully requests that this Court enter the attached Order granting admission *pro hac vice* in this matter for Benjamin Whiting, Esquire.

Respectfully submitted,

KLINE & SPECTER, P.C.

By: /s/ Tobias L. Millrood
Tobias L. Millrood, Esq.
Attorney for Plaintiff Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor

Dated: July 14, 2023

3

Case ID: 220302601
Control No.: 23072530

## CERTIFICATE OF SERVICE

  I, Tobias L. Millrood, hereby certify that a true and correct copy of the foregoing Motion for Admission *Pro Hac Vice* of Benjamin Whiting was filed this date via the First Judicial District of Pennsylvania's Electronic Filing System, which thereby deems the foregoing as served on all counsel of record pursuant to Rule 205.4(g)(2)(ii) of the Pennsylvania Rules of Civil Procedure.


         /s/ Tobias L. Millrood     
         TOBIAS L. MILLROOD, ESQUIRE

Dated: July 14, 2023

Case ID: 220302601
Control No.: 23072530

FILED
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

# EXHIBIT A

Case ID: 220302601
Control No.: 23072530

**KLINE AND SPECTER, P.C.**
By:     TOBIAS L. MILLROOD, ESQUIRE
        ELIZABETH A. CRAWFORD, ESQUIRE
        JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA   19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@Klinespecter.com
Jack.Oneill@klinespecter.com

|  |  |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>*Plaintiff,*<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE,<br><br>*Defendants.* | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>MARCH TERM 2022<br>NO.  2601 |

## CANDIDATE VERIFICATION STATEMENT PURSUANT TO PA. R.C.P. 1012.1(c)

I, Benjamin Whiting, Esquire, being duly sworn, state as follows:

1.      I am an attorney and have been duly qualified and admitted to practice before the highest court of the State of New York since April 14, 2011, New York license number 4935888, and before the highest court of the State of Illinois since November 10, 2011, Illinois license number 630721.

2.      I am also admitted to the United States District Court for the Central District of Illinois, Northern District of Illinois, Southern District of Illinois, and the Southern District of New York and the United States Circuit Court of Appeals for the Federal Circuit.

3.      I am affiliated with the law firm Keller Postman LLC, 150 N Riverside Plaza, Suite 4100, Chicago, Illinois 60606.

4.      I have never been suspended, disbarred, or otherwise disciplined.

5.      I am not currently subject to any disciplinary proceedings.

6.      I have applied for admission *pro hac vice* in the following cases in the Philadelphia Court of Common Pleas:

a.  *Abdullah v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2583
b.  *McMillian v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0140
c.  *Carter v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2588
d.  *Drayton v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2594
e.  *Stills v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2617
f.  *Mays v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2963
g.  *Padilla v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2969
h.  *Kajuffa v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2978
i.  *Ross v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2981
j.  *Parker v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2983
k.  *Henderson v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0127
l.  *Williams v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0141
m.  *Sanders v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0153
n.  *Walker-Savage v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0156
o.  *Thomas v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 015
p.  *Wieger v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 2601
q.  *Gray v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0216

7.      No motions for admission *pro hac vice* have been denied.

8.      I shall comply with and be bound by the applicable statutes, case law and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

9.      I shall submit to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the matter for which admission *pro hac vice* is being sought.

Case ID: 220302601
Control No.: 23072530

10.    I have consented to the appointment of Tobias L. Millrood, Esquire as the agent upon whom service of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in the matter for which admission *pro hac vice* is sought.

11.    The undersigned verifies that the facts set forth in the foregoing candidate verification are true and correct to the best of his knowledge, information, and belief and understands that any false statements are made subject to the penalties of 18 Pa. Code § 4904 relating to unsworn falsification to authorities.

/s/ Benjamin Whiting
BENJAMIN WHITING, ESQUIRE

Dated: July 14, 2023

3

## **VERIFICATION**

I, Benjamin J. Whiting, Esquire hereby verify that the facts contained in the *Pro Hac Vice* motions specified below are true and correct to the best of my knowledge, information and belief. I further understand that these statements are made subject to penalties of 18 Pa. C.S.A. 4904 relating to unsworn falsification to authorities.

a. *Carter v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2588
b. *Drayton v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2594
c. *Stills v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2617
d. *Mays v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2963
e. *Padilla v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2969
f. *Kajuffa v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2978
g. *Ross v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2981
h. *Parker v. Mead Johnson & Company, LLC et al*., March Term, 2022, No. 2983
i. *Henderson v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0127
j. *Williams v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0141
k. *Sanders v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0153
l. *Walker-Savage v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0156
m. *Thomas v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0158
n. *Wieger v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 2601
o. *Gray v. Mead Johnson & Company, LLC et al*., April Term, 2022, No. 0216

Benjamin J. Whiting, Esquire

DATE: 7/12/2023

FILED
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

# EXHIBIT B

Case ID: 220302601
Control No.: 23072530



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

May 30, 2023


BENJAMIN   WHITING, Esq.
KELLER POSTMAN LLC
150 N RIVERSIDE PLAZA
SUITE 4100
CHICAGO, IL 60606


SENT TO LEIGHTON MILLER VIA Email: LEIGHTON.MILLER@KELLERPOSTMAN.COM


Dear Attorney WHITING:


This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Wieger v. Mead Johnson & Company, LLC, no. 220302601, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.


Sincerely,

*Stephanie S. Libhart*

Stephanie S. Libhart
Executive Director


cc:  TOBIAS LAEL MILLROOD, Esq.

tobi.millrood@klinespecter.com


Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302601
Control No.: 23072530

FILED
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

# EXHIBIT C

Case ID: 220302601
Control No.: 23072530

**KLINE AND SPECTER, P.C.**
By:    TOBIAS L. MILLROOD, ESQUIRE
        ELIZABETH A. CRAWFORD,
ESQUIRE
        JOHN P. O'NEILL, ESQUIRE
Attorney I.D. No. 77764 / 313702 / 205677
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000 phone
(215) 792-5519 fax
Tobi.Millrood@klinespecter.com
Elizabeth.Crawford@Klinespecter.com
Jack.Oneill@klinespecter.com

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>              *Plaintiff*,<br><br>  v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE,<br><br>              *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 2601** |

## SPONSOR VERIFICATION STATEMENT PURSUANT TO PA. R.C.P. 1012.1(d)

I, Tobias L. Millrood, being duly sworn, state as follows:

      1.      I am an attorney duly admitted to practice law before this Court and am a partner

in the law firm Kline & Specter, P.C., counsel for Plaintiff Gina Wieger, on her own behalf and as

Parent and Natural Guardian of S.P., a Minor, in the above captioned matter.

      2.      I submit this verification in support of Ms. Wieger's Motion for Admission *Pro*

*Hac Vice* of Benjamin Whiting for purposes of serving as co-counsel to Ms. Wieger.

Case ID: 220302601
Control No.: 23072530

3.      After reasonable investigation, I believe Benjamin Whiting, Esquire, is a reputable and competent attorney and I am in a position to recommend his admission.

4.      I have previously acted as the sponsor of other candidates for admission *pro hac vice* in this and other courts of record in this Commonwealth.

5.      The proceeds from the settlement of a cause of action in which Benjamin Whiting, Esquire, is granted admission *pro hac vice* shall be received, held, distributed, and accounted for in accordance with Rule 1.15 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

6.      The undersigned verifies that the facts set forth in the foregoing sponsor verification are true and correct to the best of her knowledge, information, and belief and understands that any false statements are made subject to the penalties of 18 Pa. Code § 4904 relating to unsworn falsification to authorities.

/s/ Tobias L. Millrood
TOBIAS L. MILLROOD, ESQUIRE

Dated: July 14, 2023

Case ID: 220302601
Control No.: 23072530

FILED
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| *Plaintiff,* | CIVIL TRIAL DIVISION |
| v. | MARCH TERM 2022 NO. 2601 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, | |
| *Defendants.* | |

## ORDER

AND NOW THIS _____ day of _____, 2023, upon consideration of Plaintiff Gina Wieger's Motion for Admission *Pro Hac Vice* of Benjamin Whiting, it is hereby **ORDERED** that the motion is **GRANTED**. It is further **ORDERED** that pursuant to Pennsylvania Rule of Civil Procedure 1012.1, Pennsylvania Bar Admission Rule 301, and 204 Pa. Code § 81.503, Benjamin Whiting, Esquire, is hereby specially admitted to the Bar of this Commonwealth for purposes limited to this particular civil action to represent Plaintiff Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor. Counsel *pro hac vice* shall pay all city business and wage taxes as required by the Court.

BY THE COURT:

_____
J.

Case ID: 220302601
Control No.: 23072530

# EXHIBIT A-42

## IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## COURT OF COMMON PLEAS OF PHILADELPHIA
### CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| **ABDULLAH ETAL** | : | **CASE ID: 220302583** |
| | : | |
| **VS** | : | |
| | : | |
| **MEAD JOHNSON & COMPANY** | : | |

### ORDER

**AND NOW**, this 24ᵗʰ day of July 2023, it is hereby ORDERED that Plaintiff may file an

amended complaint on or before September 8, 2023 (or other date agreed to by counsel). It is

FURTHER ORDERED, this order shall also apply to the following captioned matters:

| | |
|---|---|
| 220302588 | CARTER ETAL VS MEAD JOHNSON & COMPANY |
| 220302594 | DRAYTON ETAL VS MEAD JOHNSON & COMPANY |
| 220302601 | WIEGER ETAL VS MEAD JOHNSON & COMPANY |
| 220302606 | TAYLOR ETAL VS MEAD JOHNSON & COMPANY |
| 220302614 | WIEGER ETAL VS MEAD JOHNSON & COMPANY |
| 220302617 | STILLS ETAL VS MEAD JOHNSON NUTRITION |
| 220302963 | MAYS ETAL VS MEAD JOHNSON & COMPANY |
| 220302967 | WATSON ETAL VS MEAD JOHNSON & COMPANY |
| 220302969 | PADILLA ETAL VS MEAD JOHNSON & COMPANY |
| 220302978 | KAJUFFA ETAL VS MEAD JOHNSON & COMPANY |
| 220302981 | ROSS ETAL VS MEAD JOHNSON & COMPANY |
| 220302983 | PARKER ETAL VS MEAD JOHNSON & COMPANY |
| 220302986 | WIGGINS ETAL VS MEAD JOHNSON & COMPANY |
| 220400127 | HENDERSON ETAL VS MEAD JOHNSON & COMPANY |
| 220400136 | HINES ETAL VS MEAD JOHNSON & COMPANY |
| 220400138 | WITHERSPOON ETAL VS MEAD JOHNSON & COMPANY |
| 220400140 | MCMILLIAN ETAL VS MEAD JOHNSON & COMPANY |
| 220400141 | WILLIAMS ETAL VS MEAD JOHNSON & COMPANY |
| 220400142 | MOMENT ETAL VS MEAD JOHNSON & COMPANY |
| 220400145 | WHITFIELD ETAL VS MEAD JOHNSON & COMPANY |
| 220400153 | SANDERS ETAL VS MEAD JOHNSON & COMPANY |
| 220400156 | WALKER-SAVAGE ETAL VS MEAD JOHNSON & COMPANY |
| 220400158 | THOMAS ETAL VS MEAD JOHNSON & COMPANY |
| 220400159 | SHORT ETAL VS MEAD JOHNSON & COMPANY |
| 220400162 | JOHNSON ETAL VS MEAD JOHNSON & COMPANY |
| 220400208 | GOODMOND ETAL VS MEAD JOHNSON & COMPANY |
| 220400212 | GOODMOND ETAL VS MEAD JOHNSON & COMPANY |
| 220400216 | GRAY ETAL VS MEAD JOHNSON & COMPANY |

ORDER-Wieger Etal Vs Mead Johnson



22030260100082

BY THE COURT:

_____

CARPENTER, J.

# EXHIBIT A-43

**IN THE FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
COURT OF COMMON PLEAS OF PHILADELPHIA
CIVIL TRIAL DIVISION**

| | | |
|---|---|---|
| **ABDULLAH ETAL** | : | **CASE ID: 220302583** |
| | : | |
| **VS** | : | |
| | : | |
| **MEAD JOHNSON & COMPANY** | : | |

## <u>ORDER</u>

**AND NOW**, this 24th day of July 2023, it is hereby ORDERED that all discovery is to be

completed by June 3, 2024 and all other case management deadlines to extend therefrom. It is

FURTHER ORDERED, this extension shall also apply to the following captioned matters:

| | |
|---|---|
| 220302588 | **CARTER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302594 | **DRAYTON ETAL VS MEAD JOHNSON & COMPANY** |
| 220302601 | **WIEGER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302606 | **TAYLOR ETAL VS MEAD JOHNSON & COMPANY** |
| 220302614 | **WIEGER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302617 | **STILLS ETAL VS MEAD JOHNSON NUTRITION** |
| 220302963 | **MAYS ETAL VS MEAD JOHNSON & COMPANY** |
| 220302967 | **WATSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220302969 | **PADILLA ETAL VS MEAD JOHNSON & COMPANY** |
| 220302978 | **KAJUFFA ETAL VS MEAD JOHNSON & COMPANY** |
| 220302981 | **ROSS ETAL VS MEAD JOHNSON & COMPANY** |
| 220302983 | **PARKER ETAL VS MEAD JOHNSON & COMPANY** |
| 220302986 | **WIGGINS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400127 | **HENDERSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400136 | **HINES ETAL VS MEAD JOHNSON & COMPANY** |
| 220400138 | **WITHERSPOON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400140 | **MCMILLIAN ETAL VS MEAD JOHNSON & COMPANY** |
| 220400141 | **WILLIAMS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400142 | **MOMENT ETAL VS MEAD JOHNSON & COMPANY** |
| 220400145 | **WHITFIELD ETAL VS MEAD JOHNSON & COMPANY** |
| 220400153 | **SANDERS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400156 | **WALKER-SAVAGE ETAL VS MEAD JOHNSON & COMPANY** |
| 220400158 | **THOMAS ETAL VS MEAD JOHNSON & COMPANY** |
| 220400159 | **SHORT ETAL VS MEAD JOHNSON & COMPANY** |
| 220400162 | **JOHNSON ETAL VS MEAD JOHNSON & COMPANY** |
| 220400208 | **GOODMOND ETAL VS MEAD JOHNSON & COMPANY** |
| 220400212 | **GOODMOND ETAL VS MEAD JOHNSON & COMPANY** |
| 220400216 | **GRAY ETAL VS MEAD JOHNSON & COMPANY** |

ORDER-Wieger Etal Vs Mead Johnson



22030260100083

BY THE COURT:

_____

**CARPENTER, J.**

# EXHIBIT A-44



**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| **WIEGER ETAL** | **March Term 2022** |
| **VS** | **No. 02601** |
| **MEAD JOHNSON & COMPANY, LLC ETAL** | |

### *REVISED CASE MANAGEMENT ORDER*

Be advised that the Case Management Order issued for the above-captioned action has been revised as follows:

1. All discovery shall be completed not later than 03-JUN-2024.

2. Plaintiff shall submit expert reports not later than 01-JUL-2024.

3. Defendant shall submit expert reports not later than 05-AUG-2024.

4. All pre-trial motions other than motions in limine shall be filed not later than 05-AUG-2024.

5. A settlement conference will be scheduled any time after 03-SEP-2024.

6. A pre-trial conference will be scheduled at any time after 04-NOV-2024.

7. It is expected that this case shall be ready for trial by 02-DEC-2024.

All other terms and conditions on the original Case Management Order will remain in full force and effect.

*BY THE COURT:*

24-JUL-2023

**LINDA CARPENTER, J.**
**TEAM LEADER**

FJB88887(REV. 5/21/18)

RVCMO-Wieger Etal Vs Mead Joh



22030260100087

# EXHIBIT A-45

**FILED**
14 JUL 2023 05:13 pm
Civil Administration
P. CHROY

GINA WIEGER, on her own behalf and as Parent
and Natural Guardian of S.P., a Minor,

               *Plaintiff,*

    v.

MEAD JOHNSON & COMPANY, LLC, MEAD
JOHNSON NUTRITION COMPANY, ABBOTT
LABORATORIES, THE PENNSYLVANIA HOSPITAL
OF THE UNIVERSITY OF PENNSYLVANIA HEALTH
SYSTEM d/b/a PENNSYLVANIA HOSPITAL, and
THE TRUSTEES OF THE UNIVERSITY OF
PENNSYLVANIA d/b/a PENN MEDICINE,

               *Defendants.*

**IN THE COURT OF COMMON PLEAS
PHILADELPHIA COUNTY**

**CIVIL TRIAL DIVISION**

**MARCH TERM 2022
NO. 2601**

## ORDER

AND NOW THIS __14ᵗʰ__ day of __AUGUST__, 2023, upon consideration of Plaintiff

Gina Wieger's Motion for Admission *Pro Hac Vice* of Benjamin Whiting, it is hereby **ORDERED**

that the motion is **GRANTED**.  It is further **ORDERED** that pursuant to Pennsylvania Rule of

Civil Procedure 1012.1, Pennsylvania Bar Admission Rule 301, and 204 Pa. Code § 81.503,

Benjamin Whiting, Esquire, is hereby specially admitted to the Bar of this Commonwealth for

purposes limited to this particular civil action to represent Plaintiff Gina Wieger, on her own behalf

and as Parent and Natural Guardian of S.P., a Minor.  Counsel *pro hac vice* shall pay all city

business and wage taxes as required by the Court.

BY THE COURT:

                                        J.

220302601-Wieger Etal Vs Mead Johnson



22030260100095

Case ID: 220302601
Control No.: 23072530

# EXHIBIT A-46

KLINE & SPECTER, P.C.
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
    Helen A. Lawless, Esq.
    Philip M. Pasquarello, Esq.
Attorney I.D. Nos.: 28895/77764/313702/
320927/205677/327249/326263
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tom.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com
Helen.lawless@klinespecter.com
Philip.pasquarello@klinespecter.com



Filed and Attested by the
Office of Judicial Records
08 SEP 2023 02:53 pm
A. STAMATO

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : IN THE COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL TRIAL DIVISION<br>: |
| *Plaintiff*, | : MARCH TERM 2022<br>: NO. 2601 |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | : |
| *Defendants.* | : |

1

Case ID: 220302601

## <u>NOTICE TO PLEAD AND DEFEND</u>

| NOTICE | ADVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a used en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| Lawyer Referral Service<br>Philadelphia Bar Association<br>1101 Market Street, 11th Floor<br>Philadelphia, PA 19107<br>(215) 238-6338 | Lawyer Referral Service<br>Philadelphia Bar Association<br>1101 Market Street, 11th Floor<br>Philadelphia, PA 19107<br>(215) 238-6338 |

2

Case ID: 220302601

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
    Helen A. Lawless, Esq.
    Philip M. Pasquarello, Esq.
Attorney I.D. Nos.: 28895/77764/313702/
320927/205677/327249/326263
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tom.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com
Helen.lawless@klinespecter.com
Philip.pasquarello@klinespecter.com

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : **IN THE COURT OF COMMON PLEAS** <br> : **PHILADELPHIA COUNTY** <br> : <br> : **CIVIL TRIAL DIVISION** <br> : <br> : **MARCH TERM 2022** <br> : **NO. 2601** |
|          *Plaintiff,* | |
|     v. | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | |
|          *Defendants.* | |

## **FIRST AMENDED COMPLAINT**

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended

3

Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants."   Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital.  Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.   This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.   As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

Case ID: 220302601

3.      Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey.  Ms. Wieger is the parent and natural guardian of S.P., a minor.  Ms. Wieger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal

Case ID: 220302601

place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

## III.    JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.    FACTUAL ALLEGATIONS

### *S.P.'s NEC Diagnosis*

11.     S.P. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 3, 2013.

12.     At birth, S.P.'s gestational age was approximately 26 weeks and she weighed 710 grams. Upon information and belief, S.P. was fed Similac and/or Enfamil cow's milk-based products

Case ID: 220302601

by staff at Pennsylvania Hospital after her birth.

13.     Upon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products.

14.     S.P.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  S.P. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome, intestinal and feeding difficulties, growth issues, neurological injuries, and she continues to suffer other long-term health effects.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

Case ID: 220302601

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Wieger Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully

Case ID: 220302601

herein, Ms. Wieger did not know, and had no reason to know or suspect, that S.P.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wieger*

24.     Despite exercising reasonable diligence, Ms. Wieger was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of S.P.'s injuries.

25.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of S.P.'s NEC diagnosis, Ms. Wieger undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

26.     The health care providers at Penn Medicine responded only that S.P. had gotten NEC because she was born premature. Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

27.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused S.P.'s injuries. Penn Medicine's response at the time did not give Ms. Wieger any reason to suspect any wrongdoing on the part of the Defendants.

28.     Ms. Wieger is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

29.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wieger had no reason to doubt their word.

30.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

Case ID: 220302601

31.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

32.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

33.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed in Paragraphs _____ below, any research conducted by Ms. Wieger immediately

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302601

after S.P.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused S.P.'s injuries.

34.     Ms. Wieger also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Wieger unaware that the Defendant Manufacturers' products caused S.P.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wieger, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

35.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

36.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

37.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate

Case ID: 220302601

misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

38.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

39.     Additionally, Defendant Hospital failed to inform Ms. Wieger that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Wieger was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Wieger asked Plaintiff's health care providers at Defendant Hospital why a premature infant like S.P. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to S.P. could increase the risk of NEC to preterm infants, responding only that S.P. had gotten NEC solely because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

40.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Carter of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly

Case ID: 220302601

informed Ms. Wieger that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like S.P., it was enough for Ms. Wieger to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

41.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required

Case ID: 220302601

companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born

14

Case ID: 220302601

prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.    Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.    One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative

Case ID: 220302601

claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302601




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and

Case ID: 220302601

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

18

Case ID: 220302601

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

61.     Prior to S.P.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like S.P.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

Case ID: 220302601

62.     Prior to S.P.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like S.P.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

63.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like S.P.

### *The Defendant Manufacturers' Inadequate Warnings*

64.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

65.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

66.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

67.     Mead cites no medical literature or research to guide the use of its products.

68.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the

magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

69.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

70.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

71.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

72.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

73.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

Case ID: 220302601

74.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

75.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

76.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

77.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.  It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience

Case ID: 220302601

"changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

78.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

79.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

80.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

81.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these

Case ID: 220302601

products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

82.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

*Safer Alternative Designs*

83.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

84.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

85.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

86.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

87.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

88.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

89.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

90.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury

and death from NEC.

91.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

92.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

93.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

94.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

95.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

> a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;
>
> b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;
>
> c.    For past, present, and future out-of-pocket costs, lost income and/or lost

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

98.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the

products at issue in this litigation unreasonably dangerous.

99.          Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow

Case ID: 220302601

their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.    Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

100.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

101.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

102.    The unwarned-of risks are not of a kind that an ordinary consumer would expect.  Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

103.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

104.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of

unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

106. At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

107. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

108. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

Case ID: 220302601

e.     Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.     Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.     Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.     Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

109.   In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

110.   As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

111.   Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

112.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 220302601

of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

113.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 220302601

herein.

114. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

115. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

116. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

117. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

     a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

     b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

     c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

Case ID: 220302601

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

118.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

119.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant

Case ID: 220302601

Manufacturers' unreasonably dangerous cow's milk-based products.

120.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured

Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

121.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's

injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers,

individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection

Case ID: 220302601

with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

122.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

123.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

124.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

125.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

126.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

        a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

        b.      That their cow's milk-based products were necessary to the growth and

nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

127.    Abbott and Mead were negligent or careless in not determining those representations to be false.

128.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

129.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

Case ID: 220302601

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

130. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

131. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent,

Case ID: 220302601

and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

132.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

133.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

134.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

135.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

136.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

Case ID: 220302601

137.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

138.    Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

139.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

140.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

       a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

       b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

Case ID: 220302601

c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d. Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

142. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its

Case ID: 220302601

medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

143. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

144. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

145. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning

Case ID: 220302601

capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

146.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

147.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

148.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their

intended manner and for their intended purpose and ensured quality care for the Injured Infant.

149.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

150.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

151.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

152.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

153.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its

Case ID: 220302601

medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

154.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.      Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based

46

products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

155. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

156. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

Case ID: 220302601

157.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

158.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

159.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

160.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

161.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

Case ID: 220302601

c.       Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.       Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.       Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.       Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.       Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.       Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.       Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for

Case ID: 220302601

premature infants had not influenced the use and/or misuse of the Defendant

Manufacturers' products.

162.    A reasonable hospital under the same or similar circumstances would have warned of the

above risks, would have instructed its healthcare professionals and medical staff on the safe use of

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant

Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably

dangerous products without adequate warning.

163.    A reasonable hospital under the same or similar circumstances would have overseen and

managed its healthcare professionals and medical staff to ensure that they received proper training

and updating on the risks associated with feeding cow's milk-based formula to premature infants.

164.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its

duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured

Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

165.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to

oversee its healthcare professionals and medical staff on the danger posed by the Defendant

Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the

Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

developing NEC and significant injuries.

166.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's

negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of

income, and/or other harms.    Her life has been significantly affected by the Injured Infant's

injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania

Case ID: 220302601

Hospital, individually, jointly and severally, as follows:

      a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

      c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

      d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

      e.    For interest as permitted by law;

      f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

      g.    For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

167.    Plaintiff hereby demands a jury trial for all claims triable.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Timothy A. Burke
           Thomas R. Kline, Esq.

51

Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.
Helen A. Lawless, Esq.
Philip M. Pasquarello, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

ben.whiting@kellerpostman.com

Date: 9/8/23

Case ID: 220302601

# EXHIBIT A-47

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**ATTORNEYS FOR MEAD JOHNSON &
COMPANY, LLC AND MEAD
JOHNSON NUTRITION COMPANY**

Filed and Attested by the
Office of Judicial Records
30 MAR 2022 10:51 pm
B. MERCEDES

**STEPTOE & JOHNSON, LLP**
Erica L. Gerson, Esquire
1330 Connecticut Avenue NW
Washington, DC 20036
(202) 429-3049
egerson@steptoe.com

| | |
|---|---|
| **GINA WEIGER, on her own behalf and as Parent and Natural Guardian of P.S., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| Plaintiffs, | : **MARCH TERM, 2022**<br>: **No. 2601** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

## WITHDRAWAL OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly withdraw the appearance of Erica L. Gerson as counsel for Defendants,

Mead Johnson & Company, LLC and Mead Johnson Nutrition Company in the above-

referenced matter.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire

**STEPTOE & JOHNSON, LLP**

/s/ Erica L. Gerson
Erica L. Gerson, Esquire

**Attorneys for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

Dated: September 22, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, hereby certify that I caused to be served a true and correct copy of the foregoing document to all counsel of record via the Court's electronic filing system.

<u>/s/ Kenneth A. Murphy</u>
Kenneth A. Murphy, Esquire

Dated: September 22, 2023