# EXHIBIT A-56

*Filed and Attested by the Office of Judicial Records 07 NOV 2023 11:38 am N. SWEENEY*

TERRAINE ABDULLAH, et al.,                          :
         Plaintiff,                               :  MARCH TERM, 2022
      v.                                          :  No. 220302583
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

HOLLI CARTER, et al.,                               :
        Plaintiff,                               :  MARCH TERM, 2022
      v.                                          :  No. 220302588
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

SHONDERA DRAYTON, et al.,                           :
        Plaintiff,                               :  MARCH TERM, 2022
      v.                                          :  No. 220302594
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

JANEE HENDERSON, et al.,                            :
        Plaintiff,                               :  APRIL TERM, 2022
      v.                                          :  No. 220400127
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

DELQUAN HINES, et al.,
        Plaintiff,                               APRIL TERM, 2022
      v.                                          No. 220400136
MEAD JOHNSON & COMPANY, LLC, et al.,
        Defendants.

SHEMIKA JOHNSON, et al.,                            :
        Plaintiff,                               :  APRIL TERM, 2022
      v.                                          :  No. 220400162
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

CATHERINE McMILLIAN, et al.,
        Plaintiff,                               APRIL TERM, 2022
      v.                                          No. 220400140
MEAD JOHNSON & COMPANY, LLC, et al.,
        Defendants.

DAMEKA MOMENT, et al.,                              :
        Plaintiff,                               :  APRIL TERM, 2022
      v.                                          :  No. 220400142
MEAD JOHNSON & COMPANY, LLC, et al.,                :
        Defendants.                              :

LOREN SANDERS, et al.,                              :

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON | : |
| ISAIAH SAVAGE, JR., et al., | : MARCH TERM, 2022 |
| Plaintiff, | : No. 220400156 |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ROBERT WHITFIELD, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400145 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302601 |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

|  |  |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>     Defendants. | :<br>: |

|  |  |
|---|---|
| MELVENIA WILLIAMS, et al.,<br>     Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY,<br>LLC, et al.,<br>Defendants. | :<br>:   APRIL TERM, 2022<br>: No. 220400141<br>:<br>: |
| IVYANN WITHERSPOON, et al.,<br>     Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY,<br>LLC, et al.,<br>Defendants. | :<br>:   APRIL TERM, 2022<br>: No. 220400138<br>:<br>: |

**<u>ORDER</u>**

**AND NOW** this _____ day of _____, 2023, upon consideration of Plaintiff's Motion to Compel Deposition of Defendant, Hospital of The University of Pennsylvania's Corporate Designee, and any response thereto, is hereby **ORDERED** that said Motion is **GRANTED.**

**IT IS FURTHER ORDERED** that counsel for Defendant shall make Defendant's Corporate Designee available within 20 days of the date of this Order, on a mutually agreeable date and time.

**BY THE COURT:**

_____
                                                                          J.

*Discovery Deadline: February 5, 2024*

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

| | |
|---|---|
| TERRAINE ABDULLAH, et al., :<br>Plaintiff, :<br>v. :<br>MEAD JOHNSON & COMPANY, LLC, et al., :<br>Defendants. : | MARCH TERM, 2022<br>No. 220302583 |
| HOLLI CARTER, et al., :<br>Plaintiff, :<br>v. :<br>MEAD JOHNSON & COMPANY, LLC, et al., :<br>Defendants. : | MARCH TERM, 2022<br>No. 220302588 |
| SHONDERA DRAYTON, et al., :<br>Plaintiff, :<br>v. :<br>MEAD JOHNSON & COMPANY, LLC, et al., :<br>Defendants. : | MARCH TERM, 2022<br>No. 220302594 |
| JANEE HENDERSON, et al., :<br>Plaintiff, :<br>v. :<br>MEAD JOHNSON & COMPANY, LLC, et al., :<br>Defendants. : | APRIL TERM, 2022<br>No. 220400127 |
| DELQUAN HINES, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400136 |
| SHEMIKA JOHNSON, et al., :<br>Plaintiff, : | APRIL TERM, 2022 |

| | |
|---|---|
| v. | : No. 220400162 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CATHERINE McMILLIAN, et al., | |
| Plaintiff, | APRIL TERM, 2022 |
| v. | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| DAMEKA MOMENT, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON | : |
| ISAIAH SAVAGE, JR., et al., | : MARCH TERM, 2022 |
| Plaintiff, | : No. 220400156 |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

|  |  |  |
|---|---|---|
| Defendants. | : | |
| ROBERT WHITFIELD, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400145 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| MELVENIA WILLIAMS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| IVYANN WITHERSPOON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400138 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

## PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF CORPORATE DESIGNEE

Plaintiffs, by and through their counsel, Kline & Specter, P.C., submit this Motion to Compel the Deposition of Defendant Hospital of the University of Pennsylvania's Corporate Designee as follows:

## FACTUAL BACKGROUND

1. This action arises out of the injuries suffered by premature infants who were given the Defendant Manufacturers' bovine-based infant feeding products at the named Defendant Hospital. The Defendant Hospital acquired and supplied the Defendant Manufacturers' products

to the Injured Infants and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured premature Infants to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given bovine-based feeding products. As a result, the Injured Infants were seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.  Plaintiffs bring these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infants' consumption of the Defendant Manufacturers' unreasonably dangerous bovine-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infants by the Defendant Hospital.

3.  Plaintiffs commenced these actions by filing complaints in March and April of 2022.

4.  On August 17, 2023, Plaintiff's Counsel emailed Defense Counsel indicating the need to depose Defendant's Corporate Designee. See Email of August 17, 2023, and corresponding Letter and Notice of Deposition attached hereto as Exhibit "A".

5.  On September 27, 2023, Plaintiff's Counsel emailed Defense Counsel to follow up on the August 17, 2023, request to depose Defendant's Corporate Designee because Defendants never provided dates for said deposition. See Email of September 27, 2023, attached hereto as Exhibit "B".

6.  On October 11, 2023, Plaintiff's Counsel emailed Defense Counsel a Notice of Deposition to depose Defendant's Corporate Designee on November 1, 2023, because Defendants never provided dates for said deposition. See Email of October 11, 2023, and corresponding Notice of Deposition attached hereto as Exhibit "C".

7.   On October 30, 2023, Defendants emailed Plaintiffs refusing to produce Defendant's Corporate Designee for deposition on November 1, 2023. <u>See</u> Email of October 30, 2023, attached hereto as Exhibit "D".

8.   To date, Defense counsel has not provided any available dates for the deposition of Defendant's Corporate Designee.

9.   Pennsylvania Rule of Civil Procedure 4001 states in relevant part that a "party may take the testimony of any person, including a party, by deposition upon oral examination … for the purpose of discovery … or for preparation or trial of a case."

10. Plaintiffs will be severely prejudiced in their ability to prepare their cases for trial and/or resolve these cases through settlement without this deposition.

WHEREFORE, Plaintiff respectfully requests this Honorable Court enter an Order in the form attached hereto, compelling the deposition of Defendant's Corporate Designee within twenty (20) days of this Order or suffer appropriate sanctions upon application to this Court.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:   */s/ John P. O'Neill*
JOHN P.  O'NEILL, ESQUIRE
TIMOTHY A. BURKE, ESQUIRE
*Attorneys for Plaintiffs*

DATE:  <u>November 7, 2023</u>

## <u>VERIFICATION</u>

I, JOHN P. O'NEILL, ESQUIRE, hereby state that I am counsel for the Plaintiff in the above action and verify that the statements made in the foregoing **Plaintiff's Motion to Compel Depositions**, are true and correct to the best of my knowledge, information, and belief. The undersigned understands that the statements therein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsification to authorities.

_____
JOHN P. O'NEILL, ESQUIRE

DATED: <u>November 3, 2023</u>

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

## <u>CERTIFICATE OF SERVICE</u>

I, JOHN P. O'NEILL, ESQUIRE, hereby certify that on the date appearing below, a true and correct copy of **Plaintiff's Motion to Compel Depositions** was served upon the following counsel of record for all parties via the Court's electronic filing system:

**KLINE & SPECTER, P.C.**

By:   /s/ John P. O'Neill

JOHN P.  O'NEILL, ESQUIRE

*Attorneys for Plaintiffs*

DATE:  November 7, 2023

# EXHIBIT A



*Filed and Attested by the Office of Judicial Records 07 NOV 2023 11:38 am N. SWEENEY*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| **From:** | Carol Lippmann |
| **To:** | jayoung@burnswhite.com; rsmargulies@burnswhite.com; srengle@burnswhite.com |
| **Cc:** | Tobi Millrood; Melissa Merk; Timothy Burke; Elizabeth Crawford; Jack O'Neill; Patrick Sidebotham; Ben Whiting; Mark Weinstein; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; Sean.Fahey@troutman.com; dbrooks@eckertseamans.com; Brooke Scicchitano; Jennifer V. Weachter |
| **Bcc:** | NECPhiladelphiaGeneralZ3453077@klinespecter.filevineapp.com |
| **Subject:** | NEC Infant Formula Litigation | The Pennsylvania Health System d/b/a Pennsylvania Hospital |
| **Date:** | Thursday, August 17, 2023 8:09:00 PM |
| **Attachments:** | 2023-08-17 Letter to Penn Hospital re NoD.pdf<br>NEC Corp Designee NoD - UPH dba Penn Hospital.pdf |

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The The Pennsylvania Health System d/b/a Pennsylvania Hospital.


Thank you,

**Carol Lippmann**
Litigation Paralegal to Tobi Millrood, Esq.
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
D. (215) 772-1392
F. (215) 792-5502
Carol.lippmann@klinespecter.com
www.klinespecter.com

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# KLINE & SPECTER PC

**ATTORNEYS AT LAW**
**1525 LOCUST STREET**
**PHILADELPHIA, PENNSYLVANIA 19102**
**WWW.KLINESPECTER.COM**

TOBIAS L. MILLROOD                                        TOBI.MILLROOD@KLINESPECTER.COM

_____

**215-772-1358**

**800-597-9585**

FAX: **215-792-5502**

August 17, 2023

**Via Email Only**
James A. Young, Esquire
Richard S. Margulies, Esquire
Susan R. Engle, Esquire
BURNS WHITE LLC
1880 John F. Kennedy Boulevard, 10th FL
Philadelphia, PA 19103

Re:     Abdullah, et al.. v. Mead Johnson & Company, et al., Case No. 2203025832
        Carter, et al., v. Mead Johnson & Company, et al., Case No. 220302588
        Drayton et al., v. Mead Johnson & Company, et al., Case No.220302594
        Stills, et al., v. Mead Johnson & Company, et al., Case No. 220302617
        Taylor, et al., v. Mead Johnson & Company, et al., Case No. 220302606
        Wieger, et al., v. Mead Johnson & Company, et al., Case No.220302614
        Wieger, et al., v. Mead Johnson & Company, et al., Case No. 220302601
        Henderson, et al., v. Mead Johnson & Company, et al., Case No. 220400127

Dear Counsel:

Attached is a Notice of Video Deposition of the Corporate Designee(s) of Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital. This notice applies to the following the following cases pending against The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital in the infant formula litigation.

- Abdullah, et al.. v. Mead Johnson & Company, et al., Case No. 2203025832
- Carter, et al., v. Mead Johnson & Company, et al., Case No. 220302588
- Drayton et al., v. Mead Johnson & Company, et al., Case No.220302594
- Stills, et al., v. Mead Johnson & Company, et al., Case No. 220302617
- Taylor, et al., v. Mead Johnson & Company, et al., Case No. 220302606
- Wieger, et al., v. Mead Johnson & Company, et al., Case No.220302614
- Wieger, et al., v. Mead Johnson & Company, et al., Case No. 220302601
- Henderson, et al., v. Mead Johnson & Company, et al., Case No. 220400127

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Page 2

Very truly yours,

Tobias L. Millrood

Enclosure
cc:     All Counsel of Record (via email only)

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | | |
|---|---|---|
| TERRAINE ABDULLAH, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| HOLLI CARTER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| SHONDERA DRAYTON, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302594 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| ALICE STILLS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| CHRISTINA TAYLOR, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302606 |

1

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> : |
| GINA WIEGER, et al., <br>           Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   MARCH TERM, 2022 <br> :   No. 220302614 <br> : <br> : |
| GINA WIEGER, et al., <br>           Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>       Defendants. | : <br> :   MARCH TERM, 2022 <br> :   No. 220302601 <br> : <br> : |
| JANEE HENDERSON, et al., <br>           Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> :   APRIL TERM, 2022 <br> :   No. 220400127 <br> : <br> : |

### NOTICE OF VIDEO DEPOSITION OF CORPORATE DESIGNEE(S) OF THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL

TO:    James A. Young, Esquire
        Burns White LLC
        1880 John F. Kennedy Blvd., 10th Floor
        Philadelphia, PA 19103

      **KINDLY TAKE NOTICE** that Plaintiffs in the above-captioned matter will take

the deposition(s) of one or more Corporate Designees of The Pennsylvania Hospital of

the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively,

"Defendants") on ___, 2023 at 10:00 a.m. at _____.

      The deposition will be taken before a person duly authorized to administer oaths and

will be recorded by video and stenographic means.

      Defendants are requested to designate one or more officers, directors, managing agents, or

other persons who shall be authorized to testify to matters known or reasonably available to the

<div align="center">2</div>

organization and who is the individual most knowledgeable about the Neonatal Intensive Care

Unit at The Pennsylvania Hospital of the University of Pennsylvania Health System from 2002

to the present, and specifically including the following subjects:

1. All policies and procedures relating to premature babies and/or babies in the Neonatal Intensive Care Unit;
2. All policies and procedures relating to the feeding of premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
3. All policies and procedures relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
4. Knowledge of what year donor breast milk became available to mothers of premature babies and/or babies in the Neonatal Intensive Care Unit;
5. All policies and procedures as to when donor breast milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
6. Knowledge of what commercial formula/bovine formula(s) were given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
7. Knowledge of all of Defendants' policies and procedures relating to lactation consultants from 2002 to the present;
8. Knowledge of all policies and procedures pertaining to additional monitoring for premature babies and/or babies in the Neonatal Intensive Care Unit who receive commercial milk/bovine milk from 2002 to the present;
9. Knowledge of any policies and procedures pertaining to consent forms relating to giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
10. Knowledge of any policies and procedures pertaining to consent forms relating to giving donor breast milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
11. Knowledge of any policies and procedures pertaining to preventing necrotizing enterocolitis from 2002 to the present;
12. Knowledge of when it was known to Defendants that commercial milk/bovine milk can increase the risk of necrotizing enterocolitis from 2002 to the present;
13. Knowledge of any communications received by Defendants from Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present.
14. Knowledge of any communications from Defendants to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present;
15. Knowledge of any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present.

3

16. Knowledge of the costs to and/or profits generated from Defendants provision of commercial milk/ bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and/or

17. Knowledge of any scholarly, educational, training and/or other materials relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present

Please consider this a request to produce any and all records, and/or documents that refer, relate, and/or pertain to the to the above-listed categories.

The deponent is also instructed to bring with him/her the following: (1) any and all communications and/or other documents involving Defendants and relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (2) any and all documents relating to communications between Defendants Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present; (3) any and all documents relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present; (4) any and all documents relating to any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present. (5) any and all documents related to the costs to and/or profits generated from Defendants provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (6) any and all documents regarding any complaints and/or warnings related to the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present whether or not initiated or settled through

4

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

lawsuits, (7) all reports of injuries allegedly arising from the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and (9) any and all other documents relative to or responsive to this Notice of Deposition.

The deponent must also bring with him/her complete copies of all prior deposition transcripts where he/she has offered sworn testimony in cases involving similar or comparable products and/or allegations. The deponent shall also bring a copy of his or her CV or resume. The deposition will continue from day to day until completed.

**KLINE & SPECTER, P.C.**

/s/Tobias L. Millrood

TOBIAS L. MILLROOD, ESQUIRE

***Attorney for Plaintiff***

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

**CERTIFICATE OF SERVICE**

I, Tobias L. Millrood, hereby certify that on the date below, I served a true and correct

copy of the foregoing Notice of Deposition on the following counsel of records:

| | |
|---|---|
| Catherine M. Recker (PA Bar No. 56813)<br>Amy B. Carver (PA Bar No. 84819)<br>Richard D. Walk, III (PA Bar No. 329420)<br>WELSH & RECKER, P.C.<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br>cmrecker@welshrecker.com<br>abcarver@welshrecker.com<br>rwalk@welshrecker.com<br><br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>TUCKER LAW GROUP, LLC<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>kmurphy@tlgattorneys.com<br>holson@tlgattorneys.com<br><br>*Attorneys for Defendant Mead Johnson &*<br>*Company LLC and* Mead Johnson Nutrition<br>Company | James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a*<br>*Pennsylvania Hospital and University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a Penn*<br>*Medicine* |
| Sean P. Fahey, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>3000 Two Logan Square<br>Philadelphia, PA 19103-2799<br>Tel: (215) 981-4296<br>Sean.Fahey@troutman.com<br><br>Ronn E. Fuchs, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>301 Carnegie Center, Suite 400 | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com<br>Jennifer V. Weachter<br>JWeachter@eckertseamans.com |

Certification Due Date: 11/14/2023<br>Response Date: 11/21/2023<br>Case ID: 220302601<br>Control No.: 23111658

| | |
|---|---|
| Princeton, NJ 08540<br>Tel: (609) 951-4184<br>Ronni.Fuchs@troutman.com<br><br>Joseph E. O'Neill<br>Meaghann C. Porth<br>Ryan J. O'Neill<br>CAMPBELL CONROY & O'NEILL, P.C.<br>1205 Westlake Drive, Suite 330<br> Berwyn, PA 19312<br>Tel: (610) 964-1900<br><br><br>John R. Timmer (PA ID No. 89814)<br>SCHNADER HARRISON SEGAL<br>& LEWIS LLIP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103-7286<br>Tel: (215) 751-2309/2451<br>Fax: (215) 751-22-05<br>jtimmer@schnader.com<br><br>Kimberly A. Brown (PA ID No. 56200)<br>JONES DAY<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA 15219<br>Tel: (412) 394-7995<br>Fax: (412) 394-7959<br>kabrown@jonesday.com<br><br><br>*Attorneys for Defendant Abbott Laboratories* | *Attorneys for Defendants Albert Einstein Medical Center a/k/a Einstein Medical Center and Albert Einstein Healthcare Network d/b/a Einstein Healthcare Network* |
| James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLOC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587=1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br> bscicchitano@eckertseamans.com<br>Jennifer V. Weachter<br>JWeachter@eckertseamans.com |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| Attorneys for Defendant, Temple University Health System, Inc., d/b/a Temple University Hospital | Attorney for Defendants, Thomas Jefferson University Hospitals, Inc., d/b/a Thomas Jefferson University Hospital, and Thomas Jefferson University d/b/a Jefferson Health System |
|---|---|

**KLINE & SPECTER, P.C.**

By: _/s/ Tobias L. Millrood_
    Tobias L. Millrood
    1525 Locust Street
    Philadelphia, PA 19102
    Phone: 215-772-1000
    Fax: 215-772-1359
    tobi.millrood@klinespecter.com

Dated: August 17, 2023

*Plaintiff's' Counsel*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| From: | Carol Lippmann |
|---|---|
| To: | jayoung@burnswhite.com; rsmargulies@burnswhite.com; srengle@burnswhite.com |
| Cc: | Tobi Millrood; Melissa Merk; Jack O"Neill; Elizabeth Crawford; Helen Lawless; Ben Whiting; Mark Weinstein; Patrick Sidebotham; Timothy Burke; jayoung@burnswhite.com; rsmargulies@burnswhite.com; srengle@burnswhite.com; dbrooks@eckertseamans.com; Brooke Scicchitano; Jennifer V. Weachter; Sean.Fahey@troutman.com; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com |
| Bcc: | NECPhiladelphiaGeneralZ3453077@klinespecter.filevineapp.com |
| Subject: | NEC Infant Formula Litigation | The Trustees of the University of Pennsylvania d/b/a Penn Medicine |
| Date: | Thursday, August 17, 2023 8:07:00 PM |
| Attachments: | 2023-08-17 Letter to Penn Medecine re NoD.pdf<br>NEC Corp Designee NoD - UPH dba Penn Medicine.pdf |

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The Trustees of the University of Pennsylvania d/b/a Penn Medicine.


Thank you,

**Carol Lippmann**
Litigation Paralegal to Tobi Millrood, Esq.
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
D. (215) 772-1392
F. (215) 792-5502
Carol.lippmann@klinespecter.com
www.klinespecter.com

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# KLINE & SPECTER PC

### ATTORNEYS AT LAW
### 1525 LOCUST STREET
### PHILADELPHIA, PENNSYLVANIA 19102
### WWW.KLINESPECTER.COM

TOBIAS L. MILLROOD                                                  TOBI.MILLROOD@KLINESPECTER.COM

_____

### 215-772-1358
### 800-597-9585
### FAX: 215-792-5502

August 17, 2023

**Via Email Only**
James A. Young, Esquire
Richard S. Margulies, Esquire
Susan R. Engle, Esquire
BURNS WHITE LLC
1880 John F. Kennedy Boulevard, 10th FL
Philadelphia, PA 19103

> Re:  Johnson, et al.. v. Mead Johnson & Company, et al., Case No. 220400162
> McMillian, et al., v. Mead Johnson & Company, et al., Case No. 220400140
> Moment, et al., v. Mead Johnson & Company, et al., Case No.220400142
> Sanders, et al., v. Mead Johnson & Company, et al., Case No. 220400153
> Short, et al., v. Mead Johnson & Company, et al., Case No. 220400159
> Thomas, et al., v. Mead Johnson & Company, et al., Case No.220400158
> Walker-Savage, et al., v. Mead Johnson & Company, et al., Case No. 220400156
> Whitfield, et al., v. Mead Johnson & Company, et al., Case No. 220400145
> Williams, et al., v. Mead Johnson & Company, et al., Case No. 220400141
> Hines, et al., v. Mead Johnson & Company, et al., Case No. 220400136
> Witherspoon, et al., v. Mead Johnson & Company, et al., Case No. 220400138

Dear Counsel:

Attached is a Notice of Video Deposition of the Corporate Designee(s) of Defendant the Trustees of the University of Pennsylvania d/b/a Penn Medicine. This notice applies to the following the following cases pending against the Trustees of the University of Pennsylvania d/b/a Penn Medicine in the infant formula litigation.

- Johnson, et al.. v. Mead Johnson & Company, et al., Case No. 220400162
- McMillian, et al., v. Mead Johnson & Company, et al., Case No. 220400140
- Moment, et al., v. Mead Johnson & Company, et al., Case No.220400142
- Sanders, et al., v. Mead Johnson & Company, et al., Case No. 220400153
- Short, et al., v. Mead Johnson & Company, et al., Case No. 220400159
- Thomas, et al., v. Mead Johnson & Company, et al., Case No.220400158
- Walker-Savage, et al., v. Mead Johnson & Company, et al., Case No. 220400156
- Whitfield, et al., v. Mead Johnson & Company, et al., Case No. 220400145

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Page 2

- Williams, et al., v. Mead Johnson & Company, et al., Case No. 220400141
- Hines, et al., v. Mead Johnson & Company, et al., Case No. 220400136
- Witherspoon, et al., v. Mead Johnson & Company, et al., Case No. 220400138

Very truly yours,

Tobias L. Millrood

Enclosure
cc:      All Counsel of Record (via email only)

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| SHEMIKA JOHNSON, et al., : | |
| Plaintiff, : | APRIL TERM, 2022 |
| v. : | No. 220400162 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
| Defendants. : | |
| CATHERINE McMILLIAN, et al., : | |
| Plaintiff, : | APRIL TERM, 2022 |
| v. : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
| Defendants. : | |
| DAMEKA MOMENT, et al., : | |
| Plaintiff, : | APRIL TERM, 2022 |
| v. : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
| Defendants. : | |
| LOREN SANDERS, et al., : | |
| Plaintiff, : | APRIL TERM, 2022 |
| v. : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
| Defendants. : | |
| SAMAYA SHORT, et al., : | |
| Plaintiff, : | APRIL TERM, 2022 |
| v. : | No. 220400159 |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : |
| NATISHA THOMAS, et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : MARCH TERM, 2022 : No. 220400158 : : : |
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : MARCH TERM, 2022 : No. 220400156 : : : |
| ROBERT WHITFIELD, et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : APRIL TERM, 2022 : No. 220400145 : : : |
| MELVENIA WILLIAMS, et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : APRIL TERM, 2022 : No. 220400141 : : : |
| DELQUAN HINES, et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : APRIL TERM, 2022 : No. 220400136 : : : |
| IVYANN WITHERSPOON, et al., Plaintiff, v. MEAD JOHNSON & COMPANY, LLC, et al., Defendants. | : : APRIL TERM, 2022 : No. 220400138 : : |

**NOTICE OF VIDEO DEPOSITION OF CORPORATE DESIGNEE(S) OF THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE**

TO:    James A. Young, Esquire
       Richard S. Margulies, Esquire
       Susan R. Engle, Esquire
       BURNS WHITE LLC
       1880 John F. Kennedy Boulevard, 10th FL

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Philadelphia, PA 19103

**KINDLY TAKE NOTICE** that Plaintiffs in the above-captioned matter will take the deposition(s) of one or more Corporate Designees of the Trustees of the University of Pennsylvania d/b/a Penn Medicine (collectively, "Defendants") on _____, 2023 at 10:00 a.m. at

_____.

The deposition will be taken before a person duly authorized to administer oaths and will be recorded by video and stenographic means.

Defendants are requested to designate one or more officers, directors, managing agents, or other persons who shall be authorized to testify to matters known or reasonably available to the organization and who is the individual most knowledgeable about the Neonatal Intensive Care Unit at The Pennsylvania Hospital of the University of Pennsylvania Health System from 2002 to the present, and specifically including the following subjects:

1. All policies and procedures relating to premature babies and/or babies in the Neonatal Intensive Care Unit;
2. All policies and procedures relating to the feeding of premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
3. All policies and procedures relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
4. Knowledge of what year donor breast milk became available to mothers of premature babies and/or babies in the Neonatal Intensive Care Unit;
5. All policies and procedures as to when donor breast milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
6. Knowledge of what commercial formula/bovine formula(s) were given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
7. Knowledge of all of Defendants' policies and procedures relating to lactation consultants from 2002 to the present;
8. Knowledge of all policies and procedures pertaining to additional monitoring for premature babies and/or babies in the Neonatal Intensive Care Unit who receive commercial milk/bovine milk from 2002 to the present;
9. Knowledge of any policies and procedures pertaining to consent forms relating to giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;

3

10. Knowledge of any policies and procedures pertaining to consent forms relating to giving donor breast milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;

11. Knowledge of any policies and procedures pertaining to preventing necrotizing enterocolitis from 2002 to the present;

12. Knowledge of when it was known to Defendants that commercial milk/bovine milk can increase the risk of necrotizing enterocolitis from 2002 to the present;

13. Knowledge of any communications received by Defendants from Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present.

14. Knowledge of any communications from Defendants to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present;

15. Knowledge of any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present.

16. Knowledge of the costs to and/or profits generated from Defendants provision of commercial milk/ bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and/or

17. Knowledge of any scholarly, educational, training and/or other materials relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present

Please consider this a request to produce any and all records, and/or documents that refer, relate, and/or pertain to the to the above-listed categories.

The deponent is also instructed to bring with him/her the following: (1) any and all communications and/or other documents involving Defendants and relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (2) any and all documents relating to communications between Defendants Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present; (3) any and all documents relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present; (4) any and all documents relating to any marketing, training, and/or promotional materials

4

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present. (5) any and all documents related to the costs to and/or profits generated from Defendants provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (6) any and all documents regarding any complaints and/or warnings related to the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present whether or not initiated or settled through lawsuits, (7) all reports of injuries allegedly arising from the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and (9) any and all other documents relative to or responsive to this Notice of Deposition.

The deponent must also bring with him/her complete copies of all prior deposition transcripts where he/she has offered sworn testimony in cases involving similar or comparable products and/or allegations. The deponent shall also bring a copy of his or her CV or resume. The deposition will continue from day to day until completed.

**KLINE & SPECTER, P.C.**

/s/Tobias L. Millrood

TOBIAS L. MILLROOD, ESQUIRE

*Attorney for Plaintiff*

5

<u>**CERTIFICATE OF SERVICE**</u>

I, Tobias L. Millrood, hereby certify that on the date below, I served a true and correct

copy of the foregoing Notice of Deposition on the following counsel of records:

| | |
|---|---|
| Catherine M. Recker (PA Bar No. 56813)<br>Amy B. Carver (PA Bar No. 84819)<br>Richard D. Walk, III (PA Bar No. 329420)<br>WELSH & RECKER, P.C.<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br>cmrecker@welshrecker.com<br>abcarver@welshrecker.com<br>rwalk@welshrecker.com<br><br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>TUCKER LAW GROUP, LLC<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>kmurphy@tlgattorneys.com<br>holson@tlgattorneys.com<br><br><br>*Attorneys for Defendant Mead Johnson &*<br>*Company LLC and* Mead Johnson Nutrition<br>Company | James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a*<br>*Pennsylvania Hospital and University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a Penn*<br>*Medicine* |
| Sean P. Fahey, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>3000 Two Logan Square<br>Philadelphia, PA 19103-2799<br>Tel: (215) 981-4296<br>Sean.Fahey@troutman.com<br><br>Ronn E. Fuchs, Esquire | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com |

Certification Due Date: 11/14/2023<br>Response Date: 11/21/2023<br>Case ID: 220302601<br>Control No.: 23111658

| | |
|---|---|
| TROUTMAN PEPPER HAMILTON SANDERS LLP<br>301 Carnegie Center, Suite 400<br>Princeton, NJ 08540<br>Tel: (609) 951-4184<br>Ronni.Fuchs@troutman.com<br><br>Joseph E. O'Neill<br>Meaghann C. Porth<br>Ryan J. O'Neill<br>CAMPBELL CONROY & O'NEILL, P.C.<br>1205 Westlake Drive, Suite 330<br>Berwyn, PA 19312<br>Tel: (610) 964-1900<br><br><br>John R. Timmer (PA ID No. 89814)<br>SCHNADER HARRISON SEGAL<br>& LEWIS LLIP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103-7286<br>Tel: (215) 751-2309/2451<br>Fax: (215) 751-22-05<br>jtimmer@schnader.com<br><br>Kimberly A. Brown (PA ID No. 56200)<br>JONES DAY<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA 15219<br>Tel: (412) 394-7995<br>Fax: (412) 394-7959<br>kabrown@jonesday.com<br><br><br>*Attorneys for Defendant Abbott Laboratories* | Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorneys for Defendants Albert Einstein Medical Center a/k/a Einstein Medical Center and Albert Einstein Healthcare Network d/b/a Einstein Healthcare Network* |
| James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLOC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587=1625/1628/1669<br>jayoung@burnswhite.com | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant, Temple University Health System, Inc., d/b/a Temple University Hospital* | Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorney for Defendants, Thomas Jefferson University Hospitals, Inc., d/b/a Thomas Jefferson University Hospital, and Thomas Jefferson University d/b/a Jefferson Health System* |
|---|---|

**KLINE & SPECTER, P.C.**

By: */s/ Tobias L. Millrood*
    Tobias L. Millrood
    1525 Locust Street
    Philadelphia, PA 19102
    Phone: 215-772-1000
    Fax: 215-772-1359
    tobi.millrood@klinespecter.com

Dated: August 17, 2023          *Plaintiff's Counsel*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# EXHIBIT B



Filed and Attested by the
Office of Judicial Records
07 NOV 2023 11:38 am
N. SWEENEY

| | |
|---|---|
| **From:** | Elizabeth Crawford |
| **To:** | Carol Lippmann; jayoung; rsmargulies; srengle@burnswhite.com |
| **Cc:** | Tobi Millrood; Melissa Merk; Timothy Burke; Jack O''Neill; Patrick Sidebotham; Ben Whiting; Mark Weinstein; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; Sean.Fahey; Donald J. Brooks Jr.; Brooke Scicchitano; Jennifer V. Weachter |
| **Subject:** | Re: NEC Infant Formula Litigation | The Pennsylvania Health System d/b/a Pennsylvania |
| **Date:** | Wednesday, September 27, 2023 11:57:25 AM |

Counsel: Following up on dates for our notice of deposition of the corporate designee(s) of the Pennsylvania Health System. Please provide dates at your earliest opportunity. Thank you.

**Elizabeth A. Crawford, Esquire**

*Partner*

Kline & Specter

1525 Locust Street

Philadelphia, PA 19102

P: 215-792-5619

E: Elizabeth.Crawford@klinespecter.com

W: www.klinespecter.com/elizabethcrawford

---

**From:** Carol Lippmann <Carol.Lippmann@klinespecter.com>
**Sent:** Thursday, August 17, 2023 8:09 PM
**To:** jayoung <jayoung@burnswhite.com>; rsmargulies <rsmargulies@burnswhite.com>; srengle@burnswhite.com <srengle@burnswhite.com>
**Cc:** Tobi Millrood <Tobi.Millrood@klinespecter.com>; Melissa Merk <Melissa.Merk@klinespecter.com>; Timothy Burke <Timothy.Burke@klinespecter.com>; Elizabeth Crawford <Elizabeth.Crawford@KlineSpecter.com>; Jack O'Neill <Jack.ONeill@klinespecter.com>; Patrick Sidebotham <Patrick.Sidebotham@klinespecter.com>; Ben Whiting <ben.whiting@kellerpostman.com>; Mark Weinstein <mark.weinstein@kellerpostman.com>; cmrecker@welshrecker.com <cmrecker@welshrecker.com>; abcarver@welshrecker.com <abcarver@welshrecker.com>; rwalk@welshrecker.com <rwalk@welshrecker.com>; kmurphy@tlgattorneys.com <kmurphy@tlgattorneys.com>; holson@tlgattorneys.com <holson@tlgattorneys.com>; Sean.Fahey <Sean.Fahey@Troutman.com>; Donald J. Brooks Jr. <dbrooks@eckertseamans.com>; Brooke Scicchitano <bscicchitano@eckertseamans.com>; Jennifer V. Weachter <JWeachter@eckertseamans.com>
**Subject:** NEC Infant Formula Litigation | The Pennsylvania Health System d/b/a Pennsylvania Hospital

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The The Pennsylvania Health System d/b/a Pennsylvania Hospital.

Thank you,

**Carol Lippmann**

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Litigation Paralegal to Tobi Millrood, Esq.
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
D. (215) 772-1392
F. (215) 792-5502
Carol.lippmann@klinespecter.com
www.klinespecter.com

| | |
|---|---|
| **From:** | Elizabeth Crawford |
| **To:** | Carol Lippmann; jayoung; rsmargulies; srengle@burnswhite.com |
| **Cc:** | Tobi Millrood; Melissa Merk; Jack O'Neill; Helen Lawless; Ben Whiting; Mark Weinstein; Patrick Sidebotham; Timothy Burke; Donald J. Brooks Jr.; Brooke Scicchitano; Jennifer V. Weachter; Sean.Fahey; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com |
| **Subject:** | Re: NEC Infant Formula Litigation \| The Trustees of the University of Pennsylvania d/b/a Penn Medicine |
| **Date:** | Wednesday, September 27, 2023 11:58:03 AM |

Counsel: Following up on dates for our notice of deposition of the corporate designee(s) of Penn Medicine. Please provide dates at your earliest opportunity. Thank you.

**Elizabeth A. Crawford, Esquire**

*Partner*

KLINE & SPECTER

1525 LOCUST STREET

PHILADELPHIA, PA 19102

P: 215-792-5619

E: ELIZABETH.CRAWFORD@KLINESPECTER.COM

W: WWW.KLINESPECTER.COM/ELIZABETHCRAWFORD

---

**From:** Carol Lippmann <Carol.Lippmann@klinespecter.com>
**Sent:** Thursday, August 17, 2023 8:07 PM
**To:** jayoung <jayoung@burnswhite.com>; rsmargulies <rsmargulies@burnswhite.com>; srengle@burnswhite.com <srengle@burnswhite.com>
**Cc:** Tobi Millrood <Tobi.Millrood@klinespecter.com>; Melissa Merk <Melissa.Merk@klinespecter.com>; Jack O'Neill <Jack.ONeill@klinespecter.com>; Elizabeth Crawford <Elizabeth.Crawford@KlineSpecter.com>; Helen Lawless <Helen.Lawless@klinespecter.com>; Ben Whiting <ben.whiting@kellerpostman.com>; Mark Weinstein <mark.weinstein@kellerpostman.com>; Patrick Sidebotham <Patrick.Sidebotham@klinespecter.com>; Timothy Burke <Timothy.Burke@klinespecter.com>; jayoung <jayoung@burnswhite.com>; rsmargulies <rsmargulies@burnswhite.com>; srengle@burnswhite.com <srengle@burnswhite.com>; Donald J. Brooks Jr. <dbrooks@eckertseamans.com>; Brooke Scicchitano <bscicchitano@eckertseamans.com>; Jennifer V. Weachter <JWeachter@eckertseamans.com>; Sean.Fahey <Sean.Fahey@Troutman.com>; kmurphy@tlgattorneys.com <kmurphy@tlgattorneys.com>; holson@tlgattorneys.com <holson@tlgattorneys.com>; cmrecker@welshrecker.com <cmrecker@welshrecker.com>; abcarver@welshrecker.com <abcarver@welshrecker.com>; rwalk@welshrecker.com <rwalk@welshrecker.com>
**Subject:** NEC Infant Formula Litigation \| The Trustees of the University of Pennsylvania d/b/a Penn Medicine

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The Trustees of the University of Pennsylvania d/b/a Penn Medicine.

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Thank you,

**Carol Lippmann**
Litigation Paralegal to Tobi Millrood, Esq.
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
D. (215) 772-1392
F. (215) 792-5502
Carol.lippmann@klinespecter.com
www.klinespecter.com

# EXHIBIT C



*Filed and Attested by the
Office of Judicial Records
07 NOV 2023 11:38 am
N. SWEENEY*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| From: | Amanda Bee |
| To: | jayoung; rsmargulies; srengle@burnswhite.com |
| Cc: | Tobi Millrood; Timothy Burke; Elizabeth Crawford; Melissa Merk; Philip Pasquarello; Helen Lawless; Jack O"Neill; Patrick Sidebotham; ben.whiting@kellerpostman.com; mark.weinstein@kellerpostman.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; Sean.Fahey; Donald J. Brooks Jr.; bscicchitano@eckertseamans.com; Jennifer V. Weachter; Carol Lippmann |
| Subject: | NEC Infant Formula Litigation | The Pennsylvania Health System d/b/a Pennsylvania Hospital |
| Date: | Wednesday, October 11, 2023 3:33:41 PM |
| Attachments: | NEC Corp Designee NoD - UPH dba Penn Hospital 10.11.23.pdf<br>2023-10-11 Letter to Penn Hospital re NoD.pdf |

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The Pennsylvania Health System d/b/a Pennsylvania Hospital.

Thank you,

**Amanda L. Bee**
Legal Assistant to Jack O'Neill, Esquire and Richard Gorman, Esquire
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
215.772.1000
215.772.0563 direct dial
www.klinespecter.com

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# KLINE & SPECTER PC

**ATTORNEYS AT LAW**
**1525 LOCUST STREET**
**PHILADELPHIA, PENNSYLVANIA 19102**
**WWW.KLINESPECTER.COM**

TOBIAS L. MILLROOD                                        TOBI.MILLROOD@KLINESPECTER.COM

215-772-1358

800-597-9585

FAX: 215-792-5502

October 11, 2023

**Via Email Only**
James A. Young, Esquire
Richard S. Margulies, Esquire
Susan R. Engle, Esquire
BURNS WHITE LLC
1880 John F. Kennedy Boulevard, 10th FL
Philadelphia, PA 19103

Re:     Abdullah, et al.. v. Mead Johnson & Company, et al., Case No. 2203025832
Carter, et al., v. Mead Johnson & Company, et al., Case No. 220302588
Drayton et al., v. Mead Johnson & Company, et al., Case No.220302594
Stills, et al., v. Mead Johnson & Company, et al., Case No. 220302617
Taylor, et al., v. Mead Johnson & Company, et al., Case No. 220302606
Wieger, et al., v. Mead Johnson & Company, et al., Case No.220302614
Wieger, et al., v. Mead Johnson & Company, et al., Case No. 220302601
Henderson, et al., v. Mead Johnson & Company, et al., Case No. 220400127

Dear Counsel:

Attached is a Notice of Video Deposition of the Corporate Designee(s) of Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital. This notice applies to the following the following cases pending against The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital in the infant formula litigation.

- Abdullah, et al.. v. Mead Johnson & Company, et al., Case No. 2203025832
- Carter, et al., v. Mead Johnson & Company, et al., Case No. 220302588
- Drayton et al., v. Mead Johnson & Company, et al., Case No.220302594
- Stills, et al., v. Mead Johnson & Company, et al., Case No. 220302617
- Taylor, et al., v. Mead Johnson & Company, et al., Case No. 220302606
- Wieger, et al., v. Mead Johnson & Company, et al., Case No.220302614
- Wieger, et al., v. Mead Johnson & Company, et al., Case No. 220302601
- Henderson, et al., v. Mead Johnson & Company, et al., Case No. 220400127

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Page 2

Very truly yours,

Tobias L. Millrood

Enclosure
cc:     All Counsel of Record (via email only)

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| TERRAINE ABDULLAH, et al., : | |
|        Plaintiff, : | MARCH TERM, 2022 |
|     v. : | No. 220302583 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
|        Defendants. : | |
| HOLLI CARTER, et al., : | |
|        Plaintiff, : | MARCH TERM, 2022 |
|     v. : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
|        Defendants. : | |
| SHONDERA DRAYTON, et al., : | |
|        Plaintiff, : | MARCH TERM, 2022 |
|     v. : | No. 220302594 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
|        Defendants. : | |
| ALICE STILLS, et al., : | |
|        Plaintiff, : | MARCH TERM, 2022 |
|     v. : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., : | |
|        Defendants. : | |
| CHRISTINA TAYLOR, et al., : | |
|        Plaintiff, : | MARCH TERM, 2022 |
|     v. : | No. 220302606 |

1

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : |
| GINA WIEGER, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : <br> : MARCH TERM, 2022 <br> : No. 220302614 <br> : <br> : |
| GINA WIEGER, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : <br> : MARCH TERM, 2022 <br> : No. 220302601 <br> : <br> : |
| JANEE HENDERSON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : <br> : APRIL TERM, 2022 <br> : No. 220400127 <br> : <br> : |

**NOTICE OF VIDEO DEPOSITION OF CORPORATE DESIGNEE(S) OF THE
PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA
HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL**

TO: James A. Young, Esquire
Burns White LLC
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103

    **KINDLY TAKE NOTICE** that Plaintiffs in the above-captioned matter will take

the deposition(s) of one or more Corporate Designees of The Pennsylvania Hospital of

the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively,

"Defendants") on November 1, 2023 at 10:00 a.m. at the office of Kline & Specter, P.C. at 1525

Locust Street, Philadelphia, PA 19102.

    The deposition will be taken before a person duly authorized to administer oaths and

will be recorded by video and stenographic means.

    Defendants are requested to designate one or more officers, directors, managing agents, or

<div align="center">2</div>

other persons who shall be authorized to testify to matters known or reasonably available to the

organization and who is the individual most knowledgeable about the Neonatal Intensive Care

Unit at The Pennsylvania Hospital of the University of Pennsylvania Health System from 2002

to the present, and specifically including the following subjects:

1. All policies and procedures relating to premature babies and/or babies in the Neonatal Intensive Care Unit;
2. All policies and procedures relating to the feeding of premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
3. All policies and procedures relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
4. Knowledge of what year donor breast milk became available to mothers of premature babies and/or babies in the Neonatal Intensive Care Unit;
5. All policies and procedures as to when donor breast milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
6. Knowledge of what commercial formula/bovine formula(s) were given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
7. Knowledge of all of Defendants' policies and procedures relating to lactation consultants from 2002 to the present;
8. Knowledge of all policies and procedures pertaining to additional monitoring for premature babies and/or babies in the Neonatal Intensive Care Unit who receive commercial milk/bovine milk from 2002 to the present;
9. Knowledge of any policies and procedures pertaining to consent forms relating to giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
10. Knowledge of any policies and procedures pertaining to consent forms relating to giving donor breast milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
11. Knowledge of any policies and procedures pertaining to preventing necrotizing enterocolitis from 2002 to the present;
12. Knowledge of when it was known to Defendants that commercial milk/bovine milk can increase the risk of necrotizing enterocolitis from 2002 to the present;
13. Knowledge of any communications received by Defendants from Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present.
14. Knowledge of any communications from Defendants to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present;
15. Knowledge of any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present.

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

16. Knowledge of the costs to and/or profits generated from Defendants provision of commercial milk/ bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and/or

17. Knowledge of any scholarly, educational, training and/or other materials relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present

Please consider this a request to produce any and all records, and/or documents that refer, relate, and/or pertain to the to the above-listed categories.

The deponent is also instructed to bring with him/her the following: (1) any and all communications and/or other documents involving Defendants and relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (2) any and all documents relating to communications between Defendants Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present; (3) any and all documents relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present; (4) any and all documents relating to any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present. (5) any and all documents related to the costs to and/or profits generated from Defendants provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (6) any and all documents regarding any complaints and/or warnings related to the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present whether or not initiated or settled through

4

lawsuits, (7) all reports of injuries allegedly arising from the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and (9) any and all other documents relative to or responsive to this Notice of Deposition.

The deponent must also bring with him/her complete copies of all prior deposition transcripts where he/she has offered sworn testimony in cases involving similar or comparable products and/or allegations. The deponent shall also bring a copy of his or her CV or resume. The deposition will continue from day to day until completed.

**KLINE & SPECTER, P.C.**

TOBIAS L. MILLROOD, ESQUIRE

*Attorney for Plaintiff*

5

<u>**CERTIFICATE OF SERVICE**</u>

     I, Tobias L. Millrood, hereby certify that on the date below, I served a true and correct

copy of the foregoing Notice of Deposition on the following counsel of records:

| | |
|---|---|
| Catherine M. Recker (PA Bar No. 56813)<br>Amy B. Carver (PA Bar No. 84819)<br>Richard D. Walk, III (PA Bar No. 329420)<br>WELSH & RECKER, P.C.<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br>cmrecker@welshrecker.com<br>abcarver@welshrecker.com<br>rwalk@welshrecker.com<br><br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>TUCKER LAW GROUP, LLC<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>kmurphy@tlgattorneys.com<br>holson@tlgattorneys.com<br><br><br>*Attorneys for Defendant Mead Johnson &*<br>*Company LLC and* Mead Johnson Nutrition<br>Company | James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a*<br>*Pennsylvania Hospital and University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a Penn*<br>*Medicine*<br><br>Kathleen M. Kramer, Esquire<br>Gabor Ovari, Esquire<br>MARSHALL DENNEHEY, P.C.<br>2000 Market Street, Suite 2300<br>Philadelphia, PA 19103<br>Tel: (215) 575-2600<br>kmkramer@mdwcg.com<br>ggovari@mdwcg.com<br><br>*Attorneys for Defendant, The Trustees of the*<br>*University of Pennsylvania d/b/a The*<br>*Hospital of the University of Pennsylvania* |
| Sean P. Fahey, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>3000 Two Logan Square | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place |

6

Certification Due Date: 11/14/2023<br>Response Date: 11/21/2023<br>Case ID: 220302601<br>Control No.: 23111658

| | |
|---|---|
| Philadelphia, PA 19103-2799<br>Tel: (215) 981-4296<br>Sean.Fahey@troutman.com<br><br>Ronn E. Fuchs, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>301 Carnegie Center, Suite 400<br>Princeton, NJ 08540<br>Tel: (609) 951-4184<br>Ronni.Fuchs@troutman.com<br>Noel.Ix@Troutman.com<br>Christopher.Brolley@troutman.com;<br>Brett.Broczkowski@troutman.com<br><br>Joseph E. O'Neill<br>Meaghann C. Porth<br>Ryan J. O'Neill<br>CAMPBELL CONROY & O'NEILL, P.C.<br>1205 Westlake Drive, Suite 330<br>Berwyn, PA 19312<br>Tel: (610) 964-1900<br>joneil@campbelltriallawyers.com<br>mporth@campbelltriallawyers.com<br>roneil@campbelltriallawyers.com<br><br>Margues Hillman Richeson, Esquire<br>JONES DAY<br>901 Lakeside Avenue<br>North Point<br>Cleveland, Ohio 44114<br>Tel: (216) 586-7195<br>mhricheson@jonesday.com<br><br>Jennifer B. Flannery, Esquire<br>Attorney ID No. 75546<br>JONES DAY<br>1221 Peachtree Street, N.E., Suite 400<br>Atlanta, GE 30361<br>Tel: (404) 581-8008<br>jbflannery@jonesday.com<br><br><br>*Attorneys for Defendant Abbott Laboratories* | 50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com<br>Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorneys for Defendants Albert Einstein Medical Center a/k/a Einstein Medical Center and Albert Einstein Healthcare Network d/b/a Einstein Healthcare Network* |
| James A. Young, Esquire | Donald J. Brooks, Jr., Esquire |

7

| | |
|---|---|
| Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLOC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587=1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant, Temple University<br>Health System, Inc., d/b/a Temple University<br>Hospital* | Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com<br>Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorney for Defendants, Thomas Jefferson<br>University Hospitals, Inc., d/b/a Thomas<br>Jefferson University Hospital, and Thomas<br>Jefferson University d/b/a Jefferson Health<br>System* |

**KLINE & SPECTER, P.C.**

By: _____

Tobias L. Millrood
1525 Locust Street
Philadelphia, PA 19102
Phone: 215-772-1000
Fax: 215-772-1359
tobi.millrood@klinespecter.com

Dated: October 11, 2023                    *Plaintiff's' Counsel*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| **From:** | Amanda Bee |
| **To:** | jayoung; rsmargulies; srengle@burnswhite.com |
| **Cc:** | Tobi Millrood; Timothy Burke; Elizabeth Crawford; Melissa Merk; Helen Lawless; Philip Pasquarello; Jack O"Neill; Patrick Sidebotham; Donald J. Brooks Jr.; ben.whiting@kellerpostman.com; mark.weinstein@kellerpostman.com; bsicchitano@eckertseamans.com; Jennifer V. Weachter; Sean.Fahey; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; Carol Lippmann |
| **Subject:** | NEC Infant Formula Litigation \| The Trustees of the University of Pennsylvania d/b/a Penn Medicine |
| **Date:** | Wednesday, October 11, 2023 3:33:38 PM |
| **Attachments:** | 2023-10-11 Letter to Penn Medecine re NoD.pdf |
| | NEC Corp Designee NoD - UPH dba Penn Medicine 10.11.23.pdf |
| | 2023-10-11 Letter to Penn Medecine re NoD.pdf |
| | NEC Corp Designee NoD - UPH dba Penn Medicine 10.11.23.pdf |

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The Trustees of the University of Pennsylvania d/b/a Penn Medicine.

  Thank you,

**Amanda L. Bee**
Legal Assistant to Jack O'Neill, Esquire and Richard Gorman, Esquire
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
215.772.1000
215.772.0563 direct dial
www.klinespecter.com

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# KLINE & SPECTER PC

### ATTORNEYS AT LAW
### 1525 LOCUST STREET
### PHILADELPHIA, PENNSYLVANIA 19102
### WWW.KLINESPECTER.COM

TOBIAS L. MILLROOD                                           TOBI.MILLROOD@KLINESPECTER.COM

_____

### 215-772-1358
### 800-597-9585
### FAX: 215-792-5502

October 11, 2023

**Via Email Only**
James A. Young, Esquire
Richard S. Margulies, Esquire
Susan R. Engle, Esquire
BURNS WHITE LLC
1880 John F. Kennedy Boulevard, 10th FL
Philadelphia, PA 19103

Re:    Johnson, et al.. v. Mead Johnson & Company, et al., Case No. 220400162
McMillian, et al., v. Mead Johnson & Company, et al., Case No. 220400140
Moment, et al., v. Mead Johnson & Company, et al., Case No.220400142
Sanders, et al., v. Mead Johnson & Company, et al., Case No. 220400153
Short, et al., v. Mead Johnson & Company, et al., Case No. 220400159
Thomas, et al., v. Mead Johnson & Company, et al., Case No.220400158
Walker-Savage, et al., v. Mead Johnson & Company, et al., Case No. 220400156
Whitfield, et al., v. Mead Johnson & Company, et al., Case No. 220400145
Williams, et al., v. Mead Johnson & Company, et al., Case No. 220400141
Hines, et al., v. Mead Johnson & Company, et al., Case No. 220400136
Witherspoon, et al., v. Mead Johnson & Company, et al., Case No. 220400138

Dear Counsel:

Attached is a Notice of Video Deposition of the Corporate Designee(s) of Defendant the Trustees of the University of Pennsylvania d/b/a Penn Medicine. This notice applies to the following the following cases pending against the Trustees of the University of Pennsylvania d/b/a Penn Medicine in the infant formula litigation.

- Johnson, et al.. v. Mead Johnson & Company, et al., Case No. 220400162
- McMillian, et al., v. Mead Johnson & Company, et al., Case No. 220400140
- Moment, et al., v. Mead Johnson & Company, et al., Case No.220400142
- Sanders, et al., v. Mead Johnson & Company, et al., Case No. 220400153
- Short, et al., v. Mead Johnson & Company, et al., Case No. 220400159
- Thomas, et al., v. Mead Johnson & Company, et al., Case No.220400158
- Walker-Savage, et al., v. Mead Johnson & Company, et al., Case No. 220400156
- Whitfield, et al., v. Mead Johnson & Company, et al., Case No. 220400145

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Page 2

- Williams, et al., v. Mead Johnson & Company, et al., Case No. 220400141
- Hines, et al., v. Mead Johnson & Company, et al., Case No. 220400136
- Witherspoon, et al., v. Mead Johnson & Company, et al., Case No. 220400138

Very truly yours,

Tobias L. Millrood

Enclosure
cc:     All Counsel of Record (via email only)

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. No.320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.
Attorneys for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | | |
|---|---|---|
| SHEMIKA JOHNSON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400162 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| CATHERINE McMILLIAN, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| DAMEKA MOMENT, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| LOREN SANDERS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| SAMAYA SHORT, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |

1

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: |

| | |
|---|---|
| NATISHA THOMAS, et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220400158<br>:<br>: |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON<br>ISAIAH SAVAGE, JR., et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220400156<br>:<br>:<br>: |

| | |
|---|---|
| ROBERT WHITFIELD, et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400145<br>:<br>: |

| | |
|---|---|
| MELVENIA WILLIAMS, et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400141<br>:<br>: |

| | |
|---|---|
| DELQUAN HINES, et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400136<br>:<br>: |

| | |
|---|---|
| IVYANN WITHERSPOON, et al.,<br>            Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>            Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400138<br>:<br>: |

**NOTICE OF VIDEO DEPOSITION OF CORPORATE DESIGNEE(S) OF THE**
**TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE**

TO:    James A. Young, Esquire
      Richard S. Margulies, Esquire
      Susan R. Engle, Esquire
      BURNS WHITE LLC
      1880 John F. Kennedy Boulevard, 10th FL

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

Philadelphia, PA 19103

**KINDLY TAKE NOTICE** that Plaintiffs in the above-captioned matter will take the deposition(s) of one or more Corporate Designees of the Trustees of the University of Pennsylvania d/b/a Penn Medicine (collectively, "Defendants") on November 1, 2023 at 10:00 a.m. at the office of Kline & Specter, P.C. at 1525 Locust Street, Philadelphia, PA 19102.

The deposition will be taken before a person duly authorized to administer oaths and will be recorded by video and stenographic means.

Defendants are requested to designate one or more officers, directors, managing agents, or other persons who shall be authorized to testify to matters known or reasonably available to the organization and who is the individual most knowledgeable about the Neonatal Intensive Care Unit at The Pennsylvania Hospital of the University of Pennsylvania Health System from 2002 to the present, and specifically including the following subjects:

1. All policies and procedures relating to premature babies and/or babies in the Neonatal Intensive Care Unit;
2. All policies and procedures relating to the feeding of premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
3. All policies and procedures relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
4. Knowledge of what year donor breast milk became available to mothers of premature babies and/or babies in the Neonatal Intensive Care Unit;
5. All policies and procedures as to when donor breast milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
6. Knowledge of what commercial formula/bovine formula(s) were given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;
7. Knowledge of all of Defendants' policies and procedures relating to lactation consultants from 2002 to the present;
8. Knowledge of all policies and procedures pertaining to additional monitoring for premature babies and/or babies in the Neonatal Intensive Care Unit who receive commercial milk/bovine milk from 2002 to the present;
9. Knowledge of any policies and procedures pertaining to consent forms relating to giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;

3

10. Knowledge of any policies and procedures pertaining to consent forms relating to giving donor breast milk to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present;

11. Knowledge of any policies and procedures pertaining to preventing necrotizing enterocolitis from 2002 to the present;

12. Knowledge of when it was known to Defendants that commercial milk/bovine milk can increase the risk of necrotizing enterocolitis from 2002 to the present;

13. Knowledge of any communications received by Defendants from Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present.

14. Knowledge of any communications from Defendants to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present;

15. Knowledge of any marketing, training, and/or promotional materials relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present.

16. Knowledge of the costs to and/or profits generated from Defendants provision of commercial milk/ bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and/or

17. Knowledge of any scholarly, educational, training and/or other materials relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present

Please consider this a request to produce any and all records, and/or documents that refer, relate, and/or pertain to the to the above-listed categories.

The deponent is also instructed to bring with him/her the following: (1) any and all communications and/or other documents involving Defendants and relating to when commercial milk/bovine milk should be given to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (2) any and all documents relating to communications between Defendants Mead Johnson and Company LLC, Mead Johnson Nutrition Company, and/or Abbott Laboratories from 2002 to the present; (3) any and all documents relating to the dangers of giving commercial milk/bovine milk to premature babies and/or babies in the Neonatal Intensive Care Unit that were in the possession of Defendants from 2002 to the present; (4) any and all documents relating to any marketing, training, and/or promotional materials

4

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

relating to Mead Johnson and Company LLC, Mead Johnson Nutrition Company, Abbott Laboratories and/or any products marketed, manufactured, and/or sold by same that were in the possession of Defendants from 2002 to the present. (5) any and all documents related to the costs to and/or profits generated from Defendants provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; (6) any and all documents regarding any complaints and/or warnings related to the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present whether or not initiated or settled through lawsuits, (7) all reports of injuries allegedly arising from the provision of commercial milk/bovine formula(s) to premature babies and/or babies in the Neonatal Intensive Care Unit from 2002 to the present; and (9) any and all other documents relative to or responsive to this Notice of Deposition.

The deponent must also bring with him/her complete copies of all prior deposition transcripts where he/she has offered sworn testimony in cases involving similar or comparable products and/or allegations. The deponent shall also bring a copy of his or her CV or resume. The deposition will continue from day to day until completed.

**KLINE & SPECTER, P.C.**

**TOBIAS L. MILLROOD, ESQUIRE**

*Attorney for Plaintiff*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

## CERTIFICATE OF SERVICE

I, Tobias L. Millrood, hereby certify that on the date below, I served a true and correct

copy of the foregoing Notice of Deposition on the following counsel of records:

| | |
|---|---|
| Catherine M. Recker (PA Bar No. 56813)<br>Amy B. Carver (PA Bar No. 84819)<br>Richard D. Walk, III (PA Bar No. 329420)<br>WELSH & RECKER, P.C.<br>306 Walnut Street<br>Philadelphia, PA 19106<br>Tel: (215) 972-6430<br>cmrecker@welshrecker.com<br>abcarver@welshrecker.com<br>rwalk@welshrecker.com<br><br>Kenneth A. Murphy, Esquire<br>Heather R. Olson, Esquire<br>TUCKER LAW GROUP, LLC<br>Ten Penn Center<br>1801 Market Street, Suite 2500<br>Philadelphia, PA 19103<br>kmurphy@tlgattorneys.com<br>holson@tlgattorneys.com<br><br><br>*Attorneys for Defendant Mead Johnson &*<br>*Company LLC and* Mead Johnson Nutrition<br>Company | James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587-1625/1628/1669<br>jayoung@burnswhite.com<br>rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a*<br>*Pennsylvania Hospital and University of*<br>*Pennsylvania Hospital of the University of*<br>*Pennsylvania Health System d/b/a Penn*<br>*Medicine* |
| Sean P. Fahey, Esquire<br>TROUTMAN PEPPER HAMILTON<br>SANDERS LLP<br>3000 Two Logan Square<br>Philadelphia, PA 19103-2799<br>Tel: (215) 981-4296<br>Sean.Fahey@troutman.com<br><br>Ronn E. Fuchs, Esquire | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| TROUTMAN PEPPER HAMILTON SANDERS LLP<br>301 Carnegie Center, Suite 400<br>Princeton, NJ 08540<br>Tel: (609) 951-4184<br>Ronni.Fuchs@troutman.com<br><br>Joseph E. O'Neill<br>Meaghann C. Porth<br>Ryan J. O'Neill<br>CAMPBELL CONROY & O'NEILL, P.C.<br>1205 Westlake Drive, Suite 330<br>Berwyn, PA 19312<br>Tel: (610) 964-1900<br><br><br>John R. Timmer (PA ID No. 89814)<br>SCHNADER HARRISON SEGAL<br>& LEWIS LLIP<br>1600 Market Street, Suite 3600<br>Philadelphia, PA 19103-7286<br>Tel: (215) 751-2309/2451<br>Fax: (215) 751-22-05<br>jtimmer@schnader.com<br><br>Kimberly A. Brown (PA ID No. 56200)<br>JONES DAY<br>500 Grant Street, Suite 4500<br>Pittsburgh, PA 15219<br>Tel: (412) 394-7995<br>Fax: (412) 394-7959<br>kabrown@jonesday.com<br><br><br>*Attorneys for Defendant Abbott Laboratories* | Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorneys for Defendants Albert Einstein Medical Center a/k/a Einstein Medical Center and Albert Einstein Healthcare Network d/b/a Einstein Healthcare Network* |
| James A. Young, Esquire<br>Richard S. Margulies, Esquire<br>Susan R. Engle, Esquire<br>BURNS WHITE LLOC<br>Attorney ID Nos. 00213/62306/81671<br>1880 John F. Kennedy Boulevard, 10th FL<br>Philadelphia, PA 19103<br>Tel: (215) 587=1625/1628/1669<br>jayoung@burnswhite.com | Donald J. Brooks, Jr., Esquire<br>Brooke A. Scicchitano, Esquire<br>ECKERT SEAMANS CHERIN & MELOTT<br>Two Liberty Place<br>50 South 16th Street, 22nd Floor<br>Philadelphia, PA 19102<br>Tel: (215) 851-8400<br>dbrooks@eckertseamans.com<br>bscicchitano@eckertseamans.com |

7

| | |
|---|---|
| rsmargulies@burnswhite.com<br>srengle@burnswhite.com<br><br>*Attorneys for Defendant, Temple University Health System, Inc., d/b/a Temple University Hospital* | Jennifer V. Weachter<br>JWeachter@eckertseamans.com<br><br>*Attorney for Defendants, Thomas Jefferson University Hospitals, Inc., d/b/a Thomas Jefferson University Hospital, and Thomas Jefferson University d/b/a Jefferson Health System* |

**KLINE & SPECTER,**

**P.C.** By: _____

Tobias L. Millrood
1525 Locust Street
Philadelphia, PA 19102
Phone: 215-772-1000
Fax: 215-772-1359
tobi.millrood@klinespecter.com

Dated: October 11, 2023                    *Plaintiff's' Counsel*

8

# EXHIBIT D



*Filed and Attested by the*
*Office of Judicial Records*
*07 NOV 2023 11:38 am*
*N. SWEENEY*

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

| | |
|---|---|
| **From:** | Engle, Susan R. |
| **To:** | Amanda Bee; jayoung; rsmargulies |
| **Cc:** | Tobi Millrood; Timothy Burke; Elizabeth Crawford; Melissa Merk; Helen Lawless; Philip Pasquarello; Jack O"Neill; Patrick Sidebotham; Donald J. Brooks Jr.; ben.whiting@kellerpostman.com; mark.weinstein@kellerpostman.com; bscicchitano@eckertseamans.com; Jennifer V. Weachter; Sean.Fahey; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; Carol Lippmann |
| **Subject:** | RE: NEC Infant Formula Litigation | The Trustees of the University of Pennsylvania d/b/a Penn Medicine |
| **Date:** | Monday, October 30, 2023 1:17:02 PM |
| **Attachments:** | image569267.PNG |
| | image5c0afc.PNG |

Good afternoon all,

We are in receipt corporate designee notices to our clients unilaterally scheduling depositions for November 1, 2023. We write to advise that we will not be able to produce corporate designees on behalf of our clients on that date, but we are working diligently to obtain the information requested via discovery and the corporate designee notices and will be in contact regarding promptly rescheduling these depositions. Please feel to reach out with any questions or concerns.

Best,

Susan Engle

## Susan R. Engle, Esq.
**Member**



1880 John F. Kennedy Boulevard, 10th Floor · Philadelphia, PA 19103
215-587-1669 (O) · 215-587-1699 (F)
srengle@burnswhite.com · burnswhite.com



**From:** Amanda Bee <Amanda.Bee@klinespecter.com>
**Sent:** Wednesday, October 11, 2023 3:34 PM
**To:** Young, James A. <jayoung@burnswhite.com>; Margulies, Richard S. <rsmargulies@burnswhite.com>; Engle, Susan R. <srengle@burnswhite.com>
**Cc:** Tobi Millrood <Tobi.Millrood@klinespecter.com>; Timothy Burke <Timothy.Burke@klinespecter.com>; Elizabeth Crawford <Elizabeth.Crawford@KlineSpecter.com>; Melissa Merk <Melissa.Merk@klinespecter.com>; Helen Lawless <Helen.Lawless@klinespecter.com>; Philip Pasquarello <Philip.Pasquarello@KlineSpecter.com>; Jack O'Neill <Jack.ONeill@klinespecter.com>; Patrick Sidebotham

<span style="color:red">Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658</span>

<Patrick.Sidebotham@klinespecter.com>; Donald J. Brooks Jr. <dbrooks@eckertseamans.com>; ben.whiting@kellerpostman.com; mark.weinstein@kellerpostman.com; bscicchitano@eckertseamans.com; Jennifer V. Weachter <JWeachter@eckertseamans.com>; Sean.Fahey <Sean.Fahey@Troutman.com>; kmurphy@tlgattorneys.com; holson@tlgattorneys.com; cmrecker@welshrecker.com; abcarver@welshrecker.com; rwalk@welshrecker.com; Carol Lippmann <Carol.Lippmann@klinespecter.com>
**Subject:** NEC Infant Formula Litigation | The Trustees of the University of Pennsylvania d/b/a Penn Medicine

Dear Counsel:

Please see the attached correspondence and Notice of Video Deposition of Corporate Designee(s) of The Trustees of the University of Pennsylvania d/b/a Penn Medicine.

Thank you,

**Amanda L. Bee**
Legal Assistant to Jack O'Neill, Esquire and Richard Gorman, Esquire
Kline & Specter, P.C.
1525 Locust Street
Philadelphia, PA 19102
215.772.1000
215.772.0563 direct dial
www.klinespecter.com

We intend to send this transmission (including any attachments) only to the appropriate recipients. If you received this message in error, please notify the sender by replying to this message and then delete it from your system. This transmission may contain confidential or privileged information and may constitute non-public information. Use, disclosure, dissemination, distribution, or reproduction of this message by unintended recipients is not authorized and may be unlawful. Unless otherwise stated by the sender, this transmission (including any attachments) does not create or confirm a contract, agreement, offer or acceptance between the sender and any recipient.

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# EXHIBIT A-57

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
10 NOV 2023 01:32 pm
P. DIVON

| | | |
|---|---|---|
| HOLLI CARTER, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302588 |
| BRANDY GOODMOND, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400208 |
| BRANDY GOODMOND, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400212 |
| JANEE HENDERSON, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400127 |
| KRISTEN KAJUFFA, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302978 |
| NAFEESAH MAYS, et al.,<br>    *Plaintiff,*<br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | : <br> : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302963 |
| CATHERINE McMILLIAN, et al.,<br>    *Plaintiff,* | : <br> : | APRIL TERM, 2022<br>No. 220400140 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

|  |  |  |
|---|---|---|
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| DAMEKA MOMENT, et al., *Plaintiff,* v. | : : : | APRIL TERM, 2022 No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| NYDIA PARKER, et al., *Plaintiff,* v. | : : : | MARCH TERM, 2022 No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| ALEXANDRIA ROSS, et al., *Plaintiff,* v. | : : : | MARCH TERM, 2022 No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| LOREN SANDERS, et al., *Plaintiff,* v. | : : : | APRIL TERM, 2022 No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| SAMAYA SHORT, et al., *Plaintiff,* v. | : : : | APRIL TERM, 2022 No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| ALICE STILLS, et al., *Plaintiff,* v. | : : : | MARCH TERM, 2022 No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : | |
| CHRISTINA TAYLOR, et al., *Plaintiff,* | : : | MARCH TERM, 2022 No. 220302606 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

| | | |
|---|---|---|
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | | |
| NATISHA THOMAS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| | : | No. 220400156 |
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| JEANNATE WATSON, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| SHANITA WIGGINS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| MELVENIA WILLIAMS, et al., *Plaintiff,* | : | APRIL TERM, 2022 |

3

|  |  |  |
|---|---|---|
| v. | : | No. 220400141 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* |  |  |

## <u>ORDER OF THE COURT</u>

On this ____ day of _____, 2023, upon consideration of defendant Abbott Laboratories' motion to compel and to strike improper objections and insufficient answers to Abbott's discovery requests, its brief in support, and any response thereto, it is hereby ORDERED that:

1.      Plaintiffs' objections to all Standard Form Interrogatories, Interrogatory Nos. 1 through 41, are stricken.

2.      Plaintiffs' insufficient answers to Standard Form Interrogatory Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, and 41 are stricken.

3.      Plaintiffs' objections to Supplemental Interrogatory Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67 are stricken.

4.      Plaintiffs' insufficient answers to Supplemental Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63 are stricken.

5.      Plaintiffs' objections and insufficient responses to Requests for Production 1, 2, 5, 6, 8, 9, 17, 19, 20, 21, 22, 23, 24, 38, 39, 42, 44, and 45 are stricken.

6.      Plaintiffs are directed to respond to all Interrogatories and Requests for Production identified in paragraphs 1 through 5 above within twenty (20) days of the date of this Order or risk sanctions.

4

7. Plaintiffs are further directed to provide complete sets of relevant medical authorizations for both infant and parent, as well as insurance and education authorizations for the infant and – to the extent parent claims any economic or psychologic injury due to the infant's NEC, employment, and psychiatric authorizations for the parent to Abbott within twenty (20) days of the date of this Order or otherwise obtain the records themselves and produce them to Abbott within twenty (20) days of the date of this Order.

BY THE COURT:

_____

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**

Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**

Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| | : | No. 220400140 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

|  | : |  |
| --- | --- | --- |
| v. | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| DAMEKA MOMENT, et al.,<br>*Plaintiff,* | : | APRIL TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| NYDIA PARKER, et al.,<br>*Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| ALEXANDRIA ROSS, et al.,<br>*Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| LOREN SANDERS, et al.,<br>*Plaintiff,* | : | APRIL TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| SAMAYA SHORT, et al.,<br>*Plaintiff,* | : | APRIL TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| ALICE STILLS, et al.,<br>*Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | : |  |

| CHRISTINA TAYLOR, et al.,<br>*Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
|  | : | No. 220302606 |

3

| | | |
|---|---|---|
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | | |
| NATISHA THOMAS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., *Plaintiff,* | : : : | MARCH TERM, 2022 No. 220400156 |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| JEANNATE WATSON, et al., *Plaintiff,* | : : | MARCH TERM, 2022 No. 220302967 |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| GINA WIEGER, et al., *Plaintiff,* | : : | MARCH TERM, 2022 No. 220302614 |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| GINA WIEGER, et al., *Plaintiff,* | : : | MARCH TERM, 2022 No. 220302601 |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| SHANITA WIGGINS, et al., *Plaintiff,* | : : | MARCH TERM, 2022 No. 220302986 |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |
| MELVENIA WILLIAMS, et al., *Plaintiff,* | : | APRIL TERM, 2022 |

4

|  |  |
|---|---|
| v. | : No. 220400141 |
|  | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* |  |

**DEFENDANT ABBOTT LABORATORIES' MOTION TO COMPEL,
AND TO STRIKE IMPROPER OBJECTIONS AND INSUFFICIENT ANSWERS
TO ABBOTT'S DISCOVERY REQUESTS**

Defendant Abbott Laboratories ("Abbott") files the instant motion after several unsuccessful attempts to obtain discovery from plaintiffs that is critical to the parties' claims and defenses. Plaintiffs' repeated failure to produce medical records, lists of treaters, full and complete authorizations, and to otherwise supplement their deficient discovery responses has stalled this litigation, and prevented Abbott from commencing plaintiffs' depositions—which this Court suggested should occur by the end of this year.

By way of background, in March and April of 2020, plaintiffs filed 29 actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. Each complaint alleges that the infant suffers from "long-term health effects." *See, e.g., Carter* Compl. ¶ 14. More than half of the infants are now over 10 years old. Regardless of their age, Abbott is entitled to know their current condition, their medical course from the time of birth through the present, and their psychologic and/or educational course. Moreover, because alternative causes of the children's injuries might only be found in parent medical records, these cases place the parents' health at issue as well. Finally, to the extent the parents claim any psychologic injury or wage loss, Abbott is also entitled to those records.

5

The cases were removed to federal court and transferred to a Multidistrict Litigation (MDL), where they remained pending for months until they were remanded to this Court. On July 24, 2023, the parties appeared before the Honorable Linda Carpenter for a "one-year status conference" (though the cases had been pending in the MDL for a good portion of that year). At the conference, Judge Carpenter encouraged the parties to move ahead with depositions of the plaintiffs expeditiously. Following the conference, Judge Carpenter issued a Case Management Order that set a discovery cutoff date of June 3, 2024.

On August 9, 2023, two weeks after the conference, Abbott served interrogatories and requests for production of documents on plaintiffs. Plaintiffs requested, and Abbott granted, an extension of time for the responses, but with an understanding that plaintiffs' counsel would be providing authorizations, lists of treaters and records in their possession expeditiously in order to permit Abbott to collect records and prepare for plaintiffs' depositions. Plaintiffs produced none of these records and, on October 11 and 12, 2023, plaintiffs provided significantly deficient responses to the discovery. Exemplar interrogatory responses and request for production responses are attached hereto as Exhibit A and Exhibit B, respectively. Despite several efforts to discuss these deficiencies, plaintiffs failed to respond, necessitating this Court's intervention. Because plaintiffs' actions have, among other things, prevented Abbott from being able to begin plaintiffs' depositions, Abbott files the instant motion to strike plaintiffs' improper objections and insufficient discovery responses and seeks an order requiring plaintiffs to timely provide sufficient responses. In support of its motion, Abbott states the following:

1.      In the above-captioned cases, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed these cases against defendants Mead Johnson,

6

Abbott, and the infants' hospitals of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendants administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiffs, and that plaintiffs were injured, and suffer long-term health effects, as a result.

2. Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaints were filed by parents ("plaintiff-parents") on their own behalf, and also as parent and natural guardians of the infant plaintiffs ("plaintiff") (together "plaintiffs").

3. On July 24, 2024, the Court held a status conference in all actions. During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the calendar year.

4. To that end, on August 9, 2023, Abbott served a set of interrogatories and a set of requests for production on all plaintiffs. The interrogatories consisted of both Standard Form Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories.

5. On August 30, 2023, plaintiffs emailed Abbott, seeking a 4-week extension of time to respond to Abbott's discovery requests. In that communication, plaintiffs suggested that, if it would help support the extension, plaintiffs would serve as many authorizations as possible by the original September 9 deadline.

6. That same day, Abbott responded, asking whether plaintiffs could provide authorizations, lists of treaters, and any medical records in their possession. Abbott followed up

7

the next day, making clear that – in order not to lose time on the collection and analysis of medical records, it would need plaintiffs to provide authorizations, lists of treaters, and any medical records in their possession.

7.    On August 31, plaintiffs responded, agreeing to provide Abbott with the records in their possession, a list of treaters, and medical, education, and insurance authorizations.  Plaintiffs also agreed to supply employment records, if pursuing a wage loss claim,  and psychiatric authorizations, if pursuing a psychiatric injury claim.

8.    Notwithstanding plaintiffs' representations, both the original deadline for plaintiffs' discovery responses and the extension deadline came and went without the provision of any authorizations, treater lists, or medical records.

9.    On  October 11, 2023, plaintiffs provided the deficient set of discovery responses at issue here, along with a very limited number of authorizations. Plaintiffs did not provide a single medical record or treater list.

10.    After reviewing the limited authorizations and discovery responses, Abbott sent an email to plaintiffs on October 16, identifying several significant deficiencies.  *See* Email of 10/16/2023, Ex. C.  Abbott indicated that plaintiffs had wholly failed to hold up their end of the bargain in producing authorizations, treater lists, and medical records in advance of the October 9 deadline.  Abbott also pointed out that, as of October 16, plaintiffs had wholly failed to produce medical records or treater lists for any of the 21 plaintiffs and failed to serve any authorizations for 7 of the 21 plaintiffs.[1]  Abbott also explained that the authorizations received to date were

---

[1] While plaintiffs initially filed 29 actions, on September 8, plaintiffs filed amended complaints in only 21 of the 29 original actions.  Plaintiffs have indicated they will be voluntarily dismissing the other 8 actions, and accordingly, plaintiffs did not respond to any of Abbott's discovery requests directed to those 8 plaintiffs. Notwithstanding, over two months later, plaintiffs have yet to petition the Court for dismissal of these actions, and indeed, on November 3 and November 7, plaintiffs filed several motions to compel in actions that they had previously

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

themselves insufficient, as they pertained to very limited providers and omitted relevant treaters as well as insurance, employment, and education authorizations. *See id.* Finally, with respect to the discovery responses, Abbott notified plaintiffs that they had improperly objected to all Standard Form Interrogatories, in violation of Phila. Cnty. Loc. R. 4005(D), and had only provided limited substantive responses to only approximately 10 of the 68 interrogatories propounded.

11.     Abbott received no response to this email communication.

12.     On October 26, 2023, without addressing Abbott's issues, plaintiffs produced some additional authorizations, but these still clearly omitted authorizations for relevant treaters.  As Abbott pointed out in follow-up communications to plaintiffs' counsel, the authorizations do not include a single infant's pediatrician(s), gastroenterologist(s) or the mother's OB/GYN.

13.     In 15 of the 21 cases, plaintiffs provided two or fewer authorizations for each infant, all relating to hospitals.  Again, there are no authorizations for doctors who provided ongoing care, or authorizations relating to insurance, psychologic or educational records, or even insurance records (which often serve as the source to identify other care).  In all 20 cases in which plaintiffs produced authorizations, plaintiffs provided only *one* authorization for each parent.  Plaintiffs failed to provide any authorizations whatsoever in *Wiggins* and failed to produce any infant authorizations whatsoever in *Williams*.

14.     On October 27, 2023, Abbott sent plaintiffs a detailed deficiency letter that identified numerous deficiencies in plaintiffs' discovery responses and authorizations.  *See* Deficiency Letter, Ex. D.  Abbott requested that plaintiffs respond on or before November 3 and

---

represented would be dismissed.  To the extent plaintiffs continue to pursue these actions despite purporting to seek their dismissal, Abbott will move to compel answers to the discovery it has propounded on those plaintiffs.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

either (a) amend or supplement their insufficient discovery responses or (b) provide a date on which the parties can meet and confer during the week of November 6.

15. Abbott received no response to this deficiency letter.

16. To date, plaintiffs have failed to respond to Abbott's email communications or deficiency letter, have failed to supplement their discovery responses, and have failed to produce a single list of treaters, or produce a single medical record (as they agreed they would do).

17. In light of plaintiffs' unwillingness to meet their discovery obligations, the intervention of this Court is necessary to resolve the deficiencies outlined below. Abbott respectfully requests that the Court strike plaintiffs' improper objections and insufficient answers to Abbott's discovery requests for the following reasons:

## I. MOTION TO STRIKE PLAINTIFFS' IMPROPER AND INSUFFICIENT RESPONSES TO CERTAIN INTERROGATORIES.

18. Abbott incorporates the foregoing paragraphs as if set forth herein.

19. Abbott propounded both Standard Form Interrogatories (Interrogatory Nos. 1 through 41) and supplemental interrogatories (Interrogatory Nos. 42 through 68) on plaintiffs.

20. In total, plaintiffs provided only limited substantive answers to approximately 10 of the 68 interrogatories.

### A. Standard Form Interrogatories

21. Pursuant to Phila. Cnty. Loc. Rule 4005, a party may propound "Standard Form Interrogatories" on another party, which have been adopted by the Court.

22. Rule 4005(D) provides that "[t]he Court will not entertain objections to the standard interrogatories and parties who file such objections will be subject to sanctions including imposition of counsel fees."

23. Abbott propounded a total of 41 Standard Form Interrogatories in each action.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

24.     Despite the clear instruction of Rule 4005(D), plaintiffs universally objected to each and every one of the Standard Form Interrogatories propounded by Abbott in all 21 cases. Accordingly, all objections to Interrogatory No. 1 through Interrogatory No. 41 should be stricken in all 21 cases.

25.     Moreover, plaintiffs wholly failed to provide any response to at least 26 of the 41 Standard Form Interrogatories.[2]  These include Interrogatory Nos. 2, 3, 5, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 24, 28, 29, 33, 34, 35, 36, 37, 39, and 40.

26.     Additionally, with respect to the Standard Form Interrogatories to which plaintiffs "responded," the responses are entirely insufficient.  These include Interrogatory Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41 (to which plaintiffs responded by referring to incomplete sets of authorizations and unproduced medical records); Nos. 1 and 22 (to which plaintiffs responded by providing incomplete biographical information); and Nos. 31 and 32 (to which only some plaintiffs responded and did so by providing vague and limited information regarding potential witnesses).

**B.    Supplemental Interrogatories**

27.     In addition to the Standard Form Interrogatories, Abbott propounded 27 supplemental interrogatories on each plaintiff.  Plaintiffs outright objected and wholly failed to respond to certain of these interrogatories.  In other instances, plaintiffs' responses to these supplemental interrogatories were wholly insufficient.

28.     First, plaintiffs universally objected to, and failed to provide any response for, 14 of the 27 supplemental interrogatories.  These include Interrogatory Nos. 42, 48, 51, 52, 55, 56,

---

[2] Whereas all 21 plaintiffs failed to respond to 26 of the 41 Standard Form Interrogatories, approximately half of the plaintiffs failed to respond to two additional Standard Form Interrogatory—Nos. 31 and 32—as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

57, 58, 59, 60, 61, 62, 64, and 67. These interrogatories seek information relevant—indeed, critical—to these actions.

29.     Second, plaintiffs responded to several supplemental interrogatories by suggesting that discovery is "early or ongoing" or that the interrogatory was "premature." These include Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63. This response is wholly unsupportable. These supplemental interrogatories seek information uniquely within plaintiffs' possession; indeed, much of this information should have been in plaintiffs' possession prior to filing their complaints.

## II. MOTION TO STRIKE PLAINTIFFS' IMPROPER AND INSUFFICIENT RESPONSES TO CERTAIN REQUESTS FOR PRODUCTION.

30.     Abbott incorporates the foregoing paragraphs as if set forth herein.

31.     Pursuant to Pa. R. Civ. P. 4009.11, Abbott propounded 46 requests for production on plaintiffs in all 21 cases. Plaintiffs' responses to numerous of these requests are insufficient.

32.     First, plaintiffs responded to several requests (Request Nos. 1, 6, 9, 17, 38, 39, 42, and 44) by directing Abbott to incomplete sets of authorizations and medical records that have not yet been produced. This response is entirely insufficient. Plaintiffs do not discharge their obligation to respond to these requests by referring to incomplete set of authorizations and medical records that they agreed yet failed to produce.

33.     Second, plaintiffs objected to several requests (Request Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45) as premature. This objection is unsupportable. These requests were timely propounded, and they seek information uniquely within plaintiffs' possession—indeed, the majority seek information that should have been in plaintiffs' possession prior to filing their complaints.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

34.     Third, plaintiffs objected to several requests (Request Nos. 2, 20, 21, 22, 23, and 24) as seeking "health information protected by state and federal law." This objection is unsupportable. Plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information.

35.     Fourth, plaintiffs objected to two requests—Request Nos. 8 and 9—as "not limited in time and scope." This is categorically incorrect. The very terms of both requests make clear they are appropriately temporally limited.

## III. MOTION TO COMPEL PLAINTIFFS TO PROVIDE COMPLETE SETS OF AUTHORIZATIONS FOR ALL INFANTS AND PARENTS OR OTHERWISE PRODUCE THE RELEVANT RECORDS THEMSELVES.

36.     Abbott incorporates the foregoing paragraphs as if set forth herein.

37.     As part of its requests for production, Abbott requested that plaintiffs execute medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both infant and parent.

38.     On October 11, nearly 45 days after plaintiffs said they would produce authorizations and medical records on a rolling basis, plaintiffs provided Abbott with a very limited number of authorizations for only some of the plaintiffs.

39.     Two weeks later, on October 26, plaintiffs provided another limited set of authorizations.

40.     To date, although plaintiffs provided at least one authorization in 20 of the 21 cases, the authorizations provided remain incomplete.

41.     Plaintiffs' failure to timely provide complete sets of authorizations for all parents and infants is compounded by plaintiffs' deficient discovery responses. In particular, in response to several interrogatories and requests for production, *plaintiffs direct Abbott to the authorizations*

13

*and medical records and fail to provide any substantive information.* It is entirely inappropriate for plaintiffs to direct Abbott to incomplete authorizations or unproduced medical records in response to Abbott's discovery requests.

42.  Accordingly, Abbott respectfully requests that this Court direct plaintiffs to either provide a complete set of authorizations for all infants and parents or otherwise direct plaintiffs to obtain the medical records themselves for production to Abbott.

WHEREFORE, Abbott respectfully requests that this Court strike plaintiffs' improper and insufficient objections and responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

Dated: November 10, 2023

Respectfully Submitted:

<table>
<tr>
<td>

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

</td>
<td>

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

</td>
</tr>
<tr>
<td>

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

</td>
<td>

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

</td>
</tr>
</table>

14

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

15

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

|  | : | No. 220400140 |
|---|---|---|
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| DAMEKA MOMENT, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400142 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| NYDIA PARKER, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302983 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| ALEXANDRIA ROSS, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302981 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| LOREN SANDERS, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| SAMAYA SHORT, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| ALICE STILLS, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |

| CHRISTINA TAYLOR, et al., | : |  |
|---|---|---|
| *Plaintiff,* | : | MARCH TERM, 2022 |
|  | : | No. 220302606 |

2

|  | : |  |
| --- | --- | --- |
| v. | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |

| NATISHA THOMAS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220400156 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| JEANNATE WATSON, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| SHANITA WIGGINS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| --- | --- | --- |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : | |

| MELVENIA WILLIAMS, et al., *Plaintiff,* | : | APRIL TERM, 2022 |
| --- | --- | --- |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

v.                                              :   No. 220400141
                                                :
MEAD JOHNSON & COMPANY, LLC, et al.,            :
            *Defendants.*

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF
MOTION TO COMPEL, AND TO STRIKE IMPROPER OBJECTIONS AND
INSUFFICIENT ANSWERS TO ABBOTT'S DISCOVERY REQUESTS**

**MATTER BEFORE THE COURT**

The motion of Abbott Laboratories ("Abbott") to compel and to strike improper objections and insufficient answers to Abbott's discovery requests is before this Court. Plaintiffs' discovery responses to Abbott's discovery are entirely deficient, as borne out by a few simple facts:

1. Plaintiffs improperly objected to each and every Standard Form Interrogatory Abbott propounded;

2. Plaintiffs provided *limited* substantive responses to, at most, 10 of the 68 Interrogatories Abbott propounded;

3. Plaintiffs failed to provide a full and complete set of authorizations for any plaintiff in any action;[3] and

4. Plaintiffs failed to produce a single document, let alone a single medical record, in any of the actions.

---

[3] A full and complete set of authorizations would include (1) medical authorizations for all relevant treaters of both parent and infant from the time of birth until the present day, (2) all relevant insurance authorizations, (3) all relevant employment authorizations, (4) all relevant education authorizations, and (5) all relevant psychiatric authorizations.

Abbott respectfully requests that this Court strike plaintiffs' improper objections and insufficient responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

## STATEMENT OF QUESTIONS INVOLVED

1.      Should the Court grant Abbott's motion to strike and strike plaintiffs' objections to all Standard Form Interrogatories as improper under Phila. Cnty. Loc. R. 4005(D)? Answer: Yes.

2.      Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified Standard Form Interrogatories? Answer: Yes.

3.      Should the Court grant Abbott's motion to strike and strike plaintiffs' improper objections to the specified supplemental interrogatories? Answer: Yes.

4.      Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified supplemental interrogatories? Answer: Yes.

5.      Should the Court grant Abbott's motion to strike and strike plaintiffs' improper objections to the specified requests for production? Answer: Yes.

6.      Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified requests for production? Answer: Yes.

7.      Should the Court grant Abbott's motion to strike and order plaintiffs to provide complete responses to all insufficiently answered interrogatories and requests for production? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

tailored to address the distinct, special nutritional needs of premature, low birthweight infants.[4] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

Plaintiffs in these cases allege that the infants developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

---

[4] Abbott manufactures infant nutrition products under the "Similac" brand name. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff-parents universally allege that their infants were born prematurely at Philadelphia-area hospitals. They further allege the infants were administered Similac and/or Enfamil cow's milk-based products by medical professionals at the respective hospital after birth.

Plaintiffs further claim that the infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. Indeed, ***each and every*** plaintiff alleges that the infant suffers from "long-term health effects." *See, e.g.*, *Carter* Compl. ¶ 14. Regardless of their age, Abbott is entitled to know their current condition, their medical course from the time of birth through the present, and their psychologic and/or educational course.[5] Moreover, because alternative causes of the children's injuries might only be found in parent medical records, these cases place the parents' health at issue as well. Finally, to the extent the parents claim any psychologic injury or wage loss, Abbott is also entitled to those records.

## PROCEDURAL HISTORY OF THE DISPUTE

On July 24, 2023, the Court held a status conference in all actions. During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the calendar year.

To that end, on August 9, 2023, Abbott served a set of interrogatories and a set of requests for production of documents on plaintiffs. The interrogatories consisted of both Standard Form Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories. On August 30, 2023, plaintiffs emailed Abbott, seeking a 4-week extension of the time to respond to Abbott's discovery requests. In that communication, plaintiffs suggested that,

---

[5] While age is not determinative of Abbott's need for these documents, the need is particularly obvious given that all infants claim long-term injuries and over half of the infants are now over 10 years old.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

if it would help support the extension, plaintiffs would serve as many authorizations as possible by the original September 9 deadline.

That same day, Abbott responded, asking whether plaintiffs could provide authorizations, lists of treaters, and any medical records in their possession.  Abbott followed up the next day, making clear that – in order not to lose time on the collection and analysis of medical records, it would need plaintiffs to provide authorizations, lists of treaters, and any medical records in their possession.

On August 31, plaintiffs responded, agreeing to provide Abbott with the records in their possession, a list of treaters, and medical, education, and insurance authorizations.  Plaintiffs also agreed to supply employment records, if pursuing a wage loss claim,  and psychiatric authorizations, if pursuing a psychiatric injury claim.

Notwithstanding plaintiffs' representations, both the original deadline for plaintiffs' discovery response, and the extension deadline came and went without the provision of any authorizations, treater lists, or medical records,

On  October 11, 2023, plaintiffs provided the deficient set of discovery responses at issue here, along with a very limited number of authorizations. Plaintiffs did not provide a single medical record or treater list.

After reviewing the limited authorizations and deficient discovery responses, Abbott sent an email to plaintiffs on October 16, identifying several significant deficiencies.  *See* Email of 10/16/2023, Ex. C.  For starters, plaintiffs had wholly failed to hold up their end of the bargain in producing authorizations, treater lists, and medical records in advance of the October 9 deadline. Indeed, plaintiffs missed the deadline altogether.  Additionally, as of that time, plaintiffs had wholly failed to serve any authorizations for 7 of the 21 plaintiffs, and had wholly failed to produce

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

medical records for any of the 21 plaintiffs.[6]  Importantly, the belated authorizations received to date were also insufficient, insofar as it was clear that authorizations for relevant treaters had been omitted.  *See id.*  Finally, with respect to the discovery responses, plaintiffs had improperly objected to all Standard Form Interrogatories, in violation of Phila. Cnty. Loc. R. 4005(D), and, perhaps more troublingly, had only provided limited substantive responses to approximately 10 of the 68 interrogatories propounded.  Abbott received no response to this email communication.

On October 26, 2023, without addressing Abbott's issues, plaintiffs produced a limited set of additional authorizations, but these still clearly omitted authorizations for relevant treaters.  As Abbott pointed out in subsequent communications to plaintiffs' counsel, the authorizations do not include a single infant's pediatrician(s), gastroenterologist(s) or the mother's OB/GYN.  In 15 of the 21 cases, plaintiffs provided two or fewer authorizations for each infant.  In all 20 cases in which plaintiffs produced authorizations, plaintiffs provided only one authorization for each parent.  Plaintiffs failed to provide any authorizations whatsoever in *Wiggins*, and failed to provide any infant authorizations whatsoever in *Williams*.

On October 27, 2023, Abbott sent plaintiffs a detailed deficiency letter that identified numerous deficiencies in plaintiffs' discovery responses and authorizations.  *See* Deficiency Letter, Ex. D.  Therein, Abbott requested that plaintiffs respond on or before November 3 and either (a) amend or supplement their insufficient discovery responses or (b) provide a date on

---

[6] While plaintiffs initially filed 29 actions, plaintiffs filed amended complaints in only 21 of the 29 original actions on September 8.  Plaintiffs have indicated they will be voluntarily dismissing the other 8 actions, and accordingly, plaintiffs did not respond to any of Abbott's discovery requests directed to those 8 plaintiffs. Notwithstanding, over two months later, plaintiffs have yet to petition the Court for dismissal of any of these actions, and indeed, on November 3 and November 7, plaintiffs filed several motions to compel in actions that they had previously represented would be dismissed.  To the extent plaintiffs continue to pursue these actions despite purporting to seek their dismissal, Abbott will move to compel answers to the discovery it has propounded on those plaintiffs.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

which the parties can meet and confer the week of November 6. Abbott received no response to this deficiency letter.

## Legal Standard

Pennsylvania Rule of Civil Procedure 4003.1(a) provides that "a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . ." *See* Pa. R. Civ. P. 4003.1(a). Additionally, Rule 4019(a)(1)(i) provides that "[t]he court may, on motion, make an appropriate order if a party fails to serve answers, sufficient answers, or objections to written interrogatories under Rule 4005." *See id.* R. 4019(a)(1)(i).

## I. PLAINTIFFS' OBJECTIONS AND RESPONSES TO ABBOTT'S INTERROGATORIES SHOULD BE STRICKEN AS IMPROPER AND INSUFFICIENT.

Abbott propounded both Standard Form Interrogatories (Interrogatory Nos. 1 through 41) and supplemental interrogatories (Interrogatory Nos. 42 through 68) on plaintiffs. In total, plaintiffs provided limited substantive responses to only approximately ***10 of the 68 interrogatories***.

Plaintiffs' responses to both types of interrogatories are insufficient and deficient for several reasons, as discussed below.

### A. Standard Form Interrogatories

Pursuant to Phila. Cnty. Loc. Rule 4005, a party may propound "Standard Form Interrogatories" on another party, which have been adopted by the Court. *See* Phila Cnty. Loc. R. 4005. Plaintiffs' responses to these Standard Form Interrogatories should be stricken for several reasons, each of which is discussed below.

10

1.  **Plaintiffs improperly objected to each and every Standard Form Interrogatory.**

Rule 4005(D) provides that "[t]he Court will not entertain objections to the standard interrogatories and *parties who file such objections will be subject to sanctions including imposition of counsel fees*." *See* Phila. Cnty. Loc. R. 4005(D) (emphasis added).

Abbott propounded a total of 41 Standard Form Interrogatories in each case. Despite the clear instruction of Rule 4005(D), plaintiffs universally objected to each and every one of the Standard Form Interrogatories propounded by Abbott in all 21 cases.

Accordingly, all objections to Interrogatory No. 1 through Interrogatory No. 41 should be stricken in all 21 cases.

2.  **Plaintiffs failed entirely to respond to 26 of the 41 Standard Form Interrogatories.**

Plaintiffs' failure to comply with Loc. R. 4005(D) is compounded by the fact that plaintiffs failed to provide any response to at least 26 of the 41 Standard Form Interrogatories.[7] These include Interrogatory Nos. 2, 3, 5, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 24, 28, 29, 33, 34, 35, 36, 37, 39, and 40. Plaintiffs' lack of response generally fell into three categories: refusal to respond, offers to meet and confer, and unspecific promises to supplement.

In response to Interrogatory Nos. 3, 18, 19, 20, 24, 28, 29, 39, and 40, plaintiffs outright objected to the interrogatory and provided no further response. This is a wholly inappropriate response to Standard Form Interrogatories, which, by rule, may not be objected to.

In response to Interrogatory Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, and 36, plaintiffs objected to the interrogatory and offered to meet and confer, providing no substantive response to

---

[7] Whereas all 21 plaintiffs failed to respond to 26 of the 41 Standard Form Interrogatories, approximately half of the plaintiffs failed to respond to two additional Standard Form Interrogatories—Nos. 31 and 32—as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

any part of the interrogatory.[8]  Despite plaintiffs' unfounded objections, these requests are highly

relevant and appropriate, including, among others:

- Interrogatory No. 2: If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

- Interrogatory No. 5: State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

- Interrogatory No. 7: Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint? If so, state: (a) A description of the injuries or diseases you suffered; (b) The date and place of any accident, if such an injury or disease was caused by an accident; and (c) The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

- Interrogatory No. 10: State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

- Interrogatory Nos. 14 & 34: Have you given any statement concerning this action or its subject matter? If so, state: (a) The name and last known address of each person to whom a statement was given; (b) When and where each statement was given; and (c) Please consider this a Request to Produce the statements referred to in the above answer.

In response to Interrogatory Nos. 11, 12, 17, and 37, plaintiffs objected to the interrogatory

and responded only that they will supplement their responses with unspecified information at some

unspecified time in the future.  Notwithstanding, these interrogatories seek basic information about

cases that plaintiffs themselves brought, which plaintiffs should have had in their possession prior

to filing their complaints.  For example, Interrogatory Nos. 11 and 12 inquire as to the names and

---

[8] As the procedural history of this dispute demonstrates, plaintiffs' "offer" to meet and confer was nothing more than an effort to placate Abbott.  Abbott attempted to engage plaintiffs in discussions regarding the insufficient responses on October 16 and again on October 27.  Plaintiffs wholly ignored both communications and have never provided availability for a meet and confer.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

locations of witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the amended complaints. Plaintiffs' suggestion that the investigation as to each of these areas of inquiry is premature strains credulity. Even if some information remains subject to investigation, plaintiffs must provide the information they currently have.

### 3. Plaintiffs' reference to medical authorizations and/or records in response to the Standard Form Interrogatories are insufficient.

In response to several Standard Form Interrogatories (Interrogatory Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41), plaintiffs responded only by referring to the incomplete medical authorizations and unspecified medical records, none of which have been produced by plaintiffs. . These responses are insufficient.

Where a party responds to an interrogatory by reference to documents, "the answering party must 'specify the records from which the answer may be derived.'" *See Northampton Borough Mun. Auth. v. Remsco Assocs., Inc.*, 22 Pa. D. & C.3d 541, 544 (Ct. Comm. Pls. 1981) (citing Pa. R. Civ. P. 4006(b)). Drawing on Federal Rule of Civil Procedure 33(c), the court in *Northampton Borough* determined that "the specification shall be in sufficient detail to permit the interrogating party to locate and to identify as readily as can the party served, the records from which the answer may be ascertained." *See id.* (quoting Fed. R. Civ. P. 33(c)); *see also id.* (holding reference to "various letters of transmittal of Remsco and the engineer" to be an insufficiently specific reference to documents in response to an interrogatory).

Here, as in *Northampton Borough*, plaintiffs have insufficiently described the records that they claim contains the responsive information. Instead, plaintiffs vaguely reference authorizations and medical records that "***have been or will be produced***." But plaintiffs have yet to produce a single medical record to Abbott. Accordingly, far from identifying a specific portion

13

of a tangible document from which Abbott could glean the requested information, plaintiffs instead refer broadly to unproduced records. This response does not satisfy plaintiffs' obligations under Rule 4006.

Moreover, reference to incomplete authorizations does not constitute an adequate response to these interrogatories. First, plaintiffs have failed to produce a complete set of authorizations in any of the cases. In the 20 cases in which medical authorizations have been produced, plaintiff provided no more than one medical authorization for each parent, which was universally designated for the infant's birth hospital. Plaintiffs have not produced a single authorization for any OB/GYN or any other treating specialist.

As noted above, each plaintiff alleges that the infant suffered long-term health effects resulting from their NEC diagnosis. Yet, when asked about the infants' long-term injuries in Interrogatory No. 23, plaintiffs simply directed Abbott to authorizations. But, in 15 of the 21 of the cases, plaintiffs provided two *or fewer* authorizations for each infant. Plaintiffs have not produced an authorization for any pediatrician, primary care provider, or other treating specialists in any case. Plaintiffs cannot allege, on one hand, that infants suffer long-term health effects, while simultaneously failing to provide Abbott the authorizations necessary to take discovery on those alleged health effects. Beyond the medical authorizations, plaintiffs have not produced a *single* insurance, education, employment, or psychiatric/psychotherapy authorization in *any* of the 21 cases.

Moreover, even if the authorizations were complete (they are not), they are hardly responsive to these interrogatories. To begin, the authorizations do not provide any substantive information besides the name of a single hospital, which is arguably only partially responsive to Interrogatory Nos. 6 and 27 from the above list. Additionally, as described more fully below in

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

section III, plaintiffs have yet to produce a full and complete set of authorizations for any parent or infant, meaning, at best, the authorizations are only partially responsive. Furthermore, plaintiffs have yet to turn over a single medical record in any of the 21 cases.[9] It is entirely inappropriate for plaintiffs to rely on incomplete authorizations or unproduced records in response to the above-listed interrogatories.

**4. Plaintiffs' "responses" to the Standard Form Interrogatories are insufficient.**

Plaintiffs provided limited substantive responses to no more than four Standard Form Interrogatories, and, in most cases, only two Standard Form Interrogatories. Even in these limited instances where plaintiffs provided a substantive response, the information is still insufficient and incomplete.

In Interrogatory Nos. 1 and 22, Abbott requested "(a) Your full name; (b) Any other names you have used or been known by; (c) Your date and place of birth; (d) Your marital status at the time of the incident; (e) Your present marital status; (f) Your present home address; and (g) Your social security number." In response, plaintiffs universally provided only parent's home address, infant's home address, infant's date and place of birth, and in one instance, infant's date of death. While plaintiffs agreed to produce social security numbers after entry of a protective order, plaintiffs failed to respond to the remaining components of the request and instead objected, in defiance of Rule 4005(D).

Similarly, only 10 of the 21 plaintiffs provided any substantive response to Interrogatory Nos. 31 and 32. These interrogatories sought information about the witnesses and people with

---

[9] Yet, plaintiffs suggested in their response to Pennsylvania Hospital's preliminary objections that they relied on these medical records in preparing their amended complaints.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the amended complaints.

Eleven of the 21 plaintiffs objected outright to both Interrogatory Nos. 31 and 32, noting only that plaintiff would supplement "if necessary." Six of the 21 plaintiffs responded to Interrogatory No. 32 by providing only the name of the birth hospital and standing on their objections to Interrogatory No. 31. Four of the 21 plaintiffs responded to Interrogatory Nos. 31 and 32 by only providing very limited information on potential witnesses, such as the name of the infants' father and/or grandfather (*Henderson*, *McMillian*), unnamed nurses in the NICU (*Parker*), and unnamed employees of the Children's Hospital of Philadelphia (*Sanders*).

The responses provided to these four interrogatories are facially insufficient, and beyond these very limited answers, plaintiffs provided no other substantive information in response to the Standard Form Interrogatories.

### 5. Plaintiffs' response regarding the ongoing nature of discovery is insufficient.

Plaintiffs universally responded to Interrogatory Nos. 23, 26, and 27 by suggesting that, as discovery is ongoing, "Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes."[10] The potentially changing nature of infants' injuries does not relieve plaintiffs of their discovery obligation to respond to these Standard Form Interrogatories and identify any presently known injuries that are responsive thereto. *See Appleman v. Feathers*, 79 Pa. D. & C.4th 353, 360-61 (Ct. Comm. Pls. 2006) ("Referring to the complaint and stating that discovery is ongoing does not constitute full and complete answers.").

---

[10] In one stark example, plaintiff Nafeesah Mays responded to Interrogatory No. 22 and indicated that infant A.R. died on August 15, 2005. Yet, despite infant's passing, plaintiff Mays responded to Interrogatory Nos. 23, 26, and 27 by claiming that "Infant is continuing to develop and may face new, or worsened, injuries as time passes."

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

*    *    *

Accordingly, for the foregoing reasons, Abbott respectfully requests that plaintiffs' objections and responses to all aforementioned Standard Form Interrogatories be stricken and that plaintiffs be ordered to provide full and complete responses to these interrogatories within 20 days of the date of the Court's order.

**B.  Supplemental Interrogatories**

In addition to the Standard Form Interrogatories, Abbott propounded 27 supplemental interrogatories on each plaintiff. Plaintiffs outright objected and wholly failed to respond to more than half of these interrogatories. In the other half, plaintiffs' responses were wholly insufficient.

**1.  Plaintiffs universally objected and failed to provide a response to 14 of the 27 supplemental interrogatories.**

Plaintiffs failed to respond to more than half of the supplemental interrogatories Abbott propounded (Interrogatory Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67). This non-response is wholly inappropriate. These interrogatories seek fundamental information that is highly relevant to plaintiffs' claims and Abbott's defenses, including, among others, the identity of the formula product administered to infant (Interrogatory No. 42), what additional/different warnings plaintiffs contend Abbott should have provided regarding its preterm infant nutrition products (Interrogatory No. 48), the date on which infant was diagnosed with NEC (Interrogatory No. 52), the identity of other pregnancies the plaintiff-parent has experienced and whether those infants received preterm infant formula (Interrogatory Nos. 55 and 56), the identity of persons who maintain relevant records (Interrogatory No. 57), infant's non-NEC diagnoses, if any (Interrogatory No. 58), and parent and infant's educational background and employment (Interrogatory Nos. 61 and 62).

17

These issues are central to the case at hand. Plaintiffs themselves placed these questions squarely at issue in this litigation. Plaintiffs allege their infant ingested Abbott's formula, was diagnosed with NEC, and suffered injuries as a result. Abbott is entitled to investigate and test these allegations by requesting fundamental information from plaintiffs regarding the nature of their claims.

**2.    Plaintiffs' response regarding the ongoing nature of discovery is insufficient.**

Similar to their response to the Standard Form Interrogatories, plaintiffs objected or responded to several supplemental interrogatories (Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63), asserting that discovery is "early and ongoing" or that the interrogatory itself was "premature." These objections and responses are unsupportable, as the ongoing nature of discovery does not excuse plaintiffs from satisfying their discovery obligations. *See Appleman*, 79 Pa. D. & C.4th at 360-61 ("Referring to the complaint and stating that discovery is ongoing does not constitute full and complete answers.").

These interrogatories seek basic information about cases that plaintiffs themselves brought, which plaintiffs should have had in their possession prior to filing their complaints. For example, Interrogatory No. 42 simply seeks identification of the product infant was administered. Additionally, Interrogatory No. 50 seeks information regarding the mechanism by which plaintiffs assert Abbott's preterm infant nutrition products allegedly cause NEC. Plaintiffs have initiated these cases and allege these very claims. Plaintiffs cannot continue to avoid answering basic questions that go to the heart of their claims by continuously asserting that their investigation is "ongoing."[11]

---

[11] Plaintiffs also objected to Interrogatory No. 42 as requiring expert opinion. This objection, too, is unsupportable. The information required to respond to Interrogatory No. 42 would be uniquely in plaintiffs' possession or, at worst, readily available to plaintiffs through their medical records. These deficiencies are not cured by any

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Despite having 60 days to respond to Abbott's discovery requests, plaintiffs nonetheless responded that discovery was ongoing or that the request was premature to additional relevant interrogatories, including:

- Interrogatory No. 43: STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials.

- Interrogatory No. 44: STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

- Interrogatory No. 46: IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items.

To the extent plaintiffs provided any response to these interrogatories, the responses were generic, lacked substantive information, and failed to answer all components of the interrogatories. For example, in response to Interrogatory No. 44, regarding communications with healthcare providers regarding the decision to administer nutrition to infant, including the persons involved, as well as the time, place, manner, and content of the communication, plaintiffs' responses included generic phrases such as:

- "Plaintiff recalls discussing the benefits of feeding premature babies with human milk but does not recall having conversations related to consent to feed her child." (*Goodmond Rya G.*, *Goodmond Ryh G.*);

---

vague promise to supplement at a later date. Rather, plaintiffs have a plain discovery obligation to provide contemporaneous responses to these relevant requests.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

- "Plaintiff recalls signing a consent form for her child to be given formula or fortifier." (*Kajuffa*);

- "Plaintiff recalls being consulted about nutrition . . . ." (*Moment*); and

- "Plaintiff recalls having conversations related to consent to feed her child." (*Taylor*).

In each of these instances, plaintiffs fail to provide basic information that is central to the claims they brought, including the location, time, content, and participants of these conversations.[12] And plaintiffs' failure to produce this basic information has prevented Abbott from being in a position to take plaintiffs' depositions.

*       *       *

Accordingly, for the foregoing reasons, Abbott respectfully requests that plaintiffs' objections and responses to all aforementioned supplemental interrogatories be stricken and that plaintiffs be ordered to provide full and complete responses to these interrogatories within 20 days of the date of the Court's order.

## II. SEVERAL OF PLAINTIFFS' OBJECTIONS AND RESPONSES TO ABBOTT'S REQUESTS FOR PRODUCTION ARE IMPROPER AND INSUFFICIENT, AND THEREFORE, THEY SHOULD BE STRICKEN.

Abbott propounded 46 requests for production on plaintiffs in all 21 cases. Plaintiffs' responses to numerous of these requests are insufficient.

### 1. Plaintiffs' reference to medical authorizations, medical records, or unspecified third-party productions in response to several requests is insufficient.

In response to numerous requests (*e.g.*, Request Nos. 1, 6, 9, 17, 38, 39, 42, and 44), plaintiffs responded only by directing Abbott to incomplete medical authorizations, unproduced medical records, and unspecified third-party productions. For the reasons already discussed above,

---

[12] These same failures and lack of substantive information similarly plague plaintiffs' responses to Interrogatory Nos. 42, 45, 46, 47 and 53.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

this response is entirely insufficient. As described more fully above, plaintiffs failed to provide complete sets of authorizations for any parent or infant and similarly failed to produce a single medical record. In 15 of the 21 of the cases, plaintiffs provided two *or fewer* authorizations for each infant. In 20 cases, plaintiffs provided only *one* authorization for each parent, failing entirely to produce any parent or infant authorization in *Wiggins*. Plaintiffs in no way discharge their discovery obligations by referring to incomplete, unproduced, or unspecified documents.

Moreover, plaintiffs' manner of response, by simply referring to the authorizations, is deficient for yet another reason. In particular, neither the authorizations, nor the medical records that they authorize Abbott to obtain, would result in documents responsive to a majority of these requests, including, for example:

- Request No. 1: All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

- Request No. 6: All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

- Request No. 17: All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

- Request No. 38: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- Request No. 39: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- Request No. 42: All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

- Request No. 44: All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**2. Plaintiffs' objection to certain requests as premature is unsupportable and thus insufficient.**

Plaintiffs objected to several requests (Request Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45) as premature. This objection is unsupportable. These requests were timely propounded, and they seek information uniquely within plaintiffs' possession—indeed, the majority seek information that should have been in plaintiffs' possession prior to filing their complaints.

To provide a stark example, plaintiffs universally objected that it was premature of Abbott to seek authorizations for medical records from plaintiffs. Notwithstanding, plaintiffs responded to eight additional requests by referring Abbott to authorizations and medical records. Plaintiffs cannot have it both ways. Plaintiffs' failure to provide this critical and relevant information, or otherwise authorize Abbott to obtain it itself, prevents Abbott from preparing for the depositions of plaintiffs.

**3. Plaintiffs' objection that certain requests seek health-related information is unsupportable and thus insufficient.**

Plaintiffs objected to several requests, suggesting they sought "health information protected by state and federal law." This objection is unsupportable for multiple reasons. First, plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information.

Courts in this Commonwealth have held that "[b]y filing actions for personal injuries, the plaintiff-patients waive their privilege and, in effect, implicitly consent to disclosures by their physicians concerning matters relating to the plaintiff-patients' medical conditions." *See Moses v. Williams*, 549 A.2d 950, 956 (Pa. Super. Ct. 1988). Indeed, courts have similarly found that "privileges protecting records for mental health treatment, drug and alcohol rehabilitation, and communications to psychiatrists/psychologists are waived by filing a personal injury lawsuit

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

placing such conditions at issue." *See Gormley v. Edgar*, 995 A.2d 1197, 1205 (Pa. Super. Ct. 2010) ("[O]ur legislature could not have intended the miscarriage of justice that would result if a plaintiff could file a lawsuit and then deny a defendant relevant evidence that would mitigate defendant's liability.").

Here, plaintiffs, both parents and infants, have squarely placed their physical condition at issue in this litigation, and, by bringing the instant actions for the recovery of damages based on personal injury, they have waived any right to claim a privilege over this critical and central information.

In any event, as each of Request Nos. 20, 21, 22, 23, and 24 makes clear, the authorizations through which Abbott seeks permission to collect this health-related information are HIPAA-compliant.

### 4. Plaintiffs' scope-related objections to Request Nos. 8 and 9 are unsupportable and thus insufficient.

Plaintiffs object to Request Nos. 8 and 9 as "not limited in time and scope." This is categorically incorrect. Request No. 8, by its very terms, seeks documents "in the ten (10) years preceding the events giving rise to this LAWSUIT to the present." In addition, Request No. 9 seeks medical bills, statements, or invoices "for which YOU seek damages in this LAWSUIT." This request is clearly limited to and targeted at documents which detail the amount of plaintiffs' alleged damages. There is no colorable argument that these documents are outside of the temporal scope of this litigation or otherwise "not related or relevant to the issues in this case," as plaintiffs claim.

### III. PLAINTIFFS FAILED TO SATISFY THEIR DISCOVERY OBLIGATIONS BY PROVIDING INCOMPLETE AUTHORIZATIONS.

As part of its requests for production, Abbott requested that plaintiffs execute medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both infant

and parent. Plaintiffs initially agreed to "serve as many authorizations as possible by 9/8." Plaintiffs also agreed to provide us with the medical records they had, as well as "med, education, [and] insurance auths." Notwithstanding, as of October 9, the date on which plaintiffs' discovery responses were due pursuant to the extension, not one authorization had been received.

On October 11, nearly 45 days after plaintiffs said they would produce authorizations and medical records on a rolling basis, plaintiffs provided Abbott with a very limited number of authorizations for only some of the plaintiffs. Two weeks later, on October 26, plaintiffs provided another limited set of authorizations..

To date, plaintiffs have not provided a complete set of authorizations in any of the 21 actions, insofar as each is (1) missing medical authorizations relating to additional relevant treaters, and (2) missing any and all insurance, education, and psychiatric/psychotherapy authorizations. In particular, for all 20 parents for whom an authorization have been produced, plaintiffs provided only a single authorization, designated for the infant's birth hospital. Plaintiffs did not provide any authorizations directed at other treaters, notably the parent's OB/GYN or other treating specialists. Additionally, plaintiffs did not provide any insurance, employment, education, or psychiatric/psychotherapy authorizations for any parent. Plaintiffs have failed to provide any parent authorization whatsoever in the *Wiggins* action (Case No. 220302986).

Similarly, in 15 of the 21 cases, parents provided two ***or fewer*** authorizations for each infant. Where plaintiffs did provide two authorizations for an infant, one was universally designated for the birth hospital and another was designated for a different treating hospital. In only rare instances, plaintiffs provided authorizations for more than 2 hospitals. Yet, across all 21 cases, plaintiffs provided no authorizations for other types of treaters, including pediatricians or other treating specialists. Additionally, plaintiffs did not provide any insurance, employment,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

education, or psychiatric/psychotherapy authorizations for any infant in any case. Plaintiffs have failed to provide any infant authorizations whatsoever in the *Wiggins* (Case No. 220302986) and *Williams* actions (Case No. 220400141).

Plaintiffs' failure to timely provide complete sets of authorizations for all parents and infants is compounded by plaintiffs' deficient discovery responses. In particular, in response to several interrogatories and requests for production, plaintiffs improperly respond by simply directing Abbott to incomplete authorizations and unproduced medical records, and otherwise failing to provide any substantive information. .

Accordingly, Abbott respectfully requests that this Court direct plaintiffs to either provide a complete set of authorizations for all infants and parents or otherwise direct plaintiffs to obtain the medical records themselves for production to Abbott.

**CONCLUSION**

For the foregoing reasons, Abbott respectfully requests that this Court strike plaintiffs' improper and insufficient objections and responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

Dated: November 10, 2023                    Respectfully Submitted:


/s/ *Sean P. Fahey*                          /s/ *Joseph E. O'Neil*
Sean P. Fahey (PA Bar No. 73305)             Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                 Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                              Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                        **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                       1205 Westlakes Drive, Suite 330
215.981.4296                                 Berwyn, PA 19312
Sean.Fahey@troutman.com                      610.964.6388
                                             JONeil@CampbellTrialLawyers.com
                                             MPorth@campbell-trial-lawyers.com
                                             RONeil@campbell-trial-lawyers.com

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac
vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

# EXHIBIT A

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrod, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos. : 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
tobi.millrod@klinespecter.com
elizabeth.crawford@klinespecter.com
jack.oneill@klinespecter.com

KELLER POSTMAN LLC
By:
    Benjamin J. Whiting, Esq. (*pro hac vice*)
Attorney I.D. No.: IL 6307321
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
ben.whiting@kellerpostman.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as PARENT AND NATURAL GUARDIAN OF J.C., A MINOR,<br><br>                      *Plaintiff*,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC, ET AL.<br><br>                 *Defendants*. | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>MARCH TERM 2022<br>NO. 2588 |

**PLAINTIFF HOLLI CARTER'S RESPONSE TO ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES DIRECTED TO PLAINTIFF HOLLI CARTER ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD J.C.**

    Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a Minor, through counsel, hereby objects and responds to Defendant Abbott Laboratories Interrogatories, as follows:

1

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Requests to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine or any other recognized privilege.

2.      Plaintiff objects to the Requests to the extent that they require Respondents to search for and produce documents or information that are not within their possession, custody, or control.

3.      Plaintiff objects to the Requests to the extent they seek information or documents that cannot be located by Respondents after reasonably diligent inquiry, are readily available from public sources, or are available to Complaint Counsel from another source or by other means that are more convenient, more appropriate, less burdensome, or less expensive.

4.      Plaintiff objects to the Requests to the extent they seek legal conclusions and/or would require Respondents to reach a legal conclusion in order to prepare a response.

## RESPONSES TO INTERROGATORIES

## STANDARD FORM INTERROGATORIES TO PLAINTIFF HOLLI CARTER

**INTERROGATORY NO. 1** (**Medical Malpractice Case Standard Interrogatory No. 1**):

State:

      (a)      Your full name;

      (b)      Any other names you have used or been known by;

      (c)      Your date and place of birth;

      (d)      Your marital status at the time of the incident;

      (e)      Your present marital status;

      (f)      Your present home address; and

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

(g)      Your social security number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial because it is not limited to the time period or products relevant to the claims and defenses in this case. Subject to and without waiving any objections, Holli Carter resides at 16 Carmen Dr, Cape May Court House, NJ 08210. Once a protective order has been entered in this case, Plaintiffs will duly supplement its response to this interrogatory with additional information.

**INTERROGATORY NO. 2 (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Without waiving this objection, Plaintiff is willing to meet and confer with Defendant or whether a more limited request would suffice.

**INTERROGATORY NO. 3 (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period and not relevant to the claims and defenses in this case. Plaintiff also objects to the extent that the term "infirmities" is vague and/or undefined.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**INTERROGATORY NO. 4 (Medical Malpractice Case Standard Interrogatory No. 4)**:

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible. Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**INTERROGATORY NO. 5 (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and seeks irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 6 (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

    (a)    The name and address of each hospital at which you were treated or examined;

    (b)    The dates on which each such treatment or examination at

<div align="center">4</div>

a hospital was rendered and the charges by the hospital

for each;

(c)     The name and address of each doctor or practitioner by whom

you were treated or examined;

(d)     The dates on which each such treatment or examination by

a doctor or practitioner was rendered and the charges for

each;

(e)     The identity of all reports regarding any medical treatment

or examination, setting forth the author and date of such

reports; and

(f)     Please consider this as a request to produce copies of all

reports referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**<u>INTERROGATORY NO. 7</u> (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

If so, state:

(a)  A description of the injuries or diseases you suffered;

(b)  The date and place of any accident, if such an injury or disease was caused by an accident; and

(c)  The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 8 (Medical Malpractice Case Standard Interrogatory No. 8):**

For the period of three years immediately preceding the date of the treatment, surgery or examination referred to in the complaint, state:

(a)  The name and address of each of your employers or, if you were self-employed during that period, each of your business addresses and the name of the business while self-employed;

(b)  The dates of commencement and termination of each of your periods of

6

employment or self-employment;

(c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment; and

(d)     Your average weekly earnings from each employment or self- employment; the average number of hours worked by you per week in each employment or self-employment; and the amount of income from employment or self-employment reported on your Federal Income Tax Return for each year.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 9 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

(a)     The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self- employed;

(b)     The dates of commencement and termination of each of your periods of employment or self-employment;

(c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

(d)     The wage, salary or rate of earnings received by you in each employment or self-employment and the amount of income reported on your Federal Income Tax Return for each year subsequent to the accident; and

(e)     The dates of all absences from your occupation, the reasons therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 10 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff also objects that the Interrogatory is compound and overly burdensome. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 11 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

concerning the happening of the treatment, surgery or examination or conditions or circumstances at the time of the treatment, surgery or examination prior to, after, or at the time of the accident, excepting those persons who acquired such knowledge during the course of this litigation.

   **RESPONSE**: Plaintiff objects to this Interrogatory to the extent it is premature.

   Subject to the foregoing objections, as discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 12 (Medical Malpractice Case Standard Interrogatory No. 12):**

   With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

   **RESPONSE**: Plaintiff objects to this Interrogatory to the extent it is premature.

   Subject to the foregoing objections, as discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 13 (Medical Malpractice Case Standard Interrogatory No. 13):**

   Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

   (a)   The name and last known address of each such person;

   (b)   When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

   (c)   The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

   (d)   Please consider this a Request to Produce those statements referred to in the above answer.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague. Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

**INTERROGATORY NO. 14 (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

  (a)  The name and last known address of each person to whom a statement was given;

  (b)  When and where each statement was given; and

  (c)  Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any statement concerning this action or its subject matter" is overbroad and vague. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 15 (Medical Malpractice Case Standard Interrogatory No. 15):**

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

If the answer is in the affirmative, state:

10

(a)    The date(s) when such photographs, diagrams or models were made;

(b)    The name and address of the party making them;

(c)    Where they were made;

(d)    The object(s) or subject(s) each photograph, diagram or model represents; and

(e)    Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because the Interrogatory is vague. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**<u>INTERROGATORY NO. 16</u> (Medical Malpractice Case Standard Interrogatory No. 16):**

(a)    Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

(b)    If the answer to (a) is in the affirmative, state:

    (1)    the name, address, and employer of all persons who conducted any investigations;

    (2)    The dates of the investigation;

    (3)    The dates of any reports of any investigations and the identity of the persons who have possession thereof; and

    (4)    Please consider this a request to produce your investigation reports, except those portions which are protected from discovery by Pennsylvania Rule of Civil Procedure 4003.3.

11

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any investigations of the treatment, surgery or examination" is overbroad and vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 17 (Medical Malpractice Case Standard Interrogatory No. 17):**

(a)   State the name and address of each person whom you expect to call as expert witnesses at trial and state the subject matter on which the expert is expected to testify.

(b)   For each such expert, state, or have the expert state, the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each such opinion. (Experts' reports containing the same information may be attached in lieu of an answer.)

(c)   If the expert is employed and/or self-employed, identify the employer and the nature of employment hereof.

(d)   Identify all documents submitted to the expert and all products and/or locales inspected by the expert in connection with preparations for his/her testimony.

(e)   Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of specialization or expertise, all publications authored, including the title of the work and the book in which it was printed giving the date of publication.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 18 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you base each claim of negligence or malpractice alleged in this action.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 19 (Medical Malpractice Case Standard Interrogatory No. 19):**

    (a)    Were the injuries you allege in this action caused in part by sickness, disease, abnormality or injury other than the injuries you claim resulted from the treatment, surgery or examination upon which this action is based?

    (b)    If so, state specifically the nature of each such sickness, disease, abnormality or injury and how each affected you.

    (c)    Are there any medical, x-rays, hospital or other reports which indicate the

13

nature of each such sickness, disease or abnormality or injury and how each affected you.

(d)    If so, where and when was each report made and what is the name and present or last known address of the person who made each such report and each such person who has custody or possession of each such report or any copy thereof?

(e)    Have you been furnished with any such information in any way other than by the documents referred to in this interrogatory? If so, how, when and where and by whom?

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff also objects that the Interrogatory requires expert opinion.

**INTERROGATORY NO. 20 (Product Liability Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

**RESPONSE:** Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks

legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery.

**INTERROGATORY NO. 21 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

<u>**STANDARD FORM INTERROGATORIES TO PLAINTIFF J.C.**</u>

**INTERROGATORY NO. 22 (Medical Malpractice Case Standard Interrogatory No. 1):**

State:

    (a)    Your full name;

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

(b)    Any other names you have used or been known by;

(c)    Your date and place of birth;

(d)    Your marital status at the time of the incident;

(e)    Your present marital status;

(f)    Your present home address; and

(g)    Your social security number.

**RESPONSE**: H.C. was born on October 6, 2014, at Pennsylvania Hospital. H.C. resides at 16 Carmen Dr, Cape May Court House, NJ 08210.

Plaintiff will provide H.C.'s social security number after this Court enters a protective order for this litigation.

**INTERROGATORY NO. 23 (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects that the interrogatory is vague as to "treatment" and "examination." Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

16

**INTERROGATORY NO. 24 (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period and not relevant to the claims and defenses in this case. Plaintiff also objects to the extent that the term "infirmities" is vague and/or undefined.

**INTERROGATORY NO. 25 (Medical Malpractice Case Standard Interrogatory No. 4):**

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible. Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**INTERROGATORY NO. 26 (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion. Plaintiff further objects to this Interrogatory as compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

**INTERROGATORY NO. 27 (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

(a) The name and address of each hospital at which you were treated or examined;

(b) The dates on which each such treatment or examination at a hospital was rendered and the charges by the hospital for each;

(c) The name and address of each doctor or practitioner by whom you were treated or examined;

(d) The dates on which each such treatment or examination by a doctor or practitioner was rendered and the charges for each;

(e) The identity of all reports regarding any medical treatment or examination, setting forth the author and date of such reports; and

(f) Please consider this as a request to produce copies of all reports referred to in the above answer.

18

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion. Plaintiff further objects to this Interrogatory as compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

**INTERROGATORY NO. 28 (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

If so, state:

(a)     A description of the injuries or diseases you suffered;

(b)     The date and place of any accident, if such an injury or disease was caused by an accident; and

(c)     The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff further objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

**INTERROGATORY NO. 29 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

      (a)     The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self- employed;

      (b)     The dates of commencement and termination of each of your periods of employment or self-employment;

      (c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

      (d)     The wage, salary or rate of earnings received by you in each employment or self-employment and the amount of income reported on your Federal Income Tax Return for each year subsequent to the accident; and

      (e)     The dates of all absences from your occupation, the reasons therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 30 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "unable to perform adequately any of her customary social or other activities." Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinions.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case. As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 31 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts concerning the happening of the treatment, surgery or examination or conditions or circumstances at the time of the treatment, surgery or examination prior to, after, or at the time of the accident, excepting those persons who acquired such knowledge during the course of this litigation.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "has knowledge of facts concerning the happening of the incident, treatment, surgery or examination or conditions or circumstances." Plaintiff also objects that this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge.

**INTERROGATORY NO. 32 (Medical Malpractice Case Standard Interrogatory No. 12):**

With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "has knowledge of facts concerning the happening of the incident, treatment, surgery or examination or conditions or circumstances." Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge.

Subject to and without waiving any objections, Pennsylvania Hospital. Plaintiff will supplement the response to this interrogatory, if needed.

**INTERROGATORY NO. 33 (Medical Malpractice Case Standard Interrogatory No. 13):**

Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

(a)     The name and last known address of each such person;

(b)     When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

(c)     The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

(d)     Please consider this a Request to Produce those statements referred to in the above answer.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any statement concerning this action or its subject matter." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this interrogatory because it seeks information protected by the attorney-client privilege and work product doctrine. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 34 (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

    (a)    The name and last known address of each person to whom a statement was given;

    (b)    When and where each statement was given; and

    (c)    Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any statement concerning this action or its subject matter." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this interrogatory because it seeks information protected by the attorney-client privilege and work product doctrine. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 35 (Medical Malpractice Case Standard Interrogatory No. 15):**

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

If the answer is in the affirmative, state:

(a)    The date(s) when such photographs, diagrams or models were made;

(b)    The name and address of the party making them;

(c)    Where they were made;

(d)    The object(s) or subject(s) each photograph, diagram or model represents; and

(e)    Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any other matters or things involved in this treatment, surgery or examination." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 36 (Medical Malpractice Case Standard Interrogatory No. 16):**

(a)    Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

(b)    If the answer to (a) is in the affirmative, state:

(1)    the name, address, and employer of all persons who conducted any investigations;

(2)    The dates of the investigation;

(3)    The dates of any reports of any investigations and the identity of the persons who have possession thereof; and

24

(4)     Please consider this a request to produce your investigation reports, except those portions which are protected from discovery by Pennsylvania Rule of Civil Procedure 4003.3.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any investigations of the treatment, surgery or examination" is vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 37 (Medical Malpractice Case Standard Interrogatory No. 17):**

(a)     State the name and address of each person whom you expect to call as expert witnesses at trial and state the subject matter on which the expert is expected to testify.

(b)     For each such expert, state, or have the expert state, the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each such opinion. (Experts' reports containing the same information may be attached in lieu of an answer.)

(c)     If the expert is employed and/or self-employed, identify the employer and the nature of employment hereof.

(d)     Identify all documents submitted to the expert and all products and/or locales inspected by the expert in connection with preparations for his/her testimony.

(e)     Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of specialization or expertise, all publications authored, including the title of

the work and the book in which it was printed giving the date of publication.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of each of the experts likely to be called at trial. Further, because discovery is just beginning in this litigation, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to finalize a comprehensive opinion with respect to the facts and issues involved in this action.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 38 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you base each claim of negligence or malpractice alleged in this action.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery.

Subject to these objections, Plaintiff directs Defendant to the complaint filed in this case. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 39 (Medical Malpractice Case Standard Interrogatory No. 19):**

(a) Were the injuries you allege in this action caused in part by sickness, disease, abnormality or injury other than the injuries you claim resulted from the treatment, surgery or examination upon which this action is based?

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

(b)     If so, state specifically the nature of each such sickness, disease, abnormality or injury and how each affected you.

(c)     Are there any medical, x-rays, hospital or other reports which indicate the nature of each such sickness, disease or abnormality or injury and how each affected you.

(d)     If so, where and when was each report made and what is the name and present or last known address of the person who made each such report and each such person who has custody or possession of each such report or any copy thereof?

(e)     Have you been furnished with any such information in any way other than by the documents referred to in this interrogatory? If so, how, when and where and by whom?

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff also objects that the Interrogatory requires expert opinion.

**<u>INTERROGATORY NO. 40</u> (Product Liability Case Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE:** Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff.  Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 41 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

<div align="center">

**SUPPLEMENTAL INTERROGATORIES TO PLAINTIFFS
HOLLI CARTER AND J.C.**

</div>

**INTERROGATORY NO. 42:**

IDENTIFY all PRETERM INFANT FORMULA PRODUCTS administered to the INFANT prior to the INFANT'S alleged necrotizing enterocolitis ("NEC") diagnosis, including the full product name, manufacturer name of any IDENTIFIED PRETERM INFANT FORMULA

PRODUCTS, the date(s) on which each identified PRETERM INFANT FORMULA PRODUCT was allegedly administered to the INFANT, the approximate dosage/amount consumed on each of the dates each PRETERM INFANT FORMULAPRODUCT was allegedly administered to the INFANT, and the identity of any HEALTH CARE PROVIDER who administered the PRETERM INFANT FORMULA PRODUCT to the INFANT. If the PRETERM INFANT FORMULA PRODUCT was administered to the INFANT by someone other than a HEALTH CARE PROVIDER, STATE as much and IDENTIFY the administering individual.

**RESPONSE**: Plaintiff objects to this Request as premature. Plaintiff further objects to this Request as it requires expert testimony. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 43:**

STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials.

**RESPONSE**: Plaintiff does not remember seeing any packaging and has no other responsive information related to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 44:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**: Plaintiff does not recall having conversations related to consent to feed her child. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

## INTERROGATORY NO. 45:

IDENTIFY any DOCUMENTS YOU and/or PARENTS received from any HEALTH CARE PROVIDER RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS, including without limitation the name or title of the DOCUMENT, the PERSON who provided the DOCUMENT to YOU and/or PARENTS, the date YOU and/or PARENTS received the DOCUMENT, and the substance of any discussions about the DOCUMENT.

**RESPONSE:** Plaintiff does not recall seeing any documents responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

## INTERROGATORY NO. 46:

IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE:** Plaintiff does not recall seeing any materials responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 47:**

IDENTIFY any and all advertising RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS saw at or before the time the INFANT was allegedly diagnosed with NEC, including without limitation the date(s), time, place, and manner YOU and/or PARENTS saw the advertising, and the substance of the advertising.

**RESPONSE**: Plaintiff recalls seeing promotional posters relating to infant formula products. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 48:**

If YOU contend that ABBOTT should have provided different, additional, and/or other instructions and warnings relating to the use of the PRETERM INFANT FORMULA PRODUCTS, please IDENTIFY what different, additional, or other instructions and warnings ABBOTT should have given, and why it should have given those different, additional, or other instructions.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 49:**

DESCRIBE how and when YOU and/or PARENTS first believed there to be a connection between PRETERM INFANT FORMULA PRODUCTS and NEC, including the source(s) from which YOU and/or PARENTS learned of such information, a DESCRIPTION of the information relayed or cited by each source, and the date(s) on which YOU and/or PARENTS heard or spoke to those sources.

**RESPONSE**: Plaintiff objects based upon attorney-client privilege and the attorney work-product doctrine. Plaintiff refers Defendant to the amended complaint.

**INTERROGATORY NO. 50:**

IDENTIFY, with particularity, the mechanism(s) or interaction(s) unique to PRETERM INFANT FORMULA PRODUCTS that YOU allege cause or otherwise increase the risk for development of NEC, including the sources(s) from which YOU and/or PARENTS learned of the mechanism(s) or interaction(s), a DESCRIPTION of the information relayed or cited by each source, the date(s) on which YOU and/or PARENTS heard or spoke to these sources, and the results of any confirmatory testing that YOU and/or PARENTS are aware RELATED TO the unique mechanism or interaction.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to

the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 51:**

STATE whether donor milk, breast milk, or OTHER INFANT FORMULA PRODUCTS were available to be administered to INFANT at the time INFANT was in the Neonatal Intensive Care Unit. If yes, IDENTIFY which milk or formula products were available to be administered to INFANT and whether any such products were actually administered to INFANT.

**RESPONSE:** Plaintiff objects that this Interrogatory is directed to the wrong party. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 52:**

STATE the date on which INFANT was diagnosed with NEC, whether such diagnosis was made during the INFANT's admission in the Neonatal Intensive Care Unit, and whether any HEALTH CARE PROVIDER suggested any cause of INFANT's NEC. To the extent INFANT has not been diagnosed with NEC, so STATE.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

**INTERROGATORY NO. 53:**

IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, with whom YOU and/or PARENTS have had any COMMUNICATION(S) regarding the cause(s) of INFANT's NEC and DESCRIBE the contents of those COMMUNICATION(S). DESCRIBE the contents of all COMMUNICATIONS that YOU IDENTIFY.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE**: Plaintiff does not recall being told by healthcare providers that NEC is related to prematurity. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 54:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any PERSONS, including but not limited to any manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS, and if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**: Plaintiff objects that this Interrogatory is vague and overbroad because it seeks all communications ever had by the Infant and the Parent. Plaintiff is willing to discuss an appropriately scoped Interrogatory.

**INTERROGATORY NO. 55:**

IDENTIFY any and all pregnancies that INFANT's mother has experienced, and for each pregnancy, STATE the date of conception, IDENTIFY whether the pregnancy resulted in an abortion, a miscarriage, a stillbirth, or a live birth, and for still- and/or live-births, STATE the name, birthdate, birth weight, and the gestational week at birth for each child, and IDENTIFY any and all breast milk, donor milk, PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS that were fed or administered to each child.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 56:**

For each child IDENTIFIED in Interrogatory No. 55 above, IDENTIFY all PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS administered to each child, including the full product name and manufacturer name of any such products and the dates of administration.

**RESPONSE**: Plaintiff directs Defendant to her response to Interrogatory No. 55.

**INTERROGATORY NO. 57:**

IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, who maintains or who has maintained any MEDICAL RECORDS regarding the provision of any medical care to YOU or INFANT, and IDENTIFY any COMMUNICATIONS you have had with those IDENTIFIED PERSONS.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

**INTERROGATORY NO. 58:**

IDENTIFY all non-NEC diagnoses that INFANT has received from time of birth through the present. For each diagnosis, IDENTIFY the condition diagnosed, the date of diagnosis, the HEALTH CARE PROVIDER who rendered the diagnosis, any course of treatment undertaken for the condition, and the identity of any HEALTHCARE PROVIDER who administered that course of treatment.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**INTERROGATORY NO. 59:**

STATE whether YOU and/or PARENTS ever purchased PRETERM INFANT FORMULA PRODUCTS from any online site or retail store. For each product purchased, IDENTIFY the product name, manufacturer name, date of purchase, and location of purchase. Purchase records of the specified products may be produced in lieu of a written response.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 60:**

IDENTIFY each home address where YOU have resided and provide the dates YOU lived at the address and IDENTIFY the persons, if any, who lived with YOU for the ten (10) years preceding the events giving rise to this LAWSUIT to the present. If INFANT has not resided with YOU at any time during that period, IDENTIFY the address(es) where INFANT has resided, provide the dates INFANT lived at the address and IDENTIFY the persons, if any, who lived with INFANT.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

## INTERROGATORY NO. 61:

IDENTIFY YOUR educational background, identifying all high school, secondary schools, colleges, and vocational training schools that YOU have attended. IDENTIFY INFANT's educational background, including all primary schools, secondary schools, colleges, and vocational training schools that INFANT has attended.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

## INTERROGATORY NO. 62:

IDENTIFY any position of employment that YOU or INFANT have held during the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether full-time or part-time, and DESCRIBE each position of employment, including the name of the employer, compensation received, location, and dates (range) of the employment.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 63:**

Apart from the present LAWSUIT, DESCRIBE any prior legal proceedings in which YOU or INFANT have been a party (including administrative charges, unemployment claims, and bankruptcy petitions) including the court which handled the proceeding, the case name, the civil action or docket number associated with the legal proceeding, a description of the claims asserted in the legal proceeding, and the final result, outcome, or adjudication of the claims (e.g. whether dismissed by parties, dismissed by court, judgment granted in favor of a party).

**RESPONSE**: Plaintiff does not recall any prior legal proceeding responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 64:**

IDENTIFY all social media accounts (e.g. LinkedIn, Facebook, MySpace, Twitter, Tumbler, Pinterest, Instagram, Snapchat, etc.) and electronic accounts (including but not limited to e-mail, text messages, or messaging accounts, such as Gmail, Yahoo, Comcast, Verizon, iChat, Apple FaceTime, AOL Instant Messenger, BlackBerry Messenger, chat rooms) that YOU or INFANT have created, hosted, maintained, used and/or had access to at any time during the period of two years prior to the INFANT's birth through the present.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 65:**

IDENTIFY and itemize any damages YOU seek to recover from ABBOTT in this LAWSUIT (on behalf of YOU or others, including the INFANT), whether economic, non-economic, punitive or other and DESCRIBE each element of damage or component of recovery that YOU are seeking from ABBOTT, STATE the specific dollar amounts YOU are claiming, the manner in which each amount was computed, the dates(s) each such loss or damage was incurred, the name of the person, firm and/or company to whom such amounts are owed, whether the expense and/or loss in question has been paid and, if so, by whom it was so paid.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

**INTERROGATORY NO. 66:**

IDENTIFY every life, health, or disability insurance company or government entity (including Medicare and Medicaid) to which YOU or INFANT or anyone on his behalf, ever

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

applied for insurance coverage, and include the type of insurance for which she applied, the date she applied, the identity of any agency or broker through which such application was made, whether a policy was issued or denied, and, if issued, any policy numbers assigned to her/him.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is not limited in time or scope.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement this response.

## INTERROGATORY NO. 67:

IDENTIFY all persons with whom YOU and/or PARENTS have communicated for the purpose of considering, investigating, pursuing, arranging, or obtaining LITIGATION FUNDING and for any such third-party PERSON or entity: STATE the date(s) YOU had such COMMUNICATIONS; STATE the amount of payments or cash advances YOU have received from such third-party PERSON or entity; STATE the IDENTITY of any DOCUMENTS that YOU provided to any such third-party PERSON or entity; STATE any facts or information YOU shared with such third-party PERSON or entity relating to the above-captioned litigation including, but not limited to, impressions of YOUR likelihood of receiving a monetary reward; and STATE the results of any evaluation, assessment, valuation, and/or other analysis by such third party PERSON or entity of the claims asserted against ABBOTT in the COMPLAINT, any claims that were contemplated against ABBOTT but not asserted in the COMPLAINT, and/or any claims contemplated by YOU against any other third party, including but not limited to other manufacturers of PRETERM INFANT FORMULA PRODUCTS and HEALTH CARE PRACTITIONERS, that YOU believe may have been responsible for YOUR alleged INJURIES

40

and the INFANT's alleged INJURIES.

**RESPONSE:** Plaintiff objects to this Request on the ground that it seeks information that is irrelevant and immaterial to Plaintiff's claims.

**INTERROGATORY NO. 68:**

For each expert identified in response to Interrogatory Nos. 17 and 37, STATE the following information:

      (a)    The amount of any compensation to be paid to the expert;

      (b)    Any and all cases in which the expert witness has testified, either at deposition or trial, within the last four (4) years; and

      (c)    A list of all publications authored by the expert witness over the last ten (10) years.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

                    Respectfully submitted,

                    KLINE & SPECTER, P.C.

                    By: /s/ Tobias L. Millrood
                    Tobias L. Millrood, Esq.

Dated: October 12, 2023

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

# EXHIBIT B

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Kᴌɪɴᴇ & Sᴘᴇᴄᴛᴇʀ, P.C.
By:
 Tobias L. Millrood, Esq.
 Elizabeth A. Crawford, Esq.
 John P. O'Neill, Esq.
Attorney I.D. Nos. : 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
tobi.millrood@klinespecter.com
elizabeth.crawford@klinespecter.com
jack.oneill@klinespecter.com

Kᴇʟʟᴇʀ Pᴏsᴛᴍᴀɴ LLC
By:
 Benjamin J. Whiting, Esq. (*pro hac vice*)
Attorney I.D. No.: IL 6307321
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
ben.whiting@kellerpostman.com

| | |
|---|---|
| Hᴏʟʟɪ Cᴀʀᴛᴇʀ, ON HER OWN BEHALF AND AS Pᴀʀᴇɴᴛ ᴀɴᴅ Nᴀᴛᴜʀᴀʟ Gᴜᴀʀᴅɪᴀɴ OF J.C., A Mɪɴᴏʀ, <br><br>          *Plaintiff*, <br><br>  v. <br><br> Mᴇᴀᴅ Jᴏʜɴsᴏɴ & Cᴏᴍᴘᴀɴʏ, LLC, ᴇᴛ ᴀʟ. <br><br>          *Defendants.* | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY <br><br> CIVIL TRIAL DIVISION <br><br> MARCH TERM 2022 <br> NO. 2588 |

## PLAINTIFF'S RESPONSE TO ABBOTT LABORATORIES' FIRST REQUESTS FOR PRODUCTION DIRECTED TO PLAINTIFF HOLLI CARTER, ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD J.C.

 Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a

Minor, through counsel, hereby objects and responds to Defendant Abbott Laboratories' Requests

for Production, as follows:

<div align="center">1</div>

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Requests to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine or any other recognized privilege.

2.      Plaintiff objects to the Requests to the extent that they require Respondents to search for and produce documents or information that are not within their possession, custody, or control.

3.      Plaintiff objects to the Requests to the extent they seek information or documents that cannot be located by Respondents after reasonably diligent inquiry, are readily available from public sources, or are available to Complaint Counsel from another source or by other means that are more convenient, more appropriate, less burdensome, or less expensive.

4.      Plaintiff objects to the Requests to the extent they seek legal conclusions and/or would require Respondents to reach a legal conclusion in order to prepare a response.

## ANSWERS TO REQUESTS FOR PRODUCTION

## REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff objects to this Request because the term "support, refute, or relate to any of YOUR allegations in the COMPLAINT" is overbroad, vague, and unduly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS that constitute, refer to, or relate in any way to COMMUNICATIONS related to any INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE**: Plaintiff objects to this Request for Production because it is premature. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law and may exceed the scope of discovery. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will at the appropriate time produce documents in Plaintiff's possession, custody, or control that are responsive to this request. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS (including, but not limited to, email or other electronic forms) containing, reflecting, or relating to any COMMUNICATIONS between YOU and any treating physician and/or other HEALTH CARE PRACTITIONER whom YOU intend to call as a witness

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

to offer any medical opinion in this action.

    **RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 4:

    All DOCUMENTS produced to YOU by any third-party in response to a subpoena or other formal or informal request for DOCUMENTS related to this LAWSUIT.

    **RESPONSE:** At this time, Plaintiff has no documents responsive to this request.

## REQUEST FOR PRODUCTION NO. 5:

    Any written or recorded statements obtained by YOU in connection with the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

    **RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and vague and is premature. Plaintiff also objects to this Request for Production because it seeks statements protected by attorney-client privilege and the work product doctrine.

    Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

## REQUEST FOR PRODUCTION NO. 6:

    All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

    **RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 1.

## REQUEST FOR PRODUCTION NO. 7:

    Each of the PARENTS' federal, state, and local income tax returns for the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether filed individually or

<div align="center">4</div>

jointly, including all attachments, schedules, and Wage or Earnings Statements (Forms W-2). To the extent INFANT has independently filed any federal, state, or local income tax return since birth, provide those returns as well, including all attachments, schedules, and Wages or Earnings Statements (Forms W-2).

**RESPONSE:** Plaintiff objects to this Request for Production because it seeks confidential tax records, which are deemed to be private communications with the government.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS which refer or relate to any welfare benefits or claims, worker's compensation benefits or claims, social security benefits or claims, health or disability benefits or claims, or any other governmental benefits or claims that were provided to or made by or on behalf of YOU, PARENTS, or INFANT in the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and not limited in time or scope, and calls for the production of documents that are not related or relevant to the issues in this case.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 9:**

All medical bills, statements, or invoices from any hospital, medical facility, doctor,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

therapist, social worker, counselor, psychologist, or other physical or mental health care provider for goods or services for which YOU seek damages in this LAWSUIT, and any other bills, statements, or invoices, of any nature, for which YOU seek damages.

**RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and not limited in time or scope, and calls for the production of documents that are not related or relevant to the issues in this case.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS supporting or in any way relating to YOUR claim for damages in this LAWSUIT, including but not limited to medical and hospital expenses, burial and funeral expenses, mental anguish, pain, suffering, loss of earnings, earning capacity, society, support, services, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, solace, companionship, and prospective inheritance.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS that constitute, refer to, or relate to any out-of-pocket expenses which YOU contend are RELATED TO any INJURY as alleged in this LAWSUIT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS reflecting, referring to, or relating to any claim, lawsuit, and/or legal proceeding for alleged personal injuries in which YOU, PARENTS, or INFANT were involved in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including, but not limited to, copies of claim forms, statements, correspondence, depositions or sworn testimony of any type given by YOU and/or PARENTS related to any claim, including claims to governmental agencies or under the terms of an insurance policy, lawsuit, or proceeding.

**RESPONSE:** Plaintiff objects to this Request because it is compound, overbroad, and seeks information irrelevant and immaterial to the claims and defenses in this case.

Subject to and without waiving any objections, at this time, Plaintiff does not recall being involved in a prior lawsuit or litigation relating to Infant's diagnosis of, or treatment for, NEC or NEC-like symptoms. Plaintiff notes that there are multiple parties in this litigation. Beyond that, Plaintiff is willing to confer with Defendant about the scope of this Request.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS relating to monetary payments received by YOU, PARENTS, or INFANT from any person, entity, or governmental body as a result of the INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 14:**

Any insurance lien letter or correspondence related to the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS relating to any liens or any subrogation interest or claims held or asserted against YOU or PARENTS by any third-party.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 16:**

Any contract or DOCUMENT evidencing an agreement of compromise, settlement, release, covenant not to sue, "Mary Carter" agreement, or any other kind of settlement, agreement, understanding, or deal which any party or potential party to this LAWSUIT has with any other person, firm, corporation, party, or potential party with respect to the events associated with the subject matter of this LAWSUIT. This Request includes any past, present, and future settlements, deals, agreements, arrangements, understandings, or conduct by or between YOU, YOUR attorneys, agents, or representatives and any other person, entity, or such person's or entity's attorneys whatsoever, including any agreements to produce or withhold any evidence, exhibits, witnesses, or testimony.

**RESPONSE:** At this time, Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS referenced, cited, consulted, or used in preparing the COMPLAINT.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE:** Plaintiff objects to this Request as overbroad and vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this Request.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS YOU intend to introduce as exhibits at trial.

**RESPONSE:** Plaintiff objects to this Request as premature. Plaintiff further objects at this time based upon attorney-client privilege and the attorney work product doctrine.

**REQUEST FOR PRODUCTION NO. 20:**

The attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information signed by YOU or INFANT for any hospital, medical facility, doctor, pharmacy, therapist, social worker, counselor, psychologist, or other physical or mental health care provider that has treated INFANT. Exhibit A includes the authorizations to be signed by YOU or INFANT if INFANT is not a minor and has capacity to sign the authorizations; Exhibit B includes the authorizations to be signed by YOU on behalf of INFANT if INFANT is a minor and/or does not have capacity to sign the authorizations).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 21:**

The attached HIPAA-compliant Authorization to Disclose Medical Information (signed by YOU) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker, or other physical or mental health care provider that treated YOU in the ten (10) years preceding the events giving rise to this LAWSUIT to the present (Exhibit A).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 22:**

The attached HIPAA-compliant Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information authorization (signed by YOU) directed to each hospital, medical facility, medical practitioner, doctor, pharmacy, therapist, social worker, or other physical or mental health care provider (including any psychiatric or psychological practitioner or facility)

10

who treated YOU on or after INFANT's date of birth for any psychiatric, psychological, and/or emotional injuries for which YOU seek recovery in the COMPLAINT (Exhibit A).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 23:**

The attached Authorization to Release Insurance Information, Authorization to Release Education Information and Authorization to Release Employment Information signed by YOU or INFANT directed to each insurance company, educational institution and employer identified in response to ABBOTT's Interrogatories to PLAINTIFF and any amendments thereto (Exhibits A and B).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 24:**

To the extent YOU identified in your Interrogatory Responses any twin or other sibling of the INFANT carried in the same pregnancy, the attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information (signed by YOU or the sibling of the INFANT on his or her own behalf) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker, counselor, psychologist, or other physical or mental health care provider that treated INFANT's sibling (Exhibits A and B).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will at the appropriate time execute relevant authorizations for records. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 25:**

All DOCUMENTS that constitute, refer to, or relate to INFANT's personal medical history and/or treatment throughout INFANT's lifetime, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 26:

All DOCUMENTS that constitute, refer to, or relate to YOUR personal medical history and/or treatment in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 27:

All DOCUMENTS and COMMUNICATIONS, including those sent through a patient-portal system, between YOU and any HEALTH CARE PRACTITIONER, or any PERSON acting on behalf of or assisting a HEALTH CARE PRACTITIONER, in the ten (10) years preceding the events giving rise to this LAWSUIT to the present relating to YOUR personal medical history and/or treatment or INFANT's personal medical history and/or treatment.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 28:

All DOCUMENTS and COMMUNICATIONS that constitute, refer to, or relate to YOUR use of, or treatment for, drugs or alcohol.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 29:

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which INFANT has received insurance coverage.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which YOU have received insurance coverage.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 31:**

All DOCUMENTS that EVIDENCE YOUR and/or PARENTS' purchase of or payment for, or contemplated purchase of or contemplated payment for, any PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 32:**

All DOCUMENTS that constitute MARKETING that YOU and/or PARENTS saw or read about PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 33:**

All DOCUMENTS that constitute, contain, refer to, or relate to any packaging or labeling that YOU and/or PARENTS reviewed for PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 34:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and ABBOTT.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 35:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any seller, manufacturer, or supplier of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 39:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 40:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT's social media accounts that constitute, refer to, or relate to ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request. As discovery is ongoing, Plaintiff will supplement this request if needed.

**REQUEST FOR PRODUCTION NO. 41:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT'S social media accounts that constitute, refer to, or relate to INFANT or any alleged INJURY.

**RESPONSE:** Plaintiff objects to this Request as vague and overbroad because it seeks all social media posts and documents related to Plaintiff's child. As discovery is ongoing, Plaintiff will supplement this request if needed.

**REQUEST FOR PRODUCTION NO. 42:**

All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 43:**

All DOCUMENTS and COMMUNICATIONS relating to LITIGATION FUNDING IN CONNECTION WITH this LAWSUIT.

**RESPONSE:** Plaintiff objects to this Request on the ground that it seeks information that is irrelevant and immaterial to Plaintiff's claims.

**REQUEST FOR PRODUCTION NO. 44:**

All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE**: Plaintiff objects that this Request is overbroad because it seeks ten years of information and contains no limitation for subject matter or relevance. Plaintiff also refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 45:**

For each expert identified in response to Abbott's First Set of Interrogatories to Plaintiffs, produce ALL DOCUMENTS and/or COMMUNICATIONS that reflect or contain facts or data they generated, created, or considered, along with all notes, files, literature, and other DOCUMENTS and things created, received, examined, or considered by the witness.

**RESPONSE**: Plaintiff objects to this Request because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, because discovery is just beginning in this litigation, the Request is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to finalize a comprehensive opinion with respect to the facts and issues involved in this action.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**REQUEST FOR PRODUCTION NO. 46:**

All DOCUMENTS that constitute, reflect, reference, or relate in any way to any tests or analyses that YOU or any experts identified in response to Abbott's First Set of Interrogatories, consultants, other retained agents, or anyone acting on YOUR behalf have performed on or with PRETERM INFANT FORMULA PRODUCTS. This Request includes but is not limited to any draft or final protocols, all data collected or generated, all photographs or videotapes taken or made, and all DOCUMENTS reflecting or recording the results and interpretations of these tests or analyses.

**RESPONSE**: Plaintiff refers Defendant to her response to Request No. 45.

Respectfully submitted,

KLINE & SPECTER, P.C.
By: /s/ Tobias L. Millrood
Tobias L. Millrood, Esq.

Dated: October 12, 2023

# EXHIBIT C

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

| | |
|---|---|
| **From:** | Fuchs, Ronni E. <Ronni.Fuchs@Troutman.com> |
| **Sent:** | Monday, October 16, 2023 4:04 PM |
| **To:** | Timothy Burke |
| **Cc:** | Fahey, Sean P. |
| **Subject:** | RE: NEC Phila Cases |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tim,

I am writing to let you know that the authorizations and responses to discovery are entirely inadequate, and not consistent with what plaintiffs agreed to provide. In August, Abbott served discovery, which included requests for lists of treating physicians and blank authorizations. We granted plaintiffs an extension of time to respond to our discovery with the understanding that plaintiffs would be providing us with records in your possession, and authorizations sufficient to permit record collection. In fact, in an August email exchange (included below) regarding plaintiffs' request that Abbott provide a four week extension on discovery responses, Tobi said that plaintiffs would be providing us with records you have, and – on a rolling basis – with lists of treaters, medical, education, and insurance authorizations. He also stated that plaintiffs would provide employment records (if seeking a wage loss claim) and psychiatric authorizations (if claiming emotional injury). We received nothing until last week. And what we received was not what we were told we would receive.

First, we did not receive *any* medical records. Second, we did not receive *any* authorizations for 7 cases of the 21 in which amended complaints were filed; in 14 cases, we received authorizations to permit collection of parent records from the birth hospital only; and, in only 12 cases, we received authorizations to permit collection of child records from birth hospitals and, at most, one or two other hospitals. Your discovery responses do not list any treaters, but just refer us to the authorizations. Surely, you are not suggesting that these children did not have pediatric or other medical care, or that the mothers received no obstetric care other than in the birth hospital?

As you know, the Court entered a schedule requiring all discovery to be completed by the beginning of June 2024 and suggested we begin plaintiffs' depositions as soon as possible. The process we were discussing, where you provide either lists of treaters and blank authorizations (or even a reasonably complete set of designated authorizations) for all 21 cases, along with records in your possession, would have given us a chance to meet that deadline. But we cannot do so with what you provided.

I also ask you to review the discovery responses. The majority of the interrogatories were Standard Form Interrogatories propounded pursuant to Local Rule 4005. Despite the prohibition on objections to standard form interrogatories, plaintiffs objected to each of them. Moreover, plaintiffs only provided substantive information in response about 10 of the 68 interrogatories for each plaintiff (limited to information such as the infant's address, date of birth, and hospital of birth). We will send you a letter detailing the deficiencies in plaintiffs' responses, but I ask that we have a call later this week about these issues.

Finally, when we spoke, you indicated you were surprised that defendants filed preliminary objections to the amended complaints. I want to make it clear that defendants' preliminary objections are not filed to preserve the record but because plaintiffs did not address the critical deficiencies in the initial pleadings. For example, Judge Carpenter pointed out during the last status conference that plaintiffs had not identified the formula products administered to each infant, suggesting that plaintiffs amend their complaints to identify the product administered or otherwise explain why such identification was not possible. But universally across the amended complaints, plaintiffs use the exact same phrasing as

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

had appeared in the initial complaints regarding the product used: "Abbott and/or Mead Johnson," without explaining why product identification is impossible in any case. Likewise, even with the benefit of amendment, plaintiffs still failed to plead the existence of a misrepresentation by either Mead Johnson or Abbott, let alone whether any plaintiff saw, heard, or relied on any such misrepresentation to their detriment. These are just two examples of substantive deficiencies that existed in the initial complaints and have not been remedied in plaintiffs' pleadings.

Please let me know when you are available to discuss plaintiffs' responses to discovery.

--Ronni

**Ronni E. Fuchs**
**Partner**
Direct: 609.951.4183 | Mobile: 267.907.3719 | Internal: 812-4183
ronni.fuchs@troutman.com

_____

**troutman pepper**
301 Carnegie Center
Suite 400
Princeton, NJ 08540
troutman.com

_____
Troutman Pepper is a Mansfield Certified Plus Firm

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

# EXHIBIT D

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Ronni E. Fuchs**
D 609.951.4183
Ronni.Fuchs@Troutman.com

October 27, 2023

**VIA E-MAIL**

Tobi Millrood
Tobi.Millrood@klinespecter.com

Timothy Burke
Timothy.Burke@klinespecter.com

Re:     *Preterm Infant Nutrition Litigation (PCCP Case Numbers PCCP Case Nos.*
        *220302583, 220302588, 220302594, 220302601, 220302606, 220302614, 220302617,*
        *220302963, 220302967, 220302969, 220302978, 220302981, 220302983, 220302986,*
        *220400127, 220400136, 220400138, 220400140, 220400141, 220400142, 220400145,*
        *220400153, 220400156, 220400158, 220400159, 220400162, 220400208, 220400212,*
        *and 220400216) Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott").  This letter pertains to Plaintiffs'
deficient Responses to Abbott's First Set of Interrogatories ("INTs"), Plaintiffs' deficient
Responses to Abbott's First Set of Requests for Production of Documents ("RFPs"), and the
limited Authorizations that Plaintiffs have provided to date.[1]  Abbott propounded these INTs and
RFPs on August 9, 2023, and agreed to Plaintiffs' request for an extension of time to respond
until October 9, 2023.  In the discussion regarding the extension, Abbott made clear that it would
grant the extension but that it needed authorizations, lists of treaters, and any records in Plaintiffs'
possession sooner than October 9 in order to prepare for Plaintiffs' depositions.  In response, on
August 31st, you said "[w]e will provide you with records we have. We will assemble a list of
treaters. We will supply med, education, insurance auths. We will supply employment records if
a wage loss claim is pursued and psych auth if we are claiming psych injury."

Despite that assurance, Abbott received nothing – no records, authorizations, or lists of treaters
prior to October 9.  On October 11 and 12, Plaintiffs provided responses to INTs and RFPs, with
a small set of authorizations for about half of the cases.  On October 16, 2023, Abbott informed
Plaintiffs of the significant deficiencies in its responses, including missing authorizations,
incomplete sets of authorizations, lack of treater lists and lack of any records from Plaintiffs.  We

_____

     [1] Abbott uses the term "Plaintiffs" to refer to all Plaintiffs across the 21 cases in which Amended
Complaints have been filed.  We understand that you will be filing petitions for the dismissal of the eight
cases in which Amended Complaints were not filed.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 2



received no response until October 26, when we received limited authorizations in most (but not all) of the remaining cases. At the Case Management Conference before Judge Carpenter in July 2023, there was discussion about beginning to take Plaintiffs' depositions by the end of this year. This was always going to be challenging, but in light of Plaintiffs' failure to produce any medical records, sufficient authorizations to permit the collection of records, or meaningful responses to written discovery, Plaintiffs have almost ensured that Defendants will not be in a position even to begin these depositions this calendar year.

As discussed below and in our October 16th email to you, Plaintiffs' responses are deficient, and we request that they be promptly supplemented no later than November 3, 2023. If you disagree and believe that any response is not deficient, we request a telephonic meet and confer. Please let us know your availability for a call during the week of November 6. We appreciate Plaintiffs' anticipated cooperation in resolving these deficiencies.

## I.      Authorizations

In **Request for Production Nos. 20-24**, Abbott requested signed medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both Infant and Parent, to permit Abbott to begin the collection of relevant medical records. Plaintiffs corresponded with Abbott in late August, seeking an extension of time to respond to the discovery. Abbott agreed to provide Plaintiffs with a 30-day extension of time to respond to the discovery, but with an agreement that Plaintiffs would be providing Abbott with (1) signed authorizations, (2) lists of treaters, and (3) medical records in Plaintiffs' possession.

Yet, it was not until October 11, 2023 that Plaintiffs first provided Abbott with any authorizations – and then, only in about half of the cases. Plaintiffs then provided limited authorizations in seven additional cases on October 26, 2023 (after Abbott sent correspondence following up). Plaintiffs' delay in providing even these limited authorizations – and continued delay in providing **full and complete** authorizations – prevented Abbott from adequately preparing to take Plaintiffs' depositions by the end of this year.

The medical authorizations provided are "designated" authorizations; that is, they are directed to single specific entities and therefore cannot be used to collect records from any additional providers. Abbott requested Plaintiffs to provide blank authorizations along with lists of treaters. This would have permitted Abbott to efficiently collect records. Instead, by providing authorizations for only limited providers, Plaintiffs have ensured further delay in the collection of records.

Beyond the reasons noted above, the authorizations are deficient in several other respects:

***First***, with regard to Infant authorizations that have been produced, Plaintiffs provided a single authorization in five cases, which was directed to the Infant's birth hospital. As discussed with the Court in July, the birth records do not provide information about the child's ongoing course or current condition. In ten more cases, Plaintiffs provided only two authorizations, one directed to the Infant's birth hospital and one additional hospital. In three cases, Plaintiffs provided authorizations for three or more hospitals, which consisted of the Infant's birth hospital and two or more additional hospitals. Plaintiff provided an authorization for pediatric care in only one case. In no other instance did Plaintiffs provide any medical authorizations for the Infant's pediatrician,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 3



GI treating physician, or any other medical provider. Plaintiffs also did not provide any insurance, education, or psychiatric/psychotherapy authorizations. ***Plaintiffs failed to produce any Infant authorizations in Wiggins** and **Williams.***

***Second***, with regard to Parent authorizations that have been produced, Plaintiff-Parents provided only one authorization in 19 cases – that for the birth hospital. Plaintiffs did not provide any authorizations for Plaintiff-Parents' obstetrician/ gynecologist or any other treaters. Plaintiffs also did not provide any insurance, employment, or psychiatric/psychotherapy authorizations. ***Plaintiffs failed to produce any Parent authorizations in Wiggins**.*

Finally, Plaintiffs failed to produce lists of treaters or a single medical record in their possession. Abbott expects Plaintiffs to produce (1) ***full and complete*** authorizations in ***all*** 21 cases, (2) lists of treaters, and (3) all medical records in Plaintiffs possession, no later than November 3, 2023.

## II.   Interrogatories (INTs)

Plaintiffs' responses to Abbott's INTs are almost entirely deficient. Abbott first discusses deficiencies in the Standard INT responses, before reviewing deficiencies in the Supplemental INT responses. As a threshold issue, Plaintiffs failed to verify any of their INT responses as required by Pa. R. Civ. P. 4006(a)(1).

### A.   <u>Standard Interrogatories Pursuant to Phila. Cnty. Loc. R. 4005 (INT Nos. 1 through 41)</u>

***First***, Plaintiffs improperly objected to each and every Standard INT. Abbott propounded 21 Standard INTs on each Infant and Parent. Abbott clearly indicated in the introductory paragraph that these INTs were propounded pursuant to Phila. Cnty. Loc. R. 4005. Additionally, Abbott even cited the Standard Interrogatory category and Interrogatory Number next to each Standard INT.

Pursuant to the plain text of that rule, "The Court will not entertain objections to the standard interrogatories ***and parties who file such objections will be subject to sanctions*** including imposition of counsel fees." *See* Phila. Cnty. Loc. R. 4005(D) (emphasis added). Notwithstanding this clear instruction and caution, Plaintiffs universally objected to each and every one of the Standard INTs that Abbott propounded in all 21 cases.

The failure to comply with Loc. R. 4005(D) is compounded by the fact that, in response to at least 26 of the 42 Standard INTs, Plaintiffs provided absolutely no response at all.[2] These non-responses fall into three categories: refusal to respond, offers to meet and confer, and unspecific promises to supplement. Each type of non-response is discussed below.

In response to **INT Nos. 3, 18, 19, 20, 24, 28, 29, 39, and 40**, Plaintiffs outright objected to the Standard INT and provided no further response. This is an especially inappropriate response to Standard INTs, which, by rule, may not be objected to.

---

[2] About half of the Plaintiffs failed to respond to Standard INTs 31 and 32 as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 4



In response to **INT Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, and 36**, Plaintiffs objected to the Standard INT and offered to meet and confer. Plaintiffs provided absolutely no other substantive response to any part of the INTs that Plaintiffs did not find objectionable. Despite Plaintiffs' unfounded objections, these requests are highly relevant and appropriate, including:

- **INT No. 2**: If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

- **INT No. 5**: State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

- **INT No. 7**: Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint? If so, state: (a) A description of the injuries or diseases you suffered; (b) The date and place of any accident, if such an injury or disease was caused by an accident; and (c) The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

- **INT No. 10**: State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

- **INT Nos. 14 & 34**: Have you given any statement concerning this action or its subject matter? If so, state: (a) The name and last known address of each person to whom a statement was given; (b) When and where each statement was given; and (c) Please consider this a Request to Produce the statements referred to in the above answer.

In response to **INT Nos. 11, 12, 17, and 37**, Plaintiffs objected to the INTs and responded only that they will supplement their responses with unspecified information at some unspecified time in the future. This response is wholly inappropriate. These INTs seek basic information about cases that Plaintiffs themselves brought, which Plaintiffs should have had in their possession prior to filing their complaints.

Moreover, the information responsive to each of these interrogatories is uniquely within Plaintiffs' possession and relevant to the cases. For example, **INT Nos. 11 and 12** inquire as to the names and locations of witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the Amended Complaints. Plaintiffs' suggestion that the investigation as to each of these areas of inquiry is premature strains credulity. Even if some information remains subject to investigation, Plaintiffs must provide the information they currently have.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 5



***Second***, with respect to the Standard INTs to which Plaintiffs arguably "responded," the responses are overwhelmingly deficient. In response to **INT Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41**, Plaintiffs generically refer to medical authorizations, medical records, and/or other unspecified productions by Defendants or third parties. These responses are wholly insufficient. To begin, the authorizations do not provide any substantive information besides the name of a single hospital, which is arguably only partially responsive to **INT Nos. 6 and 27** from the above list. Further, Plaintiffs have yet to turn over a single medical record in any of the 21 cases, despite suggesting in their response to Pennsylvania Hospital's preliminary objections that they relied on these records in preparing their Amended Complaints. *See* Pls. Resp. to Penn POs, at pg. 13. Lastly, Plaintiffs' vague reference to "all relevant documents that will be produced during the course of discovery" is wholly insufficient.

***Third***, Plaintiffs provided substantive information in response to no more than four Standard INTs, and, in most cases, only two Standard INTs. In **INT Nos. 1 and 22**, Abbott requested "(a) Your full name; (b) Any other names you have used or been known by; (c) Your date and place of birth; (d) Your marital status at the time of the incident; € Your present marital status; (f) Your present home address; and (g) Your social security number." In response, Plaintiffs provided only Parent's home address, Infant's home address, Infant's date and place of birth, and in one instance, Infant's date of death. While Plaintiffs agreed to produce social security numbers after entry of a protective order, Plaintiffs failed to respond to the remaining components of the request and instead, objected in defiance of Rule 4005(D).

Similarly, only 10 of the 21 Plaintiffs provided any substantive response to **INT Nos. 31 and 32**. **INT Nos. 31 and 32** sought information about the witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the Amended Complaints. Eleven of the 21 Plaintiffs objected outright to both **INT Nos. 31 and 32**, noting only that Plaintiff would supplement "if necessary." Six of the 21 Plaintiffs responded to **INT No. 32** by providing only the name of the birth hospital and standing on their objections to **INT No. 31**. Four of the 21 Plaintiffs responded to **INT Nos. 31 and 32** by only providing very limited information on potential witnesses, such as the name of the Infants' father and/or grandfather (*Henderson*, *McMillian*), unnamed nurses in the NICU (*Parker*), and unnamed employees of the Children's Hospital of Philadelphia (*Sanders*). Beyond these very limited answers, Plaintiffs provided no other substantive information in response to the Standard INTs.

***Fourth***, Plaintiffs responded to Standard **INT Nos. 23, 26, and 27** by suggesting that, as discovery is ongoing, "Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes." The potentially changing nature of Infants' injuries does not relieve Plaintiffs of their discovery obligation to respond to this Standard INT and identify any presently known injuries that are responsive thereto. Moreover, Plaintiff Mays responded to **INT No. 22** and indicated that Infant A.R. died on August 15, 2005. Yet, despite Infant's passing, Plaintiff Mays responded to **INT Nos. 23, 26, and 27** by claiming that "Infant is continuing to develop and may face new, or worsened, injuries as time passes."

Abbott requests that Plaintiffs amend and supplement their deficient INT responses, and withdraw all objections, so as to cure the deficiencies indicated above, no later than November 3, 2023.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 6



---

  B.  <u>Supplemental Interrogatories</u>

Abbott also propounded 27 Supplemental INTs on Plaintiffs. Much like the Standard INTs, Plaintiffs responded with a mixture of pure objections, offers to meet and confer, vague references to authorizations and medical records not yet produced, and extraordinarily limited substantive information. Each deficiency is reviewed below.

***First***, Plaintiffs objected or responded to several INTs, asserting that discovery is "early and ongoing" or "premature" (**INT Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63**). This objection is unfounded and does not excuse Plaintiffs from satisfying their discovery obligations. These INTs seek basic information about cases that Plaintiffs themselves brought, which Plaintiffs should have had in their possession prior to filing their complaints. Additionally, Plaintiffs' failure to produce this basic information has prevented Defendants from being in a position to take Plaintiffs' depositions.

For example, **INT No. 42** simply seeks identification of the product Infant was administered. Plaintiffs cannot continue to avoid answering basic questions that go to the heart of their claims by continuously asserting that their investigation is "ongoing."[3]

Moreover, Abbott served these requests on August 9, 2023. Despite an extension to October 9, 2023, Plaintiffs provided substantively deficient responses. These requests sought information that is particularly and uniquely within Plaintiffs' possession. For example:

- STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials. (**INT No. 43**)

- STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS. (**INT No. 44**).

- IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items

---

[3] Plaintiffs also objected to **INT No. 42** as requiring expert opinion. This objection, too, is unsupportable. The information required to respond **INT No. 42** would be uniquely in Plaintiffs' possession or, at worst, readily available to Plaintiffs through their medical records. These deficiencies are not cured by any vague promise to supplement at a later date. Rather, Plaintiffs have a plain discovery obligation to provide contemporaneous responses to these relevant requests.

<span style="color:red">Certification Due Date: 11/20/2023</span>
<span style="color:red">Response Date: 11/27/2023</span>
<span style="color:red">Case ID: 220302601</span>
<span style="color:red">Control No.: 23112452</span>

**Deficiency Letter**
**October 27, 2023**
Page 7



---

to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items. (**INT No. 46**)

To the extent Plaintiffs provided any response to these interrogatories, the responses were wholly generic, lacking substantive information, and failed to answer all components of the INTs. For example, in response to **INT No. 44** about communications with HCPs regarding the decision to administer nutrition to Infant, including the persons involved, as well as the time, place, manner, and content of the communication, Plaintiffs' responses included generic phrases such as:

- "Plaintiff recalls discussing the benefits of feeding premature babies with human milk but does not recall having conversations related to consent to feed her child." (*Goodmond Rya G.*, *Goodmond Ryh G.*);

- "Plaintiff recalls signing a consent form for her child to be given formula or fortifier." (*Kajuffa*);

- "Plaintiff recalls being consulted about nutrition . . . ." (*Moment*); and

- "Plaintiff recalls having conversations related to consent to feed her child." (*Taylor*).

In each of these instances, Plaintiffs fail to provide basic information that is central to the claims they brought, including the location, time, content, and participants of these conversations.[4]

***Second***, Plaintiffs universally objected and failed to provide any further response to 14 of the 27 Supplemental INTs. (**INT Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67**). Plaintiffs' failure to provide any responses to these INTs is wholly unacceptable. These INTs seek information that is highly relevant to Plaintiffs' claims and Abbott's defenses, including, among others, the identity of the formula product administered to Infant (**INT No. 42**), what additional/different warnings Plaintiffs contend Abbott should have provided regarding its preterm infant nutrition products (**INT No. 48**), the date on which Infant was diagnosed with NEC (**INT No. 52**), the identity of other pregnancies the Plaintiff-Parent has experienced and whether those Infants received preterm Infant formula (**INT Nos. 55 and 56**), the identity of persons who maintain relevant records (**INT No. 57**), Infant's non-NEC diagnoses, if any (**INT No. 58**), and Parent and Infant's educational background and employment (**INT Nos. 61 and 62**). These issues are central to the case at hand. Plaintiffs themselves placed these questions squarely at issue in this litigation. Plaintiffs have alleged their Infant ingested Abbott's formula; Plaintiffs have alleged their Infant was diagnosed with NEC; and Plaintiffs have alleged that there are alternative forms of nutrition available. Abbott is entitled to investigate and test these allegations by requesting information from Plaintiffs regarding these allegations, and Plaintiffs' claim that discovery is "ongoing" in no way relieves them of their obligation to provide complete and accurate responses to these INTs that detail the information presently known to Plaintiffs.

---

[4] Note that these same failures and lack of substantive information similarly plague Plaintiffs' responses to **INT Nos. 42, 45, 46, 47 and 53**.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 8



Abbott requests that Plaintiffs amend and supplement their deficient responses, and withdraw all unsupportable objections, so as to cure the deficiencies described above, no later than November 3, 2023.

### III.    Requests for Production of Documents (RFPs)

All Plaintiffs across all 21 cases provided identical deficient responses to each of the 46 Requests for Production propounded by Abbott.  The deficiencies in Plaintiffs' responses to these RFPs are detailed below.

***First***, in response to **RFP Nos. 1, 6, 9, 17, 38, 39, 42, and 44**, Plaintiffs directed Abbott to unspecified medical authorizations, medical records that have been **or will be** produced, and, in some instances, third-party productions.  To date, Plaintiffs have not produced a single medical record to Abbott.  Even in the cases in which Plaintiffs provided Infant authorizations, Plaintiffs generally provided authorizations for only the Infant's birth hospital and one other treating hospital, entirely omitting authorizations for pediatricians and other treaters.  For Parents, Plaintiffs generally only provided authorizations for the Infant's birth hospital, omitting any OB/GYN or other treaters.   Plaintiffs also failed to provide any insurance, educational, employment, or psychiatric/psychotherapy authorizations. Accordingly, in light of Plaintiffs' failure to timely provide Abbott with complete authorizations for all 21 cases, Plaintiffs' referral to those limited set of authorizations in an effort to respond to the above-mentioned RFPs is wholly insufficient.

Moreover, Plaintiffs' manner of response, by simply referring to the authorizations, is deficient for yet another reason.  In particular, neither the authorizations, nor the medical records that they authorize Abbott to obtain, would result in documents responsive to a majority of these requests, including, for example:

- **RFP No. 1**: All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

- **RFP No. 6**: All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

- **RFP No. 17**: All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

- **RFP No. 38**: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- **RFP No. 39**: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 9



- **RFP No. 42**: All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

- **RFP No. 44**: All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

*Second*, in response to **RFP Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45,** Plaintiffs objected to each RFP as "premature." This objection is unsupportable. The information responsive to each of these RFPs is uniquely within Plaintiffs' possession. These RFPs seek basic information, much of which Plaintiffs should have had in their possession at the time the Initial Complaints were filed, and none of which requires any lengthy investigation to uncover. To provide a stark example, Plaintiffs universally objected that it was premature of Abbott to seek authorizations for medical records from Plaintiffs. Notwithstanding, Plaintiffs responded to eight additional RFPs by referring Abbott to those very authorizations and medical records. Plaintiffs cannot have it both ways. Plaintiffs' failure to provide this critical and relevant information, or otherwise authorize Abbott to obtain it itself, prevents Abbott from preparing for the depositions of Plaintiffs.

*Third*, in response to **RFP Nos. 2, 20, 21, 22, 23, and 24**, Plaintiffs objected to each RFP as seeking "health information protected by state and federal law." This objection is unsupportable for several reasons. Plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information. Moreover, as each of **RFP Nos. 20, 21, 22, 23, and 24** makes clear, the authorizations through which Abbott seeks permission to collect this information are HIPAA-compliant.

*Fourth*, Plaintiffs object to **RFP Nos. 8 and 9** as "not limited in time and scope." This is categorically incorrect. **RFP No. 8**, by its very terms, seeks documents "in the ten (10) years preceding the events giving rise to this LAWSUIT to the present." In addition, **RFP No. 9** seeks medical bills, statements, or invoices "for which YOU seek damages in this LAWSUIT." This request is clearly limited to and targeted at documents which detail the amount of Plaintiffs' alleged damages. There is no colorable argument that these documents are outside of the temporal scope of this litigation or otherwise "not related or relevant to the issues in this case" as Plaintiffs claim.

Abbott requests that Plaintiffs amend and supplement their deficient responses, and withdraw all unsupportable objections, so as to cure the deficiencies indicated above, no later than November 3, 2023.

\*  \*  \*

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

**Deficiency Letter**
**October 27, 2023**
Page 10



It is Abbott's hope that the parties can resolve most, if not all, of the above deficiencies, or at least significantly narrow the issues that will need to be raised with the Court. Abbott requests a prompt response to this letter by November 3, 2023 and, in the absence of remediation of all deficiencies, a meet and confer during the week of November 6.

Very truly yours,

Ronni E. Fuchs

cc:      All counsel of record (via email)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: November 10, 2023                  */s/ Ronni E. Fuchs*
                                          Ronni E. Fuchs

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302601
Control No.: 23112452

## **CERTIFICATE OF COMPLIANCE**

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

# EXHIBIT A-58

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

Filed and Attested by the
Office of Judicial Records
14 NOV 2023 02:55 pm
N. SWEENEY

| | |
|---|---|
| TERRAINE ABDULLAH, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302583 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| HOLLI CARTER, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| SHONDERA DRAYTON, et al., | : |
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302594 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| JANEE HENDERSON, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| DELQUAN HINES, et al., | |
| Plaintiff, | APRIL TERM, 2022 |
| v. | No. 220400136 |
| MEAD JOHNSON & COMPANY, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| SHEMIKA JOHNSON, et al., | : |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400162 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CATHERINE McMILLIAN, et al., | |
| Plaintiff, | APRIL TERM, 2022 |
| v. | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | |
| Defendants. | |

| | |
|---|---|
| DAMEKA MOMENT, et al., | |
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |

Case ID: 220302601
Control No.: 23111658

|  |  |
|---|---|
| Defendants. | : |

| | |
|---|---|
| LOREN SANDERS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400153 |

| | |
|---|---|
| SAMAYA SHORT, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400159 |

| | |
|---|---|
| ALICE STILLS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302617 |

| | |
|---|---|
| CHRISTINA TAYLOR, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302606 |

| | |
|---|---|
| NATISHA THOMAS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220400158 |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON<br>ISAIAH SAVAGE, JR., et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220400156 |

| | |
|---|---|
| ROBERT WHITFIELD, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400145 |

| | |
|---|---|
| GINA WIEGER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302614 |

| | |
|---|---|
| GINA WIEGER, et al., | : |

Case ID: 220302601<br>Control No.: 23111658

|  | : | MARCH TERM, 2022 |
| Plaintiff, | : | No. 220302601 |
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| MELVENIA WILLIAMS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| IVYANN WITHERSPOON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400138 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

**Attorney Certification of Good Faith**
**Pursuant to Phila.Civ.R. * 208.2(e)**

The undersigned counsel for movant hereby certifies and attests that:

√ a.     He or she has had the contacts described below with opposing counsel or unrepresented party regarding discovery matter contained in the foregoing discovery motion in an effort to resolve the specific discovery dispute(s) at issue and, further, that despite all counsel's good faith attempts to resolve the dispute(s), counsel have been unable to do so.

Description:

On August 17, 2023, Plaintiff's Counsel emailed Defense Counsel indicating the need to depose Defendant's Corporate Designee.

On September 27, 2023, Plaintiff's Counsel emailed Defense Counsel to follow up on the August 17, 2023, request to depose Defendant's Corporate Designee because Defendants never provided dates for said deposition.

On October 11, 2023, Plaintiff's Counsel emailed Defense Counsel a Notice of Deposition to depose Defendant's Corporate Designee on November 1, 2023, because Defendants never provided dates for said deposition.

On October 30, 2023, Defendants emailed Plaintiffs refusing to produce Defendant's Corporate Designee for deposition on November 1, 2023.

To date, Defense counsel has not provided any available dates for the deposition of Defendant's Corporate Designee.  On October 30., 2023 Counsel for Defendant advised Plaintiffs' Counsel that they are working diligently to obtain the information requested via

discovery and the corporate designee notices and will in contact regarding promptly rescheduling these depositions, but it has failed to do so to date.

_ b.     He or she has made good faith but unsuccessful efforts described below to contact opposing counsel or unrepresented party in effort to resolve the discovery dispute.

Description:

N/A. See above.

CERTIFIED TO THE COURT BY:

**KLINE & SPECTER, P.C.**

Date: November 14, 2023          By:     */s/ John P. O'Neill*
                                         JOHN P.  O'NEILL, ESQUIRE
                                         TIMOTHY A. BURKE, ESQUIRE
                                         Attorney ID Nos. 205677 / 320927
                                         KLINE & SPECTER, P.C.
                                         1525 Locust Street
                                         Philadelphia, PA 19102
                                         Tel: (215) 772-1000
                                         Fax: (215) 772-1359

                                         *Attorneys for Plaintiffs*

**Note: The Signature of Respondent's Counsel is Not Required**

# EXHIBIT A-59

*Filed and Attested by the*
*Office of Judicial Records*
*27 NOV 2023 04:39 pm*
*M. TIERNEY*

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor<br><br>        Plaintiff<br><br>      v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302588 |
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br>        Plaintiffs,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM 2022<br>NO. 220302583 |
| Shondera Drayton, on her own behalf and as Parent and Natural Guardian of A.D., a minor,<br>        Plaintiffs<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302594 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of M.P., a minor,<br>        Plaintiffs,<br>      v.<br>Mead Johnson & Company, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302614 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor,<br>        Plaintiffs,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302601 |
| Alice Stills, on her own behalf and as Parent and Natural Guardian of M.E., a minor,<br>        Plaintiffs,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al..<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302617 |
| Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor,<br>        Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>NO. 220302606 |

## **ORDER**

**AND NOW**, this _____ day of _____ 2023, upon

consideration of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health

System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn

Medicine's Response to Plaintiffs' Motion to Compel the Deposition of Corporate Designee, it is

hereby **ORDERED**, **ADJUDGED,** and **DECREED** that Plaintiffs' Motion to Compel the

Deposition of Corporate Designee is **DENIED**.

_____
                                                                          J.

**BURNS WHITE LLC**
By:    **James A. Young, Esq.**
       **Richard S. Margulies, Esq.**
       **Susan R. Engle, Esq.**
       Attorney ID Nos. 00213/62306/81671
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

*Attorneys For Defendants,*
*The Pennsylvania Hospital of the University of*
*Pennsylvania Health System d/b/a*
*Pennsylvania Hospital and The Trustees of the*
*University of Pennsylvania d/b/a Penn*
*Medicine*

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor<br><br>　　　　　　　　Plaintiff<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>　　　　　　　　Defendants. | MARCH TERM, 2022<br>NO. 220302588 |
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br>　　　　　　　　Plaintiffs,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>　　　　　　　　Defendants. | MARCH TERM 2022<br>NO. 220302583 |
| Shondera Drayton, on her own behalf and as Parent and Natural Guardian of A.D., a minor,<br>　　　　　　　　Plaintiffs<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>　　　　　　　　Defendants. | MARCH TERM, 2022<br>NO. 220302594 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of M.P., a minor,<br>　　　　　　　　Plaintiffs,<br>　　　v.<br>Mead Johnson & Company, LLC, et al.,<br>　　　　　　　　Defendants. | MARCH TERM, 2022<br>NO. 220302614 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor,<br>　　　　　　　　Plaintiffs,<br>　　　v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>　　　　　　　　Defendants. | MARCH TERM, 2022<br>NO. 220302601 |

| | |
|---|---|
| Alice Stills, on her own behalf and as Parent and Natural Guardian of M.E., a minor, | : |
| Plaintiffs, | : |
| v. | : MARCH TERM, 2022 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : NO. 220302617 |
| Defendants. | : |

| | |
|---|---|
| Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor, | : |
| Plaintiff, | : |
| v. | : MARCH TERM, 2022 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : NO. 220302606 |
| Defendants. | : |

## DEFENDANTS, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA D/B/A PENN MEDICINE, RESPONSE TO PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF CORPORATE DESIGNEE

Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine (hereinafter "Responding Defendants"), by and through their counsel, Burns White LLC, hereby file the instant Response to Plaintiffs' Motion to Compel the Deposition of Corporate Designee, and aver in support as follows:

1. It is admitted that this paragraph summarizes the allegations made in Plaintiffs' Complaints. The substance of the allegations is denied.

2. It is admitted that this paragraph summarizes the allegations made in Plaintiffs' Complaints. The substance of the allegations is denied.

3. Admitted.

4. Admitted that Exhibit "A" was sent to defense counsel.

5. Admitted that Exhibit "B" was sent to defense counsel.

6. Admitted that Exhibit "C" was sent to defense counsel.

7. Denied as stated. It is admitted that defense counsel send the email marked as Exhibit

"D."  It is denied that Responding Defendant refused to produce a witness.  The deposition was unilaterally noticed and Responding Defendant was not able to coordinate a witness on such short notice without regard for the schedules of all counsel and the witness.

8.  Denied.  Responding Defendant has provided dates for two of its three clients, and has advised Plaintiffs' counsel that it is actively working to schedule the last of the depositions.  It is expected a date will be agreed upon by all parties imminently.

9.  Admitted.

10. Denied.

WHEREFORE, Defendants request that this Honorable Court sustain Defendants' Objections to Plaintiff's Motion to Compel and enter the attached proposed Order.

Respectfully submitted,

**BURNS WHITE LLC**

BY:     _/s/ Susan R. Engle_____
        JAMES A. YOUNG, ESQ.
        RICHARD S. MARGULIES, ESQ.
        SUSAN R. ENGLE, ESQ.

        *Attorneys for Defendants,*
        *The Pennsylvania Hospital of the University*
        *of Pennsylvania Health System d/b/a*
        *Pennsylvania Hospital and The Trustees of*
        *the University of Pennsylvania d/b/a Penn*
        *Medicine*

## CERTIFICATE OF SERVICE

I, Susan R. Engle, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Response of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Motion to Compel the Deposition of Corporate Designee to be served via the electronic filing system to all counsel of record.

BY:     _/s/ Susan R. Engle_____

Dated:  November 27, 2023

# EXHIBIT A-60

Filed and Attested by the
Office of Judicial Records
03 NOV 2023 11:88 am
N. SWEENEY

| | |
|---|---|
| TERRAINE ABDULLAH, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>:<br>: MARCH TERM, 2022<br>: No. 220302583<br>:<br>: |
| HOLLI CARTER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302588<br>: |
| SHONDERA DRAYTON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302594<br>: |
| JANEE HENDERSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400127<br>: |
| DELQUAN HINES, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400136 |
| SHEMIKA JOHNSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400162<br>: |
| CATHERINE McMILLIAN, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | APRIL TERM, 2022<br>No. 220400140 |
| DAMEKA MOMENT, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400142<br>: |
| LOREN SANDERS, et al., | : |

220302601-Wieger Etal Vs Mead Johnson



22030260100124

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

|  | |  |
|---|---|---|
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| SAMAYA SHORT, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| ALICE STILLS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| CHRISTINA TAYLOR, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| NATISHA THOMAS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| TRINA WALKER-SAVAGE and CLIFTON | : | |
| ISAIAH SAVAGE, JR., et al., | : | MARCH TERM, 2022 |
| Plaintiff, | : | No. 220400156 |
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| ROBERT WHITFIELD, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400145 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

|  | |  |
|---|---|---|
| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

MEAD JOHNSON & COMPANY, LLC, et al., :
    Defendants. :

| | |
|---|---|
| MELVENIA WILLIAMS, et al., : | APRIL TERM, 2022 |
|    Plaintiff, : | No. 220400141 |
| v. : | |
| MEAD JOHNSON & COMPANY, : | |
| LLC, et al., | |
| Defendants. : | |
| IVYANN WITHERSPOON, et al., : | APRIL TERM, 2022 |
|    Plaintiff, : | No. 220400138 |
| v. : | |
| MEAD JOHNSON & COMPANY, : | |
| LLC, et al., | |
| Defendants. : | |

## *th*     ORDER

**AND NOW** this ___28___ day of _____Nov._____, 2023, upon

consideration of Plaintiff's Motion to Compel Deposition of Defendant, Hospital of The University

of Pennsylvania's Corporate Designee, and any response thereto, is hereby **ORDERED** that said

Motion is **GRANTED.**

    **IT IS FURTHER ORDERED** that counsel for Defendant shall make Defendant's

Corporate Designee available within 20 days of the date of this Order, on a mutually agreeable

date and time.

DOCKETED

NOV 28 2023

K CALDWELL
JUDICIAL RECORDS

*Discovery Deadline: February 5, 2024*

BY THE COURT:

_____ J.

MOTION SUBMITTED

NOV 28 2023

UNCONTESTED

Certification Due Date: 11/14/2023
Response Date: 11/21/2023
Case ID: 220302601
Control No.: 23111658

# EXHIBIT A-61

**FILED**

20 OCT 2023 04:44 pm

**Civil Administration**

A. CLARKE

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| : | |
| Plaintiffs, : | **MARCH TERM, 2022** **No. 2601** |
| v. : | |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| : | |
| Defendants. : | |

## ORDER

**AND NOW**, this _14th_ day of _December_, 2023, upon consideration of

the Motion for Admission Pro Hac Vice of Evan Glassman, Esquire, to Represent

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it

is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Evan

Glassman, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson &

Company, LLC and Mead Johnson Nutrition Company.

BY THE COURT:

_____ J.

220302601-Wieger Etal Vs Mead Johnson



22030260100126

Case ID: 220302601
Control No.: 23104227

# EXHIBIT A-62

**COURT OF COMMON PLEAS OF PHILADELPHIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the*
*Office of Judicial Records*
*22 JAN 2024 03:18 pm*
*E. HAURIN*

| | |
|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor,* | : |
| | : |
| | : Case No.: 220302583 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| HOLLI CARTER, *on her own behalf and as Parent and Natural Guardian of J.C., a Minor,* | : |
| | : |
| | : Case No.: 220302588 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| SHONDERA DRAYTON, *on her own behalf and as Parent and Natural Guardian of* A.D.*, a Minor,* | : |
| | : |
| | : Case No.: 220302594 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |

Page 1

Case ID: 220302601
Control No.: 24014692

MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; ABBOTT : 
LABORATORIES; THE PENNSYLVANIA : 
HOSPITAL OF THE UNIVERSITY OF : 
PENNSYLVANIA HEALTH SYSTEM, *d/b/a* : 
PENNSYLVANIA HOSPITAL; and THE : 
TRUSTEES OF THE UNIVERSITY OF : 
PENNSYLVANIA, *d/b/a* PENN MEDICINE, : 
                                     : 
        Defendants. : 

BRANDY GOODMOND, *on her own behalf and as* : 
*Parent and Natural Guardian of* RYA G*., a Minor*, : 
                                     :   Case No.: 220400208
        Plaintiffs, : 
                                     :   **JURY TRIAL DEMANDED**
v. : 
                                     : 
MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; : 
ABBOTT LABORATORIES; THOMAS JEFFERSON : 
UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS : 
JEFFERSON UNIVERSITY HOSPITAL, and : 
THOMAS JEFFERSON UNIVERSITY, *d/b/a*, : 
JEFFERSON HEALTH SYSTEM, : 
                                     : 
        Defendants. : 

BRANDY GOODMOND, *on her own behalf and as* : 
*Parent and Natural Guardian of* RYH G*., a Minor*, : 
                                     :   Case No.: 220400212
        Plaintiffs, : 
                                     :   **JURY TRIAL DEMANDED**
v. : 
                                     : 
MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; ABBOTT : 
LABORATORIES; THOMAS JEFFERSON : 
UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS : 
JEFFERSON UNIVERSITY HOSPITAL, and : 
THOMAS JEFFERSON UNIVERSITY, *d/b/a*, : 
JEFFERSON HEALTH SYSTEM, : 
                                     : 
        Defendants. : 

TONYA GRAY, *on her own behalf and as Parent and* : 

Page 2

Case ID: 220302601
Control No.: 24014692

| | |
|---|---|
| *Natural Guardian of* J.M.*, a Minor,* | : |
| | :    Case No.: 220400216 |
| Plaintiffs, | : |
| | :    **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THOMAS JEFFERSON | : |
| UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS | : |
| JEFFERSON UNIVERSITY HOSPITAL, and | : |
| THOMAS JEFFERSON UNIVERSITY, *d/b/a*, | : |
| JEFFERSON HEALTH SYSTEM, | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| JANEE HENDERSON, *on her own behalf and as* | : |
| *Parent and Natural Guardian of* S.C.*, a Minor,* | : |
| | :    Case No.: 220400127 |
| Plaintiffs, | : |
| | :    **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE TRUSTEES OF THE | : |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE | : |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA; and THE TRUSTEES OF THE | : |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN | : |
| MEDICINE, | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| SHEMIKA JOHNSON, *on her own behalf and as* | : |
| *Parent and Natural Guardian of* W.J.*, a Minor,* | : |
| | :    Case No.: 220400162 |
| Plaintiffs, | : |
| | :    **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE TRUSTEES OF THE | : |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE | : |
| HOSPITAL OF THE UNIVERSITY OF | : |

Page 3

Case ID: 220302601
Control No.: 24014692

PENNSYLVANIA; and THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN   :
MEDICINE,   :
  :
            Defendants.   :

KRISTEN KAJUFFA, *on her own behalf and as*   :
*Parent and Natural Guardian of* B.K.*, a Minor,*   :
  :   Case No.: 220302978
  :
            Plaintiffs,   :
  :   **JURY TRIAL DEMANDED**
v.   :
  :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; TEMPLE UNIVERSITY   :
HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY   :
HOSPITAL,   :
  :
            Defendants.   :

NAFEESAH MAYS, *on her own behalf and as Parent*   :
*and Natural Guardian of* A.R.*, a Minor,*   :
  :   Case No.: 220302963
  :
            Plaintiffs,   :
  :   **JURY TRIAL DEMANDED**
v.   :
  :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; ALBERT EINSTEIN MEDICAL   :
CENTER, *a/k/a* EINSTEIN MEDICAL CENTER, and   :
ALBERT EINSTEIN HEALTHCARE NETWORK,   :
*d/b/a,* EINSTEIN HEALTHCARE NETWORK,   :
  :
            Defendants.   :

CATHERINE MCMILLIAN, *on her own behalf and as*   :
*Parent and Natural Guardian of* T.M.*, a Minor,*   :
  :   Case No.: 220400140
  :
            Plaintiffs,   :
  :   **JURY TRIAL DEMANDED**
v.   :
  :
MEAD JOHNSON & COMPANY LLC; MEAD   :

Page 4

Case ID: 220302601
Control No.: 24014692

JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE   :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA; and THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN   :
MEDICINE,   :
   :
      Defendants.   :

---

DAMEKA MOMENT, *on her own behalf and as*   :
*Parent and Natural Guardian of* A.M., *a Minor,*   :
   :  Case No.: 220400142
   :
      Plaintiffs,   :
   :  **JURY TRIAL DEMANDED**
v.   :
   :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE   :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA; and THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN   :
MEDICINE,   :
   :
      Defendants.   :

---

NYDIA PARKER, *on her own behalf and as Parent*   :
*and Natural Guardian of* M.H., *a Minor,*   :
   :  Case No.: 220302983
   :
      Plaintiffs,   :
   :  **JURY TRIAL DEMANDED**
v.   :
   :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; TEMPLE UNIVERSITY   :
HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY   :
HOSPITAL,   :
   :
      Defendants.   :

---

ALEXANDRIA ROSS, *on her own behalf and as*   :
*Parent and Natural Guardian of* B.M., *a Minor,*   :
   :  Case No.: 220302981

Page 5

Case ID: 220302601
Control No.: 24014692

|  | : |  |
|---|---|---|
| Plaintiffs, | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| v. | : |  |
|  | : |  |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |  |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |  |
| LABORATORIES; TEMPLE UNIVERSITY | : |  |
| HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY | : |  |
| HOSPITAL, | : |  |
|  | : |  |
| Defendants. | : |  |

| LOREN SANDERS, *on her own behalf and as Parent* | : |  |
|---|---|---|
| *and Natural Guardian of* Q.S., *a Minor*, | : |  |
|  | : | Case No.: 220400153 |
| Plaintiffs, | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| v. | : |  |
|  | : |  |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |  |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |  |
| LABORATORIES; THE TRUSTEES OF THE | : |  |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE | : |  |
| HOSPITAL OF THE UNIVERSITY OF | : |  |
| PENNSYLVANIA; and THE TRUSTEES OF THE | : |  |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN | : |  |
| MEDICINE, | : |  |
|  | : |  |
| Defendants. | : |  |

| SAMAYA SHORT, *on her own behalf and as Parent* | : |  |
|---|---|---|
| *and Natural Guardian of* S.M., *a Minor*, | : |  |
|  | : | Case No.: 220400159 |
| Plaintiffs, | : |  |
|  | : | **JURY TRIAL DEMANDED** |
| v. | : |  |
|  | : |  |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |  |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |  |
| LABORATORIES; THE TRUSTEES OF THE | : |  |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE | : |  |
| HOSPITAL OF THE UNIVERSITY OF | : |  |
| PENNSYLVANIA; and THE TRUSTEES OF THE | : |  |
| UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN | : |  |
| MEDICINE, | : |  |
|  | : |  |

Case ID: 220302601
Control No.: 24014692

|  |  |
|---|---|
| Defendants. | : |

ALICE STILLS, *on her own behalf and as Parent and* : 
*Natural Guardian of* M.E.*, a Minor,* :
                                   :   Case No.: 220302617

     Plaintiffs,          :

                                   :   **JURY TRIAL DEMANDED**

v.                              :

MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE PENNSYLVANIA   :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA HEALTH SYSTEM, *d/b/a*   :
PENNSYLVANIA HOSPITAL; and THE   :
TRUSTEES OF THE UNIVERSITY OF   :
PENNSYLVANIA, *d/b/a* PENN MEDICINE,   :
                                   :

     Defendants.          :

CHRISTINA TAYLOR, *on her own behalf and as* :
*Parent and Natural Guardian of* I.H.*, a Minor,* :
                                   :   Case No.: 220302606

     Plaintiffs,          :

                                   :   **JURY TRIAL DEMANDED**

v.                              :

MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE PENNSYLVANIA   :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA HEALTH SYSTEM, *d/b/a*   :
PENNSYLVANIA HOSPITAL; and THE   :
TRUSTEES OF THE UNIVERSITY OF   :
PENNSYLVANIA, *d/b/a* PENN MEDICINE,   :
                                   :

     Defendants.          :

NATISHA THOMAS, *on her own behalf and as* :
*Parent and Natural Guardian of* R.T.*, a Minor,* :
                                   :   Case No.: 220400158

     Plaintiffs,           :

                                   :   **JURY TRIAL DEMANDED**

v.                              :

MEAD JOHNSON & COMPANY LLC; MEAD   :

Case ID: 220302601
Control No.: 24014692

JOHNSON NUTRITION COMPANY; ABBOTT :
LABORATORIES; THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE :
THE HOSPITAL OF THE UNIVERSITY OF :
PENNSYLVANIA; and THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN :
MEDICINE, :
 :
   Defendants. :

TRINA WALKER-SAVAGE and CLIFTON ISAIAH :
WALKER-SAVAGE, JR., :
 :  Case No.: 220400156
   Plaintiffs, :
 :  **JURY TRIAL DEMANDED**
v. :
 :
MEAD JOHNSON & COMPANY LLC; MEAD :
JOHNSON NUTRITION COMPANY; ABBOTT :
LABORATORIES; THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE :
HOSPITAL OF THE UNIVERSITY OF :
PENNSYLVANIA; and THE TRUSTEES OF THE :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN :
MEDICINE, :
 :
   Defendants. :

JEANNATE WATSON, *on her own behalf and as* :
*Parent and Natural Guardian of* B.L.*, a Minor,* :
 :  Case No.: 220302967
   Plaintiffs, :
 :  **JURY TRIAL DEMANDED**
v. :
 :
MEAD JOHNSON & COMPANY LLC; MEAD :
JOHNSON NUTRITION COMPANY; ABBOTT :
LABORATORIES; ALBERT EINSTEIN MEDICAL :
CENTER, *a/k/a* EINSTEIN MEDICAL CENTER, and :
ALBERT EINSTEIN HEALTHCARE NETWORK, :
*d/b/a,* EINSTEIN HEALTHCARE NETWORK, :
 :
   Defendants. :

GINA WIEGER, *on her own behalf and as Parent and* :
*Natural Guardian of* M.P.*, a Minor,* :

Page 8

Case ID: 220302601
Control No.: 24014692

|  |  |
|---|---|
| Plaintiffs, | : Case No.: 220302614 |
| | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE PENNSYLVANIA | : |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA HEALTH SYSTEM, *d/b/a* | : |
| PENNSYLVANIA HOSPITAL; and THE | : |
| TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and* | : |
| *Natural Guardian of* S.P.*, a Minor,* | : |
| | : Case No.: 220302601 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE PENNSYLVANIA | : |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA HEALTH SYSTEM, *d/b/a* | : |
| PENNSYLVANIA HOSPITAL; and THE | : |
| TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| SHANITA WIGGINS, *on her own behalf and as* | : |
| *Parent and Natural Guardian of* T.B.*, a Minor,* | : |
| | : Case No.: 220302986 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; TEMPLE UNIVERSITY | : |
| HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY | : |
| HOSPITAL, | : |

Page 9

Case ID: 220302601
Control No.: 24014692

|  | : |  |
| --- | --- | --- |
| Defendants. | : | |

| MELVENIA WILLIAMS, *on her own behalf and as Parent and Natural Guardian of* R.W*., a Minor,* | : | |
| | : | Case No.: 220400141 |
| Plaintiffs, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : : | |
| | : | |
| Defendants. | : | |

| IVYANN WITHERSPOON, *on her own behalf and as Parent and Natural Guardian of* A.H., *a Minor,* | : | |
| | : | Case No.: 220400138 |
| Plaintiffs, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : | |
| | : | |
| Defendants. | : | |

### [PROPOSED] STIPULATED PROTECTIVE ORDER

To expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure

Case ID: 220302601
Control No.: 24014692

that protection is afforded only to material so entitled, plaintiffs in the above-captioned litigation ("Plaintiffs") and defendants Mead Johnson & Company, LLC, Mead Johnson Nutrition Company; Abbott Laboratories; Albert Einstein Medical Center, a/k/a Einstein Medical Center; Albert Einstein Healthcare Network, d/b/a, Einstein Healthcare Network; Mead Johnson & Company LLC; Mead Johnson Nutrition Company; Temple University Health System, d/b/a Temple University Hospital; The Pennsylvania Hospital of the University of Pennsylvania Health System, d/b/a Pennsylvania Hospital; The Trustees of the University Of Pennsylvania, d/b/a Penn Medicine; The Trustees of the University of Pennsylvania, d/b/a The Hospital of the University of Pennsylvania; Thomas Jefferson University Hospitals, Inc., d/b/a Thomas Jefferson University Hospital; Thomas Jefferson University, d/b/a, Jefferson Health System ("Defendants"), by and through their respective counsel, and pursuant to Pa. R.C.P. No. 4012, hereby stipulate and agree to the terms of this Stipulated Protective Order as follows:

IT IS HEREBY STIPULATED, subject to the approval of the Court that:

1. **APPLICABILITY OF THE PROTECTIVE ORDER.** This Stipulated Order Governing the Designation and Handling of Confidential Materials (hereinafter "Order") shall govern for pre-trial purposes the handling of documents, depositions, deposition exhibits, interrogatory responses, responses to requests for admissions, responses to requests for production of documents, and all other discovery obtained pursuant to the Pennsylvania Rules of Civil Procedure and Rules of Evidence by or from a Party in connection with the Action (this information hereinafter referred to as "Discovery Material"). Except where federal law applies, Pennsylvania law and rules shall govern this order. All references to "Party," "Receiving Party," "Producing Party" or "Designating Party" throughout this Order are intended to include Non-parties.

Case ID: 220302601
Control No.: 24014692

The Parties acknowledge that this Order does not confer blanket protections on all disclosures, responses to discovery, or testimony and that the protection it affords extends only to the information or items that are entitled to protection under the terms of this Order and any other applicable law. Furthermore, the Parties acknowledge that neither this Order—nor the confidentiality designations thereunder—constitutes a ruling by this Court that any specific information is, in fact, confidential.

2.      **OTHER DEFINITIONS**

   a.   **Action**: The above-captioned actions and any other Pennsylvania Court action coordinated with them for any purposes, including discovery purposes, and any other related actions in the Philadelphia Court of Common Pleas, provided additional or different Parties to those actions agree to be bound by the terms of this Order, and those other courts that enter this Order or a substantively identical order in reciprocal fashion.

   b.   **Party**: any party to this Action.

   c.   **Non-party**:  any individual, corporation, association, or other natural person or entity that is not a Party to this Action.

   d.   **Receiving Party**: a Party or Non-party that receives Discovery Material from a Producing Party.

   e.   **Producing Party**: a Party or Non-party that produces Discovery Material in this Action.

   f.   **Designating Party**: a Party or Non-party that designates information or items that it produces in disclosures or in responses to discovery or provides in the form of deposition testimony as Covered Information (as defined

Case ID: 220302601
Control No.: 24014692

below).  The Designating Party bears the burden of establishing good cause for the protection of all such information or items.

g. **Challenging Party**: a Party that elects to initiate a challenge to a Designating Party's confidentiality designation.

h. **TIFF**: A widely used and supported graphic file format for storing bit-mapped images, with many different compression formats and resolutions.

i. **Native Format**: An electronic document's associated file structure defined by the original creating application.  For example, the native format of an Excel workbook is a .xls or .xslx file.

3. **DESIGNATION OF MATERIAL AS "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL"**.  Any Producing Party may designate Discovery Material as "Confidential" or "Highly Confidential" under the terms of this Order if the Producing Party in good faith reasonably believes that such Discovery Material contains non-public, confidential, personal, proprietary or commercially sensitive information that requires protections provided in this Order (hereinafter referred to as "Confidential Material" or "Highly Confidential Material" as set forth below).  Confidential Material and Highly Confidential Material are collectively defined as "Covered Information."

a. **"Confidential Material."** "Confidential Material" means material or information that constitutes, reflects, discloses or contains (i) information protected from disclosure by any applicable State or federal statute or regulation; (ii) research, design, development, financial, technical, marketing, planning, manufacturing or commercial information that the Designating Party has maintained as confidential, as such terms are used in

Case ID: 220302601
Control No.: 24014692

Pa. R.C.P. 4012(a)(9), and any applicable case law interpreting these rules; and (iii) trade secrets as defined by the Restatement of Torts § 757 comment. Confidential Material shall also include any Protected Data (defined below). For avoidance of all doubt, all medical records produced in this case shall be designated Confidential and treated as personal health information ("PHI") in accordance with the Health Insurance Portability and Accountability Act ("HIPAA").

(i) **"Protected Data."** Protected Data shall refer to any information that a Party believes in good faith to be subject to federal, state, or foreign Data Protection Laws or other regulatory privacy obligations, including but not limited to Personal Health Information ("PHI") and Personally Identifiable Information ("PII"). Protected Data constitutes highly sensitive materials requiring special protection. Examples of such Data Protection Laws include, without limitation, The Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq. (financial information); The Health Insurance Portability and Accountability Act and the regulations thereunder, 45 CFR Part 160 and Subparts A and E of Part 164 (medical information); and the *General Data Protection Regulation (GDPR):* Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing

Case ID: 220302601
Control No.: 24014692

of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation), OJ 2016 L 119/1. Certain Protected Data may compel alternative or additional protections beyond those afforded Confidential Material, in which event the Parties shall meet and confer in good faith, and, if unsuccessful, shall move the Court for appropriate relief.

b. **"Highly Confidential Material."** For purposes of this Order, Highly Confidential Material shall include, but is not limited to, Confidential Material as defined herein containing non-public product design, development, research, or testing information or extremely sensitive, highly confidential, non-public information, consisting either of trade secrets or proprietary or other highly confidential business, financial, regulatory, research, marketing, manufacturing, or other strategic information (including without limitation information regarding business plans, technical data, and non-public designs), the disclosure of which would create a substantial risk of competitive or business injury to the Producing Party. It is possible that Defendants may view certain Highly Confidential Information as requiring additional protections beyond those afforded Highly Confidential Material, in which event the Parties shall meet and confer in good faith about potential additional protections, and, if unsuccessful, Defendants shall move the Court for appropriate relief before producing the information.

(i). Certain Highly Confidential Information that contains trade secrets or

Case ID: 220302601
Control No.: 24014692

proprietary or other highly confidential business, financial, regulatory, research, marketing, manufacturing or other strategic information that, if shared with Defendants' competitors (including each other) would result in competitive harm, will bear the additional designation "Highly Confidential – Outside Counsel Only."  Material designated by one Defendant as "Highly Confidential – Outside Counsel Only" shall be afforded the same protections afforded to documents designated as "Highly Confidential," and in addition, shall not be made available to the other Defendants' in-house counsel or other current employees, absent written agreement by the Producing Party or by order of the Court after *in camera* review.

4.    **MARKING OF DOCUMENTS.**  The designation of Discovery Material as Confidential Material or Highly Confidential Material for purposes of this Order shall be made in the following manner:

a.  **TIFF Documents.**  In the case of documents or other materials containing Covered Information produced in TIFF format (apart from depositions or other pre-trial testimony), designation shall be made by affixing the legend "Confidential" or "Highly Confidential" to all pages in each document containing any Confidential Material or Highly Confidential Material respectively.

b.  **Native Documents.**  With respect to documents or materials containing Covered Information produced in Native Format, the Designating Party shall include the highest level of confidentiality designation in the filename and/or on a slip sheet placeholder produced along with the native document.

c.  **Designating Depositions.**  With respect to any deposition, confidential

Case ID: 220302601
Control No.: 24014692

treatment may be invoked on the record (before the deposition or proceeding is concluded) or within twenty-one (21) days following receipt of the transcript by identifying the specific portions of the testimony as to which protection is sought and the level of protection sought (Confidential or Highly Confidential). If that right is invoked, the deposition transcripts shall be treated as Confidential or Highly Confidential, as appropriate, for 21 days following receipt of the transcript. After the expiration of that period, the transcript shall be treated only as specific portions are actually designated.

d. **Non-Written Materials.** Any non-text Covered Information (e.g., videotape, audio tape, computer disk, etc.) may be designated as such by labeling the outside of such material as "Confidential" or "Highly Confidential." In the event a Receiving Party generates any "hard copy" transcription or printout from any such designated non-written materials, the person who generates such "hard copy" transcription or printout shall take reasonable steps to maintain the confidentiality of such materials and properly identify and stamp each page of such material as "Confidential" or "Highly Confidential" consistent with the original designation by the Producing Party.

5. **ADVERSE EVENT PROTECTIONS**. To protect against unauthorized disclosure of Confidential Information, and to comply with all applicable state and federal laws and regulations, the producing party will redact from produced documents, materials and other things, the following items: the names, street addresses, Social Security numbers, tax identification numbers, and other personal identifying information of patients and individuals in clinical studies or adverse event reports (unless the above-referenced information relates to named plaintiffs in

Case ID: 220302601
Control No.: 24014692

these Actions, except that Social Security numbers and tax identification numbers of named plaintiffs will be redacted as to any documents produced in accordance with this provision). Moreover, no disclosure of Confidential Information will be required to the extent that it is prohibited by an executed research or clinical trial consent form or applicable state and federal law and regulations. Other general identifying information, however, such as patient or health provider numbers, health provider names, and adverse event reporter names, may not be redacted unless required by state or federal law. Nothing in this paragraph shall require any Party to produce personal identifying information or personal health information in a manner that does not comply with federal or state law. Further, nothing in this agreement prevents either party from moving this court to compel the production of redacted information. Pursuant to 21 C.F.R. §§ 314.430(e) & (f) and 20.63.(f), the names and other information which would identify any patients who were reported as experiencing adverse events that are not redacted shall be treated as Confidential, regardless of whether the document containing such names is designated as Confidential.

6. **DISCLOSURE OF COVERED INFORMATION.** The failure to designate Covered Information does not constitute a waiver of such claim and may be remedied by prompt supplemental written notice upon discovery of the disclosure, with the effect that such Covered Information will be subject to the protections of this Order. The Receiving Party shall exercise good faith efforts to ensure that copies made of Covered Information produced to it, and copies made by others who obtained such Covered Information directly or indirectly from the Receiving Party, include the appropriate confidentiality legend, to the same extent that the Covered Information has been marked with the appropriate confidentiality legend by the Producing Party.

7. **MATERIALS PREPARED BASED UPON COVERED INFORMATION.** Any notes, lists, memoranda, indices, compilations, or other materials prepared

Case ID: 220302601
Control No.: 24014692

or based on an examination of Covered Information, that quote from or paraphrase Covered Information with such specificity that the Covered Information can be identified shall be accorded the same status of confidentiality as the underlying Covered Information from which they are made, and to the extent those materials are disclosed to other Parties or Non-parties, or produced or filed in this matter, shall be designated with the appropriate confidentiality legend, and shall be subject to all of the terms of this Protective Order.

8. **NOTICE TO NON-PARTIES.** Any Party issuing a subpoena to a Non-party shall include a reference to this Protective Order with an offer to provide a copy to the Non-party upon request.

9. **GOOD-FAITH BELIEF.** For purposes of this Order, the Designating Party bears the burden of establishing the appropriate designation of all such Discovery Material. The designation of any Discovery Material as "Confidential" or "Highly Confidential" pursuant to this Order shall constitute the verification by the Designating Party and its counsel that the material constitutes "Confidential" or "Highly Confidential" as defined above.

If at any time prior to the trial of these Actions, a Designating Party realizes that previously produced Discovery Material should be designated as "Confidential" or "Highly Confidential" the Designating Party may so designate by advising all other Parties in writing and by producing replacement documents or material with the appropriate "Confidential" or "Highly Confidential" designation as described above. The designated documents or material will thereafter be treated as "Confidential" or "Highly Confidential" pursuant to this Order. Upon receipt of such designation in writing and re-production of the material with the "Confidential" or "Highly Confidential" legend, the Parties and other persons subject to this Order shall take reasonable and appropriate steps to notify any and all recipients of the

Case ID: 220302601
Control No.: 24014692

Discovery Material about the protected status of the newly designated "Confidential" or "Highly Confidential" Discovery Material and to retrieve the newly designated "Confidential" or "Highly Confidential" Discovery Material from any person who is not permitted by this Order to have Confidential Information.

10. **PERSONS AUTHORIZED TO RECEIVE CONFIDENTIAL MATERIAL.** Confidential Material may be disclosed only to the following "Qualified Persons":

    a. the Court, including attorneys, employees, judges, magistrates, secretaries, special masters, stenographic reporters, staff, transcribers and all other personnel necessary to assist the Court in its function, and the jury (and any appellate court or other court (and their personnel) before which the Parties appear in this Action);

    b. mediators or other individuals engaged or consulted in settlement of all or part of this Action;

    c. Court reporters, stenographers, and videographers retained to record testimony taken in this Action and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents or otherwise assisting in e-discovery;

    d. counsel for the Parties other than in-house counsel, and such counsel's employees who have responsibility for the preparation and trial of the Action;

    e. in-house counsel for the Parties, and such in-house counsel's employees who have responsibility for the preparation and trial of the Action;

    f. Parties and employees or former employees of a Party to this Order but only to the extent that the specifically named individual Party's or employee's or

Case ID: 220302601
Control No.: 24014692

former employee's assistance or testimony is necessary to this Action;

g.  litigation support services, including outside copying services, court reporters, stenographers or companies engaged in the business of supporting computerized or electronic litigation discovery or trial preparation, retained by a Party or its counsel, provided that they execute Exhibit A as described in Paragraph 12 of this Order;

h.  any individual expert, consultant, investigator, or expert consulting firm retained by counsel of record in connection with this Action to the extent necessary for the individual expert, consultant, investigator, or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Action, provided, however, that: (i) the disclosure shall be made only to an individual expert, or to members, partners, employees or agents of an expert consulting firm as the expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting firm (the "Designated Expert Personnel"); (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Action; (iii) the individual and/or a representative of each expert consulting firm sign the Attestation attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; (iv) absent notice and consent of the Designating Party or on application to and order of the Court, excluding any retention for this Action, the individual expert and each of the Designated Expert Personnel is neither a current nor former (within the past three years from the date of this Order) employee of

Case ID: 220302601
Control No.: 24014692

any Party or any entity which directly competes with any of the Defendants as to infant formula; and (v) the terms of Paragraph 17 of this Order are satisfied;

i.   Any person (i) who created, authored, received or reviewed such Covered Information; (ii) is or was a custodian of the Covered Information; (iii) is identified on such Covered Information; or (iv) is or was an employee of the Producing Party and is reasonably believed to have knowledge of the matters in the Covered Information (provided that any former employee agrees to be bound by the provisions of the Order by signing a copy of Exhibit A prior to being shown any Covered Information);

j.   Any employees of Defendants who are involved with the receipt, review, evaluation, and/or reporting of adverse event reports and other patient-related information to governmental and regulatory agencies to whom Defendants are legally obligated to report such information, and the governmental and regulatory agencies to whom Defendants report such information.

k.   witnesses at depositions or who are noticed for depositions to whom disclosure is in good faith reasonably necessary to conduct the Action, with the limitations that (i) witnesses shall not retain a copy of documents containing Confidential or Highly Confidential Information, except witnesses may retain a copy of all exhibits marked at their depositions in connection with review of the transcripts; (ii) pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential or Highly Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed  to anyone except as permitted under this Order; (iii)

Case ID: 220302601
Control No.: 24014692

witnesses noticed for depositions who are shown Confidential or Highly Confidential Information in advance of their deposition must agree to be bound by the provisions of the Order by signing a copy of Exhibit A prior to being shown Confidential or Highly Confidential Information; and (iv) witnesses at depositions must either sign a copy of Exhibit A or, if they refuse, receive an admonition that he or she will be subject to sanctions, including contempt, for violating the terms of the Protective Order.

l. mock jurors who have agreed to be bound by the provisions of the Order by signing a copy of Exhibit A;

m. auditors and insurers of the Parties; and

n. any other person as may be designated by written agreement by the Producing Party or by order of the Court.

11. **PERSONS AUTHORIZED TO RECEIVE HIGHLY CONFIDENTIAL MATERIAL.** Except as specifically provided for in this or subsequent Court orders, Highly Confidential Material, or their contents may be disclosed, summarized, described, or otherwise communicated or made available in whole or in part only to "Qualified Persons" (defined in Paragraph 10). Highly Confidential Material produced by one Defendant may not be shown to employees of any other infant formula manufacturer (other than those encompassed by Paragraph 10(e)), absent written agreement by the Producing Party or by order of the Court after *in camera* review. Highly Confidential Material that are contracts between a Defendant and one organizational customer (e.g., hospitals, but not to include retailer or consumer purchasers of Defendants' products) may not be shown to a different organizational customer of Defendants, unless the deponent is reasonably believed to have knowledge of the matter in that particular

Case ID: 220302601
Control No.: 24014692

Highly Confidential document, absent written agreement by the Producing Party or by order of the Court after *in camera* review. Further, the Producing Party may seek emergency relief at a deposition if a Highly Confidential Document is presented to a witness and the Producing Party believes in good faith that immediate protection is appropriate.

12. **EXECUTING THE NON-DISCLOSURE AGREEMENT.** Each person as identified in Paragraphs 11(b), (c), (g), (h), (k) and 12(a) to whom Covered Information is disclosed shall execute a non-disclosure agreement in the form annexed hereto as Exhibit A before receiving Covered Information. Copies of the executed Exhibit A shall be retained by counsel disclosing Covered Information to such person. Consistent with Paragraph 17, a non-disclosure agreement executed by a consultant shall not be available to any other Party except on a court order following a showing of exceptional circumstances.

13. **CHALLENGING CONFIDENTIALITY DESIGNATIONS.** A Party objecting in good faith to the designation of any material as Confidential or Highly Confidential shall give written notice including a brief statement of the basis for the objection to the Designating Party after receiving such material. Upon receipt of the written objection, counsel for the Designating Party shall, within ten (10) business days, provide a written response to the objecting Party explaining the basis and supporting authority for the designation. The Parties shall meet and confer in good faith to attempt to resolve the dispute without resort to Court intervention. If the objecting Party and the Designating Party cannot resolve their dispute through such meet and confer discussions, within 15 business days after the Parties have reached an impasse after meet and confer efforts, the Challenging Party shall move the Court for an order modifying or removing such designation. The Designating Party shall have 14 business days to file a response. The challenging party shall have 7 days to file a reply. The Designating Party has the burden of

Case ID: 220302601
Control No.: 24014692

establishing that the document is entitled to protection. Any material so designated shall remain Confidential or Highly Confidential, and shall be subject to all restrictions on its disclosure and use set forth in this Order until one of the following occurs: (1) the Designating Party withdraws such designation in writing; or (2) the Court rules that the challenged material should be re-designated. In either event, the Designating Party shall reproduce copies of the re-designated material with the appropriate confidentiality designations at the Designating Party's expense within ten business days.

14. **SUBPOENA FOR COVERED INFORMATION.** If any Party has obtained Covered Information under the terms of this Order and receives a request to produce such Covered Information by subpoena or other compulsory process commanding the production of such Covered Information, such Party shall promptly notify the Designating Party, including in such notice the date set for the production of such subpoenaed information. Prior to the response date, the Designating Party shall provide written notice of any intent to seek a protective order. Upon receipt of such notice, the Party or person receiving the subpoena shall inform the person seeking the protected discovery material that such information is subject to the foregoing Order. No production or other disclosure of such information pursuant to the subpoena or other process shall occur until the deadline for the Designating Party to respond to written notice of the subpoena.

If the Designating Party informs the Party served with the subpoena that it has filed a motion seeking a protective order from the court where the subpoena or order issued, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by that court, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material—and nothing

Case ID: 220302601
Control No.: 24014692

in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

15. **USE OF DISCOVERY MATERIAL.** Covered Information shall be used solely for purposes of prosecuting, defending or attempting to resolve this Action, including any appeal (subject to any coordination order that is entered).

16. **REDACTIONS ALLOWED.**

    a. Any Producing Party may redact from documents (i) matter that the Producing Party claims is privileged information; or (ii) any Protected Data. The Producing Party shall mark each redaction with a legend stating "REDACTED," and specify the basis for the redaction as appropriate, consistent with the privilege logging provisions of the stipulated order regarding the disclosure of privileged information. Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked. If counsel for the Producing Party agrees or if the Court orders that documents initially redacted shall not be subject to redaction or shall receive alternative treatment, and the documents are subsequently produced in unredacted form, then those unredacted documents shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

    b. In addition to the foregoing, the following shall apply to redactions of Protected Data:

        i. Any Party may redact Protected Data that it claims, in good faith, requires protections under the terms of this Order. Protected Data,

Case ID: 220302601
Control No.: 24014692

however, shall not be redacted from documents to the extent it directly relates to or identifies an individual named as a Party in connection with the subject matter of this Action. Protected Data of an individual named as a Party shall otherwise receive the same protections and treatment afforded to other Protected Data under this Protective Order.

    ii.  Protected Data shall be redacted from any public filing not filed under seal.

c. The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Covered Information as set forth in Paragraph 13.

d. Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

17.    **PRIVILEGED MATERIALS.** With respect to documents designated as privileged and included in a privilege log in another jurisdiction, those documents need not be added to a separate or additional privilege log in this Action. For those documents that have not previously been logged as privileged, any party intending to assert a privilege over such documents shall generate a privilege log compliant with the Pennsylvania Rules of Civil Procedure.

18.    **EXPERT MATERIALS.** As to Plaintiffs and Defendants, a testifying expert's work product and communications between a Party's attorney and testifying expert, including

Case ID: 220302601
Control No.: 24014692

drafts of any reports or disclosures, are protected from discovery except to the extent that the communication (i) relates to compensation for the expert's study or testimony; (ii) identifies facts or data that the Party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identifies assumptions that the Party's attorney provided and that the expert relied on in forming the opinions to be expressed. This paragraph, however, shall not be construed to relieve either Party of the obligation to respond to Pennsylvania Rule of Civil Procedure 4005 interrogatories. It will also not be construed to relieve the expert from producing any data analyses, formulas, or other information relied upon, considered, or generated by the testifying expert in forming his or her opinions. The identity, opinions, and work product of a consultant are discoverable only to the extent specified in under Pennsylvania law.

19.      **EXCLUSION OF INDIVIDUALS FROM DEPOSITIONS.** Counsel shall have the right to exclude any person who is not authorized by this Order to receive documents or information designated as Covered Information from any deposition where testimony regarding Covered Information or the use of Covered Information is likely to arise.

20.      **SECURITY OF COVERED INFORMATION.** Any person in possession of another Party's Covered Information shall exercise the same care with regard to the storage, custody, or use of Covered Information as they would apply to their own material of the same or comparable sensitivity. Receiving Parties must take reasonable precautions to protect Covered Information from loss, misuse and unauthorized access, disclosure, alteration and destruction, including but not limited to:

     a.   Covered Information in electronic format shall be maintained in a secure litigation support site(s) that applies standard industry practices regarding data

Case ID: 220302601
Control No.: 24014692

security, including but not limited to application of access control rights to those persons entitled to access Covered Information under this Order;

b. To whatever extent the software tracks user access, an audit trail of use and access to litigation support site(s), to the extent the litigation support software tracks user access, shall be maintained while this Action, including any appeals, is pending;

c. Any Covered Information downloaded from the litigation support site(s) in electronic format shall be stored only on device(s) (e.g. laptop, tablet, smartphone, thumb drive, portable hard drive) that are password protected and/or encrypted with access limited to persons entitled to access Covered Information under this Order. If the user is unable to password protect and/or encrypt the device, then the Covered Information shall be password protected and/or encrypted at the file level.

d. Covered Information in paper format is to be maintained in a secure location with access limited to persons entitled to access Covered Information under this Order; and

e. Summaries of Covered Information, including any lists, memorandum, indices or compilations prepared or based on an examination of Covered Information, that quote from or paraphrase Covered Information in a manner that enables it to be identified shall be accorded the same status of confidentiality as the underlying Covered Information.

f. If the recipient of Covered Information is shipping data in electronic format, the recipient shall encrypt the data prior to shipping and provide the encryption

Case ID: 220302601
Control No.: 24014692

key in separate correspondence. If hard copy documents are shipped, the Receiving Party will ship the documents using secure packaging tape via Federal Express or UPS and retain a tracking number for the materials. If the Receiving Party learns at any time that the Covered Information has been retrieved or viewed by unauthorized parties during shipment, it will immediately notify the Producing Party and take all reasonable measures to retrieve the improperly disclosed materials.

g. If the Receiving Party discovers a breach of security[1] relating to the Covered Information of a Producing Party, the Receiving Party shall: (1) provide written notice to the Producing Party of the breach within 48 hours of the Receiving Party's discovery of the breach; (2) investigate the effects of the breach, undertake reasonable, industry-standard actions to remediate the effects of the breach, and provide the Producing Party with assurance reasonably satisfactory to the Receiving Party that the breach shall not recur; and (3) provide sufficient information about the breach that the Producing Party can ascertain the size and scope of the breach. The Receiving Party agrees to cooperate with the Producing Party or law enforcement in investigating any such security incident.

21. **USE IN FILINGS AND COURT PROCEEDINGS.** Any Party seeking to file or attach to a filing or introduce at a court proceeding any documents designated as "Confidential" or "Highly Confidential" shall comply with the Court's procedures for filing under seal.

---

[1] Breach is defined to include, but is not limited to, the confirmed or suspected: (i) disclosure or use of Covered Information by or to an unauthorized person; and/or (ii) the loss, theft or hacking of a device containing Covered Information.

Case ID: 220302601
Control No.: 24014692

22.     **IMPROPER DISCLOSURE OF COVERED INFORMATION.**  Disclosure of Covered Information other than in accordance with the terms of this Order may subject a Party to such sanctions and remedies as the Court may deem appropriate.

23.     **FINAL TERMINATION.**  Upon termination of the Action, including, for example, a voluntary dismissal or an exhaustion of any and all appeals, counsel for each Party shall, upon request of the Producing Party, return all Covered Information, including any copies, excerpts and summaries thereof, or shall destroy the same at the option of the Receiving Party and provide written confirmation of destruction, and shall purge all such information from all machine-readable media on which the Covered Information resides.  Notwithstanding the foregoing, counsel for each Party and the in-house counsel of each Defendant designated under Paragraph 10(e) may retain all pleadings, briefs, memoranda, exhibits to any pleading, discovery responses, deposition transcripts, deposition exhibits, expert reports, motions, trial exhibits, and other documents filed with the Court that refer to or incorporate Covered Information, and will continue to be bound by this Order with respect to all such retained information.  Further, attorney work- product materials that contain Covered Information need not be destroyed, but, if they are not destroyed, the person in possession of the attorney work-product will continue to be bound by this Order with respect to all such retained information.

24.     **PROTECTIVE ORDER REMAINS IN FORCE.**  This Protective Order shall remain in force and effect until modified, superseded, or terminated by consent of the Parties or by order of the Court made upon reasonable written notice.  Unless otherwise ordered or agreed upon by the Parties, this Protective Order shall survive the termination of this Action.  The Court retains jurisdiction even after termination of this Action to enforce this Protective Order and to make such amendments, modifications, deletions and additions to this Protective Order as the

Case ID: 220302601
Control No.: 24014692

Court may from time to time deem appropriate.

25. **MODIFYING THIS ORDER.** Nothing in this Protective Order shall be construed to prohibit the Parties from agreeing to modify any provision of this Order or seeking relief from the Court. Nor shall anything in this Order or any Party's compliance herewith be construed as a waiver of any Party's rights under applicable law.

**APPROVED BY:**

**PLAINTIFFS:**

> By: */s/ Timothy A. Burke*
> **KLINE & SPECTER**
> Thomas Kline
> Tobi Millrood
> Elizabeth Crawford
> Timothy Burke
>
> **KELLER POSTMAN**
> Ben Whiting *(Pro Hac Vice)*
> Mark Weinstein

**DEFENDANTS:**

Abbott Laboratories

> By: */s/ Sean P. Fahey*
> **TROUTMAN PEPPER HAMILTON SANDERS LLP**
> Sean P. Fahey
> Ronni E. Fuchs
>
> **CAMPBELL CONROY & O'NEIL, P.C.**
> Joseph E. O'Neil
> Ryan O'Neil
>
> **JONES DAY**
> Marques Hillman Richeson *(Pro Hac Vice)*
> Jennifer B. Flannery

Case ID: 220302601
Control No.: 24014692

**Mead Johnson & Company, LLC and Mead
Johnson Nutrition Company**

By: */s/ Kenneth A. Murphy*
**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy
Heather R. Olson

**WELSH & RECKER, P.C.**
Catherine M. Recker
Amy B. Carver
Richard D. Walk, III

**The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a
Pennsylvania Hospital and The Trustees of the
University of Pennsylvania d/b/a Penn
Medicine**

By: */s/ Richard S. Margulies*
**BURNS WHITE LLC**
Richard S. Margulies
James A. Young
Susan R. Engle

By: */s/ Gabor Ovari*
**MARSHALL DENNEHEY WARNER
COLEMAN GOGGIN**
Gabor Ovari
Kathleen Karmer

**Temple University Health System, Inc. d/b/a/
Temple University Hospital**

By: */s/ Richard S. Margulies*
**BURNS WHITE LLC**
Richard S. Margulies
James A. Young
Susan R. Engle

**Albert Einstein Medical Center a/k/a Einstein
Medical Center and Albert Einstein
Healthcare Network d/b/a Einstein Healthcare
Network**

Case ID: 220302601
Control No.: 24014692

By: */s/ Brooke Scicchitano*
**ECKERT SEAMANS CHERIN &
MELLOT**
Donald J. Brooks, Jr.
Brooke Scicchitano

**Thomas Jefferson University Hospitals, Inc.,
d/b/a Thomas Jefferson University Hospital
and Thomas Jefferson University d/b/a
Jefferson Health System**

By: */s/ Brooke Scicchitano*
**ECKERT SEAMANS CHERIN &
MELLOT**
Donald J. Brooks, Jr.
Brooke Scicchitano

**IT IS SO ORDERED:**

**DATED:** _____

J.

Case ID: 220302601
Control No.: 24014692

**EXHIBIT A**

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [*print or type full name*], of

_____ [*print or type full address*],

have read and understand the Stipulated Protective Order that was issued by the Philadelphia Court

of Common Pleas on _____ [*insert date*] in the Action, as

defined in Paragraph 2(a) of the Protective Order.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order.

In compliance with this Order, I will not disclose in any manner any information or item that is

subject to this Stipulated Protective Order to any person or entity except in strict compliance with

the provisions of this Order.

I further agree to submit to the jurisdiction of the Philadelphia Court of Common Pleas for the

purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement

proceedings occur after termination of this action.

I declare under penalty of perjury under the laws of the Commonwealth of Pennsylvania

that the foregoing is true and correct. Signed this _____ day of _____

20_____, at _____ [*insert city and

state where sworn and signed*].

Signature:_____

# EXHIBIT A-63

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

*Wieger*                          :        CASE NO. 22030260|

    v.                          :        CONTROL NO. 24014692

*Mead Johnson*                    :

:

:

### ORDER

AND NOW, this _24th_ day of ___January___, 2024 upon consideration of the

Stipulation filed to the above-captioned Control No., it is hereby **ORDERED** that said

Stipulation is an agreement between the parties as to matters of confidentiality which shall

govern the parties' conduct in this matter. Jurisdiction will be relinquished upon final

disposition of the trial court.

BY THE COURT:

CARPENTER, J.

220302601-Wieger Etal Vs Mead Johnson

22030260100131

# EXHIBIT A-64

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

*Filed and Attested by the Office of Judicial Records 05 MAR 2024 11:58 am S. RICE*

| | | |
|---|---|---|
| **GINA WEIGER, on her own behalf and as Parent and Natural Guardian of P.S., a minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| Plaintiffs, | : | **MARCH TERM, 2022** |
| v. | : | **No. 2601** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | : | |
| | : | |
| Defendants. | : | |

## WITHDRAWAL OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly withdraw the appearance of Heather R. Olson, Esquire as counsel for

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company in

the above-referenced matter.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: February 14, 2024

/s/ Heather R. Olson
Heather R. Olson, Esquire
*Counsel for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company*

## **CERTIFICATE OF COMPLIANCE**

     I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania, Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.


Dated:  February 14, 2024              /s/ Heather R. Olson
                                        Heather R. Olson, Esquire

**CERTIFICATE OF SERVICE**

I, Heather R. Olson, Esquire, hereby certify that I caused to be served a true and correct copy of the foregoing document to all counsel of record via the Court's electronic filing system.

/s/ Heather R. Olson
Heather R. Olson, Esquire

Dated: February 14, 2024

# EXHIBIT A-65

Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor

Plaintiffs

v.

MEAD JOHNSON & COMPANY, LLC, et al.

Defendants.

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

CIVIL DIVISION

MARCH TERM, 2022
NO. 2601

Filed and Attested by the
Office of Judicial Records
27 SEP 2023 02:47 pm
E. HAURIN

## ORDER

AND NOW, this _20th_ day of _March_ 2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. ~~It is further~~ _Plaintiff shall file an Amended complaint_ **ORDERED** that ~~all claims~~ against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine ~~are hereby~~ **DISMISSED** ~~with prejudice.~~ _with specificity regarding the claims and damages in this professional negligence action._

BY THE COURT:



J.

220302601-Wieger Etal Vs Mead Johnson

22030260100136

Case ID: 220302601
Control No.: 23096294

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) E. HAURIN 03/22/2024

# EXHIBIT A-66

*Weiga v. Mead Johnson (2)*

*Case #D 220302601*

## ORDER OF THE COURT

On this 22 day of ___March___, 2024, upon consideration of defendant Abbott
Laboratories' preliminary objections to plaintiffs' amended complaints, its brief in support, and
any response thereto, it is hereby ORDERED that ~~defendant Abbott Laboratories'~~ preliminary
objections to plaintiffs' amended complaints are ~~SUSTAINED. It is further~~ ORDERED that
~~Counts I through V of plaintiffs' complaints are DISMISSED as~~ to Abbott Laboratories.

*these objections will be decided pursuant
to the coordinators
control number.
This control
number is
MOOT.*

BY THE COURT:



220302601-Wieger Etal Vs Mead Johnson



22030260100138

Case ID: 220302601
Control No.: 23096791

# EXHIBIT A-67

BURNS WHITE LLC
By:   James A. Young, Esquire
        Richard S. Margulies, Esquire
        Kyle J. Generelli, Esquire
Attorney ID Nos. 00213 / 62306 / 333291
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com

*Attorneys for Defendant*
The Pennsylvania Hospital of the University
of Pennsylvania Health System d/b/a
Pennsylvania Hospital and the Trustees of the
University of Pennsylvania d/b/a Penn
Medicine

| | | |
|---|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| MEAD JOHNSON & COMPANY, LLC | : | MARCH TERM 2022 |
| Defendants. | : | NO. 2601 |

## WITHDRAWAL OF APPEARANCE

TO THE PROTHONOTARY:

    Kindly withdraw **only** the appearance of Susan Engle, Esquire as counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-referenced matter.

                                  **BURNS WHITE LLC**
        BY:   */s/ Susan R. Engle*
                       Susan R. Engle, Esquire

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

    Kindly enter the appearance of Kyle J. Generelli, Esquire as co-counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-captioned matter.

                                  **BURNS WHITE LLC**
Date: April 2, 2024        BY:   */s/ Kyle J. Generelli*
                       Kyle J. Generelli, Esquire

## **CERTIFICATE OF SERVICE**

I, Kyle J. Generelli, Esquire, hereby certify that a true and correct copy of the foregoing *Withdrawal of Appearance/Entry of Appearance* was served via the Court's electronic filing on all counsel of record.


/s/ Kyle J. Generelli
Kyle J. Generelli, Esquire

Date: April 2, 2024

# EXHIBIT A-68

PHILADELPHIA COURT OF COMMON PLEAS
# PETITION/MOTION COVER SHEET

**CONTROL NUMBER:**

24041717

**(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)**

## FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: 04/25/2024 |
|---|---|

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March _____ Term, 2022
*Month* *Year*

No. _____ 02601

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

WIEGER ETAL VS MEAD JOHNSON & COMPANY, LLC ETAL

**INDICATE NATURE OF DOCUMENT FILED:**

☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition   ☐ Response to Motion

Has another petition/motion been decided in this case?   ☐ Yes   ☐ No
Is another petition/motion pending?   ☐ Yes   ☐ No

*If the answer to either question is yes, you must identify the judge(s):*

_____

| TYPE OF PETITION/MOTION *(see list on reverse side)* | PETITION/MOTION CODE *(see list on reverse side)* |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I. CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER

Applicable Petition/Motion Deadline: N/A

Has deadline been previously extended by the Court: N/A

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1880 JOHN F. KENNEDY
  BOULEVARD 10TH FLOOR , PHILADELPHIA
  PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____   April 5, 2024   CATHERINE M. RECKER   _____
*(Attorney Signature/Unrepresented Party)*   *(Date)*   *(Print Name)*   *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH
  POINT , CLEVELAND OH 44114
BENJAMIN WHITING
  KELLER POSTMAN 150 N. RIVERSIDE PLAZA
  SUITE 4100 , CHICAGO IL 60606
EVAN GLASSMAN
  STEPTOE & JOHNSON, LLP 1114 AVENUE OF
  THE AMERICAS , NEW YORK NY 10036

FILED
05 APR 2024 03:44 pm
Civil Administration
J. BOYD

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a minor** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| : | |
| Plaintiffs, : | **APRIL TERM, 2022** |
| : | **No. 02601** |
| v. : | |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| : | |
| Defendants. : | |

## ORDER

**AND NOW**, this _____ day of _____, 2024, upon consideration of the Motion for Admission Pro Hac Vice of T. Allon Renfro, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits T. Allon Renfro, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT**:

_____
J.

**WELSH & RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | | |
|---|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| | : | **APRIL TERM, 2022** |
| Plaintiffs, | : | **No. 02601** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

**MOTION FOR ADMISSION *PRO HAC VICE* OF T. ALLON RENFRO, ESQUIRE, TO REPRESENT MEAD JOHNSON DEFENDANTS**

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Welsh & Recker, P.C., hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting T. Allon Renfro, Esquire, to the bar of this Court, *pro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

1.    Mr. Renfro is a partner of the law firm of Swanson, Martin, & Bell, LLP and a resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300,

Chicago, IL 60611. Mr. Renfro has an attorney-client relationship with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Mr. Renfro.  A Verification Statement from Mr. Renfro, is attached hereto as Exhibit A.

2.     Mr. Renfro is a member in good standing in the state of Indiana and has been admitted to practice since 2011.  See Exhibit A.

3.     Mr. Renfro's law firm serves as national trial counsel for the Mead Johnson Defendants.  He is familiar with the complex, technical issues presented in this matter, and his participation in this case will help clarify the issues before the Court. See Exhibit A.

4.     The Mead Johnson Defendants have specifically requested that Mr. Renfro be permitted to participate in this matter and represent its interests in this matter.  See Exhibit A.

5.     Mr. Renfro is not presently suspended or disbarred in any Court, nor is he currently subject to any disciplinary proceedings by any organization authorized to discipline attorneys at law. Further, Mr. Renfro has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law.  Exhibit A.

6.     Mr. Renfro is familiar with Pennsylvania Bar Admission Rule 301 and has agreed to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers. Mr. Renfro will abide by the Rules of Court, including all disciplinary rules and, if

Case ID: 220302601
Control No.: 24041717

this motion is granted, he will serve as associate counsel with Catherine M. Recker, Esquire, counsel of record for the Mead Johnson Defendants in this matter.

7.    Mr. Renfro has applied to the Pennsylvania Interest on Lawyers' Trust Account Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under 204 Pa. Code § 81.503. to be admitted pro hac vice.  Our office received a copy of the fee payment certification letter from the IOLTA Board, a copy of which is attached as Exhibit B.

8.    Mr. Renfro will be associated with Catherine M. Recker, Esquire, of Welsh & Recker, P.C., at all stages of this action.  Ms. Recker, after reasonable investigation, believes that Mr. Renfro is a reputable and competent attorney and recommends that he be considered for admission *pro hac vice*. A true Verification Statement from Ms. Recker pursuant to Pa. R. C. P. 1012.1(d)(2) is attached hereto as Exhibit C.

9.    Catherine M. Recker, Esquire, of Welsh & Recker, P.C., is a member in good standing of the Bar of the Commonwealth of Pennsylvania. Welsh & Recker and Catherine M. Recker, Esquire will be counsel of record for the Mead Johnson Defendants and will continue to participate fully in this litigation and will sign, serve, and accept service of all papers on the Mead Johnson Defendants' behalf.

10.   All the requirements to satisfy the applicable rules of Court are met.

11.   There is no good cause for denial of this motion.

**WHEREFORE**, it is respectfully requested that this Court enter the attached Order granting T. Allon Renfro, Esquire leave to appear as counsel *pro hac vice* for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

Case ID: 220302601
Control No.: 24041717

Respectfully submitted,

**WELSH & RECKER, P.C.**

Date: April 5, 2024

/s/ Catherine M. Recker
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

4

Case ID: 220302601
Control No.: 24041717

## CERTIFICATE OF SERVICE

I, Catherine M. Recker, Esquire certify that on this date, I caused a copy of the foregoing Motion for *Pro Hac Vice* admission of T. Allon Renfro to be electronically filed through the Court's electronic filing system and that such filing generates a notice of that constitutes service on all counsel of record.

**WELSH & RECKER, P.C.**

Date: April 5, 2024                    /s/ Catherine M. Recker
                                        Catherine M. Recker, Esquire

# EXHIBIT A

Case ID: 220302601
Control No.: 24041717

## <u>VERIFICATION OF T. ALLON RENFRO, ESQUIRE</u>

I, T. Allon Renfro, Esquire, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am a partner of the law firm Swanson, Martin & Bell, LLP and resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300, Chicago, IL 60611. Telephone: (312) 222-8525; email address: trenfro@smbtrials.com.

2. I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: State of Indiana (30099-53) State of Illinois (6309991) Additionally, I have been admitted to practice in the following courts: U.S. District Court, Northern District of Indiana, U.S. District Court, Southern District of Indiana, U.S. District Court, Northern District of Illinois, U.S. District Court, Southern District of Illinois, U.S. District Court, Eastern District of Wisconsin.

3. I am a member in good standing of all Bars to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice:*

| Case Name | Case Number |
|---|---|
| Carter, et al. v. Mead Johnson & Company, LLC, et al. | 220302588 |
| Wieger, at al. v. Mead Johnson & Company, LLC, et al. | 220302614 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302601 |
| Taylor, et al. v. Mead Johnson & Company, LLC, et al. | 220302606 |
| Stills, et al. v. Mead Johnson & Company, LLC, et al. | 220302617 |
| Mays, at al. v. Mead Johnson & Company, LLC, et al. | 220302963 |
| Watson, et al. v. Mead Johnson & Company, LLC, et al. | 220302967 |
| Kajuffa, et al. v. Mead Johnson & Company, LLC, et al. | 220302978 |
| Ross, et al. v. Mead Johnson & Company, LLC, et al. | 220302981 |
| Parker, et al. v. Mead Johnson & Company, LLC, et al. | 220302983 |
| Wiggins, at al. v. Mead Johnson & Company, LLC, et al. | 220302986 |
| Henderson, et al. v. Mead Johnson & Company, LLC, et al. | 220400127 |
| McMillian, et al. v. Mead Johnson & Company, LLC, et al. | 220400140 |
| Williams, et al. v. Mead Johnson & Company, LLC, et al. | 220400141 |
| Moment, et al. v. Mead Johnson & Company, LLC, et al. | 220400142 |
| Sanders, at al. v. Mead Johnson & Company, LLC, et al. | 220400153 |
| Walker-Savage, et al. v. Mead Johnson & Company, LLC, et al. | 220400156 |

Case ID: 220302601
Control No.: 24041717

| Thomas, et al. v. Mead Johnson & Company, LLC, et al. | 220400158 |
| Short, et al. v. Mead Johnson & Company, LLC, et al. | 220400159 |
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400208 |
| Goodmond, at al. v. Mead Johnson & Company, LLC, et al. | 220400212 |

6. If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7. I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8. If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9. I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Catherine M. Recker, Esquire, of Welsh & Recker, P.C., as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information,

Case ID: 220302601
Control No.: 24041717

and belief. I understand that statements herein are made subject to the penalties of 18

Pa. CS § 4904 (relating to unsworn falsification to authorities).


Date: April 5, 2024                    /s/ T. Allon Renfro_____
                                       T. Allon Renfro, Esquire

4

# EXHIBIT B

Case ID: 220302601
Control No.: 24041717



SUPREME COURT OF PENNSYLVANIA
PENNSYLVANIA INTEREST ON
LAWYERS TRUST ACCOUNT BOARD

April 03, 2024

TIMOTHY ALLON RENFRO, Esq.
SWANSON, MARTIN & BELL, LLP
330 N. WABASH, SUITE 3300
CHICAGO, IL 60611

SENT TO TIMOTHY ALLON RENFRO VIA Email: TRENFRO@SMBTRIALS.COM

Dear Attorney RENFRO:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Gina Wieger v. Mead Johnson & Company, LLC, no. 220302601, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc: CATHERINE M. RECKER, Esq.

cmrecker@welshrecker.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302601
Control No.: 24041717

# EXHIBIT C

Case ID: 220302601
Control No.: 24041717

**WELSH AND RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:   (215) 972-6430
Fax:   (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | | |
|---|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a minor** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| | : | |
| | : | **APRIL TERM, 2022** |
| Plaintiffs, | : | **No. 02601** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

### VERIFICATION OF CATHERINE M. RECKER, ESQUIRE

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) |
| | ) ss: |
| COUNTY OF PHILADELPHIA | ) |

     I, Catherine M. Recker, hereby submit this Verification Statement in support of the attached Motion to Admit T. Allon Renfro, Esquire *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

1.    I am a Partner at Welsh & Recker, P.C., located at 306 Walnut St., Philadelphia, PA 19106.

2.    I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania

Case ID: 220302601
Control No.: 24041717

(#56813), the State of New Jersey (#044221989). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. District Court, Middle District of Pennsylvania, U.S. District Court, Western District of Pennsylvania, U.S. District Court, District of New Jersey, U.S. District Court, Southern District of New York, U.S. Court of Appeals, Third Circuit, U.S. Court of Appeals, Fourth Circuit, United States Supreme Court.

3.    I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4.    I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5.    I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that T. Allon Renfro, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6.    I am not currently acting as the sponsor of any other candidate for admission pro hac vice in Pennsylvania.

7.    If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Mr. Renfro is granted admission *pro hac vice* shall be received, held, distributed, and accounted

2

Case ID: 220302601
Control No.: 24041717

for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

    I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS §4904 (relating to unsworn falsification to authorities).

**WELSH & RECKER, P.C.**

By:    /s/ Catherine M. Recker___
       Catherine M. Recker, Esquire

Date: April 5, 2024

Case ID: 220302601
Control No.: 24041717

# EXHIBIT A-69

BURNS WHITE LLC
By:     James A. Young, Esquire
        Richard S. Margulies, Esquire
        Douglas A. Brockman, Esquire
        Kyle J. Generelli, Esquire
Attorney ID Nos. 00213/62306/67185/333291
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com; rsmargulies@burnswhite.com
dabrockman@burnswhite.com; kjgenerelli@burnswhite.com

*Attorneys for Defendant,
The Pennsylvania Hospital of
the University of Pennsylvania
Health System d/b/a
Pennsylvania Hospital and The
Trustees of the University of
Pennsylvania d/b/a Penn
Medicine*

| | | |
|---|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY, LLC | : | NO. 2601 |
| Defendants. | : | |

## WITHDRAWAL OF APPEARANCE

TO THE PROTHONOTARY:

    Kindly withdraw **only** the appearance of Kyle J. Generelli, Esquire as counsel on behalf of
Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a
Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine,
in the above-referenced matter.

                                **BURNS WHITE LLC**
                        BY:     */s/ Kyle J. Generelli*
                                Kyle J. Generelli, Esquire

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

    Kindly enter the appearance of Douglas A. Brockman, Esquire as co-counsel on behalf of
Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a

Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine,

in the above-captioned matter.

                                        **BURNS WHITE LLC**

Date: <u>April 25, 2024</u>                BY: <u>*/s/ Douglas A. Brockman*</u>
                                        Douglas A. Brockman, Esquire

Case ID: 220302601

## <u>CERTIFICATE OF SERVICE</u>

I, Kyle J. Generelli, Esquire, hereby certify that a true and correct copy of the foregoing *Withdrawal of Appearance/Entry of Appearance* was served via the Court's electronic filing on all counsel of record.

<div align="right">

*/s/ Kyle J. Generelli*
Kyle J. Generelli, Esquire

</div>

Date: <u>April 25, 2024</u>

# EXHIBIT A-70

**FILED**
05 APR 2024 03:44 pm
**Civil Administration**
J. BOYD

| | |
|---|---|
| **GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiffs, | **APRIL TERM, 2022** |
| v. | **No. 02601** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | **UNCONTESTED** |
| Defendants. | |

**ORDER**

**AND NOW**, this 29th day of April, 2024, upon consideration of the Motion for Admission Pro Hac Vice of T. Allon Renfro, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits T. Allon Renfro, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT:**

_____ J.

220302601-Wieger Etal Vs Mead Johnson

22030260100145

Case ID: 220302601
Control No.: 24041717

# EXHIBIT A-71

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Klein, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



Filed and Attested by the
Office of Judicial Records
17 AUG 2024 04:14 pm
S. GILLIAM

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : **IN THE COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **CIVIL TRIAL DIVISION**<br>: |
| *Plaintiff,* | : **MARCH TERM 2022**<br>: **NO. 02601** |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENNSYLVANIA HOSPITAL, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| *Defendants.* | :<br>:<br>:<br>: |

**NOTICE TO DEFEND**

| NOTICE | ADVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | Colegio de Abogados del Lackawanna<br>233 Penn Avenue, Scranton, PA 18503<br>(570) 961-2714 |
| Lackawanna Bar Association<br>233 Penn Avenue<br>Scranton, PA 18503<br> (570) 961-2714 | |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>                *Plaintiff*,<br><br>  v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>                *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO.  02601** |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.       INTRODUCTION

1.       This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.       Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.       PARTIES

3.       Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey. Ms. Wieger is the parent and natural guardian of S.P., a minor. Ms. Wieger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.       Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

2

Case ID: 220302601

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

Case ID: 220302601

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.     FACTUAL ALLEGATIONS

### *S.P.'s NEC Diagnosis*

11.     S.P. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 3, 2013.

12.     At birth, S.P.'s gestational age was approximately 26 weeks and she weighed 710 grams. S.P. was enrolled in the Neurodevelopmental Effects of Donor Human Milk vs. Preterm Formula in WLBW Infant ("Milk Study) on December 4, 2013.

13.     Between December 5, 2013 to December 13, 2013, S.P. was fed Study Feeds comprised of, based upon information and belief, Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth. These feeds occurred despite the fact that

4

Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC.

14.     On December 14, 2013, S.P. began to develop intermittent feeding intolerance, made NPO or fed nothing by mouth. She was treated for ten days for presumed NEC from December 14, 2013, to December 25, 2013.

15.     S.P. was fed Study Feeds comprised of, based upon information and belief, premature infant bovine-milk based formula between December 25, 2013 to December 29, 2013.

16.     S.P. again developed abdominal distention and feeding intolerance and was again made NPO or fed nothing by mouth.

17.     S.P. then developed worsening abdominal distention with abdominal competition and was transferred to the Children's Hospital of Philadelphia (CHOP) for surgical evaluation for presumed NEC with possible stricture on January 7, 2014.

18.     On January 7, once S.P. arrived at CHOP, Dr. Thane Blinman performed an exploratory laparotomy and antrectomy with ostomy, which involved removal of a necrotic unsalvageable segment of S.P.'s intestine.

19.     Based upon information and belief, following her transfer to CHOP, S.P was fed a formula diet consisting exclusively of Abbott Similac Special Care 24 pre term infant formula where she continued to experience symptoms associated with NEC.

20.     Upon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products.

21.     S.P.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  S.P. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome secondary to NEC, intestinal and feeding difficulties, growth issues

Case ID: 220302601

secondary to short gut syndrome, neurological injuries, and she continues to suffer other long-term health effects secondary to short gut syndrome.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

22.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

23.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants'

Case ID: 220302601

vulnerability to NEC.

27. Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28. At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

30. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

31. Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania

Case ID: 220302601

Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Wieger Discovers Her Claim*

32.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Wieger did not know, and had no reason to know or suspect, that S.P.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wieger*

33.     Despite exercising reasonable diligence, Ms. Wieger was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of S.P.'s injuries.

34.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of S.P.'s NEC diagnosis, Ms. Wieger undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

35.     The health care providers at Penn Medicine responded only that S.P. had gotten NEC because she was born premature. Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

36.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused S.P.'s injuries. Penn Medicine's response at the time did not give Ms. Wieger any reason to suspect any wrongdoing on the part of the Defendants.

37.     Ms. Wieger is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

8

38.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wieger had no reason to doubt their word.

39.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

40.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

41.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

Case ID: 220302601

from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

42.    Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Wieger immediately after S.P.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused S.P.'s injuries.

43.    Ms. Wieger also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Wieger unaware that the Defendant Manufacturers' products caused S.P.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wieger, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

44.    In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

45.    The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would

---

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

10

Case ID: 220302601

rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

46. Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

47. Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

48. Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

49. Additionally, Defendant Hospital failed to inform Ms. Wieger that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Wieger was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Wieger asked Plaintiff's health care providers at Defendant Hospital why a premature infant like S.P. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to S.P. could increase the risk of NEC to preterm infants, responding only that S.P. had gotten NEC solely

11

because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

50. Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Weiger of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Wieger that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like S.P., it was enough for Ms. Wieger to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

51. Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

52. Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

53. Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their

12

promotional websites, reference the science showing how significantly their products increase the risk of NEC.

54.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

55.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU."  Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

56.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products

Case ID: 220302601

increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

57. Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

58. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

59. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

60. While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

14

Case ID: 220302601

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

61.    For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

62.    Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

63.    Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac

Case ID: 220302601

Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

64. Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

16

65.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

66.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

67.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons,

and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

68.     Here, S.P was discharged from CHOP with the recommendation to continue use of Abbott's Similac Special Care 24 formula.

69.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

70.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



Case ID: 220302601

71.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

72.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital.   On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts.   And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge.   The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

73.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments.   They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so

19

they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

74.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

75.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

76.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

77.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies'

Case ID: 220302601

own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

78.     On information and belief, prior to S.P.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like S.P. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

79.     On information and belief, prior to S.P.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like S.P. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

80.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like S.P.

### The Defendant Manufacturers' Inadequate Warnings

81.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the

Case ID: 220302601

product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

82.    The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

83.    Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

84.    Mead cites no medical literature or research to guide the use of its products.

85.    Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

86.    Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

87.    Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

88.    Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies. Like Mead, Abbott promotes an aggressive marketing campaign

Case ID: 220302601

designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

89.    The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

90.    Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

91.    Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

92.    Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

93.    On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known

23

that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human milk decreases the risk of NEC for premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning. Further, the Defendant Hospital created a study putting infants, such as S.P. at great risk by providing them with bovine based formula instead of exclusive human milk-based products.

94.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants. It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

95.     Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

96.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

97.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in

Case ID: 220302601

preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

98. Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

99. Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

100. Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

101. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

25

Case ID: 220302601

102. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

103. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

104. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

105. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design

26

Case ID: 220302601

provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

106.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

<div align="center">

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

</div>

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

109.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

110.    Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

111.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-

Case ID: 220302601

based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

112. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

113. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

114. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

115. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

116. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers'

conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

117.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

119.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to

29

Case ID: 220302601

warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

120.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

   a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d.  "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

   e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

   f.  Failed to insert a warning or instruction to healthcare professionals and other

30

Case ID: 220302601

medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

121. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

122. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

123. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

124. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

125.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

Case ID: 220302601

127. At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

128. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

129. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

   a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

   e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

Case ID: 220302601

    f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

    h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

130.  In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

131.  As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

132.  Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

136.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products

Case ID: 220302601

when used in the intended manner and for the intended purpose.

137. Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

138. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

 a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

 b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

 c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

 d. That cow's milk-based products were safe for premature infants; and/or

 e. That cow's milk-based products were necessary for optimum growth; and/or

 f. That cow's milk-based products were similar or equivalent to breast milk; and/or

 g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

36

Case ID: 220302601

h. That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

i. That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

j. That their products were based on up-to-date science, which made them safe for premature infants; and/or

k. Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

139. Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

140. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

a. Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

b. Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c. Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the

Case ID: 220302601

packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

Case ID: 220302601

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.  Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

39

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

141.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these intentional

40

misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

142. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

143. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302601

g. For such other and further relief as the Court deems proper.

## COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

144. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

145. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

146. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

147. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

148. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

42

Case ID: 220302601

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

i. Thet their products can be fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

j. That their products were based on up-to-date science, which made them safe for premature infants; and/or

k. Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

149. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

a. Omitting from coupons, gift bags, other promotional materials, and the packaging

Case ID: 220302601

and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

b. Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c. Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products

44

Case ID: 220302601

provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k. Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

Case ID: 220302601

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials,

46

Case ID: 220302601

and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

150.  Abbott and Mead were negligent or careless in not determining those representations to be false.

151.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

152.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

153.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of

47

life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155.  Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

156.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

48

157. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

159. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

160. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

161. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and

Case ID: 220302601

death.

162. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

163. Reasonable hospitals under the same or similar circumstances would have warned of the

Case ID: 220302601

above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

164.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

165.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

166.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

167.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

Case ID: 220302601

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

168.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

169.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

Case ID: 220302601

170.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

171.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

172.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

173.  Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

174.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded

Case ID: 220302601

the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

175.  Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

176.  Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

177.  Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

178.  Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

179.  By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

180.  Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

181.  Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

    b.  Failing to formulate, adopt, and enforce adequate rules and policies that would have

Case ID: 220302601

restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

c.  Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in

Case ID: 220302601

premature infants; and/or

i.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o.  Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

Case ID: 220302601

182. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

183. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

184. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

185. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

186. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including

Case ID: 220302601

the Injured Infant.

187.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

188.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

   a.   Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

   b.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   c.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

   d.   Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

   e.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

   f.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

Case ID: 220302601

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

189.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

190.  A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

191.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

192.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to

59

Case ID: 220302601

oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

193. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with

60

this action; and

g.  For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

194.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: <u>July 16, 2024</u>

<div align="right">

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:   */s/ Tobias L. Millrood*
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

*Attorneys for Plaintiffs*

</div>

Case ID: 220302601

# EXHIBIT A-72

BURNS WHITE LLC
By:    James A. Young, Esquire
       Richard S. Margulies, Esquire
       Douglas A. Brockman, Esquire
       Meredith A. Lowry, Esquire
Attorney ID Nos. 00213/62306/67185/321131
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com; rsmargulies@burnswhite.com
dabrockman@burnswhite.com; malowry@burnswhite.com

*Attorneys for defendant
The Pennsylvania Hospital of
the University of Pennsylvania
Health System d/b/a
Pennsylvania Hospital and The
Trustees of the University of
Pennsylvania d/b/a Penn
Medicine*

| | | |
|---|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| Plaintiffs, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY, LLC | : | NO. 2601 |
| Defendants. | : | |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

     Kindly enter the appearance of Meredith A. Lowry, Esquire as co-counsel on behalf of

Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a

Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine,

in the above-captioned matter.

Date: July 22, 2024

                           **BURNS WHITE LLC**
                         BY: */s/ Meredith A. Lowry*
                           Meredith A. Lowry, Esquire

## CERTIFICATE OF SERVICE

I, Meredith A. Lowry, Esquire, hereby certify that a true and correct copy of the foregoing

*Entry of Appearance* was served via the Court's electronic filing on all counsel of record.

Date: July 22, 2024

**BURNS WHITE LLC**

BY: */s/ Meredith A. Lowry*

Meredith A. Lowry, Esquire

# EXHIBIT A-73



| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

## ORDER

**AND NOW**, this _____ day of _____ 2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, and any Response thereto, it is

hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED**

that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.


**BY THE COURT:**


_____
                                                    J.

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

## ALTERNATIVE ORDER

**AND NOW**, this        day of                        2024, upon consideration of the

Preliminary Objections of Defendants the Pennsylvania Hospital of the University of Pennsylvania

Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania

d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, and any Response thereto, it is

hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED**

that:

1.   Count VI of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

2.   Count VII of Plaintiffs' Amended Complaint is **DISMISSED** with prejudice;

3.   Plaintiffs' claims for punitive damages as to Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

4.   Plaintiff Gina Wieger's claims in her own right are **DISMISSED** with prejudice.

5.   Plaintiffs' Second Amended Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                                            J.

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Ste. 2700
Philadelphia, PA  19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>                Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>                Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022 NO. 2601 |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Second Amended Complaint, and, in support thereof, aver as follows:

**I.    FACTUAL AND PROCEDURAL HISTORY**

1.    Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott

Case ID: 220302601
Control No.: 24081578

Laboratories ("Abbott"). A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "A."

2.     On April 20, 2022, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3) strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations. A true and correct copy of Preliminary Objections to Plaintiffs' Complaint is attached hereto as Exhibit "B."

3.     On September 8, 2023, Plaintiffs filed an Amended Complaint, which still contained substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. A true and correct copy of Plaintiffs' Amended Complaint is attached hereto as Exhibit "C."

4.     Thus, on September 27, 2023, Moving Defendants filed Preliminary Objections to Plaintiffs' Amended Complaint. A true and correct copy of Moving Defendants' Preliminary Objections to Plaintiffs' Amended Complaint is attached hereto as Exhibit "D."

5.     On March 20, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "with specificity regarding the claims and damages in this professional negligence action." A true and correct copy of the Court's Order is attached hereto Exhibit "E."

6.     On July 17, 2024, Plaintiffs filed a Second Amended Complaint, which includes some additional factual allegations, but the same fatal flaws are still present. A true and correct copy of Plaintiffs' Second Amended Complaint is attached hereto as Exhibit "F."

Case ID: 220302601
Control No.: 24081578

7.      Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[1]

8.      Plaintiffs allege that the Plaintiff-minor, S.P., was diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit F, ¶¶ 1, 23. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula and fortifiers added to human milk.[2]

9.      In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability.[3]

10.     Plaintiffs aver that S.P. was born prematurely on December 3, 2013 and that "upon information and belief" S.P. "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11, 13.

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center, Jefferson Abington Hospital and Thomas Jefferson University Hospital.

[2] Although Plaintiffs aver in the Second Amended Complaint that NEC is caused by cow's milk-based infant formula and fortifiers, as discussed *infra* and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Second Amended Complaint that indicates NEC is caused by cow's milk-based products.

[3] As is discussed below, infant formulas are regulated by the United States Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302601
Control No.: 24081578

11.    Plaintiffs allege that from December 5, 2013 to December 13, 2013, "S.P. was fed Study Feeds comprised of, based upon information and belief, Similac and/or Enfamil cow's milk-based products." *See id.*, ¶ 13.

12.    Plaintiffs aver that on December 14, 2013, S.P. was made NPO and fed nothing by mouth because she began developing "intermittent feeding intolerance." *See id.*, ¶ 14. Plaintiffs further aver that S.P. "was treated for ten days for presumed NEC from December 14, 2013 to December 25, 2013." *Id.*

13.    Plaintiffs further allege that from December 25, 2013 to December 29, 2013, S.P. "was fed Study Feeds comprised of, based upon information and belief, premature infant bovine-milk based formula." *See id.*, ¶ 15.

14.    According to Plaintiffs, S.P. developed abdominal distention, and was transferred to the Children's Hospital of Philadelphia, where, on January 7, 2014, she underwent an "exploratory laparotomy and antrectomy with ostomy, which involved removal of a necrotic unsalvageable segment of S.P.'s intestine." *See id.*, ¶¶ 17-18.

15.    Plaintiffs allege that, "[u]pon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products." *See id.*, ¶ 20.

16.    Plaintiffs further allege that S.P. "suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome secondary to NEC, intestinal and feeding difficulties, growth issues secondary to short gut syndrome, neurological injuries, and she continues to suffer other longer-term health effects secondary to short gut syndrome." *See id.*, ¶ 21.

Case ID: 220302601
Control No.: 24081578

17.     Moving Defendants Preliminarily Object to Plaintiffs' Second Amended Complaint for the reasons stated below and as set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.    ARGUMENT

### A.    DEMURRER TO COUNT VI: FAILURE TO WARN

18.     Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

19.     In alleging a failure to warn claim against Moving Defendants, Plaintiffs appear to conflate a cause of action for negligent failure to warn, with a cause of action for failing to obtain informed consent.  Under either theory, Count VI is legally deficient and must be dismissed.

**i.    Plaintiffs failed to state a cause of action for negligent failure to warn because Plaintiffs' baseless assertions that Moving Defendants are "suppliers" and that the cow's milk-based products at issue were unreasonably dangerous, are not support with sufficient factual allegations.**

20.     Plaintiffs allege in Count VI of the Second Amended Complaint that Moving Defendants "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. *See* Exhibit F, ¶ 155.

21.     Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants because they have failed to plead sufficient facts to support any assertion that Moving Defendants are "suppliers" and that the products at issue were "unreasonably dangerous."

Case ID: 220302601
Control No.: 24081578

22. Pennsylvania courts have adopted Restatement (Second) of Torts § 388 in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991).

23. Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

24. First, Moving Defendants had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce. Thus, Count VI should be dismissed for this reason alone.

25. Additionally, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn, which Plaintiffs have failed to do.

26. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

27. "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

6

Case ID: 220302601
Control No.: 24081578

28.     At the outset of their Second Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit F at ¶ 23 (emphasis added). Following this, Plaintiffs make the core claim of their Second Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *See id.*

29.     However, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant.

30.     Plaintiffs appear to base this core claim on flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in their Amended Complaint and Second Amended Complaint.

31.     In their original Complaint, in support of their assertion that the products at issue were dangerous to S.P., Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.  *See* Exhibit A, ¶¶ 17-23.

32.     As Moving Defendants argued in their Preliminary Objections to Plaintiffs' original Complaint, the studies cited by Plaintiffs demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit A, ¶¶ 17-23.

Case ID: 220302601
Control No.: 24081578

33.     Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint, and again in their Second Amended Complaint.

34.     In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Second Amended Complaint that "scientific evidence" exists demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit F, ¶¶ 29-31. However, Plaintiffs do not plead any additional facts to support their assertion that such "scientific evidence" exists.

35.     Further, Plaintiffs' baseless assertion that the cow's milk-based products at issue were "unreasonably dangerous" is incompatible with the reality that such products are carefully regulated by the United States Food and Drug Administration ("FDA"), and Plaintiffs are not alleging that Moving Defendants did anything contrary to the applicable federal regulations.

36.     The Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." *See* Pub. L. No. 96-359, 94 Stat. 1190.

37.     The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. *See* 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07.

38.     Neither the IFA nor the regulations exclude cow's milk as an ingredient, and many infant formulas for sale include cow's milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50.

39.     Plaintiffs have not alleged any facts that would justify overlooking an entire regulatory framework dedicated to ensuring the safety of infant formula in the United States.

Case ID: 220302601
Control No.: 24081578

40.     Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based products is unreasonably dangerous for its intended purpose.

41.     Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs.

> ### ii.     Count VI is also deficient to the extent Plaintiffs' "failure to warn" claim is based on an alleged failure to obtain informed consent.

42.     Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

43.     Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based products to feed her child, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

44.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.

9

Case ID: 220302601
Control No.: 24081578

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

45.     The language of the statute above reveals two significant tenets.

46.     The first is that the informed consent statute does not apply to the use of cow's milk-based products in feeding premature infants, since feeding is not a "procedure."

47.     Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 497 A.2d 646, 648 (Pa. Super. 1985).

48.     The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery, and that merely prescribing an oral medication, which does not involve touching, does not amount to battery and therefore, obtaining informed consent is not required under those circumstances. *Id.* at 649.

49.     The same principles clearly apply to infant feeding because, just like when a provider administers medication, the provider is not engaged in "touching" when formula or human milk fortifiers are ordered for an infant's feeding.

Case ID: 220302601
Control No.: 24081578

50.     Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of cow's milk-based products to feed her infant, including warning her of the risks or alternatives of same.

51.     Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See* 40 P.S. § 1303.504; *see also Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1239 (Pa. 2002) (holding that duty to obtain informed consent belongs "solely to the physician" and thus a medical facility cannot be vicariously liable for a failure to obtain informed consent); *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 930 (Pa. Super. 2007) ("Given the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'"); *Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure).

52.     For these reasons, Moving Defendants cannot be held liable for a physician's failure to obtain proper informed consent, nor can they be liable for any alleged failure to obtain informed consent related to infant feeding, which is not a "procedure" under 40 P.S. § 1303.504.

53.     Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI.

Case ID: 220302601
Control No.: 24081578

## B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

### i. Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.

54. In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

55. Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based products.

56. Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants, as discussed *supra*.

57. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

58. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula and fortifiers are unreasonably dangerous products.

59. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

Case ID: 220302601
Control No.: 24081578

### ii. **Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.**

60.     Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

61.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, Thompson requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

62.     Thus, corporate liability requires "more than individual acts of negligence." *Id.* As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "*Thompson* requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id.* at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

63.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

Case ID: 220302601
Control No.: 24081578

64.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based products was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Second Amended Complaint, such evidence cannot support a finding of corporate liability.

65.     For the reasons stated above, Count VII of Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

   **iii. Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.**

66.     Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

67.     The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

68.     However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

14

69.     There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

70.     Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

71.     Thus, the corporate negligence count against Trustees must be dismissed as a matter of law.

### C.     MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

72.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

73.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

74.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order**

15

Case ID: 220302601
Control No.: 24081578

**to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

75.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

76.     Plaintiffs' Second Amended Complaint is deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

77.     Of the 194 paragraphs in Plaintiffs' Second Amended Complaint, only eleven paragraphs address material facts relating to the Plaintiff-minor's care and treatment, diagnosis and injuries, which are utterly insufficient to enable Moving Defendants to prepare their defenses. *See* Exhibit F, ¶¶ 11-21.

78.     Plaintiffs' allegation that "upon information and belief," the Plaintiff-minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 13) does not comply with the fact-pleading requirements of Rule 1019(a), because Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor.

Case ID: 220302601
Control No.: 24081578

79. Additionally, Plaintiffs do not allege any factual basis to support their theory that cow's milk-based products caused S.P.'s NEC diagnosis, other than vague references to unidentified "scientific evidence."

80. Further, Plaintiffs fail to allege any factual basis to support a causal connection between the products at issue and S.M.'s alleged injuries.

81. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

82. These omissions are fatal defects. Therefore, Plaintiffs' Second Amended Complaint should be stricken in its entirety.

## D. MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

83. In the *Ad Damnum* clauses of Counts VI and VII of the Second Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages.

84. However, the Second Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

85. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based product following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth.

86. For example, the Second Amended Complaint does not give any indication whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to

17

Case ID: 220302601
Control No.: 24081578

discussions between her and any health care providers regarding the purported use of cow's milk-based products.

87.     Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

88.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based products.

89.     Absent specific factual allegations to justify the claim that the use of cow's milk-based products in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

90.     Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

91.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to

Case ID: 220302601
Control No.: 24081578

heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

92.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

93.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

94.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

Case ID: 220302601
Control No.: 24081578

95.     Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

96.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

97.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was

20

Case ID: 220302601
Control No.: 24081578

stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

98.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See, e.g., Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical

Case ID: 220302601
Control No.: 24081578

insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

99.     The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

100.     Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

See 40 P.S. §1303.505(c).

101.     Plaintiffs allege in this action that S.P. was fed cow's milk-based products while she was in the NICU at Pennsylvania Hospital, and that Moving Defendants "knew or should have known" that these products increased the risk of NEC. See Exhibit F, ¶ 13.

102.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it, but they have not done so. See Zazzera v. Roche, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); Dean Witter Reynolds, Inc. v. Genteel, 499 A.2d 637 (Pa. Super. 1985).

103.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

Case ID: 220302601
Control No.: 24081578

104.    For all these reasons, Plaintiffs' demand for punitive damages must be stricken with

prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

E.    **MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS**

i.    **<u>Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).</u>**

105.    Plaintiff-parent seeks to recover damages in her own right and as the parent and

natural guardian of S.P.

106.    Plaintiffs' Second Amended Complaint includes allegations in each count against

Moving Defendants that Plaintiff-parent "suffered significant emotional distress, loss of income,

and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See*

Exhibit F, ¶¶ 167, 185.

107.    However, no specific cause of action is asserted as to any damages sought by and

on behalf of Plaintiff-parent, who is not alleged in the Second Amended Complaint to have

suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants.

For this reason, Plaintiff-parent's claim should be dismissed.

108.    Further, even if Plaintiff-parent had properly articulated a cause of action in the

Second Amended Complaint to allow her to recover damages in her own right, the Second

Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall
> state the cause of action, any special damage, and the demand for relief of each
> plaintiff in a separate count, preceded by a heading naming the parties to the causes
> of action therein set forth.

109.    Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf

of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Second Amended Complaint

filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the

Case ID: 220302601
Control No.: 24081578

Second Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### ii. Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.

110.    Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

111.    Plaintiffs allege that S.P. was born on December 3, 2013, was fed the Defendant Manufacturers' products after her birth, and developed NEC thereafter. *See* Exhibit F, ¶¶ 11-21.

112.    Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

113.    In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Second Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule.

114.    In particular, Plaintiffs allege that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims before the expiration of the limitations period, alleging that Moving Defendants "hid the cause" of S.P.'s NEC diagnosis and thus Plaintiff-parent had "no reason to know or suspect" that the products at issue in this case allegedly caused S.P.'s NEC. *See* Exhibit F, ¶¶ 32-51.

115.    The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here.

116.    The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed

24

period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

117.    Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. 1989).

118.    The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995).

119.    "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018) (citations omitted).

120.    Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of S.P.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products. *See* Exhibit F, ¶¶ 32-51.

121.    Plaintiffs do not allege *any* facts to support the claim that Moving Defendants "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

122.    The fatal flaw underlying Plaintiffs' discovery rule argument is that is presupposes that a risk existed, and Moving Defendants were aware of that risk.

Case ID: 220302601
Control No.: 24081578

123. However, Plaintiffs have not plead sufficient facts to support this claim, which is also belied by FDA regulations and other statutory frameworks that exist for the purpose of ensuring the safety of infant formula in the United States.

124. The FDA does not restrict the use of cow's milk-based products for premature or low birth weight infants, and any of Plaintiffs' allegations to the contrary are completely unsupported and baseless.

125. Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

### F. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH PA.R.C.P. 1024

126. Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

127. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

128. In this case, no verification is attached to the Second Amended Complaint in violation of Rule 1024. *See* Exhibit F.

129. Accordingly, the Second Amended Complaint should be stricken for lack of an appropriate verification.

**WHEREFORE**, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Case ID: 220302601
Control No.: 24081578

Respectfully submitted:

BURNS WHITE LLC

BY: /s/ Meredith A. Lowry
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
MEREDITH A. LOWRY, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Dated: August 6, 2024

Case ID: 220302601
Control No.: 24081578

BURNS WHITE LLC
By:    James A. Young, Esquire
        Richard S. Margulies, Esquire
        Meredith A. Lowry, Esquire
Attorney ID Nos. 00213 / 62306 / 321131
1835 Market Street, Ste. 2700
Philadelphia, PA 19103
(215) 587-1625 / 1628 / 1669
jayoung@burnswhite.com
rsmargulies@burnswhite.com
malowry@burnswhite.com

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the*
*University of Pennsylvania Health*
*System d/b/a Pennsylvania Hospital and*
*The Trustees of the University of*
*Pennsylvania d/b/a Penn Medicine*

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>              Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>              Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINT**

Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania ("Trustees") (collectively, "Moving Defendants"), by and through counsel Burns White LLC, hereby file the within Preliminary Objections to Plaintiffs' Second Amended Complaint, and in support thereof aver as follows:

## I.    MATTER BEFORE THE COURT

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Second Amended Complaint.

1

Case ID: 220302601
Control No.: 24081578

## II.    STATEMENT OF QUESTIONS PRESENTED

1.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint with prejudice because Plaintiffs' Second Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous?

*Suggested answer in the affirmative*.

2.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Second Amended Complaint with prejudice because Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative*.

3.      Whether this Honorable Court should dismiss Count VI of Plaintiffs' Second Amended Complaint with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative*.

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Second Amended Complaint with prejudice because Moving Defendants cannot be held liable on a corporate negligence theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative*.

Case ID: 220302601
Control No.: 24081578

5.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Second Amended Complaint with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' Second Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Second Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020?

*Suggested answer in the affirmative.*

9.      Whether this Honorable Court should strike Plaintiff-parent's claims because they are time-barred and Plaintiff-parent has failed to allege sufficient facts to demonstrate that the limitations period should be tolled?

*Suggested answer in the affirmative.*

10.     Whether this Honorable Court should strike Plaintiffs' Second Amended Complaint for lack of an appropriate verification?

*Suggested answer in the affirmative.*

## III.     INTRODUCTION AND FACTUAL BACKGROUND

Case ID: 220302601
Control No.: 24081578

Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). A true and correct copy of Plaintiffs' Complaint is attached hereto as Exhibit "A."

On April 20, 2022, Moving Defendants filed preliminary objections to Plaintiffs' Complaint, seeking the Court to: 1) dismiss Counts VI and VII for lack of specificity; 2) strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries; 3) strike Plaintiffs' claims for punitive damages for failure to plead sufficient facts; and 4) strike Plaintiff-parent's claims for failure to state a cause of action, for failure to plead separate causes of action, and based on the applicable statute of limitations. A true and correct copy of Preliminary Objections to Plaintiffs' Complaint is attached hereto as Exhibit "B."

On September 8, 2023, Plaintiffs filed an Amended Complaint, which still contained substantially all of the fatal flaws that Moving Defendants raised in their first set of Preliminary Objections. A true and correct copy of Plaintiffs' Amended Complaint is attached hereto as Exhibit "C." Thus, on September 27, 2023, Moving Defendants filed Preliminary Objections to Plaintiffs' Amended Complaint. A true and correct copy of Moving Defendants' Preliminary Objections to Plaintiffs' Amended Complaint is attached hereto as Exhibit "D." On March 20, 2024, the Court sustained Moving Defendants' preliminary objections, and ordered Plaintiffs to file an Amended Complaint "with specificity regarding the claims and damages in this professional negligence action." A true and correct copy of the Court's Order is attached hereto Exhibit "E." On July 17, 2024, Plaintiffs filed a Second Amended Complaint, which includes some additional factual allegations, but the same fatal flaws are still present. A true and correct copy of Plaintiffs' Second Amended Complaint is attached hereto as Exhibit "F."

Case ID: 220302601
Control No.: 24081578

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[1] Plaintiffs allege that the Plaintiff-minor, S.P., was diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Exhibit F, ¶¶ 1, 23. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula and fortifiers added to human milk.[2] In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [3]

Plaintiffs aver that S.P. was born prematurely on December 3, 2013 and that "upon information and belief" S.P. "was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11, 13. Plaintiffs allege that from December 5, 2013 to December 13, 2013, "S.P. was fed Study Feeds comprised of, based upon information and belief, Similac and/or Enfamil cow's milk-based products." *See id.*, ¶ 13. Plaintiffs aver that on December 14, 2013, S.P. was made NPO and fed nothing by mouth because she began

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center, Jefferson Abington Hospital and Thomas Jefferson University Hospital.

[2] Although Plaintiffs aver in the Second Amended Complaint that NEC is caused by cow's milk-based infant formula and fortifiers, as discussed *infra* and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Second Amended Complaint that indicates NEC is caused by cow's milk-based products.

[3] As is discussed below, infant formulas are regulated by the United States Food and Drug Administration and are required to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302601
Control No.: 24081578

developing "intermittent feeding intolerance." *See id.*, ¶ 14. Plaintiffs further aver that S.P. "was treated for ten days for presumed NEC from December 14, 2013 to December 25, 2013." *Id.* Plaintiffs further allege that from December 25, 2013 to December 29, 2013, S.P. "was fed Study Feeds comprised of, based upon information and belief, premature infant bovine-milk based formula." *See id.*, ¶ 15.

According to Plaintiffs, S.P. developed abdominal distention, and was transferred to the Children's Hospital of Philadelphia, where, on January 7, 2014, she underwent an "exploratory laparotomy and antrectomy with ostomy, which involved removal of a necrotic unsalvageable segment of S.P.'s intestine." *See id.*, ¶¶ 17-18. Plaintiffs allege that, "[u]pon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products." *See id.*, ¶ 20. Plaintiffs further allege that S.P. "suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome secondary to NEC, intestinal and feeding difficulties, growth issues secondary to short gut syndrome, neurological injuries, and she continues to suffer other longer-term health effects secondary to short gut syndrome." *See id.*, ¶ 21.

Moving Defendants Preliminarily Object to Plaintiffs' Second Amended Complaint for the reasons stated below and as set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## IV.  <u>ARGUMENT</u>

### A.  **DEMURRER TO COUNT VI: FAILURE TO WARN**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

6

In alleging a failure to warn claim against Moving Defendants, Plaintiffs appear to conflate a cause of action for negligent failure to warn, with a cause of action for failing to obtain informed consent. Under either theory, Count VI is legally deficient and must be dismissed.

### i. **Plaintiffs failed to state a cause of action for negligent failure to warn because Plaintiffs' baseless assertions that Moving Defendants are "suppliers" and that the cow's milk-based products at issue were unreasonably dangerous, are not support with sufficient factual allegations.**

Plaintiffs allege in Count VI of the Second Amended Complaint that Moving Defendants "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. *See id.*, ¶ 155. Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants because they have failed to plead sufficient facts to support any assertion that Moving Defendants are "suppliers" and that the products at issue were "unreasonably dangerous."

Pennsylvania courts have adopted Restatement (Second) of Torts § 388 in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (d) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (e) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (f) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

<center>7</center>

Case ID: 220302601
Control No.: 24081578

First, Moving Defendants had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce. Thus, Count VI should be dismissed for this reason alone.

Additionally, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn, which Plaintiffs have failed to do. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.

At the outset of their Second Amended Complaint, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." *See* Exhibit F, ¶ 23 (emphasis added). Following this, Plaintiffs make the core claim of their Second Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *See id.* However, Plaintiffs do not allege any facts to support their claim that "scientific evidence" demonstrates that cow's milk-based feeding products cause NEC in preterm and low birth weight infant.

Plaintiffs appear to base this core claim on flawed studies cited in the original Complaint that Plaintiffs subsequently omitted in their Amended Complaint and Second Amended Complaint. In their original Complaint, in support of their assertion that the products at issue were dangerous to S.P., Plaintiffs referenced five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics.

8

*See* Exhibit A, ¶¶ 17-23. As Moving Defendants argued in their Preliminary Objections to Plaintiffs' original Complaint, the studies cited by Plaintiffs demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit A, ¶¶ 17-23. Plaintiffs appear to concede that the aforementioned studies did not support their allegations because Plaintiffs removed all references to the studies and deleted paragraphs 17 through 23 in their Amended Complaint, and again in their Second Amended Complaint.

In lieu of relying on the studies originally cited by Plaintiffs in their Complaint, Plaintiffs generally allege in their Second Amended Complaint that "scientific evidence" exists demonstrating that cow's milk-based products cause NEC. *See, e.g.*, Exhibit F, ¶¶ 29-31. However, Plaintiffs do not plead any additional facts to support their assertion that such "scientific evidence" exists.

Further, Plaintiffs' baseless assertion that the cow's milk-based products at issue were "unreasonably dangerous" is incompatible with the reality that such products are carefully regulated by the United States Food and Drug Administration ("FDA"), and Plaintiffs are not alleging that Moving Defendants did anything contrary to the applicable federal regulations. The Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." *See* Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. *See* 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. Neither the IFA nor the regulations exclude cow's milk as an ingredient, and many infant formulas for sale include cow's milk. 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason

9

Case ID: 220302601
Control No.: 24081578

of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Plaintiffs have not alleged any facts that would justify overlooking an entire regulatory framework dedicated to ensuring the safety of infant formula in the United States.

Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based products is unreasonably dangerous for its intended purpose. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs.

### ii. Count VI is also deficient to the extent Plaintiffs' "failure to warn" claim is based on an alleged failure to obtain informed consent.

Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based products to feed her child, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

(a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

(1) Performing surgery, including the related administration of anesthesia.

Case ID: 220302601
Control No.: 24081578

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of cow's milk-based products in feeding premature infants, since feeding is not a "procedure." Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 497 A.2d 646, 648 (Pa. Super. 1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery, and that merely prescribing an oral medication, which does not involve touching, does not amount to battery and therefore, obtaining informed consent is not required under those circumstances. *Id.* at 649.

The same principles clearly apply to infant feeding because, just like when a provider administers medication, the provider is not engaged in "touching" when formula or human milk

11

fortifiers are ordered for an infant's feeding. Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of cow's milk-based products to feed her infant, including warning her of the risks or alternatives of same.

Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See* 40 P.S. § 1303.504; *see also Valles v. Albert Einstein Medical Center*, 805 A.2d 1232, 1239 (Pa. 2002) (holding that duty to obtain informed consent belongs "solely to the physician" and thus a medical facility cannot be vicariously liable for a failure to obtain informed consent); *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 930 (Pa. Super. 2007) ("Given the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'"); *Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure).

For these reasons, Moving Defendants cannot be held liable for a physician's failure to obtain proper informed consent, nor can they be liable for any alleged failure to obtain informed consent related to infant feeding, which is not a "procedure" under 40 P.S. § 1303.504. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### i. <u>Moving Defendants cannot be held liable under a theory of corporate liability for failing to prevent the use of cow's milk-based products, which is regulated by the FDA and not precluded for use in premature or low birth weight infants.</u>

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly

Case ID: 220302601
Control No.: 24081578

liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based products. Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants, as discussed *supra*. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula and fortifiers are unreasonably dangerous products.

Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

### ii. **Plaintiffs have not sufficiently pled facts to establish "systemic negligence" as required to bring a claim for corporate negligence.**

Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

Case ID: 220302601
Control No.: 24081578

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

Corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "*Thompson* requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based products was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Second Amended Complaint, such evidence cannot support a finding of corporate liability. For the reasons stated above, Count VII of Plaintiffs' Second Amended Complaint should be dismissed with prejudice.

      iii.   **<u>Plaintiffs are precluded from bringing a corporate negligence claim against Defendant Trustees of the University of Pennsylvania, which is merely a non-hospital, corporate parent of Pennsylvania Hospital.</u>**

Case ID: 220302601
Control No.: 24081578

Even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

The *Thompson* holding has been extended to HMOs and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence. Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, the corporate negligence count against Trustees must be dismissed as a matter of law.

**C.** **MOTION TO STRIKE PLAINTIFFS' SECOND AMENDED COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support

15

Case ID: 220302601
Control No.: 24081578

the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Second Amended Complaint is deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Of the 194 paragraphs in Plaintiffs'

Case ID: 220302601
Control No.: 24081578

Second Amended Complaint, only eleven paragraphs address material facts relating to the Plaintiff-minor's care and treatment, diagnosis and injuries, which are utterly insufficient to enable Moving Defendants to prepare their defenses. *See* Exhibit F, ¶¶ 11-21. Plaintiffs' allegation that "upon information and belief," the Plaintiff-minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 13) does not comply with the fact-pleading requirements of Rule 1019(a), because Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor.

Additionally, Plaintiffs do not allege any factual basis to support their theory that cow's milk-based products caused S.P.'s NEC diagnosis, other than vague references to unidentified "scientific evidence." Further, Plaintiffs fail to allege any factual basis to support a causal connection between the products at issue and S.M.'s alleged injuries.

Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change. These omissions are fatal defects. Therefore, Plaintiffs' Second Amended Complaint should be stricken in its entirety.

### D.   MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

In the *Ad Damnum* clauses of Counts VI and VII of the Second Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in outrageous, oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. However, Second Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based product

Case ID: 220302601
Control No.: 24081578

following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth. For example, the Second Amended Complaint does not give any indication whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, outrageous, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based products. Absent specific factual allegations to justify the claim that the use of cow's milk-based products in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional

18

punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984). Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

41  P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

19

Case ID: 220302601
Control No.: 24081578

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed

20

Case ID: 220302601
Control No.: 24081578

to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an

Case ID: 220302601
Control No.: 24081578

award of punitive damages. Pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)    Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

*See* 40 P.S. §1303.505(c).

Plaintiffs allege in this action that S.P. was fed cow's milk-based products while she was in the NICU at Pennsylvania Hospital, and that Moving Defendants "knew or should have known" that these products increased the risk of NEC. *See* Exhibit F, ¶ 13. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it, but they have not done so. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue. For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

Case ID: 220302601
Control No.: 24081578

### E. MOTION TO DISMISS, OR IN THE ALTERNATIVE STRIKE, PLAINTIFF-PARENT'S CLAIMS

#### i. <u>Plaintiff-parent's claims should be dismissed for failure to articulate a cause of action, or alternatively, Plaintiff-parent's claims should be stricken for failure to comply with Pa.R.C.P. 1020(b).</u>

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P. Plaintiffs' Second Amended Complaint includes allegations in each count against Moving Defendants that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." *See* Exhibit F, ¶¶ 167, 185. However, no specific cause of action is asserted as to any damages sought by and on behalf of Plaintiff-parent, who is not alleged in the Second Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

Further, even if Plaintiff-parent had properly articulated a cause of action in the Second Amended Complaint to allow her to recover damages in her own right, the Second Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Second Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Second Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

Case ID: 220302601
Control No.: 24081578

ii. **Plaintiff-parent's claims should be dismissed because her claims are time-barred and she has not alleged sufficient facts to demonstrate that the limitations period should be tolled.**

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that S.P. was born on December 3, 2013, was fed the Defendant Manufacturers' products after her birth, and developed NEC thereafter. *See* Exhibit F, ¶¶ 11-21. Thus, since Plaintiffs' original Complaint was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Second Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. In particular, Plaintiffs allege that Plaintiff-parent did not discover a factual basis for Plaintiffs' negligence claims before the expiration of the limitations period, alleging that Moving Defendants "hid the cause" of S.P.'s NEC diagnosis and thus Plaintiff-parent had "no reason to know or suspect" that the products at issue in this case allegedly caused S.P.'s NEC. *See* Exhibit F, ¶¶ 32-51.

The discovery rule, which is a narrow exception that extends the limitation period in certain limited circumstances, does not apply here. The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992) (abrogated on other grounds).

24

Under the discovery rule, the statute of limitations is not triggered "until the plaintiff knows or reasonably should know (1) that he or she has been injured, and (2) that this injury has been caused by another party's conduct." *See Levenson v. Souser*, 557 A.2d 1081, 1086, 87 (Pa. Super. 1989). The party asserting the discovery rule bears the burden of establishing that he or she falls within it. *See Cochran v. GAF Corp.*, 666 A.2d 245, 249 (Pa. 1995). "[I]t is well-settled that the reasonable diligence standard is objective, as the question is not what the plaintiff actually knew of the injury or its cause, but what he might have known by exercising the diligence required by law." *Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018) (citations omitted).

Plaintiffs allege boilerplate accusations that Plaintiff-parent was unable to discover the cause of S.P.'s NEC diagnosis earlier, and therefore, the limitations period is tolled, because "Defendants hid the cause of NEC" from Plaintiff-parent and Defendants "fraudulently concealed" the risks of NEC from Defendant Manufacturer's products. *See* Exhibit F, ¶¶ 32-51. Plaintiffs do not allege *any* facts to support the claim that Moving Defendants "hid" information from Plaintiff-parent or "fraudulently concealed" any risks from her.

The fatal flaw underlying Plaintiffs' discovery rule argument is that is presupposes that a risk existed, and Moving Defendants were aware of that risk. However, Plaintiffs have not plead sufficient facts to support this claim, which is also belied by FDA regulations and other statutory frameworks that exist for the purpose of ensuring the safety of infant formula in the United States. The FDA does not restrict the use of cow's milk-based products for premature or low birth weight infants, and any of Plaintiffs' allegations to the contrary are completely unsupported and baseless.

Based on the foregoing, Plaintiffs have failed to plead sufficient facts to demonstrate that the applicable limitations period should be tolled.

Case ID: 220302601
Control No.: 24081578

**F.      MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH PA.R.C.P. 1024**

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, no verification is attached to the Second Amended Complaint in violation of Rule 1024. *See* Exhibit F. Accordingly, the Second Amended Complaint should be stricken for lack of an appropriate verification.

**V.      REQUESTED RELIEF**

For the foregoing reasons, Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and the Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.


                              BURNS WHITE LLC


                         BY: _/s/ Meredith A. Lowry_____
                              JAMES A. YOUNG, ESQ.
                              RICHARD S. MARGULIES, ESQ.
                              MEREDITH A. LOWRY, ESQ.
                              Attorneys for Defendants,
                              The Pennsylvania Hospital of the University of
                              Pennsylvania Health System d/b/a Pennsylvania
                              Hospital and The Trustees of the University of
                              Pennsylvania d/b/a Penn Medicine


Dated:  August 6, 2024

Case ID: 220302601
Control No.: 24081578

## <u>CERTIFICATE OF SERVICE</u>

I, Meredith A. Lowry, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Second Amended Complaint, to be served via the electronic filing system to all counsel of record.

BY: */s/ Meredith A. Lowry*
      MEREDITH A. LOWRY, ESQ.

Dated: August 6, 2024

# EXHIBIT A

Case ID: 220302601
Control No.: 24081578

ANAPOL WEISS
BY: TRACY FINKEN, ESQUIRE
Identification Number: 82258
One Logan Square
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
(215) 735-0773
Email:  tfinken@anapolweiss.com

**ATTORNEY FOR PLAINTIFFS**

Keller Lenkner LLC
BY: Ashley Keller (pro hac vice forthcoming)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**ATTORNEY FOR PLAINTIFFS**

Walsh Law PLLC
BY:  Alex Walsh (pro hac vice forthcoming)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

**ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| **GINA WIEGER, on her own behalf and** | : | **COURT OF COMMON PLEAS** |
| **as Parent and Natural Guardian of S.P.,** | : | **PHILADELPHIA COUNTY** |
| **a Minor** | : | |
| **214 Gibbs Ave** | : | |
| **Trenton, NJ 08611-3218** | : | |
| **Plaintiffs** | : | |
| v. | : | **CIVIL ACTION** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | **NO.** |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **MEAD JOHNSON NUTRITION COMPANY** | : | |
| **Illinois Corporation Service Co.** | : | |
| **801 Adlai Stevenson Drive** | : | |
| **Springfield, IL 62703** | : | |
| | : | |
| | : | |
| **ABBOTT LABORATORIES** | : | |

Filed and Attested by the
Office of Judicial Records
24 MAR 2022 03:16 pm
S. RICE

1

Case ID: 220302601

CT Corporation System :
208 So. Lasalle Street, Suite 814 :
Chicago, IL 60604 :
:
:
THE PENNSYLVANIA HOSPITAL OF :
THE UNIVERSITY OF PENNSYLVANIA :
HEALTH SYSTEM d/b/a PENNSYLVANIA :
HOSPITAL :
3400 Civic Center Blvd. :
Philadelphia, PA 19104 :
:
:
THE TRUSTEES OF THE UNIVERSITY OF :
PENNSYLVANIA d/b/a PENN MEDICINE :
133 South 36th Street :
Philadelphia, PA 19104 :
:
**Defendants** : **JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

## NOTICE TO DEFEND

NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701

AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701

2

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

ANAPOL WEISS
BY: TRACY FINKEN, ESQUIRE
IDENTIFICATION NUMBER: 82258
ONE LOGAN SQUARE
130 N. 18TH STREET, SUITE 1600
PHILADELPHIA, PA 19103
(215) 735-0773
EMAIL: TFINKEN@ANAPOLWEISS.COM                    **ATTORNEY FOR PLAINTIFFS**

KELLER LENKNER LLC
BY: ASHLEY KELLER (PRO HAC VICE FORTHCOMING)
150 N. RIVERSIDE PLAZA, SUITE 4100
CHICAGO, ILLINOIS 60606
TELEPHONE: (312) 741-5220
FAX: (312) 971-3502
EMAIL: ACK@KELLERLENKNER.COM                      **ATTORNEY FOR PLAINTIFFS**

WALSH LAW PLLC
BY: ALEX WALSH (PRO HAC VICE FORTHCOMING)
1050 CONNECTICUT AVE, NW, SUITE 500
WASHINGTON, D.C. 20036
TELEPHONE: (202) 780-4127
FAX: (202) 780-3678
EMAIL: AWALSH@ALEXWALSHLAW.COM                    **ATTORNEY FOR PLAINTIFFS**

| | | |
|---|---|---|
| GINA WIEGER, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF S.P., A MINOR<br>214 GIBBS AVE<br>TRENTON, NJ 08611-3218<br>PLAINTIFFS<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br><br><br>MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62703<br><br><br>ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br><br>THE PENNSYLVANIA HOSPITAL OF<br>THE UNIVERSITY OF PENNSYLVANIA<br>HEALTH SYSTEM D/B/A PENNSYLVANIA | : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br><br><br>CIVIL ACTION<br><br>NO. |

3

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

HOSPITAL                                    :
3400 CIVIC CENTER BLVD.                      :
PHILADELPHIA, PA 19104                       :
                                             :
                                             :
THE TRUSTEES OF THE UNIVERSITY OF            :
PENNSYLVANIA D/B/A PENN MEDICINE             :
133 SOUTH 36TH STREET                        :
PHILADELPHIA, PA 19104                       :
                                             :
         DEFENDANTS                          :        JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.     This action arises out of the injuries suffered by premature infants (the "Injured Infants") who were given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infants and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infants to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result,

4

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

the Injured Infants were seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infants' consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infants at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey.  Ms. Wieger is the parent and Natural Guardian of S.P., a minor.  Ms. Weiger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware.  Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania.   Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.   Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931.  Defendants conduct authorized business in the Commonwealth of Pennsylvania.   They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

#### *S.P.'s NEC Diagnosis*

11.     S.P. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 13, 2013.

12.     Upon information and belief S.P. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth.

13.     Upon information and belief shortly after S.P. first ingested the Defendant Manufacturers' products, she developed NEC.

14.     S.P. was forced to undergo surgery and has continued to suffer long term health effects.

#### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

17.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was six to ten times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times more common in babies who received a combination of formula and breast milk.  For babies born at more than 30 weeks gestation, NEC was 20 times more common in those only fed cow's milk formula than in those fed breast milk.

18.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

19.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

20.     A Surgeon General report, The Surgeon General's Call to Action to Support Breastfeeding, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis."  The report also states that premature infants who are not breastfed are 138% more likely to develop NEC.

21.     The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk.  This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

22.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time.

23.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

27.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infants were fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.

### The Defendant Manufacturers' False And Misleading Marketing Regarding Cow's Milk-Based Infant Products

30.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infants' birth.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

31.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

32.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

33.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

34.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

35.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

36.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding.  We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

37.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets.  For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up.  During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.  At some point, the website was edited to remove this statement.  However, upon information and belief, the statement remained on the website until at least December 2020.

38.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder).  In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use.  For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

39.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks.  Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk."  The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

Case ID: 220302601

40.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

41.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

42.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578




43.    The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.  This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infants.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

*The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

50.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

51.     Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

56.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients. It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. However, instead of warning of those

dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infants, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

57.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.  It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

58.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

59.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.  In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

60.    These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

61.    Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infants were fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

62.    Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

*Safer Alternative Designs*

63.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.  The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

64.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

65.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
### COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

66.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

67.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

68.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

69.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infants and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

70.     The Injured Infants ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infants outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

71.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

72.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

73.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

74.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

75.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
#### (Against Abbott and Mead)

76.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

77.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

22

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

78.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.  By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.  The failure to warn makes the products at issue in this litigation unreasonably dangerous.

79.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infants, and that their products might cause the Injured Infants to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.  Among other risks, the Defendant Manufacturers:

> a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infants; and/or
>
> b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or
>
> c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

d.   Failed to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.   Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.   Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80.   Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

81.   As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

82.   The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infants those products. Had the

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

Plaintiff Parent known of the significant risks of feeding the Injured Infants cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infants.

83.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

  a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

  b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

  c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

  d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

  e. For interest as permitted by law;

  f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

  g. For such other and further relief as the Court deems proper.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

84.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

85.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

86.     At all times relevant to this action, the Injured Infants' healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

87.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

88.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infants; and/or

      b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infants; and/or

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

    c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

    h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

89. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

90.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

91.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

92.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

> a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;
>
> b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;
>
> c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;
>
> d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;
>
> e.   For interest as permitted by law;
>
> f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

g. For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

93. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

94. At all times relevant to this action, the Injured Infants consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

95. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

96. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

97. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

29

Case ID: 220302601
Control No.: 24081578

    b.   That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.   That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.   That cow's milk-based products were safe for premature infants; and/or

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

98.    Abbott and Mead knew or reasonably should have known those misrepresentations to be false.

99.    The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their infant products to babies, including the Injured Infants.

100.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infants would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

101. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

102. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e. For interest as permitted by law;

Case ID: 220302601

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

103.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

104.  At all times relevant to this action, the Injured Infants consumed the products at issue in their intended manner and for their intended purpose.

105.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

106.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

107.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infants were fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

108.  Abbott and Mead were negligent or careless in not determining those representations to be false.

109.  The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infants' physicians and medical staff, to provide their products to babies, including the Injured Infants.

110.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infants would not have been exposed to their unreasonably dangerous cow's milk-based products.

111. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

112. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infants' injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

113.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

114.   Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

115.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

116.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

117.   Penn Medicine and Pennsylvania Hospital negligently and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

118.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales

35

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

119.    Penn Medicine and Pennsylvania also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

120.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

121.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302601

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

122.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

123.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

124.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

125. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

126. As a further direct and proximate result of Penn Medicine and Pennsylvania failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, reckless, and/or malicious conduct, as permitted by law;

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

127. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

128. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

129. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

130. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

131.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.  The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.  These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

132.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

133.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

134.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

135.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly  and breached its duty by:

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

a.   Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.   Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.   Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.   Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.   Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.   Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.   Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

136. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

137. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

138. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

139. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent and reckless conduct the Plaintiff Parent suffered significant emotional distress, loss of

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

140. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

141. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

142. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly and breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

143. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

144.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

145.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

146.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

147.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, , the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital as follows:

  a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

  b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

148. Plaintiff hereby demands a jury trial for all claims triable.

Dated: March 24, 2022

Respectfully submitted,

**ANAPOL WEISS**

Tracy Finken
130 N. 18th Street, Suite 1600
Philadelphia, PA 19103
Phone: (215) 735-1130
Email: tfinken@anapolweiss.com

**KELLER LENKNER LLC**
Ashley Keller (*pro hac vice forthcoming*)
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606

Case ID: 220302601

Telephone: (312) 741-5220
Fax: (312) 971-3502
Email: ack@kellerlenkner.com

**WALSH LAW PLLC**
Alex Walsh (*pro hac vice forthcoming*)
1050 Connecticut Ave, NW, Suite 500
Washington, D.C. 20036
Telephone: (202) 780-4127
Fax: (202) 780-3678
Email: awalsh@alexwalshlaw.com

*Attorneys for Plaintiff*

Case ID: 220302601

## CERTIFICATE OF SERVICE

I hereby certify that on March 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that the foregoing document is being served on all counsel of record or parties registered to receive CM/ECF Electronic Filings.

Tracy Finken

48

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

DocuSign Envelope ID: C3C5A6A4-474B-42E2-9C88-07441826A3A3

**COURT OF COMMON PLEAS**
**PHILADELPHIA COUNTY**

Gina Wieger
             **PLAINTIFF,**     :

    **v.**                     :

                              :

Mead Johnson & Company, LLC, et al.    :    **CIVIL DIVISION**

                              :

          **DEFENDANT.**     :    **JURY TRIAL DEMANDED**

## VERIFICATION

I, Gina Wieger _____, hereby verify that I am the plaintiff in the foregoing action; that the

attached Complaint in Civil Action is based upon information which I have furnished to counsel,

and information which has been gathered by counsel in the preparation of the lawsuit. The

language of the Complaint is that of counsel and not mine. I have read the Complaint, and to the

extent the statements therein are based upon information I have given counsel, they are true and

correct to the best of my knowledge, information and belief. To the extent the contents of the

Complaint are that of counsel, I have relied upon counsel in making this Verification. I understand

that if false statements were made herein, I would be subject to the penalties of 18 Pa. C.S.A.

§4904 relating to unsworn falsification to authorities. I am authorizing my counsel to file this

Complaint based on my representation agreement with them.

By: _[DocuSigned by signature: 3A2A155EA84B437]_

DATE: 3/22/2022 _____

Case ID: 220302601

Case ID: 220302601
Control No.: 24081578

# EXHIBIT B

Case ID: 220302601
Control No.: 24081578

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiffs | CIVIL DIVISION |
| v. | MARCH TERM, 2022 NO. 2601 |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

Filed and Attested by the Office of Judicial Records 09 JUN 2023 01:34 pm G. IMPERATO

**ORDER**

**AND NOW**, this          day of                          2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                    J.

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiffs | CIVIL DIVISION |
| v. | MARCH TERM, 2022 NO. 2601 |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

## ALTERNATIVE ORDER

**AND NOW**, this          day of                          2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.  Count VI of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2.  Count VII of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3.  Plaintiffs' claims for punitive damages as to Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

4.  Plaintiff Gina Wieger's claims in her own right are **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                                            J.

BURNS WHITE LLC
By: James A. Young, Esq.
     Richard S. Margulies, Esq.
     Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>           Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>           Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' COMPLAINT**

     Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter "Moving Defendants") hereby preliminarily object to Plaintiffs' Complaint, and, in support thereof, aver as follows:

I.     **INTRODUCTION**

     1.     Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022 against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead

Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott"). See Plaintiff's Complaint, attached as Exhibit "A."[1]

2.      Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[2]

3.      Plaintiffs allege that "upon information and belief" the Plaintiff-minors, including S.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. See Plaintiffs' Complaint, attached as Exhibit "A," ¶ 13. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.[3]

4.      In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [4]

---

[1] Shortly after the filing of the Complaint, this case was removed to federal court. Following briefing and a hearing, the case was remanded to this Honorable Court. There was then an effort by all Defendants to transfer these cases to this Court's Mass Tort Program. Plaintiffs opposed this request, and same was denied by this Honorable Court. These preliminary objections were timely filed after the initial filing of the Complaint, but never ruled upon.
[2] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[3] Although Plaintiffs aver in the Complaint that NEC is caused by cow's milk-based infant formula, as discussed infra and in the accompanying Memorandum of Law, the allegations in the Complaint refer to research and studies that indicate only that NEC is *more common* in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. See Exhibit "A," ¶¶ 17-23. Plaintiffs do not cite any study or statement in the Complaint that indicates NEC is caused by cow's milk-based infant formula.

[4] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiff's contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302601
Control No.: 24082509

5.      The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Complaint.

6.      Plaintiffs aver that S.P. was born prematurely on December 13, 2013 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12.

7.      Plaintiffs further allege that "upon information and belief" S.P. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

8.      Plaintiffs generally allege that S.P. "suffered injuries and has continued to suffer long-term health effects," with no specific description of those alleged injuries or long-term health effects. *Id.*, ¶ 14.

9.      Moving Defendants Preliminarily Object to Plaintiffs' Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

II.     **ARGUMENT**

        A. **DEMURRER TO COUNT VI: FAILURE TO WARN**

10.     Plaintiffs allege in Count VI of the Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

11.     Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

Case ID: 220302601
Control No.: 23082509

12.     In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. *See* Exhibit "A," ¶¶ 17-23.

13.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

14.     Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

15.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

16.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

Case ID: 220302601
Control No.: 23081509

17.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308.

18.     Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

19.     Although Plaintiffs cite in their Complaint to research studies relating to the purported risks of cow's milk-based products in premature infants, the studies demonstrate only, assuming the facts as true as stated by Plaintiffs, that premature infants are at high risk of NEC, and that feeding such infants with breast milk may be better at reducing the risk of NEC than cow's milk-based alternatives. *See* Exhibit "A," ¶¶ 17-23.

20.     At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "A" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, reviewing the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.

21.     The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times *more common* in babies who received a combination of formula and breast milk." *Id.* at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants**

Case ID: 220302601
Control No.: 23082509

**fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.

22.     As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC compared to preterm babies fed a diet that included some cow's milk-based products." *Id.* at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet.** Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.

23.     The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death compared to fortification with a breast milk-based fortifier." *Id.* at ¶ 19. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

24.     The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id.* at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

Case ID: 220302601
Control No.: 23082509

25. According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id.* at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id.* This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not claim that cow's milk-based feeding products cause NEC.

26. The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-mild-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id.* at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

27. Thus, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

28. Further, assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

7

29.    Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

30.    The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

31.    Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.
>
> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure.  The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40  P.S. §1303.504 (emphasis added).

8

Case ID: 220302601
Control No.: 23061709

32.     Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

33.     Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

34.     Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B.      DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

35.     In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

36.     Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

37.     Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

38.     Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

9

Case ID: 220302601
Control No.: 23082509

39.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

40.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

41.     Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

42.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

43.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

44.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

10

45. Additionally, even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

46. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania*, *Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

47. However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4[th] 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4[th] 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4[th] 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5[th] 154, 159 (Pa.Com.Pl. 2007).

48. There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

49. Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

C. **MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

50. Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

11

51.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

52.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

53.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

12

Case ID: 220302601
Control No.: 23081509

54.     Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

55.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14.

56.     Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

57.     Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 37-38.

58.     Plaintiffs' Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

59.     The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

60.     Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

Case ID: 220302601
Control No.: 23061509

61.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

## D.     MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES

62.     In the *Ad Damnum* clauses of Counts VI and VII of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 38, 46.

63.     However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

64.     Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth.

65.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

66.     Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

67.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants

Case ID: 220302601
Control No.: 23082509

engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

68.     Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

69.     Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

70.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

71.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

15

72.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

73.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

74.      Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

75.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Case ID: 220302601
Control No.: 23082509

76.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

77.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd

17

Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

78.    The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

79.    Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

(c)    Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that

Case ID: 220302601
Control No.: 23082509

the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

80.     Plaintiffs allege in this action that unidentified "staff" fed S.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "A," ¶ 12.

81.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

82.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

83.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

## E.     MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS

84.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P.

85.     Plaintiffs' Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 126, 139 and 147.

19

86.     However, no specific cause of action is asserted as to any damages sought by behalf of Plaintiff-parent, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

87.     Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

88.     Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

89.     Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

90.     Plaintiffs allege that S.P. was born on December 13, 2013, was fed the Defendant manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13.

91.     Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

Case ID: 220302601
Control No.: 23082509

**WHEREFORE**, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

BURNS WHITE LLC

BY: _____

JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Case ID: 220302601
Control No.: 23082509

BURNS WHITE LLC
By: James A. Young, Esq.
    Richard S. Margulies, Esq.
    Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | | |
|---|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor | : | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiffs, | : | |
| vs. | : | MARCH TERM, 2022 |
| | : | NO. 2614 |
| Mead Johnson & Company, LLC, et al. | : | |
| Defendants | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' COMPLAINT**

## I.    MATTER BEFORE THE COURT

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Complaint.

While patently obvious that Plaintiffs' Complaint must be dismissed for clear and important violations of the procedural requirements governing pleadings and verification of the accuracy of the factual averments of the Complaint (there are not separate counts identified for the causes of action of each of the Plaintiffs attempts to allege), most of which are averred "upon information and belief," the substance of Plaintiffs' allegations do not support any legally recognized cause of action against Moving Defendants, under Pennsylvania law. Our procedural

rules do not permit a plaintiff to simply identify allegedly tortious conduct by a defendant without pleading the necessary facts to satisfy the elements of the tortious conduct.

Here, Plaintiffs plead that Moving Defendants permitted Co-Defendants' cow's milk-based infant formula to be fed to prematurely born infants, which allegedly caused those infants to develop necrotizing enterocolitis ("NEC"). Plaintiffs then plead themselves out of Court by attempting to support a "failure to warn" claim by referencing various articles that, as pleaded and for purposes of these Preliminary Objections accepted as true, do not support the contention that cow's milk-based infant formulas cause NEC. Thus, distinct from the Complaint's procedural shortcomings, Plaintiffs have failed to plead facts that support the "failure to warn" and corporate liability causes of action that they attempt to assert against Moving Defendants. It is further noteworthy that there is no viable "failure to warn" cause of action that is recognized under Pennsylvania law against Moving Defendants, as explained in this submission by Moving Defendants.

## II.     STATEMENT OF QUESTIONS PRESENTED

1.     Whether this Honorable Court should dismiss Count VI of Plaintiffs' Complaint "Failure to Warn" cause of action with prejudice because Plaintiffs' Complaint does not support the claim that cow's milk-based products are unreasonably dangerous and Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

2.     Whether this Honorable Court should dismiss Count VI of Plaintiffs' Complaint "Failure to Warn" cause of action with prejudice because it improperly alleges that Moving

2

Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Complaint "Corporate Negligence" cause of action with prejudice because Moving Defendants cannot be held liable on such a theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Complaint "Corporate Negligence" cause of action with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

5.      Whether this Honorable Court should strike Plaintiffs' Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action, and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020 and based on the applicable statute of limitations?

Case ID: 220302601
Control No.: 23082509

*Suggested answer in the affirmative.*

III. **INTRODUCTION AND FACTUAL BACKGROUND**

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including S.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Complaint, attached as Exhibit "A" at ¶ 13. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Plaintiff's Complaint, attached as Exhibit "A" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

4

Although Plaintiffs aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Complaint to research studies and reports that, as alleged by Plaintiffs, indicate only that NEC is more common in premature and low birth weight infants fed with cow's milk-based products as compared with similar infants fed with breast milk. *See* Exhibit "A," ¶¶ 17-23. As discussed in detail *supra*, assuming the truth of the factual allegations stated in Plaintiffs' Complaint, the research studies cited by Plaintiffs do not support the conclusion that NEC is caused by cow's milk-based products. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that S.P. was born prematurely on December 13, 2013 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" S.P. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13. No details are provided regarding the extent of her prematurity, her birth weight, or her condition following birth other than that she developed NEC on an unidentified date. Further, no facts are provided by Plaintiffs as to any medical care S.P. received **[add "other than surgery" for Abdullah, Taylor, Wieger/S.P.,]**, for what period of time S.P. allegedly ingested cow's milk-based products, and which product(s) she allegedly ingested.[3] Finally, the Complaint is silent as to the nature and extent of S.P.'s alleged injuries other than a vague reference to "long term health effects." *Id.* ¶ 14.

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 37-38.

Case ID: 220302601
Control No.: 24082509

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at Pennsylvania Hospital regarding the allegations that S.P. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs conceded in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 41. However, Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at Pennsylvania Hospital related to breastfeeding and/or using cow's milk-based products in this case, including whether or not she was encouraged to breastfeed and/or was unable or declined to do so. As noted, Plaintiffs plead that Plaintiff Minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff Minor developed NEC as a result.

Plaintiffs further fail to disclose in their Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas for sale include cow milk. (Exhibit "A," ¶¶ 37-38); 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The

Case ID: 220302601
Control No.: 23062509

notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

## IV. ARGUMENT

### A. DEMURRER TO COUNT VI: FAILURE TO WARN

#### 1. Moving Defendants Cannot Be Held Liable to Plaintiffs Based on a Theory of Failure to Warn Because the Infant Formula is Not Unreasonably Dangerous

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those

Case ID: 220302601
Control No.: 23082509

facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products manufactured by Mead Johnson and Abbott cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger. In support of this theory, Plaintiffs cite to five studies comparing cow's milk-based products to breast milk, a Surgeon General report on the subject, and a statement by the American Academy of Pediatrics. Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the products in question are indeed unreasonably dangerous. Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

"Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and

8

Case ID: 220302601
Control No.: 23082509

(b) has no reason to believe that those for whose use the chattel is supplied
will realize its dangerous condition, and

(c) fails to exercise reasonable care to inform them of its dangerous
condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. To survive preliminary objections, Plaintiffs must aver

sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima*

*facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*,

130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which

rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718

A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use,

i.e., the product left the supplier's control lacking any element necessary to make it safe for its

intended use." *Id.* At 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.*

Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant

Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving

Defendants' duty to warn. They have not done so as the studies they cite in their Complaint do not

say – based on the very allegations in the Complaint - what Plaintiffs claim they do. Therefore,

Moving Defendants had no corresponding duty to warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight

infants are *especially susceptible to NEC*." See Exhibit "A" at ¶ 16 (emphasis added). Following

this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products

cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research,

including numerous randomized controlled trials" confirm this claim. *Id.* Admittedly, if a product

directly causes NEC in preterm and low birth weight infants, that product would certainly be

Case ID: 220302601
Control No.: 23081509

dangerous. However, reviewing the portions of the research and trials cited by Plaintiffs in their Complaint belie their core claim.[4]

The first study cited by Plaintiffs states, according to the Complaint, that "NEC was six to ten times *more common* in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and three times *more common* in babies who received a combination of formula and breast milk." *Id.* at ¶ 17 (emphasis added). To say that NEC is more common in infants fed cow's milk-based products than those fed breast milk is to say that NEC **still occurs in infants fed exclusively breast milk**, but only at a lower rate. Thus, Plaintiffs' first study does not state cow's milk-based feeding products causes NEC.

As averred in the Complaint, the second study cited by Plaintiffs states that "preterm babies fed an exclusive breast milk-based diet were 90% less likely to develop surgical NEC compared to preterm babies fed a diet that included some cow's milk-based products." *Id.* at ¶ 18. To state that preterm infants fed only breast milk are **less likely** to develop a form of NEC is to admit that NEC still develops in preterm infants **regardless of the diet.** Thus, Plaintiffs' second study likewise does not state that cow's milk-based feeding products cause NEC.

The third study cited by Plaintiffs concluded, per the Complaint, "fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death compared to fortification with a breast milk-based fortifier." *Id.* at ¶ 19. As Plaintiffs admitted in the Complaint, preterm and low-weight-birth infants are especially susceptible to NEC. Put another way, **these infants are already at an increased**

---

[4] To the extent Plaintiffs' claim that Defendant Manufacturers' cow's milk-based products increased the risk of NEC in preterm and low-birth-weight infants, they still fail to plead sufficient facts to support this claim. The portions of the studies relied upon by Plaintiffs, taken as true at this juncture, show only that NEC can be more common in preterm and low-birth-weight infants fed cow's milk-based products than in those fed breast or donor milk. These studies do not show the cow's milk-based products **caused** any increase in risk. To the extent Plaintiffs' state the studies do reflect an increased risk of NEC in the infants, this is a legal conclusion without factual basis, which is impermissible under Pa. R. Civ. P. 1019 (see discussion *supra* at p. 19).

Case ID: 220302601
Control No.: 23081509

**risk of NEC regardless of their diet.** This study, as described in Plaintiffs' Complaint, reflects this in explaining different rates of risk of developing NEC when using cow's milk-based or breast milk-based fortifiers. What the study does not state, as alleged in the Complaint, is that cow's milk-based fortifiers cause NEC.

The Surgeon General report cited by Plaintiffs is alleged in the Complaint to reiterate the principle made in the prior three studies and states that "formula feeding is associated with *higher rates*" of NEC in preterm infants and that "premature infants who are not breastfed are 138% more likely to develop NEC." *Id.* at ¶ 20 (emphasis added). If cow's milk-based formula caused NEC as Plaintiffs aver, one might expect the Surgeon General report to so state. Instead, the Surgeon General report, as described in Plaintiffs' Complaint at ¶ 20, makes the same acknowledgment as Plaintiffs – that preterm infants are highly susceptible to NEC regardless of their diet, and that NEC occurs in different rates in preterm infants fed cow's milk-based products and breast milk. The report does not state that the former causes NEC.

According to the Complaint, the American Academy of Pediatrics makes a nearly identical statement to the Surgeon General report. *Id.* at ¶ 21. The Academy makes a recommendation that "all premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized donor milk," which recommendation is alleged to be related in part to "lower rates… of NEC." *Id.* This statement acknowledges that NEC still occurs in preterm infants fed only breast milk, but simply at a lower rate. According to the Complaint, the Academy does not state that cow's milk-based feeding products cause NEC.

The fourth and fifth studies cited by Plaintiffs in their Complaint provide similar information. As alleged in the Complaint, a study "found that premature and low-birth-weight infants fed an exclusive breast-mild-based diet suffered NEC only 3% of the time while premature

Case ID: 220302601
Control No.: 23082509

and low-birth-weight infants receiving cow's milk-based formula suffered NEC 21% of the time." In another study, as alleged in the Complaint, "babies given exclusively breast milk products suffered NEC 5% of the time," whereas "babies given cow's milk products suffered NEC 17% of the time." *Id.* at ¶ 22-23. Once again, these studies, based on the allegations in Plaintiffs' Complaint, do not state that cow's milk-based formula causes NEC.

Ultimately, Plaintiffs' claim that Defendant Manufacturers' cow's milk-based feeding products cause NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. The numerous studies and reports cited by Plaintiffs in their Complaint purportedly show higher rates of NEC in preterm and low birth weight infants fed cow's milk-based diets than those fed breast milk, but this data exists in a world where Plaintiffs admit these infants are at a high risk of developing NEC regardless of diet. All that Plaintiffs' Complaint demonstrates, as pleaded under these facts, is that breast milk may be better at reducing that already high risk of NEC in these infants than cow's milk-based alternatives. This proposition does not make the Defendant Manufacturers' cow's milk-based alternatives unreasonably dangerous within the meaning of § 388 of the Restatement (Second) of Torts and, accordingly, does not trigger a duty to warn on the part of Moving Defendants.

### 2. Moving Defendants Are Not a "Supplier" and, Therefore, Cannot Be Held Liable for Negligent Failure to Warn

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because they are not considered a supplier of cow's milk-based feeding products. Plaintiffs cite to no caselaw in Pennsylvania holding that a hospital is considered a supplier under § 388. Indeed, extensive research into this topic turns up no prior

12

decisions where a Pennsylvania court has found a hospital to be a supplier in a products liability case for negligent failure to warn.

To determine a hospital may be defined as supplier of products ancillary to and following medical services within the meaning of § 388 would be to impose on the hospital a duty to warn about every conceivable object a patient may encounter in a hospital, right down to the napkins available in the hospital cafeteria. Imposing such a duty does nothing to advance the purpose of products liability law, i.e. to protect consumers from dangerous products in the stream of commerce. Moving Defendants are not in the best position to determine what products are available in the market for premature and low weight birth infants. In light of this, Plaintiffs have not sufficiently pleaded that Moving Defendants are a supplier under § 388.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Complaint.

### 3. There is no Legal Basis for Plaintiffs to Present an Informed Consent Claim Regarding the Use of Cow's milk-based products

Plaintiffs' failure to warn claim is couched in language of product liability related to Moving Defendants' alleged duty "as a purchaser, supplier and/or distributor" to provide a product (cow's milk-based infant formula) that was free of unreasonable risk of harm to consumers (parents and their premature infants). This theory fails for the reasons stated above. However, to the extent that Plaintiffs are alleging that Moving Defendants, in providing medical care to

13

Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products, such a claim is also clearly precluded by Pennsylvania law.

Plaintiffs broadly allege that Moving Defendants failed to warn of the alleged dangers of cow's milk-based products and provide them with information necessary "to make an informed choice about whether to allow their baby to be fed the Defendant Manufacturers' products." *See* Exhibit "A" at ¶ 121. This purported failure to warn/inform allegedly led Plaintiff-minor to be fed a cow's milk-based product that Plaintiffs' contend caused and/or increased the risk of NEC. *Id.* at ¶ 125. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> > (1) Performing surgery, including the related administration of anesthesia.
> >
> > (2) Administering radiation or chemotherapy.
> >
> > (3) Administering a blood transfusion.

Case ID: 220302601
Control No.: 23082509

(4)  Inserting a surgical device or appliance.

(5)  Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no

15

informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further, "[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical

16

facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### 1. Moving Defendants Cannot be Held Liable for Corporate Negligence Regarding a Food Product Which is Permitted for its Intended Use Pursuant to Federal Law

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

17

Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the Thompson decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, Thompson requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

Id. at 1386-87 (citations omitted and emphasis added).  Thus, corporate liability requires "more than individual acts of negligence." *Id.* As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "Thompson requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not

18

been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Complaint should be dismissed with prejudice.

### 2. Plaintiffs Are Precluded From Pursuing Corporate Negligence Claims as to The Trustees of the University of Pennsylvania

As noted *infra*, the Pennsylvania Supreme Court set forth certain nondelegable duties of hospitals, which if violated may support a finding of corporate negligence. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d

<div style="text-align:center">19</div>

Case ID: 220302601
Control No.: 23082509

at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

Case ID: 220302601
Control No.: 23082509

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely but do not identify the gestational age at which the child was born or her birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id.* at ¶¶ 37-38. Plaintiffs' Complaint further fails to provide a description

21

of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

The Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

In short, Plaintiffs' Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiffs' Complaint should be stricken in its entirety.

### D.  <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 38, 46. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused

Case ID: 220302601
Control No.: 23082509

or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d

23

1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

An award of punitive damages must be supported by evidence of conduct more serious than the

mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp.

85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care

providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only

to be awarded as follows:

> (a)    Award. -- Punitive damages may be awarded for conduct that is the result
> of the health care provider's willful or wanton conduct or reckless indifference to
> the rights of others. In assessing punitive damages, the trier of fact can properly
> consider the character of the health care provider's act, the nature and extent of the
> harm to the patient that the health care provider caused or intended to cause and the
> wealth of the health care provider.
>
> (b)    Gross Negligence. -- A showing of gross negligence is insufficient to
> support an award of punitive damages.

41  P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of

punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be

intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a

necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a

defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and

that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

Since professional negligence actions involve allegations that health care professionals

deviated from the governing standard of care, punitive damages are generally not recoverable in

malpractice actions unless the medical provider's deviation from the applicable standard of care is

Case ID: 220302601
Control No.: 23082509

so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Case ID: 220302601
Control No.: 23082509

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations

26

Case ID: 220302601
Control No.: 23082509

in the Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed S.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after her birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "A," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

### E.  MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS

#### 1.  Plaintiff-Parent has Failed to State a Cause of Action

Case ID: 220302601
Control No.: 24082509

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P. Plaintiffs' Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "A," ¶¶ 126, 139 and 147. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

### 2. Plaintiffs are Required to Plead Separate Claims Pursuant to Pa.R.C.P. 1020

Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

### 3. Plaintiff-Parent's Claim Is Precluded Pursuant to the Statute of Limitations

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d

Case ID: 220302601
Control No.: 23082509

1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that S.P. was born on December 13, 2013, was fed the Defendant manufacturers' products shortly after her birth, and developed NEC shortly thereafter. *See* Exhibit "A," ¶¶ 11-13. Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

## V,   <u>REQUESTED RELIEF</u>

For the foregoing reasons, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

29

Case ID: 220302601
Control No.: 23082509

## <u>CERTIFICATE OF SERVICE</u>

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, to be served via the electronic filing system to all counsel of record.


BY: _____
      RICHARD S. MARGULIES, ESQ.


Dated: June 9, 2023

# EXHIBIT C

Case ID: 220302601
Control No.: 24081578

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
    Helen A. Lawless, Esq.
    Philip M. Pasquarello, Esq.
Attorney I.D. Nos.: 28895/77764/313702/
320927/205677/327249/326263
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tom.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com
Helen.lawless@klinespecter.com
Philip.pasquarello@klinespecter.com



*Filed and Attested by the Office of Judicial Records 08 SEP 2023 02:53 pm A. STAMATO*

|  |  |  |
|---|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : : : | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
|  | : : | CIVIL TRIAL DIVISION |
| *Plaintiff*, | : : | MARCH TERM 2022 |
| v. | : : | NO. 2601 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | : : : : : : : : : |  |
| *Defendants*. | : : |  |

1[l]

Case ID: 220302601
Control No.: 24081578

## **NOTICE TO PLEAD AND DEFEND**

**NOTICE**

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

**ADVISO**

Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Case ID: 220302601
Control No.: 24081578

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Kline, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
    Helen A. Lawless, Esq.
    Philip M. Pasquarello, Esq.
Attorney I.D. Nos.: 28895/77764/313702/
320927/205677/327249/326263
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tom.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com
Timothy.burke@klinespecter.com
Helen.lawless@klinespecter.com
Philip.pasquarello@klinespecter.com

| | |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>               *Plaintiff,*<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>               *Defendants.* | **IN THE COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 2601** |

## <u>FIRST AMENDED COMPLAINT</u>

Plaintiff brings this Amended Complaint and Demand for Jury Trial (the "Amended

3̶

Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

Case ID: 220302601
Control No.: 24081578

3.     Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey.  Ms. Wieger is the parent and natural guardian of S.P., a minor.  Ms. Wieger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal

Case ID: 220302601
Control No.: 24081578

place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

#### *S.P.'s NEC Diagnosis*

11.     S.P. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 3, 2013.

12.     At birth, S.P.'s gestational age was approximately 26 weeks and she weighed 710 grams. Upon information and belief, S.P. was fed Similac and/or Enfamil cow's milk-based products

Case ID: 220302601
Control No.: 24081578

by staff at Pennsylvania Hospital after her birth.

13.     Upon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products.

14.     S.P.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  S.P. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome, intestinal and feeding difficulties, growth issues, neurological injuries, and she continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

Case ID: 220302601
Control No.: 24081578

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Wieger Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully

Case ID: 220302601
Control No.: 24081578

herein, Ms. Wieger did not know, and had no reason to know or suspect, that S.P.'s NEC could have been caused by the Defendant Manufacturers' products.

### Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wieger

24.     Despite exercising reasonable diligence, Ms. Wieger was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of S.P.'s injuries.

25.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of S.P.'s NEC diagnosis, Ms. Wieger undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

26.     The health care providers at Penn Medicine responded only that S.P. had gotten NEC because she was born premature. Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

27.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused S.P.'s injuries. Penn Medicine's response at the time did not give Ms. Wieger any reason to suspect any wrongdoing on the part of the Defendants.

28.     Ms. Wieger is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

29.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wieger had no reason to doubt their word.

30.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

Case ID: 220302601
Control No.: 24081578

31.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

32.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

33.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed in Paragraphs _____ below, any research conducted by Ms. Wieger immediately

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302601
Control No.: 24081578

after S.P.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused S.P.'s injuries.

34.     Ms. Wieger also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Wieger unaware that the Defendant Manufacturers' products caused S.P.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wieger, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

35.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

36.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

37.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate

11

Case ID: 220302601
Control No.: 24081578

misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

38.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

39.     Additionally, Defendant Hospital failed to inform Ms. Wieger that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Wieger was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Wieger asked Plaintiff's health care providers at Defendant Hospital why a premature infant like S.P. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to S.P. could increase the risk of NEC to preterm infants, responding only that S.P. had gotten NEC solely because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

40.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Carter of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly

Case ID: 220302601
Control No.: 24081578

informed Ms. Wieger that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like S.P., it was enough for Ms. Wieger to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

41.    Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42.    Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.    Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.    Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.    Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required

Case ID: 220302601
Control No.: 24081578

companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born

Case ID: 220302601
Control No.: 24081578

prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative

15

claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 220302601
Control No.: 24081578




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and

Case ID: 220302601
Control No.: 24081578

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals'

Case ID: 220302601
Control No.: 24081578

most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

61.     Prior to S.P.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like S.P.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

Case ID: 220302601
Control No.: 24081578

62.     Prior to S.P.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like S.P.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

63.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like S.P.

### The Defendant Manufacturers' Inadequate Warnings

64.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

65.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

66.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

67.     Mead cites no medical literature or research to guide the use of its products.

68.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the

Case ID: 220302601
Control No.: 24081578

magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

69.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

70.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

71.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies. Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

72.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

73.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

Case ID: 220302601
Control No.: 24081578

74.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

75.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

76.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

77.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience

Case ID: 220302601
Control No.: 24081578

"changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

78.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

79.    Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

80.    These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

81.    Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these

33

Case ID: 220302601
Control No.: 24081578

products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

82. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

83. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

84. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

Case ID: 220302601
Control No.: 24081578

85.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

86.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

87.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

88.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

89.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

90.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury

and death from NEC.

91.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

92.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

93.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

94.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

95.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

> a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;
>
> b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;
>
> c.     For past, present, and future out-of-pocket costs, lost income and/or lost

Case ID: 220302601
Control No.: 24081578

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
#### (Against Abbott and Mead)

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

98.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the

Case ID: 220302601
Control No.: 24081578

products at issue in this litigation unreasonably dangerous.

99.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

a.     Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.     Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.     Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.     "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.     Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.     Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow

Case ID: 220302601
Control No.: 24081578

their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

100. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

101. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

102. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

103. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601
Control No.: 24081578

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT III:  NEGLIGENCE**
**(Against Abbott and Mead)**

104.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of

Case ID: 220302601
Control No.: 24081578

unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

106.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

107.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

108.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.      Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.      Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.      Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

      d.      Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

31

e.   Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

109.   In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

110.   As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

111.   Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

112.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 220302601
Control No.: 24081578

of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

113.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 220302601
Control No.: 24081578

herein.

114.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

115.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

116.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

117.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

>    a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

>    b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

>    c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

34

Case ID: 220302601
Control No.: 24081578

    d.      That cow's milk-based products were safe for premature infants; and/or

    e.      That cow's milk-based products were necessary for optimum growth; and/or

    f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

118.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

119.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant

Case ID: 220302601
Control No.: 24081578

Manufacturers' unreasonably dangerous cow's milk-based products.

120.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

121.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.    For interest as permitted by law;

    f.    For attorney's fees, expenses, and recoverable costs incurred in connection

Case ID: 220302601
Control No.: 24081578

with this action; and

g.      For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

122.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

123.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

124.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

125.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

126.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.      That their cow's milk-based products were necessary to the growth and

Case ID: 220302601
Control No.: 24081578

nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

127.  Abbott and Mead were negligent or careless in not determining those representations to be false.

128.  The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

129.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable

Case ID: 220302601
Control No.: 24081578

reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

130.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

131.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent,

Case ID: 220302601
Control No.: 24081578

and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

132.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

133.   Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

134.   At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

135.   Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

136.   Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

Case ID: 220302601
Control No.: 24081578

137.   Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

138.   Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

139.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

140.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

  a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

  b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

41

Case ID: 220302601
Control No.: 24081578

c.      Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d.      Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

141.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

142.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its

Case ID: 220302601
Control No.: 24081578

medical professionals and the parents of premature infants, including the Plaintiff Parent, would

not have realized the risks associated with feeding cow's milk-based formula to premature infants.

143.    Had Penn Medicine and  Pennsylvania Hospital exercised reasonable care by satisfying its

duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

dangerous products, the Injured Infant would not have been exposed to the Defendant

Manufacturers' cow's milk-based products.

144.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to

warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-

based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based

products, which caused and/or increased the risk of developing NEC and significant injuries.

145.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's

failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff

Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has

been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania

Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in
excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of
enjoyment of life, pain and suffering, mental anguish, and other non-
economic losses sustained as a result of Penn Medicine's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost
revenue, and/or lost profits, and/or lost business opportunity, lost earning

Case ID: 220302601
Control No.: 24081578

capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

146.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

147.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

148.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their

44

Case ID: 220302601
Control No.: 24081578

intended manner and for their intended purpose and ensured quality care for the Injured Infant.

149.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

150.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

151.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

152.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

153.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its

Case ID: 220302601
Control No.: 24081578

medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

154.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

a.    Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.    Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.    Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.    Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.    Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based

Case ID: 220302601
Control No.: 24081578

products to NEC and death in premature infants; and/or

f.     Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.     Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.     Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

155.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

156.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

Case ID: 220302601
Control No.: 24081578

157.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

158.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

159.    In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

160.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

161.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

      a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

      b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

Case ID: 220302601
Control No.: 24081578

c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for

Case ID: 220302601
Control No.: 24081578

premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

162.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

163.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

164.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

165.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

166.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania

Case ID: 220302601
Control No.: 24081578

Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

167. Plaintiff hereby demands a jury trial for all claims triable.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By: /s/ Timothy A. Burke
Thomas R. Kline, Esq.

Case ID: 220302601
Control No.: 24081578

Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.
Helen A. Lawless, Esq.
Philip M. Pasquarello, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

ben.whiting@kellerpostman.com

Date: 9/8/23

Case ID: 220302601
Control No.: 24081578

# EXHIBIT D

Case ID: 220302601
Control No.: 24081578

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

Filed and Attested by the
Office of Judicial Records
27 SEP 2023 02:47 pm
E. HAURIN

## ORDER

**AND NOW**, this        day of                          2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                J.

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>            Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>            Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

## ALTERNATIVE ORDER

**AND NOW**, this        day of                        2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.    Count VI of Plaintiffs' Complaint is **DISMISSED** with prejudice;

2.    Count VII of Plaintiffs' Complaint is **DISMISSED** with prejudice;

3.    Plaintiffs' claims for punitive damages as to Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious, outrageous, intentional and/or fraudulent conduct;

4.    Plaintiff Holli Carter's claims in her own right are **DISMISSED** with prejudice; and

5.    Plaintiffs' Complaint is **STRICKEN** for lack of an appropriate verification.

### BY THE COURT:

_____
                                                              J.

BURNS WHITE LLC
By: James A. Young, Esq.
    Richard S. Margulies, Esq.
    Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>           Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>           Defendants. | COURT OF COMMON PLEAS<br>PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

**PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL
OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE
TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA
TO PLAINTIFFS' AMENDED COMPLAINT**

Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System

("Pennsylvania Hospital") and the Trustees of the University of Pennsylvania (hereinafter

"Moving Defendants") hereby preliminarily object to Plaintiffs' Amended Complaint, and, in

support thereof, aver as follows:

I.    **INTRODUCTION**

1.    Plaintiffs instituted this action via the filing of a Complaint on March 24, 2022

against Moving Defendants as well as Co-Defendants Mead Johnson & Company, LLC, Mead

Johnson Nutritional Company (collectively referred to as "Mead Johnson") and Abbott

Case ID: 220302601
Control No.: 23085398

Laboratories ("Abbott"). See Plaintiffs' Complaint, attached as Exhibit "A."[1]  On September 8, 2023, Plaintiffs filed an Amended Complaint.  See Plaintiffs' Amended Complaint, attached as Exhibit "B."

2.      Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based infant formula by premature infants following their birth.[2]

3.      Plaintiffs allege that "upon information and belief" the Plaintiff-minors, including S.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. See Plaintiffs' Amended Complaint, attached as Exhibit "B," ¶ 13. Plaintiffs allege that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based infant formula.[3]

4.      In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson and Abbott, Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. [4]

---

[1] Shortly after the filing of the Complaint, this case was removed to federal court.  Following briefing and a hearing, the case was remanded to this Honorable Court.  There was then an effort by all Defendants to transfer these cases to this Court's Mass Tort Program.  Plaintiffs opposed this request, and same was denied by this Honorable Court. These preliminary objections were timely filed after the initial filing of the Complaint, but never ruled upon.

[2] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

[3] Although Plaintiffs aver in the Amended Complaint that NEC is caused by cow's milk-based infant formula, as discussed infra and in the accompanying Memorandum of Law, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates NEC is caused by cow's milk-based infant formula.

[4] As is discussed in detail in the accompanying Memorandum of Law, infant formulas are regulated by the United States Food and Drug Administration and require to include specified vitamins and nutrients, including infant formulas intended for low birth weight infants. The FDA permits does not restrict the use of cow's milk-based infant formula for premature or low birth weight infants. Plaintiffs' contention that cow's milk-based infant formula should never be given to premature infants is not supported by the FDA.

Case ID: 220302601
Control No.: 23085398

5.      The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four paragraphs in the Amended Complaint.

6.      Plaintiffs aver that S.P. was born prematurely on December 3, 2013 and that "upon information and belief was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth." *Id.*, ¶¶ 11-12.

7.      Plaintiffs further allege that "upon information and belief" S.P. developed NEC after ingesting the Defendant manufacturers' products, while in Hospital Defendant's NICU. *Id.*, ¶ 13 - 14.

8.      Plaintiffs generally allege that S.P. suffered injuries, including but not limited to a diagnosis of NEC, treatment with unspecified surgery, and suffers from short gut syndrome, intestinal and feeding difficulties, growth issues, neurological injuries, as well as other long-term health effects. *Id.*, ¶ 14.

9.      Moving Defendants Preliminarily Object to Plaintiffs' Amended Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.      ARGUMENT

### A.      DEMURRER TO COUNT VI: FAILURE TO WARN

10.     Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm.

11.     Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products made by the Defendant Manufacturers cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger.

3

12.     In support of this theory, Plaintiffs simply aver that "(e)xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which may in turn lead to other medical complications, surgeries, long-term health problems, and death." *See* Exhibit "B," ¶16.

13.     Taking these facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the product in question is indeed unreasonably dangerous.

14.     Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

15.     "Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388.

4

16.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998).

17.     "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308.

18.     Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn.

19.     Although Plaintiffs vaguely refer in their Amended Complaint to research studies and trials relating to the purported risks of cow's milk-based products in premature infants, no such studies have been cited for the proposition that feeding premature infants cow's milk-based formula causes NEC in preterm and low-birth-weight infants.

20.     At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "B" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Amended Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – and that "[e]xtensive scientific research, including numerous randomized controlled trials" confirm this claim. *Id.* However, Plaintiffs fail to cite any such research or trials with specificity to support their claim.

21.     Simply put, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to state facts to establish that cow's milk-based infant formula is unreasonably dangerous for its intended purpose.

Case ID: 220302601
Control No.: 23086398

22.     Further, assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as unreasonably dangerous for their intended use as opposed to simply being a less effective alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because medical providers are not "supplying" a product to a patient within the stream of commerce.

23.     Plaintiffs' failure to warn claim is similarly precluded to the extent that Plaintiffs are alleging that Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products.

24.     The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent.

25.     Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

> (a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:
>
> (1) Performing surgery, including the related administration of anesthesia.
>
> (2) Administering radiation or chemotherapy.
>
> (3) Administering a blood transfusion.
>
> (4) Inserting a surgical device or appliance.
>
> (5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

6

Case ID: 220302601
Control No.: 23085398

> (b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

26. Since the use of infant formula in feeding premature infants is not a "procedure," there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same.

27. Further, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

28. Thus, a hospital cannot be held liable for a physician's failure to obtain proper informed consent. *Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002).

**B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER**

29. In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

30. Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn, since both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula.

7

31.     Infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants.

32.     Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide cow's-milk based products to low birth weight infants.

33.     Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is an unreasonably dangerous product.

34.     Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to prevent the use of cow's milk-based products in the feeding of premature infants in the hospital.

35.     Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995).

36.     In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

*Id.* at 1386-87 (citations omitted and emphasis added).

37.     Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider.

38.     Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the

8

specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Amended Complaint, such evidence cannot support a finding of corporate liability.

39. Additionally, even assuming Plaintiffs had a viable corporate negligence claim against Pennsylvania Hospital, any such claim is precluded against the Trustees of the University of Pennsylvania since it is not a hospital.

40. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012).

41. However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

42. There is no legal basis for holding that the purported corporate parent of a hospital, such as the Trustees of the University of Pennsylvania, can be held liable under a theory of corporate negligence.

43. Indeed, the *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07.

Case ID: 220302601
Control No.: 23085398

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

44.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.

45.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*).

46.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

47.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v.*

10

Case ID: 220302601
Control No.: 23086398

*Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

48.     Plaintiffs' Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case.

49.     Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "B," ¶¶ 11-14.

50.     Plaintiffs aver that the minor was born prematurely, the gestational age, and birth weight; however, Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products.

51.     Further, Plaintiffs have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor.

52.     Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

53.     The Amended Complaint further fails to state the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC with specificity.

Case ID: 220302601
Control No.: 23086398

54.     Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

55.     These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES**

56.     In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages.

57.     However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants.

58.     Rather, Plaintiffs merely allege vaguely that Moving Defendants "negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant," *See* Exhibit "B" at ¶136, absent any context to indicate that such an action was inappropriate based on the specific issues involved in S.P.'s medical care and condition following birth.

59.     For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

60.     Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula

12

in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants.

61.     Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least five hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula.

62.     Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case.

63.      Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of the claim.

64.     Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

65.     Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa.

Case ID: 220302601
Control No.: 23085398

Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

66.     Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)     Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)     Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

40  P.S. §1303.505.

67.     The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772.

68.      Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

69.     Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not

Case ID: 220302601
Control No.: 23085398

recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

70.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death.  *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at \*11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

15

71.     Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

72.     The facts underlying Plaintiffs' bare assertions of reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages.

Case ID: 220302601
Control No.: 23085398

73.     Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c).

74.     Plaintiffs allege in this action that unidentified "staff" fed S.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after his birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "B," ¶ 12.

75.     Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985).

76.     In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

77.     For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

**E.     <u>MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS</u>**

78.     Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P.

Case ID: 220302601
Control No.: 23086398

79. Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "B," ¶¶ 144, and 165.

80. However, no specific cause of action is asserted as to any damages sought on behalf of Plaintiff-parent, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

81. Further, even if Plaintiff-parent had properly articulated a cause of action in the Complaint to allow her to recover damages in her own right, the Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

82. Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Complaint, specifically identifying the cause of action asserted and relief sought in each count.

83. Additionally, although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524.

18

84.     Plaintiffs allege that S.P. was born on December 3, 2013, was fed the Defendant manufacturers' products after her birth, and developed NEC in the NICU. *See* Exhibit "B," ¶¶ 11-14.

85.     Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

86.     In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. *See*, Exhibit "B" ¶¶ 23 – 41.

87.     However, it is well established in Pennsylvania that a plaintiff need not know the precise extent of injuries before the statutory period begins to run. *Levenson v. Souser*, 384 Pa. Super. 132, 557 A.2d 1081, 1090 (1989).

88.     Furthermore, any contention by Plaintiffs that the statute of limitations must be tolled until such time that a plaintiff first suspected that there had been medical negligence with regard to her infant's treatment must similarly be rejected.

89.     It is well settled law that, in accordance with the discovery rule, a plaintiff need not know that she has a cause of action or suspects there has been negligence before the statute of limitations commences. *Colonna v. Rice,* 664 A.2d 979, 981 (Pa. Super. 1995); *Bigansky v. Thomas Jefferson Univ. Hosp*., 658 A.2d 423, 427, 431 n.5 (Pa. Super. 1995); *Brooks v. Sagovia*, 636 A.2d 1201, 1204 (Pa. Super. 1994); *E.J.M. v. Archdiocese of Phila.,* 622 A.2d 1388, 1394 (Pa. Super. 1993); *DeMartino v. Albert Einstein Med. Center*, 460 A.2d 295, 298-299 (Pa. Super. 1983).

90.     Indeed, it has been expressly held that "[k]nowledge of the negligence is not part of the discovery rule." *DeMartino*, *supra*, 460 A.2d at 299.

19

91.    A plaintiff need only know that there was an injury and who caused that injury, a plaintiff need not know the full extent of the injury or even suspect negligence.  *Nicolaou v. Martin,* 195 A.3d 880, 892-93 (Pa. 2018); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011); *Wilson v. El-Daief,* 964 A.2d 354, 364 (Pa. 2009).

92.    Based upon the facts plead by Plaintiffs, S.P. is alleged to have developed NEC after her birth, while still in the NICU.  See Exhibit "B" ¶¶11 – 14.  Accordingly, Plaintiff-parent knew of an injury in 2013, making any claim in her own right clearly time barred, regardless of whether she knew the extent of any claimed injury and/or when she suspected that the injury was caused by negligence.

**F.    MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

93.    Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

94.    Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

95.    In this case, no verification is attached to the Amended Complaint in violation of Rule 1024. *See* Exhibit "B."

96.    Accordingly, the Amended Complaint should be stricken for lack of an appropriate verification.

**WHEREFORE**, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

20

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

Case ID: 220302601
Control No.: 23085398

BURNS WHITE LLC
By: James A. Young, Esq.
    Richard S. Margulies, Esq.
    Attorney ID Nos. 00213/62306
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

Attorneys For Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

| | |
|---|---|
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor<br><br>        Plaintiffs<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.<br><br>        Defendants. | COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL DIVISION<br><br>MARCH TERM, 2022<br>NO. 2601 |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' COMPLAINT**

## I.    <u>MATTER BEFORE THE COURT</u>

Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System ("Pennsylvania Hospital") and The Trustees of the University of Pennsylvania to Plaintiffs' Amended Complaint.

While patently obvious that Plaintiffs' Amended Complaint must be dismissed for clear and important violations of the procedural requirements governing pleadings and verification of the accuracy of the factual averments of the Amended Complaint (there are not separate counts identified for the causes of action of each of the Plaintiffs attempts to allege), most of which are averred "upon information and belief," the substance of Plaintiffs' allegations do not support any legally recognized cause of action against Moving Defendants, under Pennsylvania law. Our

Case ID: 220302601
Control No.: 23085398

procedural rules do not permit a plaintiff to simply identify allegedly tortious conduct by a defendant without pleading the necessary facts to satisfy the elements of the tortious conduct.

Here, Plaintiffs plead that Moving Defendants permitted Co-Defendants' cow's milk-based infant formula to be fed to prematurely born infants, which allegedly caused those infants to develop necrotizing enterocolitis ("NEC"). Plaintiffs then plead themselves out of Court by attempting to support a "failure to warn" claim by referencing unnamed studies and trials in an attempt to establish that cow's milk-based infant formulas cause NEC. Thus, distinct from the Amended Complaint's procedural shortcomings, Plaintiffs have failed to plead facts that support the "failure to warn" and corporate liability causes of action that they attempt to assert against Moving Defendants. It is further noteworthy that there is no viable "failure to warn" cause of action that is recognized under Pennsylvania law against Moving Defendants, as explained in this submission by Moving Defendants.

## II.    STATEMENT OF QUESTIONS PRESENTED

1.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint "Failure to Warn" cause of action with prejudice because Plaintiffs' Amended Complaint does not support the claim that cow's milk-based products are unreasonably dangerous and Moving Defendants cannot be held liable for negligent failure to warn on the basis that they are a supplier of such products?

*Suggested answer in the affirmative.*

2.    Whether this Honorable Court should dismiss Count VI of Plaintiffs' Amended Complaint "Failure to Warn" cause of action with prejudice because it improperly alleges that Moving Defendants were required to obtain Plaintiff-parent's informed consent to use of cow's

Case ID: 220302601
Control No.: 23085398

milk-based products for feeding of Plaintiff-minor and warn her of the risks and/or alternatives of same?

*Suggested answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint "Corporate Negligence" cause of action with prejudice because Moving Defendants cannot be held liable on such a theory for a product which is regulated by the FDA and which is not precluded for use in premature or low birth weight infants, and where a hospital cannot be held liable for corporate negligence based on the alleged negligence of an individual health care provider?

*Suggested answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count VII of Plaintiffs' Amended Complaint "Corporate Negligence" cause of action with prejudice as to the Trustees of the University of Pennsylvania since it is not a hospital and because corporate negligence duties are non-delegable?

*Suggested answer in the affirmative.*

5.      Whether this Honorable Court should strike Plaintiffs' Amended Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiffs' claims for punitive damages as to Moving Defendants because the Amended Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested answer in the affirmative.*

Case ID: 220302601
Control No.: 23086398

7.      Whether this Honorable Court should strike Plaintiff-parent's claims for failure to state a cause of action, and for failure to plead separate causes of action pursuant to Pa.R.C.P. 1020 and based on the applicable statute of limitations?

*Suggested answer in the affirmative*.

8.      Whether this Honorable Court should strike Plaintiffs' Amended Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested answer in the affirmative*.

## III.    INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs have filed a slew of essentially identical lawsuits against Pennsylvania Hospital and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants in the hospital following their birth.[1] Plaintiffs allege that the Plaintiff-minors, including S.P., were diagnosed with necrotizing enterocolitis (NEC), a gastrointestinal disorder that premature infants are at increased risk to develop. *See* Plaintiffs' Amended Complaint, attached as Exhibit "B" at ¶ 16. Plaintiffs aver that premature infants fed with their mother's breast milk or donor breast milk are at decreased risk of developing NEC as compared with infants given cow's milk-based products (infant formula). Many of the allegations of the Complaint are pleaded "upon information and belief," including the allegations that Plaintiff-minors received infant formula and that they developed NEC shortly after being fed with infant formula.

In addition to asserting product liability claims against the infant formula manufacturers Mead Johnson & Company, LLC, Mead Johnson Nutritional Company (collectively referred to as

---

[1] Lawsuits involving identical claims have been filed against the Hospital of the University of Pennsylvania, Temple University Hospital, Albert Einstein Medical Center and Thomas Jefferson University Hospital.

Case ID: 220302601
Control No.: 23085398

"Mead Johnson") and Abbott Laboratories ("Abbott")[2], Plaintiffs have alleged that Moving Defendants are liable based on theories of failure to warn and corporate liability. *See* Plaintiffs' Amended Complaint, attached as Exhibit "B" at Counts VI and VII. As is discussed in detail below, Plaintiffs' claims against Moving Defendants are legally and factually deficient.

Although Plaintiffs baldly aver that NEC is caused by cow's milk-based products, Plaintiffs refer in their Amended Complaint only to research studies and trials with no specificity whatsoever. As discussed in detail *supra*, even assuming the truth of the factual allegations stated in Plaintiffs' Amended Complaint, Plaintiffs' allegations do not support the conclusion that NEC is caused by cow's milk-based products. As such, there is no basis to contend that cow's milk-based products are dangerous for premature infants, such that Moving Defendants had a duty to warn Plaintiff-parents of any risks or alternatives related to infant formula.

Plaintiffs' Complaint provides scant information regarding the factual background of this case. Plaintiffs aver that S.P. was born prematurely on December 3, 2013 and that "upon information and belief" was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth. *Id.*, ¶¶ 11-12. Plaintiffs further allege that "upon information and belief" S.P. developed NEC after ingesting Defendant manufacturers' products. *Id.*, ¶ 13. No specific details are provided regarding the infant's condition following birth other than that she developed NEC on an unidentified date, that she was treated with unspecified surgery, and suffered from short gut syndrome, intestinal and feeding difficulties, growth issues, neurological injuries as well as other long-term health effects. Id at ¶14. No specific facts are provided by Plaintiffs as to any medical care S.P. received, for what period of time S.P. allegedly ingested cow's milk-

---

[2] Mead Johnson and Abbott have been the subject of similar lawsuits in other states, including Connecticut, Illinois and California.

5

Case ID: 220302601
Control No.: 23086398

based products, and which product(s) she allegedly ingested.[3] Finally, the Amended Complaint is silent as to the nature and extent of S.P.'s alleged injuries other than a vague reference to injuries and long term health effects. *Id.* ¶ 14.

Further, the Amended Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at Pennsylvania Hospital regarding the allegations that S.P. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiffs do not provide any information regarding discussions between Plaintiff-parent and any health care providers at Pennsylvania Hospital related to breastfeeding and/or using cow's milk-based products in this case, including whether or not she was encouraged to breastfeed and/or was unable or declined to do so. As noted, Plaintiffs plead that Plaintiff Minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff Minor developed NEC as a result.

Plaintiffs further fail to disclose in their Complaint that infant formula is regulated by the United States Food and Drug Administration (FDA) and that there is no restriction on the use of cow's milk-based products for premature infants. The federal Infant Formula Act of 1980 ("IFA") was enacted "to assure the safety and nutrition of infant formulas." Pub. L. No. 96-359, 94 Stat. 1190. The IFA and its implementing regulations outline the requirements that infant formula must meet, including how infant formula is made, its contents and ingredients, and the labels used on its packages. 21 U.S.C. § 350a; 21 C.F.R. §§ 106-07. The IFA provides that infant formulas may only contain "substances that are safe and suitable for use in infant formula." 21 C.F.R. § 106.40(a). Neither the IFA nor the regulations exclude cow milk as an ingredient, and many infant formulas

---

[3] Plaintiffs aver that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas using the Enfamil brand name. *Id.*, ¶¶ 48, 49.

Case ID: 220302601
Control No.: 23085398

for sale include cow milk; 21 C.F.R. § 106.3 ("infant formula" is a "food for infants by reason of its *simulation* of human milk") (emphasis added). 21 U.S.C. § 350a; 21 C.F.R. §§ 107.50. Before selling any "new infant formula," a manufacturer must (1) register with the FDA, and (2) submit a notice to the FDA at least 90 days before marketing such formula. The notice must also state that the formula contains the required vitamins and nutrients, as demonstrated by testing. 21 U.S.C. § 350a(b). These same FDA review procedures apply when a manufacturer makes a "major change" to an existing formula. 21 U.S.C. § 350a(c)(2)(B); 21 C.F.R. § 106.3.

Further, the FDA recognizes that certain infant formulas are intended for low birth weight babies (such as infants born prematurely) or infants with unusual medical or dietary problems. Indeed, such formulas have special review requirements. 21 U.S.C. § 350a(h); 21 C.F.R. § 107.50(a). For those formulas – known as "exempt" formulas because they may be exempted from certain requirements – the required 90-day notice must include "the label and other labeling of the infant formula, a complete quantitative formulation for the infant formula, and a detailed description of the medical conditions for which the infant formula is represented." 21 C.F.R. § 107.50(b)(3). As with other formulas, the regulations do not exclude cow milk as an ingredient for infant formulas intended for use by an infant with a low birth weight.

Thus, since Plaintiffs do not allege that the product did not meet federal requirements, there is no basis for any claim that the product is unreasonably dangerous and/or should not be given under any circumstances to premature or low birth weight infants.

Case ID: 220302601
Control No.: 23085598

IV.     **ARGUMENT**

    A. **DEMURRER TO COUNT VI: FAILURE TO WARN**

        1. **Moving Defendants Cannot Be Held Liable to Plaintiffs Based on a Theory of Failure to Warn Because the Infant Formula is Not Unreasonably Dangerous**

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also*, *Willet v. Pennsylvania Med. Catastrophe Loss Fund*, 702 A.2d 850, 853 (Pa. 1997).

Plaintiffs allege in Count VI of the Amended Complaint that Moving Defendants, "as purchaser, supplier, and/or distributor of the products at issue in the litigation" owed Plaintiffs and the public a duty to provide products that were free of unreasonable risk of harm. Plaintiffs' theory against Moving Defendants is that they were aware cow's milk-based products manufactured by Mead Johnson and Abbott cause NEC in premature and low birth weight infants and negligently failed to warn the parents of those infants of this danger. However, Plaintiffs do not cite any study or statement in the Amended Complaint that indicates that NEC is caused by cow's milk-based infant formula. Taking the facts as pleaded by Plaintiffs as true, Plaintiffs have failed to state a claim for negligent failure to warn against Moving Defendants as they have failed to demonstrate the products in question are indeed unreasonably dangerous. Further, to the extent the product at issue was provided in the context of medical care, rather than commerce, there can be no claim against Moving Defendants for a product-liability based theory of failure to warn.

Case ID: 220302601
Control No.: 23085398

"Pennsylvania has adopted the Restatement (Second) of Torts in cases involving a claim of negligent failure to warn." *Dauphin Deposit Bank & Trust Co. v. Toyota Motor Corp.*, 596 A.2d 845, 850 (Pa. Super. 1991). Section 388 governs this cause of action, and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. To survive preliminary objections, Plaintiffs must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* At 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.* Based on the foregoing, Plaintiffs must aver sufficient facts demonstrating the Defendant Manufacturers' products are unreasonably dangerous for their intended use, triggering Moving Defendants' duty to warn. They have not done so as the studies they cite in their Complaint do not

Case ID: 220302601
Control No.: 23085398

say – based on the very allegations in the Complaint - what Plaintiffs claim they do. Therefore, Moving Defendants had no corresponding duty to warn.

At the outset, Plaintiffs appropriately acknowledge that "[p]reterm and low-birth-weight infants are *especially susceptible to NEC*." See Exhibit "B" at ¶ 16 (emphasis added). Following this, Plaintiffs make the core claim of their Complaint – that cow's milk-based feeding products cause NEC in preterm and low birth weight infants – a claim that is unsupported by any specific studies or trials in the Amended Complaint. *Id.* Admittedly, if a product directly causes NEC in preterm and low birth weight infants, that product would certainly be dangerous. However, Plaintiffs' Amended Complaint does nothing to support this bald allegation.

Ultimately, Plaintiffs' claim that Defendant Manufacturers' cow's milk-based feeding products cause NEC and are therefore unreasonably dangerous rests upon the notion that correlation equals causation. However, Plaintiffs have not, and cannot, establish causation. Plaintiffs readily admit at paragraph 16 of the Amended Complaint that preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. All that Plaintiffs' Amended Complaint demonstrates, as pleaded under these facts, is that breast milk may be better at reducing that already high risk of NEC in these infants than cow's milk-based alternatives. This proposition does not make the Defendant Manufacturers' cow's milk-based alternatives unreasonably dangerous within the meaning of § 388 of the Restatement (Second) of Torts and, accordingly, does not trigger a duty to warn on the part of Moving Defendants.

### 2. Moving Defendants Are Not a "Supplier" and, Therefore, Cannot Be Held Liable for Negligent Failure to Warn

Assuming *arguendo* that the Defendant Manufacturers' cow's milk-based feeding products can be seen as dangerous for their intended use as opposed to simply being a less effective

10

alternative to breast milk products, Moving Defendants still had no duty to warn of the nature of cow's milk-based products under § 388 because they are not considered a supplier of cow's milk-based feeding products. Plaintiffs cite to no caselaw in Pennsylvania holding that a hospital is considered a supplier under § 388. Indeed, extensive research into this topic turns up no prior decisions where a Pennsylvania court has found a hospital to be a supplier in a products liability case for negligent failure to warn.

To determine a hospital may be defined as supplier of products ancillary to and following medical services within the meaning of § 388 would be to impose on the hospital a duty to warn about every conceivable object a patient may encounter in a hospital, right down to the napkins available in the hospital cafeteria. Imposing such a duty does nothing to advance the purpose of products liability law, i.e. to protect consumers from dangerous products in the stream of commerce. Moving Defendants are not in the best position to determine what products are available in the market for premature and low weight birth infants. In light of this, Plaintiffs have not sufficiently pleaded that Moving Defendants are a supplier under § 388.

For the foregoing reasons, Plaintiffs have not pleaded sufficient facts to aver the Defendant Manufacturers' products are unreasonably dangerous for their intended use and thus have not established Moving Defendants had a duty to warn. Alternatively, even if the products at issue here can be viewed as unreasonably dangerous, Plaintiffs still have failed to plead sufficient facts that Moving Defendants are a supplier of products that are ancillary to the medical services provided to Plaintiffs. Accordingly, it is respectfully requested this Court sustain Moving Defendants' Preliminary Objections to Count VI: Failure to Warn of Plaintiffs' Amended Complaint.

### 3. There is no Legal Basis for Plaintiffs to Present an Informed Consent Claim Regarding the Use of Cow's milk-based products

Case ID: 220302601
Control No.: 23085398

Plaintiffs' failure to warn claim is couched in language of product liability related to Moving Defendants' alleged duty "as a purchaser, supplier and/or distributor" to provide a product (cow's milk-based infant formula) that was free of unreasonable risk of harm to consumers (parents and their premature infants). This theory fails for the reasons stated above. However, to the extent that Plaintiffs are alleging that Moving Defendants, in providing medical care to Plaintiff-minor, failed to obtain Plaintiff-parent's consent to the use of cow's milk-based products and failed to warn of the purported risks and alternatives of such products, such a claim is also clearly precluded by Pennsylvania law.

Plaintiffs broadly allege that Moving Defendants failed to warn of the alleged dangers of cow's milk-based products and provide them with information necessary "to make an informed choice about whether to allow their baby to be fed the Defendant Manufacturers' products." *See* Exhibit "B" at ¶ 140. This purported failure to warn/inform allegedly led Plaintiff-minor to be fed a cow's milk-based product that Plaintiffs' contend caused and/or increased the risk of NEC. *Id.* at ¶ 144. The sole basis upon which Plaintiffs can proceed against Moving Defendants for "failure to warn" in the context of providing medical care is to assert such a claim under a theory of failure to obtain informed consent. Plaintiffs are impliedly asserting that Moving Defendants failed to obtain Plaintiff-parent's informed consent as to whether she should use cow's milk-based infant formula to feed her child as opposed to breastfeeding or using breast donor milk, based on the alleged risks of cow's milk-based products. However, such a claim is not cognizable under Pennsylvania law.

Claims for informed consent in medical malpractice actions are governed by the Medical Care Availability and Reduction of Error Act, which provides as follows:

Case ID: 220302601
Control No.: 23085398

(a) **Duty of Physicians**.--Except in emergencies, a physician owes a duty to a patient to obtain the informed consent of the patient or the patient's authorized representative prior to conducting the following procedures:

(1) Performing surgery, including the related administration of anesthesia.

(2) Administering radiation or chemotherapy.

(3) Administering a blood transfusion.

(4) Inserting a surgical device or appliance.

(5) Administering an experimental medication, using an experimental device or using an approved medication or device in an experimental manner.

(b) Description of procedure.--Consent is informed if the patient has been given a description of a procedure set forth in subsection (a) and the risks and alternatives that a reasonably prudent patient would require to make an informed decision as to that procedure. The physician shall be entitled to present evidence of the description of that procedure and those risks and alternatives that a physician acting in accordance with accepted standards of medical practice would provide.

40 P.S. §1303.504 (emphasis added).

The clear language of the statute above reveals two significant tenets. The first is that the informed consent statute does not apply to the use of infant formula in feeding premature infants, since that is not a "procedure." Thus, there is no basis for Plaintiffs to contend that Plaintiff-parent's consent was required for the use of infant formula to feed her infant, including warning her of the risks or alternatives of same. Second, the informed consent statute only applies to physicians, not hospitals, in the context of medical procedures. *See Morgan v. MacPhail*, 550 Pa. 202, 205 (1997).

Informed consent has not been extended to any type of therapeutic treatment involving an ingestible therapeutic drug, which the court defined as "an ongoing treatment upon examination

Case ID: 220302601
Control No.: 23085398

by the treating physician, where any change of condition can be diagnosed and controlled." *Boyer v. Smith*, 345 Pa. Super. 66, 71, 497 A.2d 646, 648 (1985). The Superior Court ruled that the informed consent doctrine is premised upon the legal theory that the performance of a medical procedure without a patient's informed consent constitutes a technical assault or battery and that merely prescribing an oral medication does not involve a touching so not battery can occur and no informed consent is needed. *Id.* at 649. The same principles clearly apply to administration of infant formula to a newborn.

Further, an informed consent claim is only applicable to a physician and not the hospital and/or other health care entities. *See* 40 P.S. § 1303.504; *see also Kelly v. Methodist Hosp.*, 664 A.2d 148 (Pa. Super. 1995) (holding that generally only the physician who performs the operation on the patient has the duty of obtaining his consent for the procedure). The Pennsylvania Supreme Court has held that informed consent involves the relationship between a physician and the patient and that the failure to obtain proper informed consent is deemed a battery, and the institution plays no role in the communications involved in obtaining the same. *See Valles v. Albert Einstein Medical Center*, 805 A.2d 1232 (2002). In *Valles*, the Court decisively ruled that:

> We find that a battery which results from a lack of informed consent is not the type of action that occurs within the scope of employment. In our view, a medical facility cannot maintain control over this aspect of the physician-patient relationship. Our lower courts have recognized that the duty to obtain informed consent belongs solely to the physician. (Citations omitted). Informed consent flows from the discussions each patient has with his physician, based on the facts and circumstances each case presents. We decline to interject an element of a hospital's control into this highly individualized and dynamic relationship. We agree with the lower court that to do so would be both improvident and unworkable. Thus, we hold that as a matter of law, a medical facility lacks the control over the manner in which the physician performs his duty to obtain informed consent so as to render the facility vicariously liable.

*Id.*, 805 A.2d at 1239 (emphasis added). The *Valles* case remains the prevailing law in Pennsylvania. Pennsylvania courts have repeatedly applied this doctrine, recognizing and

14

Case ID: 220302601
Control No.: 23085398

acknowledging that "[i]n a claim alleging lack of informed consent, it is the conduct of the unauthorized procedure that constitutes the tort." *Isaac v. Jameson Mem. Hosp.*, 932 A.2d 924, 929 (Pa. Super. 2007) (*citing Moure v. Raeuchle*, 604 A.2d 1003, 1008 (Pa. Super. 1992). Further, "[g]iven the unique nature of the doctrine and its origins as a technical battery, hospitals cannot be held vicariously liable for a physician's failure to obtain informed consent because 'a medical facility cannot maintain control over this aspect of the physician-patient relationship.'" *Isaac*, 932 A.2d at 930. As such, it is clear that the instant cause of action cannot be sustained against Moving Defendants as a matter of law.

### B. DEMURRER TO COUNT VII: CORPORATE LIABILITY OF HEALTH CARE PROVIDER

#### 1. Moving Defendants Cannot be Held Liable for Corporate Negligence Regarding a Food Product Which is Permitted for its Intended Use Pursuant to Federal Law

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet *any* of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

Plaintiffs' corporate liability claim fails based on the same rationale as the claim for failure to warn. Both claims are based on the alleged failure to provide warnings to patients related to the use of cow's milk-based infant formula. As noted above, infant formula is regulated by the FDA, and there is no legal restriction on the use of cow's milk-based products for feeding of premature infants. Indeed, the Infant Formula Act expressly acknowledges that it is permissible to provide

Case ID: 220302601
Control No.: 23085398

cow's-milk based products to low birth weight infants. Further, as discussed above, Plaintiffs cannot demonstrate that cow's milk-based formula is a dangerous product. Thus, there is no legal basis to contend that Moving Defendants can be held liable pursuant to a theory of corporate liability for failing to preclude the use of cow's milk-based products in the feeding of premature infants in the hospital.

Additionally, Courts considering the application of the duties set forth in *Thompson* have insisted on more than a simple finding of a negligent act by someone for whom the hospital is purportedly responsible. *Edwards v. Brandywine Hospital*, 652 A.2d 1382 (Pa. Super. 1995). In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the court analyzed the <u>Thompson</u> decision and delineated the standards required to sustain such a claim:

> The *Thompson* theory of corporate liability **will not be triggered every time something goes wrong in a hospital which harms a patient** . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, <u>Thompson</u> requires a plaintiff to show that the hospital itself is breaching a duty and is somehow substandard…*Thompson* contemplates a kind of '**systemic negligence**'…

<u>Id.</u> at 1386-87 (citations omitted and emphasis added). Thus, corporate liability requires "more than individual acts of negligence." *Id*. As noted by the court in *Edwards*, this reading of the Court's opinion in *Thompson* is the only way to logically construe its holding, as hospitals are already held vicariously liable for the negligent acts of their employees and ostensible agents, while "<u>Thompson</u> requires a plaintiff to show that the **hospital itself** is breaching a duty and is somehow substandard." *Id*. at 1387; *see also MacDonald v. Chestnut Hill Hosp.*, 2005 Phila. Ct. Com. Pl. LEXIS 273, 18 (Pa. C.P. 2005) (granting nonsuit to the hospital defendant where "[t]here was no evidence that protocols were routinely ignored to the detriment of patients or that the kind of systematic negligence on the part of CHH required by the *Edwards* decision was present.")

16

Case ID: 220302601
Control No.: 23086398

Thus, a hospital may not be held liable via corporate negligence simply based on the alleged negligence of an individual health care provider. Accordingly, even if Plaintiffs could establish that the use of cow's milk-based infant formula was a breach of the standard of care by unidentified health care providers based on the specific circumstances of the Plaintiff-minor's case herein, which has not been pleaded by Plaintiffs considering the paucity of the allegations in the Complaint, such evidence cannot support a finding of corporate liability.

For the reasons stated above, Count VII of Plaintiffs' Complaint should be dismissed with prejudice.

### 2. Plaintiffs Are Precluded From Pursuing Corporate Negligence Claims as to The Trustees of the University of Pennsylvania

As noted *infra*, the Pennsylvania Supreme Court set forth certain nondelegable duties of hospitals, which if violated may support a finding of corporate negligence. The *Thompson* holding has been extended to HMO's and nursing home facilities, where it was determined that such entities performed similar functions as hospitals. *See Shannon v. Health America Pennsylvania, Inc.*, 718 A.2d 828 (Pa. Super. 1998); *Scampone v. Highland Park Care Center, LLC*, 57 A.3d 582 (Pa. 2012). However, courts have routinely refused to extend the *Thompson* holding past such institutions to cover other entities, such as medical clinics and physician practice groups. *See Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 62 (Pa. Super. 2004); *Dowhouer v. Judson*, 45 Pa. D. & C.4th 172, 180 (Pa.Com.Pl. 2000); *Brewer v. Geisinger Clinic, Inc.*, 45 Pa. D. & C.4th 215, 223 (Pa.Com.Pl. 2000); *Dibble v. Penn State Geisinger Clinic, Inc.*, 42 Pa. D. & C.4th 225 (Pa.Com.Pl. 1999); *Davis v. Gish*, 5 Pa. D. & C.5th 154, 159 (Pa.Com.Pl. 2007).

There is no legal basis for holding that the purported corporate parent of a hospital can be held liable under a theory of corporate negligence. The Trustees of the University of Pennsylvania is not a hospital and cannot be held liable under a theory of corporate liability, regardless of its

17

Case ID: 220302601
Control No.: 23085398

relationship with Pennsylvania Hospital. Moreover, as Pennsylvania Courts have consistently held, corporate negligence duties are "non-delegable," i.e., only one entity can be held liable for a breach of these duties. The *Scampone* Court cautioned that the trial court should ensure that "multiple entities are not exposed to liability for breach of the same non-delegable duties." 57 A.2d at 606-07. Thus, even if a corporate negligence claim were permissible as to Pennsylvania Hospital, which is denied for the reasons stated above, The Trustees of the University of Pennsylvania, which is not a hospital, cannot also be exposed to liability for an alleged breach of the same, non-delegable duties arising out of the same factual allegations. Accordingly, even accepting as true all well pled facts in Plaintiffs' Complaint, the corporate negligence claims as to the non-hospital Defendant, the Trustees of the University of Pennsylvania, are legally insufficient and must therefore be dismissed.

### C. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (*citations omitted*). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts**

18

Case ID: 220302601
Control No.: 23085398

**are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

Plaintiffs' Amended Complaint is woefully deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case. Plaintiffs' description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable Defendants to prepare their defenses. *See* Exhibit "B," ¶¶ 11-14. Plaintiffs aver that the minor was born prematurely, the gestational age and birth weight. Plaintiffs' allegation that "upon information and belief," the minor was fed Similac and/or Enfamil after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Moving Defendants with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiffs

19

have failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. Plaintiffs' Amended Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, what specific treatment was provided for that condition, and for how long.

The Amended Complaint further fails to state the nature of the "neurological injuries" and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC. Plaintiffs' damages claim is not stated with particularity, is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Moving Defendants should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

In short, Plaintiffs' Amended Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiffs' Amended Complaint. Therefore, Plaintiffs' Amended Complaint should be stricken in its entirety.

### D. <u>MOTION TO STRIKE PLAINTIFFS' CLAIMS FOR PUNITIVE DAMAGES</u>

As in the other infant formula cases, In the *Ad Damnum* clauses of Counts VI and VII of the Amended Complaint, Plaintiffs make baseless accusations that Moving Defendants engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. However, the Amended Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Moving Defendants. Rather, Plaintiffs merely allege that "upon information and belief" S.P. may have been given a cow's milk-based infant formula following birth, absent any context to indicate that such an action was inappropriate

20

based on the specific issues involved in S.P.'s medical care and condition following birth. For example, the Amended Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiffs' allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA specifically approves the use of infant formula in care of low birth weight infants, with no restriction as to the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four hospitals in Philadelphia based on identical claims belies the contention that Moving Defendants engaged in outrageous or malicious conduct in allegedly feeding the Plaintiff-minor with cow's milk-based infant formula. Absent specific factual allegations to justify the claim that the use of infant formula in S.P.'s case was extreme and outrageous, there is no basis for an award of punitive damages in this case. Merely contending that punitive damages should be awarded with no supporting factual justification requires dismissal of this claim.

Since the purpose of punitive damages is not compensation of a plaintiff but punishment of the defendant and deterrence, punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). "In fact, punitive damages are specifically designed to heap an additional punishment on a defendant who is found to have acted in a fashion which is particularly egregious." *Wagner* at *12.

21

Case ID: 220302601
Control No.: 23086398

Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Specifically, with regard to punitive damages in the context of claims against health care providers, the Medical Care and Reduction of Error (MCARE) Act permits punitive damages only to be awarded as follows:

> (a)    Award. -- Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.

> (b)    Gross Negligence. -- A showing of gross negligence is insufficient to support an award of punitive damages.

41  P.S. §1303.505.

The Supreme Court has made clear that when assessing the propriety of the imposition of punitive damages, "the state of mind of the actor is vital. The act or failure to act, must be intentional, reckless or malicious." *Hutchinson, supra* at 770. An appreciation of the risk is a necessary element of the mental state required for the imposition of punitive damages. *Id.* at 772. Thus, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.*

Case ID: 220302601
Control No.: 23086398

Since professional negligence actions involve allegations that health care professionals deviated from the governing standard of care, punitive damages are generally not recoverable in malpractice actions unless the medical provider's deviation from the applicable standard of care is so egregious as to evince a conscious or reckless disregard of a patent risk of harm to the patient. *Wagner*, *supra*.

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See*, *e.g.*, *Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages."); *McCardle v. Aldinger*, 5 Pa. D. & C.4th 421, 428 (Pa. Com. Pl. 1996) (sustaining preliminary objections and dismissing claim for punitive damages where the plaintiff alleged negligence in the prenatal care of her child that led to the child was stillborn and holding that "[i]t is not the outcome of the alleged negligence that is of consideration, but rather the alleged conduct of defendants that is at issue."); *Flurer v. Pocono Medical Ctr.*, 15 Pa. D. & C.4th 645, 670 (Pa. Com. Pl. 1992) (sustaining preliminary objections and finding that plaintiffs were not "capable of pleading the requisite behavior" for an award of punitive damages where a hospital allegedly failed

Case ID: 220302601
Control No.: 23085398

to properly utilize a fetal monitor on a pregnant woman who was involved in a serious car accident and thereafter delivered a stillborn child).

Conversely, punitive damages have been reserved for those situations that are truly egregious and utterly outrageous, and typically involve aggravating or other factors that evince a particularly reckless mind or evil motive. *See*, *e.g.*, *Medvecz v. Choi*, 569 F.2d 1221, 1227-30 (3rd Cir. 1987) (anesthesiologist who abandoned patient on operating room table and left room for a lunch break without securing a suitable replacement could be liable for punitive damages to patient who suffered irreversible paralysis from anesthesia complication that developed during his absence); *Hoffman v. Memorial Osteopathic Hospital*, 492 A.2d 1382, 386-87 (Pa. Super. 1985) (evidence that emergency room physician allowed Guillain-Barre Syndrome patient suffering from neurological paralysis to remain crying and immobile on floor for two hours as physician repeatedly stepped over patient was sufficient to support punitive damages claim); *Guernsey v. County Living Personal Care Home, Inc.*, 2006 U.S. Dist. LEXIS 31450, 2006 WL 1412765 (M.D. Pa. 2006) (punitive damages recoverable from nursing home officials who allowed resident to have access to room of 86-year old Alzheimer's patient where he repeatedly raped her, since nursing home was aware of resident's prior criminal convictions for sex registration as a sexual offender under Megan's Law, and his prior instances of grabbing and kissing staff); *Lawrence v. Kunkle*, 75 D. & C. 4th 370 (Pa. Com. Pl. 2005) (patient could maintain punitive damages claim against physician who refused to perform emergency surgery because patient did not have medical insurance even though physician knew that patient would likely suffer permanent neurologic and functional deficits if surgery was delayed).

All of the cases in the paragraph above set forth examples of egregious conduct, completely inapposite to the facts of the instant case. The facts underlying Plaintiffs' bare assertions of

Case ID: 220302601
Control No.: 23086398

reckless, outrageous or similar behavior do not even remotely meet the requisite standard under Pennsylvania law that would permit an award of punitive damages. Even assuming the allegations in the Complaint were true for the purposes of this argument only, the outcome in this case was not the result of any intentional wrongdoing or deliberate misconduct on the part of Moving Defendants or any medical provider at Pennsylvania Hospital, nor does the Complaint contain any such allegations.

Additionally, pursuant to § 505(c) of the MCARE Act, punitive damages are specifically restricted in claims involving vicarious liability:

> (c)     Vicarious liability. -- Punitive damages shall not be awarded against a healthcare provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct of its agent that resulted in an award of punitive damages.

40 P.S. §1303.505(c). Plaintiffs allege in this action that unidentified "staff" fed S.P. Similac and/or Enfamil at Pennsylvania Hospital shortly after his birth and failed to warn Plaintiff-parent of the alleged risks of such products. See Exhibit "B," ¶ 12. Even if such actions were claimed to be egregious or malicious such that punitive damages were permissible, which is denied for the reasons stated above, Plaintiffs must allege facts to establish that Moving Defendants had actual knowledge of the alleged wrongful conduct and nevertheless allowed it. *See Zazzera v. Roche*, 54 D. & C. 4th 225, 238 (Pa. Com. Pl. 2001); *Dean Witter Reynolds, Inc. v. Genteel*, 499 A.2d 637 (Pa. Super. 1985). In this matter, Plaintiffs have failed to plead any facts to suggest that Moving Defendants were aware of any alleged misconduct by any individual alleged to be an agent and allowed such conduct to continue.

For all these reasons, Plaintiffs' demand for punitive damages must be stricken with prejudice as to Moving Defendants, along with all allegations of reckless and similar conduct.

Case ID: 220302601
Control No.: 23086398

### E.  MOTION TO DISMISS PLAINTIFF-PARENT'S CLAIMS

#### 1.  Plaintiff-Parent has Failed to State a Cause of Action

Plaintiff-parent seeks to recover damages in her own right and as the parent and natural guardian of S.P. Plaintiffs' Amended Complaint includes allegations in each count asserted as to Moving Defendants in which it is averred that Plaintiff-parent "suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly altered by the Injured Infant's injuries." *See* Exhibit "B," ¶¶ 145, 158 and 166. However, no specific cause of action is asserted as to any damages sought by Plaintiff-parent in her own right, who is not alleged in the Amended Complaint to have suffered any physical injuries as a result of the alleged negligent conduct of Moving Defendants. For this reason, Plaintiff-parent's claim should be dismissed.

#### 2.  Plaintiffs are Required to Plead Separate Claims Pursuant to Pa.R.C.P. 1020

Further, even if Plaintiff-parent had properly articulated a cause of action in the Amended Complaint to allow her to recover damages in her own right, the Amended Complaint should be stricken pursuant to Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Accordingly, it is improper for Plaintiffs to plead in a single count claims on behalf of both the Plaintiff-minor and the Plaintiff-parent, as was done in the Amended Complaint filed herein. Claims on behalf of each of the Plaintiffs must be set forth in separate counts of the Amended Complaint, specifically identifying the cause of action asserted and relief sought in each count.

#### 3.  Plaintiff-Parent's Claim Is Precluded Pursuant to the Statute of Limitations

26

Case ID: 220302601
Control No.: 23085398

Although the statute of limitations for claims asserted on behalf of minors are tolled until the age of majority, Plaintiff-parent's claims were not similarly tolled and were required to have been brought within two years of the alleged injury. *See Hathi v. Krewstown Park Apts*, 561 A.2d 1261 (Pa. Super. 1989); 42 Pa.C.S. § 5524. Plaintiffs allege that S.P. was born on December 3, 2013, was fed the Defendant manufacturers' products after her birth, and developed NEC in the NICU. *See* Exhibit "B," ¶¶ 11-14. Thus, since the Complaint herein was filed on March 24, 2022, Plaintiff-parent's claims herein are clearly time-barred based on the applicable statute of limitations.

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

In an attempt to circumvent the statute of limitations issues for the Plaintiff-parent, Plaintiffs go to great lengths in their Amended Complaint to essentially assert that Plaintiff-parent's claims are somehow preserved by way of the discovery rule. *See*, Exhibit "B" ¶¶ 23 – 41. More specifically, Plaintiffs have attempted to invoke the Pennsylvania "discovery rule" by arguing that the applicable statute of limitations was not applicable because Defendants allegedly engaged in fraud and concealment about any connection between cow's milk-based infant formula and NEC. See Exhibit "B" at ¶¶ 23 - 41. However, Plaintiffs do not allege when the Plaintiff-parent learned of a potential cause of action.

The discovery rule is a recognized exception to the general rule that a statute of limitations begins to run from the date that a negligent act occurs. The discovery rule provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed period, the period of limitation does not begin to run until discovery of the injury is reasonably possible. *Hayward v. Medical Center of Beaver County*, 608 A.2d 1040, 1043 (Pa. 1992). However, in accordance with the discovery rule, a

Case ID: 220302601
Control No.: 23086398

plaintiff need not know the precise medical cause of the injury for the statute of limitations to begin running; she need only to have known that an injury occurred. *Groover v. Riddle Memorial Hospital*, 357 Pa. Super. 420, 516 A.2d 53 (1986).

Any contention by Plaintiffs that the statute of limitations must be tolled until such time that a plaintiff first suspected that there had been medical negligence with regard to her infant's treatment must similarly be rejected. It is well established in Pennsylvania that a plaintiff need not know the precise extent of injuries before the statutory period begins to run. *Levenson v. Souser*, 384 Pa. Super. 132, 557 A.2d 1081, 1090 (1989). Further, it is well settled law that, in accordance with the discovery rule, a plaintiff need not know that she has a cause of action or suspects there has been negligence before the statute of limitations commences. *Colonna v. Rice,* 664 A.2d 979, 981 (Pa. Super. 1995); *Bigansky v. Thomas Jefferson Univ. Hosp*., 658 A.2d 423, 427, 431 n.5 (Pa. Super. 1995); *Brooks v. Sagovia*, 636 A.2d 1201, 1204 (Pa. Super. 1994); *E.J.M. v. Archdiocese of Phila.,* 622 A.2d 1388, 1394 (Pa. Super. 1993); *DeMartino v. Albert Einstein Med. Center*, 460 A.2d 295, 298-299 (Pa. Super. 1983). Indeed, it has been expressly held that "[k]nowledge of the negligence is not part of the discovery rule." *DeMartino*, *supra*, 460 A.2d at 299. A plaintiff need only know that there was an injury and who caused that injury, a plaintiff need not know the full extent of the injury or even suspect negligence. *Nicolaou v. Martin,* 195 A.3d 880, 892-93 (Pa. 2018); *Gleason v. Borough of Moosic*, 15 A.3d 479, 484 (Pa. 2011); *Wilson v. El-Daief,* 964 A.2d 354, 364 (Pa. 2009).

Based upon the facts plead by Plaintiffs, S.P. is alleged to have developed NEC while still in the NICU. See Exhibit "B" ¶¶11 – 14. Accordingly, Plaintiff-parent knew of an injury in 2013, making any claim in her own right clearly time barred, regardless of whether she knew the extent of any claimed injury and/or when she suspected that the injury was caused by negligence. The

Case ID: 220302601
Control No.: 23086398

statute of limitations for Plaintiff-parent had clearly expired by the time this action was commenced on March 24, 2022.

### F. MOTION TO STRIKE PLAINTIFFS' COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading. In this case, Plaintiffs' Amended Complaint is unverified in violation of Rule 1024. *See* Exhibit "B." Accordingly, the Amended Complaint should be stricken for lack of an appropriate verification.

## V, REQUESTED RELIEF

For the foregoing reasons, Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

BURNS WHITE LLC

BY: _____
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
Attorneys for Defendants,
The Pennsylvania Hospital of the University of
Pennsylvania Health System d/b/a Pennsylvania
Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine

29

Case ID: 220302601
Control No.: 23086398

<u>**CERTIFICATE OF SERVICE**</u>

I, Richard S. Margulies, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, to be served via the electronic filing system to all counsel of record.


BY: _____
RICHARD S. MARGULIES, ESQ.

Dated: September 27, 2023

# EXHIBIT E

Case ID: 220302601
Control No.: 24081578

| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
|---|---|
| Plaintiffs | CIVIL DIVISION |
| v. | MARCH TERM, 2022 NO. 2601 |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

*Filed and Attested by the Office of Judicial Records 27 SEP 2023 02:37 pm E. HAURIN*

## ORDER

**AND NOW**, this ~~26th~~ *26th* day of ~~March~~ *Aug* 2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. ~~It is further~~ *Plaintiff shall file an Amended complaint* **ORDERED** that ~~all claims~~ against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine ~~are hereby~~ **DISMISSED** ~~with prejudice.~~ *with Specificity regarding the claims and damages in this professional negligence action.*

**BY THE COURT:**

_____ J.



22030260100136

Case ID: 220302601
Control No.: 23096294

Case ID: 220302601
Control No.: 24081578

# EXHIBIT F

Case ID: 220302601
Control No.: 24081578

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Klein, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the Office of Judicial Records 17 JUL 2024 04:14 pm S. GILLIAM*

|  |  |
|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor,<br><br>         *Plaintiff*,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENNSYLVANIA HOSPITAL,<br><br>         *Defendants*. | : **IN THE COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **CIVIL TRIAL DIVISION**<br>:<br>: **MARCH TERM 2022**<br>: **NO. 02601**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

**NOTICE TO DEFEND**

Case ID: 220302601
Control No.: 24081578

| NOTICE | ADVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | |
| | Colegio de Abogados del Lackawanna |
| | 233 Penn Avenue, Scranton, PA 18503 |
| | (570) 961-2714 |
| Lackawanna Bar Association | |
| 233 Penn Avenue | |
| Scranton, PA 18503 | |
|  (570) 961-2714 | |

Case ID: 220302601
Control No.: 24081578

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

|  |  |  |
|---|---|---|
| GINA WIEGER, on her own behalf and as Parent and Natural Guardian of S.P., a Minor, | : | **IN THE COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| *Plaintiff*, | : | |
| | : | **CIVIL TRIAL DIVISION** |
| v. | : | |
| | : | **MARCH TERM 2022** |
| | : | **NO. 02601** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, | : | |
| *Defendants.* | : | |

## SECOND AMENDED COMPLAINT

    Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

Case ID: 220302601
Control No.: 24081578

Medicine" or "Pennsylvania Hospital"), together "Defendants."    Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital.  Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.    This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.    As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Gina Wieger is a natural adult person and a resident of New Jersey.  Ms. Wieger is the parent and natural guardian of S.P., a minor.  Ms. Wieger's address is 214 Gibbs Avenue, Trenton, New Jersey 08611-3218.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

2

Case ID: 220302601
Control No.: 24081578

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

Case ID: 220302601
Control No.: 24081578

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

#### *S.P.'s NEC Diagnosis*

11.     S.P. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 3, 2013.

12.     At birth, S.P.'s gestational age was approximately 26 weeks and she weighed 710 grams. S.P. was enrolled in the Neurodevelopmental Effects of Donor Human Milk vs. Preterm Formula in WLBW Infant ("Milk Study) on December 4, 2013.

13.     Between December 5, 2013 to December 13, 2013, S.P. was fed Study Feeds comprised of, based upon information and belief, Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth. These feeds occurred despite the fact that

4

Case ID: 220302601
Control No.: 24081578

Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC.

14.     On December 14, 2013, S.P. began to develop intermittent feeding intolerance, made NPO or fed nothing by mouth. She was treated for ten days for presumed NEC from December 14, 2013, to December 25, 2013.

15.     S.P. was fed Study Feeds comprised of, based upon information and belief, premature infant bovine-milk based formula between December 25, 2013 to December 29, 2013.

16.     S.P. again developed abdominal distention and feeding intolerance and was again made NPO or fed nothing by mouth.

17.     S.P. then developed worsening abdominal distention with abdominal competition and was transferred to the Children's Hospital of Philadelphia (CHOP) for surgical evaluation for presumed NEC with possible stricture on January 7, 2014.

18.     On January 7, once S.P. arrived at CHOP, Dr. Thane Blinman performed an exploratory laparotomy and antrectomy with ostomy, which involved removal of a necrotic unsalvageable segment of S.P.'s intestine.

19.     Based upon information and belief, following her transfer to CHOP, S.P was fed a formula diet consisting exclusively of Abbott Similac Special Care 24 pre term infant formula where she continued to experience symptoms associated with NEC.

20.     Upon information and belief, S.P. developed NEC after ingesting Defendant Manufacturers' products.

21.     S.P.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  S.P. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery, short gut syndrome secondary to NEC, intestinal and feeding difficulties, growth issues

Case ID: 220302601
Control No.: 24081578

secondary to short gut syndrome, neurological injuries, and she continues to suffer other long-term health effects secondary to short gut syndrome.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

22.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

23.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

24.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

25.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

26.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants'

6

Case ID: 220302601
Control No.: 24081578

vulnerability to NEC.

27.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

28.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

29.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

30.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed  Similac and/or  Enfamil  cow's  milk-based products after her birth instead of mother's human milk and/or donor human milk.

31.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania

Case ID: 220302601
Control No.: 24081578

Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Wieger Discovers Her Claim*

32. Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Wieger did not know, and had no reason to know or suspect, that S.P.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wieger*

33. Despite exercising reasonable diligence, Ms. Wieger was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of S.P.'s injuries.

34. Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of S.P.'s NEC diagnosis, Ms. Wieger undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

35. The health care providers at Penn Medicine responded only that S.P. had gotten NEC because she was born premature. Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

36. Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused S.P.'s injuries. Penn Medicine's response at the time did not give Ms. Wieger any reason to suspect any wrongdoing on the part of the Defendants.

37. Ms. Wieger is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

Case ID: 220302601
Control No.: 24081578

38.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wieger had no reason to doubt their word.

39.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

40.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

41.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

Case ID: 220302601
Control No.: 24081578

from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

42.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Wieger immediately after S.P.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused S.P.'s injuries.

43.     Ms. Wieger also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Wieger unaware that the Defendant Manufacturers' products caused S.P.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wieger, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

44.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

45.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would

---

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302601
Control No.: 24081578

rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

46.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

47.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

48.     Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

49.     Additionally, Defendant Hospital failed to inform Ms. Wieger that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Wieger was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Wieger asked Plaintiff's health care providers at Defendant Hospital why a premature infant like S.P. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to S.P. could increase the risk of NEC to preterm infants, responding only that S.P. had gotten NEC solely

because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

50.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Weiger of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Wieger that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like S.P., it was enough for Ms. Wieger to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

51.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

52.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

53.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their

Case ID: 220302601
Control No.: 24081578

promotional websites, reference the science showing how significantly their products increase the risk of NEC.

54.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

55.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU."  Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

56.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products

<div align="center">13</div>

Case ID: 220302601
Control No.: 24081578

increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

57.    Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

58.    Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

59.    Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

60.    While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

Case ID: 220302601
Control No.: 24081578

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

61.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

62.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

63.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac

Case ID: 220302601
Control No.: 24081578

Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

64.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

16

65.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

66.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

67.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons,

Case ID: 220302601
Control No.: 24081578

and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

68.     Here, S.P was discharged from CHOP with the recommendation to continue use of Abbott's Similac Special Care 24 formula.

69.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

70.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:



Case ID: 220302601
Control No.: 24081578

71.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

72.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital.   On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts.   And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge.   The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

73.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments.   They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so

19

Case ID: 220302601
Control No.: 24081578

they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

74.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

75.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

76.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

77.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies'

Case ID: 220302601
Control No.: 24081578

own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

78.     On information and belief, prior to S.P.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like S.P. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

79.     On information and belief, prior to S.P.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like S.P. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

80.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like S.P.

### The Defendant Manufacturers' Inadequate Warnings

81.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the

Case ID: 220302601
Control No.: 24081578

product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

82.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

83.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

84.     Mead cites no medical literature or research to guide the use of its products.

85.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

86.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

87.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

88.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies. Like Mead, Abbott promotes an aggressive marketing campaign

Case ID: 220302601
Control No.: 24081578

designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

89.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

90.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

91.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

92.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

93.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known

Case ID: 220302601
Control No.: 24081578

that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that human milk decreases the risk of NEC for premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning. Further, the Defendant Hospital created a study putting infants, such as S.P. at great risk by providing them with bovine based formula instead of exclusive human milk-based products.

94.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

95.     Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

96.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

97.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in

Case ID: 220302601
Control No.: 24081578

preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

98.  Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

99.  Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

100.  Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

101.  These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

25

Case ID: 220302601
Control No.: 24081578

102.   Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

103.   Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

104.   The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

105. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design

26

provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

106.   On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
### COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

107.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.   Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

109.   Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

110.   Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

111.   The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-

27

Case ID: 220302601
Control No.: 24081578

based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

112. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

113. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

114. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

115. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

116. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

        a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

        b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers'

Case ID: 220302601
Control No.: 24081578

conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

117.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

119.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to

Case ID: 220302601
Control No.: 24081578

warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

120. Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

    a. Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b. Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c. Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d. "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f. Failed to insert a warning or instruction to healthcare professionals and other

Case ID: 220302601
Control No.: 24081578

medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

121. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

122. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

123. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

124. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601
Control No.: 24081578

    a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.   For interest as permitted by law;

    f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.   For such other and further relief as the Court deems proper.

### COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

125.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

Case ID: 220302601
Control No.: 24081578

127. At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

128. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

129. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

33

f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

130.   In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

131.   As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

132.   Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 220302601
Control No.: 24081578

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

136.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products

35

when used in the intended manner and for the intended purpose.

137. Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

138. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

    e. That cow's milk-based products were necessary for optimum growth; and/or

    f. That cow's milk-based products were similar or equivalent to breast milk; and/or

    g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

Case ID: 220302601
Control No.: 24081578

    h.   That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

    i.   That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

    j.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

139.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

140.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a.   Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.   Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.   Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the

Case ID: 220302601
Control No.: 24081578

packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

Case ID: 220302601
Control No.: 24081578

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.  Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

39

o. Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p. Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q. Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r. Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s. Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t. Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

141. The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional

Case ID: 220302601
Control No.: 24081578

misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

142. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

143. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 220302601
Control No.: 24081578

g.  For such other and further relief as the Court deems proper.

## COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

144.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

145.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

146.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

147.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

148.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

42

Case ID: 220302601
Control No.: 24081578

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

i.  Thet their products can be fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

j.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

k.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

149.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

a.  Omitting from coupons, gift bags, other promotional materials, and the packaging

Case ID: 220302601
Control No.: 24081578

and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

b.  Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c.  Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products

44

Case ID: 220302601
Control No.: 24081578

provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k. Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

Case ID: 220302601
Control No.: 24081578

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials,

46

Case ID: 220302601
Control No.: 24081578

and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.    Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

150.    Abbott and Mead were negligent or careless in not determining those representations to be false.

151.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

152.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

153.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of

Case ID: 220302601
Control No.: 24081578

life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155.  Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

156.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

48

157. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

159. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

160. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

161. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and

Case ID: 220302601
Control No.: 24081578

death.

162.  Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.  Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

163.  Reasonable hospitals under the same or similar circumstances would have warned of the

50

Case ID: 220302601
Control No.: 24081578

above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

164.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

165.   Had Penn Medicine and  Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

166.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

167.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

    a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

Case ID: 220302601
Control No.: 24081578

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

168.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

169.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

52

Case ID: 220302601
Control No.: 24081578

170.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

171.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

172.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

173. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

174.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded

Case ID: 220302601
Control No.: 24081578

the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

175. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

176. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

177. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

178. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

179. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

180. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

181. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

> a. Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or
>
> b. Failing to formulate, adopt, and enforce adequate rules and policies that would have

Case ID: 220302601
Control No.: 24081578

restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

c.  Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in

55

premature infants; and/or

i.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o.  Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

Case ID: 220302601
Control No.: 24081578

182. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

183. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

184. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

185. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

186. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including

57

the Injured Infant.

187. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

188. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

Case ID: 220302601
Control No.: 24081578

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

189.  A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

190.  A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

191.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

192.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to

59

Case ID: 220302601
Control No.: 24081578

oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

193. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with

60

this action; and

g.  For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

194.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: <u>July 16, 2024</u>

<div style="margin-left:40%">

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    <u>*/s/ Tobias L. Millrood*</u>
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

*Attorneys for Plaintiffs*

</div>

61

Case ID: 220302601
Control No.: 24081578

# EXHIBIT A-74

PHILADELPHIA COURT OF COMMON PLEAS
## PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 24084077 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

### FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
| --- | --- |
| | 09/09/2024 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March _____ Term, 2022
*Month* *Year*
No. _____ 02601

Name of Filing Party:
ABBOTT LABORATORIES-DFT

WIEGER ETAL VS MEAD JOHNSON & COMPANY, LLC ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*  ☒ Motion
☐ Answer to Petition  ☐ Response to Motion

Has another petition/motion been decided in this case? ☒ Yes ☐ No
Is another petition/motion pending? ☒ Yes ☐ No
*If the answer to either question is yes, you must identify the judge(s):*
CARPENTER

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

**I. CASE PROGRAM**

DAY FORWARD/MAJOR JURY PROGRAM

Name of Judicial Team Leader: JUDGE LINDA CARPENTER
Applicable Petition/Motion Deadline: N/A
Has deadline been previously extended by the Court: N/A

**II. PARTIES** *(required for proof of service)*
(Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)

JAMES A YOUNG
  BURNS WHITE LLC 1835 MARKET STREET
  SUITE 2700 , PHILADELPHIA PA 19103
SEAN P FAHEY
  TROUTMAN PEPPER 3000 TWO LOGAN SQ
  18TH AND ARCH STREETS , PHILADELPHIA
  PA 19103-2799
JOSEPH E ONEIL
  CAMPBELL CONROY & ONEIL 1205
  WESTLAKES DR SUITE 330 , BERWYN PA
  19312
KENNETH A MURPHY
  TUCKER LAW GROUP, LLC 1801 MARKET
  STREET SUITE 2500 , PHILADELPHIA PA
  19103-6996
MARQUES HILLMAN RICHESON
  JONES DAY 901 LAKESIDE AVENUE NORTH

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____  August 19, 2024  SEAN P. FAHEY
*(Attorney Signature/Unrepresented Party)* *(Date)*  *(Print Name)* *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date. No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File#2408040663
19-AUG-24 15:11:42

```
    POINT , CLEVELAND OH 44114
BENJAMIN WHITING
   KELLER POSTMAN 150 N. RIVERSIDE PLAZA
   SUITE 4100 , CHICAGO IL 60606
EVAN GLASSMAN
   STEPTOE & JOHNSON, LLP 1114 AVENUE OF
   THE AMERICAS , NEW YORK NY 10036
T. ALLON RENFRO
   SWANSON,MARTIN&BELL, LLP 330 N.
   WABASH, SUITE 3300 , CHICAGO IL 60611
```

**FILED**
19 AUG 2024 03:17 pm
Civil Administration
M. RIVERA

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and Natural Guardian of* S.P*., a Minor*, | : |
| Plaintiffs, | : PHILADELPHIA COUNTY : COURT OF COMMON PLEAS : TRIAL DIVISION : |
| v. | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : MARCH TERM, 2022 : No. 220302601 : : : : |
| Defendants. | : |

**ORDER**

**AND NOW,** this _____ day of _____, 2024, upon consideration of the Motion for Admission of Attorney Paula S. Quist *Pro Hac Vice*, it is hereby **ORDERED** and **DECREED** that the Motion for Admission *Pro Hac Vice* is hereby **GRANTED,** and Paula S. Quist, of Jones Day, is hereby admitted *Pro Hac Vice* for the purpose of representing Defendant Abbott Laboratories in the above-captioned action after obtaining the appropriate City of Philadelphia Business Privilege Tax License pursuant to 19-2602 of the Philadelphia Code. *Pro Hac Vice* Counsel shall pay all City Business and Wage Tax as required.

**BY THE COURT:**

_____
                                             J.

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and Natural Guardian of* S.P*., a Minor*, <br><br>                      Plaintiffs, <br><br>       v. <br><br> MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, <br><br>                Defendants. | PHILADELPHIA COUNTY <br> COURT OF COMMON PLEAS <br> TRIAL DIVISION <br><br><br> MARCH TERM, 2022 <br> No. 220302601 |

**DEFENDANT ABBOTT LABORATORIES' MOTION FOR THE**
**ADMISSION *PRO HAC VICE* OF PAULA S. QUIST, ESQUIRE**

AND NOW COMES the Defendant, Abbott Laboratories, by and through its undersigned counsel and sponsoring attorney, Sean P. Fahey, to file the instant Motion for Admission *Pro Hac Vice* of Paula S. Quist, and in support thereof, avers as follows:

1.       Undersigned counsel, primary counsel, and attorney of record on the case moves this Honorable Court for the Admission *Pro Hac Vice* of Paula S. Quist, pursuant to Pa. R. Civ. P. 1012.1.

2.       All information that is required under Section 81.504 of the IOLTA regulations has been provided to the IOLTA Board.

3.       The fee required by Section 81.505(a) of the IOLTA regulations has been paid, and true and correct copies of the receipts are attached as Exhibit A.

4.      Attorney Quist, an attorney with Jones Day, is currently licensed to practice law in the State of Illinois (admitted December 3, 2002, bar number 6278287) and the Commonwealth of Pennsylvania (admitted July 18, 2013, bar number 315639, inactive).  *See* Candidate Verification in Support of Motion for Admission of Attorney Paula S. Quist *Pro Hac Vice*, attached as Exhibit B.

5.      Attorney Quist has never been suspended, disbarred, or otherwise disciplined in any jurisdiction.  *See* Exhibit B.

6.      Attorney Quist agrees to comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.  *See* Exhibit B.

7.      Attorney Quist submits to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board with respect to acts and omissions occurring during the appearance in the above-captioned matters.  *See* Exhibit B.

8.      Attorney Quist consents to the appointment of Sean P. Fahey as the agent upon whom service of process shall be made for all actions, including disciplinary actions.  *See* Exhibit B.

9.      The undersigned counsel submits that Attorney Quist is a reputable and competent attorney, and highly recommends the candidate's admission.  *See* Sponsor Verification in Support of Motion for Admission of Paula S. Quist *Pro Hac Vice*, attached as Exhibit C.

10.     The undersigned counsel is acting as the sponsor of Attorney Quist in the Courts of this Commonwealth for this case, and cases involving Defendant Abbott Laboratories' formula products currently pending in the Philadelphia Court of Common Pleas.  *See* Exhibit B.

Case ID: 220302601
Control No.: 24084077

WHEREFORE, Defendant Abbott Laboratories and sponsoring attorney, Sean P. Fahey, respectfully request that this Honorable Court grant Defendant's Motion for Admission *Pro Hac Vice* of Attorney Quist.

Dated: August 19, 2024 Respectfully submitted,

/s/ Sean P. Fahey
Sean P. Fahey (PA 73305)
TROUTMAN PEPPER
HAMILTON SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103
Telephone: (215) 981-4296
Sean.Fahey@Troutman.com

*Attorney for Defendant*
*Abbott Laboratories*

3

# EXHIBIT A

Case ID: 220302601
Control No.: 24084077



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

August 15, 2024

PAULA   QUIST, Esq.
JONES DAY
110 NORTH WACKER DRIVE
SUITE 4800
CHICAGO, IL 60606

SENT TO PAULA QUIST VIA Email: PQUIST@JONESDAY.COM

Dear Attorney QUIST:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as WIEGER ET AL VS MEAD JOHNSON & COMPANY LLC, ET AL, no. 220302601, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc:  SEAN P. FAHEY, Esq.

     Sean.fahey@troutman.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302601
Control No.: 24084077

# EXHIBIT B

Case ID: 220302601
Control No.: 24084077

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and Natural Guardian of* S.P*., a Minor,* | : |
| | : PHILADELPHIA COUNTY |
| Plaintiffs, | : COURT OF COMMON PLEAS |
| | : TRIAL DIVISION |
| | : |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : MARCH TERM, 2022 |
| | : No. 220302601 |
| | : |
| | : |
| | : |
| | : |
| | : |
| Defendants. | |

**CANDIDATE VERIFICATION IN SUPPORT OF MOTION FOR**
**ADMISSION OF ATTORNEY PAULA S. QUIST *PRO HAC VICE***

I, Paula S. Quist, do hereby verify that the following statements are true and correct:

1.     I am currently licensed to practice law in the State of Illinois (admitted December 3, 2002, bar number 6278287) and the Commonwealth of Pennsylvania (admitted July 18, 2013, bar number 315639, inactive).

2.     I am a member in good standing and eligible to practice before the State Bar of Illinois.  I am not currently suspended or disbarred by that Bar.

3.     I am admitted to practice before the U.S. Courts of Appeals Third Circuit (admitted November 20, 2019), U.S. Courts of Appeals Sixth Circuit (admitted November 13, 2009), U.S. Courts of Appeals Seventh Circuit (admitted December 31, 2008), U.S. Courts of Appeals Federal Circuit (admitted November 3, 2006), the U.S. District Court for the Northern

District of Illinois (admitted March 3, 2003) and the U.S. District Court for the Eastern District of Michigan (admitted April 17, 2013).

4.      I have never been suspended, disbarred, or otherwise disciplined in any jurisdiction nor am I subject to any disciplinary proceedings.

5.      I also am currently admitted *pro hac vice* in the following actions pending in the Philadelphia Court of Common Pleas: *Johnson, et al. v. Mead Johnson & Company, LLC, et al.* (Case No. 220400162) and *Kajuffa, et al. v. Mead Johnson & Company, LLC, et al.* (Case No. 220302978).

6.      I am not involved in any other pending action in this Court, and I have never been denied admission *pro hac vice* in Pennsylvania.

7.      I agree to comply with and be bound by the applicable statutes, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

8.      I agree to submit to the jurisdiction of the Pennsylvania Courts and the Pennsylvania Disciplinary Board with respect to the acts and omissions occurring during appearance in the above-captioned matter.

9.      I consent to the appointment of my sponsoring attorney, Sean P. Fahey, as the agent upon whom service of process shall be made for all actions, including disciplinary actions that may arise during the above-captioned matter.

10.     I verify that the above statements are true and correct.

Case ID: 220302601
Control No.: 24084077

Dated: August 19, 2024

Respectfully submitted,

*/s/ Paula S. Quist*
Paula S. Quist
JONES DAY
110 N. Wacker Dr., Suite 4800
Chicago, IL 60606
312.269.4277
pquist@jonesday.com

Case ID: 220302601
Control No.: 24084077

# EXHIBIT C

Case ID: 220302601
Control No.: 24084077

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and Natural Guardian of* S.P.*, a Minor,* | : <br> :    PHILADELPHIA COUNTY <br> :    COURT OF COMMON PLEAS <br> Plaintiffs,     :    TRIAL DIVISION <br> : <br> v.            : <br> : <br> MEAD JOHNSON & COMPANY LLC; MEAD   :    MARCH TERM, 2022 <br> JOHNSON NUTRITION COMPANY; ABBOTT   :    No. 220302601 <br> LABORATORIES; THE PENNSYLVANIA     : <br> HOSPITAL OF THE UNIVERSITY OF      : <br> PENNSYLVANIA HEALTH SYSTEM, *d/b/a*   : <br> PENNSYLVANIA HOSPITAL; and THE     : <br> TRUSTEES OF THE UNIVERSITY OF      : <br> PENNSYLVANIA, *d/b/a* PENN MEDICINE, <br> <br> Defendants. |

**SPONSOR VERIFICATION IN SUPPORT OF MOTION FOR ADMISSION**
**OF PAULA S. QUIST *PRO HAC VICE***

I, Sean P. Fahey, do hereby verify that the following statements are true and correct:

1.      I am currently licensed to practice law in Pennsylvania (Bar No. 73305), and I am the attorney of record in the above-captioned action.

2.      After reasonable investigation, I reasonably believe Attorney Paula S. Quist to be a reputable and competent attorney, and I am in a position to recommend Attorney Quist's admission.

3.      I verify that the above statements are true and correct.

Dated: August 19, 2024    Respectfully submitted,

         */s/ Sean P. Fahey*
         Sean P. Fahey (PA 73305)
         TROUTMAN PEPPER
         HAMILTON SANDERS LLP
         3000 Two Logan Square
         Eighteenth and Arch Streets
         Philadelphia, PA 19103
         Telephone: (215) 981-4296
         Sean.Fahey@Troutman.com

Case ID: 220302601
Control No.: 24084077

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Sean P. Fahey, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Dated: August 19, 2024

<div style="margin-left:40%">

*/s/ Sean P. Fahey*
Sean P. Fahey (PA 73305)
TROUTMAN PEPPER
HAMILTON SANDERS LLP

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Sean P. Fahey, hereby certify that this 19th day of August 2024, I served a true and correct copy of the foregoing MOTION FOR ADMISSION OF ATTORNEY PAULA S. QUIST *PRO HAC VICE* via the Court's Electronic Filing System and by email on all counsel of record.

*/s/ Sean P. Fahey*
Sean P. Fahey (PA 73305)
TROUTMAN PEPPER
HAMILTON SANDERS LLP

# EXHIBIT A-75

**FILED**

03 SEP 2024 04:15 pm

**Civil Administration**

**A. MALONIS**

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302606 <br> : <br> : |
| TERRAINE ABDULLAH, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 02583 <br> : <br> : |
| HOLLI CARTER, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302588 <br> : <br> : |
| SHONDERA DRAYTON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 02594 <br> : <br> : |
| CATHERINE McMILLIAN, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400140 <br> : <br> : |
| LOREN SANDERS, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400153 <br> : <br> : |
| SAMAYA SHORT, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400159 <br> : <br> : |

Case ID: 220302601
Control No.: 24081578

| | |
|---|---|
| ALICE STILLS, et al., <br>         Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302617 <br> : <br> : <br> : |
| GINA WIEGER, et al., <br>         Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302601 <br> : <br> : |
| STEPHANIE WILKERSON, et al., <br>         Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>         Defendants. | : <br> : SEPTEMBER TERM, 2023 <br> : No. 230900730 <br> : <br> : |
| MELVENIA WILLIAMS, et al., <br>         Plaintiff, <br>     v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br>         Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400141 <br> : <br> : |

## **ORDER**

      AND NOW this the _____ day of _____, 2024, upon consideration of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System and the Trustees of the University of Pennsylvania's Preliminary Objections to the Plaintiffs' Complaint, Plaintiffs' Answer thereto, and all other appropriate considerations, it is hereby ORDERED, ADJUDGED and DECREED that Defendants' Preliminary Objections are OVERRULED.

                        BY THE COURT

                         _____
                               J.

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.                  Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 220302606 |
| TERRAINE ABDULLAH, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 02583 |
| HOLLI CARTER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 220302588 |
| SHONDERA DRAYTON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : MARCH TERM, 2022<br>: No. 02594 |

1

Case ID: 220302601
Control No.: 24081578

| | |
|---|---|
| CATHERINE McMILLIAN, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400140<br>:<br>:<br>: |
| LOREN SANDERS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400153<br>:<br>:<br>: |
| SAMAYA SHORT, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400159<br>:<br>: |
| ALICE STILLS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302617<br>:<br>: |
| GINA WIEGER, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302601<br>:<br>: |
| STEPHANIE WILKERSON, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>: SEPTEMBER TERM, 2023<br>: No. 230900730<br>:<br>:<br>: |
| MELVENIA WILLIAMS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400141<br>:<br>:<br>: |

**PLAINTIFFS' REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINTS**

2

Case ID: 220302601<br>Control No.: 24081578

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants' Preliminary Objections and responds to Defendants' Preliminary Objections and Evidentiary Exhibits as follows: [1]

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted.

6.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

7.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

8.      Admitted.

9.      Admitted.

10.      Admitted.

11.      Admitted.

---

[1] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Plaintiffs file this opposition on the instant docket and incorporate by reference the arguments herein in each of the following actions in which plaintiffs filed second amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al*., No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.,* No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.,* No. 220302594; *Gray v. Mead Johnson & Company, LLC, et al.,* No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.,* No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.,* No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.,* No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.,* No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.,* No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.,* No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.,* No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.,* No. 220400159; *Stills v. Mead Johnson & Company, LLC, et al.,* No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.,* No. 220302606*; Thomas v. Mead Johnson & Company, LLC, et al.,* No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.,* No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.,* No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.,* No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.,* No. 220400141.

Case ID: 220302601
Control No.: 24081578

12.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

13.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

14.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

15.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

16.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

17.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

18.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

19.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

20.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

21.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

22.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

23.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

24.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

25.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

26.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

27.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

28.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

29.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

30.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

31.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

32.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

33.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

34.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

35.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

36.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

37.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

38.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

39.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

40.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

41.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

42.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

43.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

44.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

45.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

46.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

47.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

48.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

49.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

50.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

51.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

52.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

53.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

54.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

55.      Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

56.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

57.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

58.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

59.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

60.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

61.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

62.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

63.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

64.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

65.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

66.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

67.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

68.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

69.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

70.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

71.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

72.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

73.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

74.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

75.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

76.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

77.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

78.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

79.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

80.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

81.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

82.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

83.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

84.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

85.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

86.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

87.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

88.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

89.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

90.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

91.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

92.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

93.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

94.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

95.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

96.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

97.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

98.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

99.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

100.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

101.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

102.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

103.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

104.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

105.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

106.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

107.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

108.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

109.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

110.     Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

111.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

112.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

113.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

114.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

115.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

116.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

117.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

118.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

119.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

120.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

121.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

Case ID: 220302601
Control No.: 24081578

122.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

123.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

124.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

125.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

126.    Denied as a conclusion of law to which no response is required. By way of further response, please see Plaintiffs' attached Memorandum of Law.

WHEREFORE, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024          By:     */s/Timothy A. Burke, Esquire*

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
AMELIA FRENKEL, ESQURIE
*Attorneys for Plaintiffs*

14

**KLINE & SPECTER, P.C.**
THOMAS R. KLINE, ESQUIRE
Attorney I.D. No. 28895
TOBIAS MILLROOD, ESQUIRE
Attorney I.D. No. 77764
ELIZABETH CRAWFORD, ESQUIRE
Attorney I.D. No. 313702
MELISSA MERK, ESQUIRE
Attorney I.D. No. 90363
TIMOTHY A. BURKE, ESQUIRE
Attorney I.D. 320927
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
(215) 772-1000/(215) 772-1359 fax.                    Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| CHRISTINA TAYLOR, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302606 |
| TERRAINE ABDULLAH, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 02583 |
| HOLLI CARTER, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 220302588 |
| SHONDERA DRAYTON, et al., : <br> Plaintiff, : <br> v. : <br> MEAD JOHNSON & COMPANY, LLC, et al., : <br> Defendants. : | MARCH TERM, 2022 <br> No. 02594 |

1

Case ID: 220302601
Control No.: 24081578

| | |
|---|---|
| CATHERINE McMILLIAN, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : APRIL TERM, 2022 <br> : No. 220400140 <br> : <br> : |
| LOREN SANDERS, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : APRIL TERM, 2022 <br> : No. 220400153 <br> : <br> : |
| SAMAYA SHORT, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : APRIL TERM, 2022 <br> : No. 220400159 <br> : <br> : |
| ALICE STILLS, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : MARCH TERM, 2022 <br> : No. 220302617 <br> : <br> : |
| GINA WIEGER, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : MARCH TERM, 2022 <br> : No. 220302601 <br> : <br> : |
| STEPHANIE WILKERSON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : SEPTEMBER TERM, 2023 <br> : No. 230900730 <br> : <br> : |
| MELVENIA WILLIAMS, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : APRIL TERM, 2022 <br> : No. 220400141 <br> : <br> : |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR REPSONSE TO PRELMINIARY OBJECTIONS OF DEFENDANTS THE PENNSYLVANIA HOSPITAL OF THE UNVIERSITY OF PENNSYLVANIA HEALTH SYSTEM AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA TO PLAINTIFFS' SECOND AMENDED COMPLAINTS

2

Case ID: 220302601 <br> Control No.: 24081578

## I.     <u>Matter Before the Court</u>

Plaintiffs, by and through their counsel, Kline & Specter, P.C., hereby oppose Defendants' Preliminary Objections and respond to the Defendants' Preliminary Objections and Evidentiary Exhibits as follows: [2]

## II.     <u>Counter Statement of Questions Involved</u>

1. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged that bovine-based formula is unreasonably dangerous and substantially increases the risk for the development of NEC in preterm infants, and where Plaintiffs are not required under the pleading standard to cite to evidence (such as medical studies) in their Complaint in support of ultimate issues that will have to be proven at trial?

   *Suggested answer in the affirmative.*

2. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Failure to Warn" claims where Plaintiffs have adequately alleged Defendants breached their duty as the hospital system and/or healthcare provider by failing to adequately communicate the facts, risks, benefits, and alternatives associated

---

[2] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Plaintiffs file this opposition on the instant docket and incorporate by reference the arguments herein in each of the following actions in which plaintiffs filed second amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al*., No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.,* No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.,* No. 220302594; *Gray v. Mead Johnson & Company, LLC, et al.,* No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.,* No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.,* No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.,* No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.,* No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.,* No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.,* No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.,* No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.,* No. 220400159; *Stills v. Mead Johnson & Company, LLC, et al.,* No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.,* No. 220302606; *Thomas v. Mead Johnson & Company, LLC, et al.,* No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.,* No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.,* No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.,* No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.,* No. 220400141.

Case ID: 220302601
Control No.: 24081578

with the use of bovine-based formula to preterm infants' parents, so that the parents could knowingly choose whether to consent on behalf of preterm infants?

*Suggested answer in the affirmative.*

3. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant hospital systems engaged in systemic negligence by failing to enact policies and procedures to prevent bovine-milk based formula from being fed to pre-term infants.

*Suggested answer in the affirmative.*

4. Whether this Honorable Court should deny Defendants' Preliminary Objections as to Plaintiffs' "Corporate Negligence" cause of action where Defendant Trustees of the University of Pennsylvania are a governing body and overseer of the Hospital of the University of Pennsylvania ("HUP"), who are in charge of enacting the HUP policies and procedures at issue in Plaintiffs' Complaint, subjecting them to Plaintiffs' Corporate Negligence claims.

*Suggested answer in the affirmative.*

5. Whether this Honorable Court should deny Defendants Preliminary Objections as to sufficiency of the pleadings where Plaintiffs have sufficient and adequately summarized material facts that inform and notify the Defendants of the claims which they must defendant?

*Suggested answer in the affirmative.*

6. Whether this Honorable Court should deny Defendants Preliminary Objections as to punitive damages where Plaintiffs have adequately plead facts providing a basis for punitive damages?

Case ID: 220302601
Control No.: 24081578

*Suggested answer in the affirmative.*

7. Whether this Honorable Court should deny Defendants Preliminary Objections for Plaintiff Parents claims where the Plaintiff parents have sufficient plead counts for individual harm as well as the harm on behalf of the Minor Plaintiff in the Complaint and where those claims are not barred by the statute of limitations?

*Suggested answer in the affirmative.*

8. Whether this Honorable Court should deny Defendants Preliminary Objections where Plaintiff's necessary verification has been filed by way of a praecipe to attach to Plaintiffs' Complaint?

*Suggested answer in the affirmative.*

### III. Plaintiffs Have Sufficiently Alleged that Pennsylvania Hospital and HUP Failed to Warn Healthcare Professionals and Parents of the Unreasonable Risk of NEC Posed by Bovine-Based Formula to Premature Infants under Count VI.

The moving Hospital Defendants failed to warn parents of premature infants, and their guardian parents, of the risk associated with goods they were supplying to those infants while under their care. A supplier of goods will be liable for their negligent failure to warn foreseeable users of that chattel under Section 388 of the Second Restatement of Torts, which has been incorporated into Pennsylvania law, if:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for the physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied; and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Case ID: 220302601
Control No.: 24081578

RST 2 § 388.

*See, e.g.*, *Binder v. Jones & Laughlin Steel Corp.*, 360 Pa. Super. 390, 396 (1987) (applying RST 2 § 388 to a metal part supplier). Section 388 applies to any supplier of a chattel to another, as explained in Section 388's accompanying comment:

> c. Persons included as "suppliers." The rules stated in this Section and throughout this Topic apply to determine the liability of any person who for any purpose or in any manner gives possession of a chattel for another's use, or who permits another to use or occupy it while it is in his own possession or control, without disclosing his knowledge that the chattel is dangerous for the use for which it is supplied or for which it is permitted to be used. These rules, therefore, apply to sellers, lessors, donors, or lenders, irrespective of whether the chattel is made by them or by a third person. They apply to all kinds of bailors, irrespective of whether the bailment is for a reward or gratuitous, and irrespective of whether the bailment is for use, transportation, safekeeping, or repair. They also apply to one who undertakes the repair of a chattel and who delivers it back with knowledge that it is defective because of the work which he is employed to do upon it.

*See* § 403 RST 2 § 388 cmt. C; *see also Maize v. Atlantic Refin. Co.*, 352 Pa. 51, 56 (1945) ("This court has laid down the rule that anyone who is responsible for the existence of any dangerous instrumentality or substance with which persons are likely to come in contact must 'impose a measure of control that is adequate to the protection of human beings' from it.").

A supplier under this Section will be liable if they supply a chattel for use, which they know or should have known is dangerous, and they fail to warn the user of that danger and to advise proper precautions. *See Hopkins v. E.I. Du Pont De Nemours & Co.*, 199 F.2d 930, 932-33 (3d Cir. 1952) (applying Pennsylvania law) (citing *Maize*, 352 Pa. at 55). Under this Section, a supplier's disclosures will be insufficient if they fall below the standard of care that would be taken by a "reasonable man in a similar situation." *Binder*, 360 Pa. Super. at 398. The greater the potential danger of the instrumentality, the greater the duty to warn against foreseeable and known dangers. *See Thomas v. Arvon Prod's*, 424 Pa. 365, 369-70 (1967); 352 Pa. at 56. "[T]he care to be exercised in a particular case must always be proportionate to the seriousness of the

Case ID: 220302601
Control No.: 24081578

consequences which are *reasonably* to be anticipated as a result of the conduct in question." 360 Pa. Super. at 398 (citations omitted) (emphasis in original). When another actor "acts as the nexus between the supplier and the actual user of the dangerous chattel," the supplier cannot "escape the duty to disclose by cavalierly relying on the [other actor] to somehow pass the information along to the actual user." *Id.*

In this case, Defendants failed to adequately communicate the facts, risks, benefits, and alternatives associated with the use of bovine-based formula to preterm infants' parents, so that could knowingly choose whether to consent on behalf of preterm infants. Defendants' duty to warn was even greater by virtue of the fact that parents could not be expected to know the risk of NEC associated with bovine-based formula and given the seriousness of NEC as a disease.

Defendants Pennsylvania Hospital and Hospital of the University of Pennsylvania argue that Plaintiff cannot state a claim for failure to warn because they were not a manufacturer of formula. However, since Plaintiffs' claims sounds in negligence, Defendant does not need to be a commercial manufacturer. Here, Defendants were responsible for providing the infant formula to medical practitioners and the NICU at their hospitals and by extension, to patients, and were therefore, suppliers for purposes of Section 388. Moreover, Plaintiff has alleged that the formula caused an increased risk when fed to infants, in other words, when it was used for its intended usage. Plaintiffs' Complaint alleges that hospitals, including HUP, entered into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not

Case ID: 220302601
Control No.: 24081578

negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel. Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants, Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants. Since NEC is a dangerous and potentially fatal disease, there was an even greater duty on Defendants to adequately warn foreseeable users of this known risk or take steps to make sure that the intermediaries they controlled, namely medical professionals, reliably communicated these risks to parents. Hence, the Hospitals failed to warn parents of the dangerous conditions associated with the formula, which parents had no reason to suspect, while supplying this formula for purposes of Section 388.

IV. **Plaintiffs' Complaint Sufficiently Alleges Facts That Support Their Claims of Corporate Liability of The Moving Health Care Provers, Thus These Claims Should not Be Dismissed**

In *Thompson v. Nason Hospital*, 591 A.2d 703, 708 (Pa. 1991), the Pennsylvania Supreme Court recognized the doctrine of corporate liability, holding that a hospital may be found directly liable for negligence if it fails to meet any of the following four duties: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients.

In considering whether the plaintiff could sustain corporate negligence claims based on these allegations, the *Edwards* court analyzed the *Thompson* decision and delineated the standards required to sustain such a claim:

Case ID: 220302601
Control No.: 24081578

The Thompson theory of corporate liability will not be triggered every time something goes wrong in a hospital which harms a patient . . . To establish corporate negligence, a plaintiff must show more than an act of negligence by an individual for whom the hospital is responsible. Rather, *Thompson* requires a plaintiff to show that **the hospital itself is breaching a duty and is somehow substandard**…Thompson contemplates a **kind of 'systemic negligence'**…

*Id*. at 1386-87 (citations omitted and emphasis added).

The facts and allegations in Plaintiffs' complaint clearly and succinctly articulate claims of a "systemic negligence" taking place at Penn and HUP, namely that the hospital engaged in a practice of entering into financially advantageous relationships with codefendant manufacturers Abbott and Mead at various times to purchase, supply, and distribute bovine-based formula to their medical professionals, knowing that these products would then be provided to infants being treated by these providers in their facilities. Hence, Defendants knowingly supplied these instrumentalities to end users, who were not merely foreseeable, but the intended recipients of the formula. Further, the Hospitals' liability is not negated by the fact that others acted as intermediaries when they negligently failed to warn their own providers of these risks and facilitated their providers receiving inaccurate information, which inaccurately downplayed the risk of NEC, from the manufacturers' sales personnel, because it is alleged that the hospitals themselves decided which formula product would be stocked and supplied in their respective NICU's and pre-term infant hospital facilities.

Further, Plaintiffs allege in their Complaint that:

A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the

Case ID: 220302601
Control No.: 24081578

danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

*See* Plaintiffs' Complaint, at ¶¶190-192.

Moreover, as shown by their own internal correspondence and the relevant academic and medical literature surrounding NEC and bovine-formula in pre-term infants, Defendants knew or should have known that bovine-based formula posed an increased risk of NEC to premature infants. *See* Ex. A, *Taylor v. Abbott Laboratories, et al.* Second Amended Complaint, at ¶¶168-193.

Finally, corporate liability can attach to a hospital system when there is a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for patients. Here Moving Defendants are the responsible corporate entities of Pennsylvania Hospital and Hospital of the University of Pennsylvania (HUP). Defendants had the duty to formulate, adopt, and enforce adequate rules and policies regarding the administration of certain formulations of baby formulas to pre-term infants in their care, and to not supply and/or have a policy of not administering bovine based formula to preterm infants which is shown in the literature to increase risk of developing NEC to those patients. *Id*. Therefore, Plaintiffs' Corporate Liability claims should not be dismissed.

**V.** **Plaintiffs' Complaint Sufficiently Alleges that Defendant Colluded to Distribute and Sell Dangerous Products, and Failed to Warn Medical Practitioners of these Risks. Plaintiffs' Claims for Punitive Damages Should Therefore Not be Dismissed.**

Punitive damages may be awarded for "'conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.' " *Hutchison v. Luddy*, 582 Pa. 114, 121 (2005) (quoting *Feld v. Merriam*, 506 Pa. 383, 395 (1984)). Punitive damages must be based on conduct that is "wanton," "willful," or "reckless." 582 Pa. at 121. As such, in

10

Case ID: 220302601
Control No.: 24081578

Pennsylvania, to withstand preliminary objections, a plaintiff must allege that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk. *Id.* Pennsylvania courts have repeatedly held that a jury should determine whether punitive damages are warranted. *SHV Coal, Inc. v. Cont'l Grain Co.*, 526 Pa. 489, 495 (1991) ("The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder and will not be disturbed by an appellate court so long as that discretion has not been abused."). Furthermore, to the extent that there is any doubt about whether the standard for punitive damages has been met, that doubt must be resolved in the Plaintiff's favor at this stage. *See Theodore v. Del. Valley Sch. Dist.*, 575 Pa. 321, 333 (2003).

For example, in *Hall v. Episcopal Long Term Care*, plaintiffs alleged that the neglect of a nursing home's staff led to the plaintiff-decedent's death. 54 A.3d 381, 394-95 (Pa. Super. 2012). The plaintiff argued that the "evidence of understaffing, falsification of records, substandard facility conditions, and improper treatment of the deceased's pain, all of which Episcopal failed to correct despite knowledge of such" demonstrated sufficiently knowing conduct to underly punitive damages. *Id.* at 394-95. The trial court concluded that punitive damages were not warranted because the nursing home's negligence "did not rise to the level of reckless disregard." *Id.* at 397 (quoting the trial court opinion). The Superior court reversed the trial court's directed verdict on the issue of punitive damages and held that the issue of punitive damages should have proceeded to the jury as "the Estate presented evidence establishing Episcopal acted in an outrageous fashion in reckless disregard to the rights of others and created an unreasonable risk of physical harm to the residents of the nursing home." *Id.* at 396-97. In so holding, the Court discussed *Scampone*, where the Superior Court likewise held that the issue of punitive damages

Case ID: 220302601
Control No.: 24081578

against one defendant should have proceeded to a jury, since they jointly engaged in conduct with a codefendant that warranted punitive damages against that defendant. *Scampone v. Grane Healthcare Co.*, 169 A.3d 600, 627 (Pa. Super. 2017) ("the punitive damages trial must include Highland since, according to Mr. Scampone's evidence, its employees colluded with Grane employees in some of the actions that warranted imposition of punitive damages, i.e., the alteration of patient records.").

In this case, Plaintiff has alleged that Penn Medicine and HUP purchased, supplied, and distributed bovine-based products, manufactured by codefendants Abbott and Mead, which they knew posed an increased risk of a serious and deadly disease to infants, in order to cut costs. The Hospital Defendants colluded with codefendants to supply Abbott and Mead's products to medical professionals at HUP and failed to warn these professionals about the known risks of these products. Defendants failed to warn healthcare professionals of the known risks of NEC posed by these products, and failed to establish a practice or policy of ensuring that these products were not fed to premature infants, as established in scientific literature, and instead arranged for these treaters to interact with Abbott and Mead salespersons. They then failed to prevent codefendants' sales representatives from making misrepresentations about the increased risk of NEC posed by bovine, instead of human-nutrition based products, and failed to correct these misrepresentations. As a result, Defendants knowingly distributed codefendants' products to practitioners who they knew would provide them to patients, in order to save costs to the Hospitals. Hence, Defendants colluded to pose an unreasonable risk of harm to minor Plaintiff and other infants.

## VI.    Plaintiff Has Adequately Pled the Facts and Damages at Issue

Defendant asserts that Plaintiffs' Complaint fails to adequately plead facts regarding liability and injuries claimed. Defendant is wrong and their Preliminary Objections should be

Case ID: 220302601
Control No.: 24081578

overruled. A complaint must give a defendant fair notice of the plaintiff's claims and a summary of the material facts that support those claims. Pa. R.C.P. 1019(a). As the Superior Court has noted:

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts **sufficient to enable the adverse party to prepare his case**. A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. <u>**Evidence from which such facts may be inferred not only need not but should not be alleged.**</u> **Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted)(emphasis added).

In assessing whether particular paragraphs in a complaint satisfy this requirement, they must be read in context with all other allegations in the complaint to determine whether the defendant has been provided adequate notice of the claim against which it must defend. *Yacoub v. Lehigh Valley Med. Associates*, P.C., 805 A.2d 579, 589 (Pa. Super. Ct. 2002). When determining whether certain allegations are sufficiently specific, Pennsylvania Law requires that the allegation be read in the context of the entire Complaint and not in a vacuum. *Hook v. L.B. Smith, Inc*., 69 D&C 2d 420 (1974); *Duchess Underwear Co. V. Sivan Manuf. Co.,* 75 D&C 185 (1950); accord *Cmwlth v. Bell Tel Co.*, 121 Pa. Cmwlth 642, 649, 551 A2d 602 (1988). The Court must determine "whether the complaint is sufficiently clear to enable the Defendant to prepare his defense or [if it] informs the Defendant with accuracy and 3 completeness of the specific basis on which recovery is sought so that he may know without question upon what grounds to make his defense." *McNeil v. Jordan*, 814 A.2d 234, 237-38 (Pa. Super. 2002).

Defendants advance several arguments regarding the alleged deficiencies of facts and injuries, all of which are incorrect:

13

Case ID: 220302601
Control No.: 24081578

- Defendants assert that Plaintiffs' Complaint does not state whether the infant actually ingested the product at issue. In contrast, Plaintiffs have pled that the infant "was fed Similac and/or Enfamil cow's milk-based products" and developed NEC "after ingesting Defendant Manufacturers' products." *See* Ex. A Plaintiff's Second Complaint at ¶¶ 11-12.

- Defendants assert that Plaintiffs' Complaint does not indicate which product was ingested. However, Plaintiff has pled that the infant was fed the Defendant's products "Similac and/or Enfamil cow's milk-based products." Id. at ¶ 11. Absent discovery, Plaintiff is limited to the detail provided in the medical records, the details of which are included in Plaintiff's Complaint. As advanced previously at oral argument, Plaintiff must be allowed to conduct full discovery to determine which manufacturer and brand each Hospital system had a distribution agreement with during certain periods of time, as that information, such as brand, is not often elicited in the medical records. Further, the Defendants themselves are the ones with the information such as purchasing receipts and or purchasing agreements with either Abbott or Mead.

- Defendants argue that Plaintiffs have not met their burden under fact pleading to show that the product was unreasonably dangerous because allegedly plaintiffs' claims are "unsupported by any specific studies or trials in the Complaint." See Def. Preliminary Objections, at 8. However, as noted above, the Superior Court has ruled that in relation to pleading facts, "evidence from which such facts may be inferred not only need not but should not be alleged," which is entirely contrary to Defendants' arguments herein. See *Baker v. Rangos*, 324 A.2d 498, 505-506 (Pa. Super. 1974)

- Defendants assert that Plaintiff has not pled the period of time during which the product at issue was ingested. However, Plaintiff alleged in the Complaint that the infant "was fed Similac and/or Enfamil cow's milk-based products by [hospital staff] after her birth." *Id.* Plaintiff's birth date is included in the Complaint.

- Defendants assert that Plaintiff failed to plead when the minor was diagnosed with NEC. However, Plaintiff pled that the infant's "These feeds occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC." *Id*. at ¶ 15. Plaintiffs averments adequately summarize the material facts necessary such that the Defendants are on notice of the claim of which they must defend, and notably the moving Defendants are the exact hospitals where the Plaintiff was initially treated for NEC, thus they have access to the exact same medical as the Plaintiffs which show the exact dates of treatment which are summarily referred to in Plaintiffs' Complaint.

- Defendants assert that Plaintiffs did not plead the treatment the infant received following the ingestion of the NEC and resulting injuries. Defendant cites no authority for the proposition that a plaintiff must describe the specific treatment an

Case ID: 220302601
Control No.: 24081578

injured party underwent following injuries resulting from the tortious conduct of a defendant.

- Defendants assert that Plaintiffs have not adequately pled the injuries suffered as a result of the product. Plaintiff has adequately pled the injuries suffered by the infant who ingested Defendant's product, specifically "As a result of Defendants' actions described infra, I.H. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery and resection of a portion of her bowels, short gut syndrome secondary to NEC, intestinal and feeding difficulties, neurological injuries, left lower extremity amputation at the forearm, and she continues to suffer developmental delays and feeding difficulties secondary to bowel resection and short gut syndrome." *Id*. at ¶ 22.

Accordingly, Defendant's Preliminary Objections should be overruled as Plaintiffs Allegations should withstand challenge under 1019(a) because they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and they are sufficiently specific so as to enable Defendants to prepare their defense.

### VII. <u>Plaintiff-Parents' Claims Against Penn Medicine and HUP Are Not Time-Barred And Should Not Be Dismissed</u>

Plaintiffs have clearly plead claims sounding in negligence on behalf of all plaintiffs, not just the injured minor plaintiff. Indeed, in the complaint, Plaintiff lists under Counts VI and VII, that "As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries." See Plaintiffs' Complaint at ¶167, 185, 193. Therefore, Defendants no additional specificity needs to be plead as to which claims apply which Plaintiffs, and Plaintiffs' Complaint complies with Pa.R.C.P. 1020, which does not require Plaintiff Parents and Plaintiffs Minors to plead separate claims for sperate Plaintiffs as Defendant suggests.

Further, Plaintiff-parents' claims are not barred by the discovery rule on two distinct grounds. The discovery rule is an exception [to the statute of limitations] that tolls the statute of limitations when an injury or its cause is not reasonably knowable." *In re Risperdal Litig.*, 656 Pa.

15

649, 661 (2019). "Under the "discovery rule," the statute of limitations begins to run when a plaintiff knows, or reasonably should have known, that: (1) an injury has been sustained; and (2) the injury has been caused by another party's conduct." *Ward v. Rice*, 828 A.2d 1118, 1121 (Pa. Super. 2003) (citing *Citsay v. Reich*, 380 Pa. Super. 366, 369 (1988)). For the discovery rule to apply, the plaintiff must have exercised the due diligence that would be expected of a reasonable person in the plaintiff's position. 828 A.2d at 1121. A plaintiff must begin exercising reasonable diligence once they know the "the salient facts concerning the occurrence of his injury and *who or what caused it*." *Romah v. Hygienic Sanitation Co.*, 705 A.2d 841, 857 (Pa. Super. 1997) (emphasis added). While reasonable diligence is an objective standard, "it is also flexible [...] to take into account differences between persons, their capacity to meet certain situations and circumstances confronting them at the time in question. In short, the standard of conduct required is a uniform one which takes "into account the fallibility of human beings."" 828 A.2d at 1121-22 (quoting RST 2d § 283 cmt's b-c). Whether someone has exercised reasonable diligence "may be best determined by the collective judgment, wisdom, and experience of jurors who have been selected at random from the community whose standard is to be applied." *Petri v. Smith*, 307 Pa. Super. 261, 271-72 (1982).

Under the discovery rule, if a plaintiff's delay is because the assurances of their physicians lull the patient into a false sense of security, this may toll the statute of limitations. *See Acker v. Palena*, 260 Pa. Super. 214, 222 (1978); *Barshady v. Schlosser*, 226 Pa. Super. 260, 263-64 (1973). The Pennsylvania Supreme Court has "expressly declined to hold, as a matter of law, that a layperson may be charged with knowledge greater than that which was communicated to her by the medical professionals who provided treatment and diagnosis." *In re Risperdal Litig.*, 656 Pa. at 662 (citing *Wilson v. El-Daief*, 600 Pa. 161, 179-180 (2009)). If a plaintiff alleges that their

Case ID: 220302601
Control No.: 24081578

delay was due to their reasonably relying upon the reassurances of their physicians, then, while construing the pleadings in the light most favorable to the moving party, a plaintiff's claims will not be time-barred. *Acker v. Palena*, 260 Pa. Super. 214, 223-24 (1978).

Likewise, the under the similar but distinct doctrine of fraudulent concealment, a form of equitable estoppel, the statute of limitations will be tolled if a plaintiff's delay is induced by reliance on the fraudulent concealment of the defendant. *Nesbitt v. Erie Coach Co.*, 416 Pa. 89, 95-96 (1964). If, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry, the defendant is estopped from invoking the bar of the statute of limitations." *Romah*, 705 A.2d at 857 (internal quotations omitted). A defendant does not need to intentionally deceive a plaintiff for the doctrine of fraudulent concealment to apply; instead, fraudulent concealment encompasses "fraud in the broadest sense which includes an unintentional deception." 416 Pa. at 96 (citation omitted). It is for the factfinder to determine whether a defendant made representations that could have induced this reliance on the part of the plaintiff. *Id.* For example, in *Romah*, the Superior Court held that the issue of whether the plaintiff's claims for gross negligence and punitive damages were tolled because the defendant concealed studies and other information from the EPA and the public that showed that the defendant's product caused increased risk of blood cell depression in men was a factual issue for the jury. 705 A.2d at 861.

Plaintiffs have alleged that all of the medical providers that Plaintiff-parents interacted with at the Hospital failed to provide them with any information regarding the increased risk of NEC to premature infants posed by the bovine-based formula that the practitioners provided. Likewise, plaintiffs have alleged that the parents were not presented with the comparative risk of NEC of these products as compared to any other alternatives. Plaintiff-parents relied upon the

Case ID: 220302601
Control No.: 24081578

representations, or lack thereof, provided by the medical professionals who were treating their infant. Further, Plaintiff alleged that Plaintiff-parents had no medical background or training and therefore could not be expected to have greater medical knowledge than these providers. Plaintiff-parents thereby reasonably relied upon, and were lulled into a false sense of security by, the assurances of the physicians treating their children. Moreover, Plaintiff has alleged that Defendants made false representations, in line with their financially advantageous relationship that they possessed with codefendant manufacturers Abbott and Mead, about the relative risks of bovine-based formula, in order to induce reliance on the part of Plaintiff-parents and thereby conceal the true source and cause of their infant's injury. Defendant hospitals facilitated interactions between medical providers and codefendant manufacturers' sales personnel, who Defendant hospital knew would mislead medical providers about the risk of NEC posed by its products. Thus, under both the discovery rule and doctrine of fraudulent concealment, Plaintiff-parents' claims are not time-barred.

## VIII. Plaintiffs Have Filed the Proper Verifications For Their Complaint

Pennsylvania Rule of Civil Procedure 1024 requires that pleadings containing averments of fact not appearing of record in the action shall state that the averment is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa.R.C.P. 1024. Plaintiff has obtained and produced proper verification as required by the Rules. Accordingly, Defendants' objection should be overruled. All such verifications have been or will be attached by way of a praecipe to attach filed to Plaintiffs' Complaint.

## IX. Request In The Alternative To Amend The Complaint

Case ID: 220302601
Control No.: 24081578

Although Plaintiff strenuously maintains the sufficiency of all of the Counts contained within the Complaint, should this Court be inclined to grant any of Defendants' specific Preliminary Objections, Plaintiff respectfully requests permission to amend the pleadings.

**WHEREFORE**, for the reasons more fully set forth in Plaintiff's accompanying Memorandum of Law, Plaintiff respectfully requests that this Honorable Court deny Defendants' Preliminary Objections, or, in the alternative, Order that Plaintiff is permitted leave to amend their Complaint.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024          By:    _/s/Timothy A. Burke, Esquire_

THOMAS KLINE, ESQUIRE
TOBI MILLROOD, ESQUIRE
ELIZABETH CRAWFORD, ESQUIRE
TIMOTHY BURKE, ESQUIRE
*Attorneys for Plaintiffs*

**KELLER POSTMAN**
BEN WHITING, ESQUIRE (*Pro Hac Vice*)
AMELIA FRENKEL, ESQURIE
*Attorneys for Plaintiffs*

19

Case ID: 220302601
Control No.: 24081578

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2024, I caused a true and correct copy of the foregoing

document to be served by electronic filing to all counsel of record.

Respectfully submitted,

**KLINE & SPECTER**,
A Professional Corporation

Date: September 3, 2024      By:     <u>*/s/Timothy A. Burke, Esquire*</u>

TIMOTHY A. BURKE, ESQUIRE

Case ID: 220302601
Control No.: 24081578

FILED
03 SEP 2024 04:15 pm
Civil Administration
A. MALONIS

**KLINE & SPECTER, P.C.**

By:

Thomas R. Klein, Esq.
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Attorney I.D. Nos.: 28895 / 77764 / 313702 / 320927 / 205677

125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



Filed and Attested by the
Office of Judicial Records
18 AUG 2024 04:15 pm
S. RICE

| | |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor,<br><br>*Plaintiff,*<br><br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENNSYLVANIA HOSPITAL,<br><br>*Defendants.* | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 02606** |

**NOTICE TO DEFEND**

Case ID: 220302606
Control No.: 24081578

| NOTICE | ADVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you. | Le han demandado a used en la corte. Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion. Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | Colegio de Abogados del Lackawanna<br>233 Penn Avenue, Scranton, PA 18503<br>(570) 961-2714 |
| Lackawanna Bar Association<br>233 Penn Avenue<br>Scranton, PA 18503<br> (570) 961-2714 | |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

| | |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor, <br><br>                     *Plaintiff*, <br><br>     v. <br><br> MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL, <br><br>                     *Defendants*. | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY <br><br> CIVIL TRIAL DIVISION <br><br> MARCH TERM 2022 <br> NO. 02606 |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Case ID: 220302606
Control No.: 24081578

Medicine" or "Pennsylvania Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Christina Taylor is a natural adult person and a resident of Delaware. Ms. Taylor is the parent and natural guardian of I.H., a minor. Ms. Taylor's address is 9 Aidone Drive, New Castle, Delaware 19720.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

Case ID: 220302606
Control No.: 24081578

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

3

Case ID: 220302606
Control No.: 24081578

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.      This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.      FACTUAL ALLEGATIONS

### I.H.'s NEC Diagnosis

11.      Infant plaintiff I.H. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 9, 2010.

12.      At birth, I.H.'s gestational age was approximately 25 weeks and she weighed 879 grams.

13.      Starting on October 9, 2010 until November 2, 2010, I.H. was fed mother's breast milk fortified with bovine-based Human Milk Fortifier (HMF), which upon information and belief was manufactured by Defendants Abbott and/or Mead.

14.      Subsequently, between November 2, 2010 and November 19, 2010 I.H. was fed full formula feeds of Abbott's Special Care 20 cal/oz or Special Care 24 cal/oz bovine-based formula.

4

15.     These feeds occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC.

16.     On November 20, 2010, Dr. Kelly Wade of the NICU diagnosed I.H. with stage II Medical NEC after noticing I.H.'s severely distended stomach and other symptoms consistent with NEC.

17.      Between November 20 and November 23, Dr. Wade attempted to treat I.H.'s NEC using antibiotics without success, and on November 23 ordered for I.H. to be emergently transferred to St. Christopher's hospital for immediate surgical evaluation.

18.     Upon arrival to the St. Christopher's NICU, I.H. was diagnosed with Stage IIIB Medical NEC, the most advanced and life-threatening stage of NEC, which indicates a perforation of the infant's intestinal track.

19.     On Nov 23, 2010 I.H. underwent surgical intervention at St. Christopher's, undergoing an intestinal resection of the jejunum and distal ileum, removing part of her small intestines, as well as a primary anastomosis procedure to attach the two ends of the resected bowels together. At the end of the surgery, I.H. was placed on a wound VAC to assist in healing and blood clotting.

20.     Subsequent, and secondary to the surgery and wound VAC placement, necrosis spread to I.H.'s left hand and forearm, and the NICU physicians amputated I.H.'s lower left extremity from the forearm down on December 8, 2010.

21.     I.H. was in patient at the St. Christopher's NICU until her discharge home on February 15, 2011.

22.     As a result of Defendants' actions described *infra*, I.H. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery and resection of a portion of her bowels, short gut syndrome secondary to NEC, intestinal and feeding difficulties, neurological injuries,

Case ID: 220302606
Control No.: 24081578

left lower extremity amputation at the forearm, and she continues to suffer developmental delays and feeding difficulties secondary to bowel resection and short gut syndrome.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

23.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

24.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

25.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

26.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

27.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants'

6

Case ID: 220302606
Control No.: 24081578

vulnerability to NEC.

28.     Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

29.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

30.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

31.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed  Similac and/or Enfamil cow's milk-based products after her birth instead of mother's human milk and/or donor human milk.

32.     Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania

Case ID: 220302606
Control No.: 24081578

Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Taylor Discovers Her Claim*

33.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Taylor did not know, and had no reason to know or suspect, that I.H.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Taylor*

34.     Despite exercising reasonable diligence, Ms. Taylor was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of I.H.'s injuries.

35.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of I.H.'s NEC diagnosis, Ms. Taylor undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

36.     The health care providers at Penn Medicine responded only that I.H. had gotten NEC because she was born premature.  Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

37.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused I.H.'s injuries.  Penn Medicine's response at the time did not give Ms. Taylor any reason to suspect any wrongdoing on the part of the Defendants.

38.     Ms. Taylor is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

8

39. Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Taylor had no reason to doubt their word.

40. Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

41. What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

42. For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

Case ID: 220302606
Control No.: 24081578

from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

43.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Taylor immediately after I.H.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused I.H.'s injuries.

44.     Ms. Taylor also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Taylor unaware that the Defendant Manufacturers' products caused I.H.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Taylor, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

45.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

46.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would

---

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302606
Control No.: 24081578

rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

47. Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

48. Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

49. Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

50. Additionally, Defendant Hospital failed to inform Ms. Taylor that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Taylor was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Taylor asked Plaintiff's health care providers at Defendant Hospital why a premature infant like I.H. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to I.H. could increase the risk of NEC to preterm infants, responding only that I.H. had gotten NEC solely

Case ID: 220302606
Control No.: 24081578

because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

51.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Taylor of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Taylor that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like I.H., it was enough for Ms. Taylor to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

52.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products

53.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

54.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their

12

promotional websites, reference the science showing how significantly their products increase the risk of NEC.

55.    For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

56.    Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU."  Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

57.    Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products

Case ID: 220302606
Control No.: 24081578

increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

58. Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

59. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

60. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

61. While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

Case ID: 220302606
Control No.: 24081578

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

62.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

63.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

64.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac

Case ID: 220302606
Control No.: 24081578

Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30.  None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction."  This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

65.    Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

Case ID: 220302606
Control No.: 24081578

66.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

67.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

68.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons,

Case ID: 220302606
Control No.: 24081578

and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

69.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

70.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



71.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm

18

Case ID: 220302606
Control No.: 24081578

infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

72. The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

73. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

Case ID: 220302606
Control No.: 24081578

74.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

75.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

76.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

77.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that

20

the preterm infant formula products were safe and without risk, even though that is not what the science said.

78.     On information and belief, prior to I.H.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like I.H.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

79.     On information and belief, prior to I.H.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like I.H.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

80.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like I.H.

### The Defendant Manufacturers' Inadequate Warnings

81.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

21

Case ID: 220302606
Control No.: 24081578

82.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

83.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

84.     Mead cites no medical literature or research to guide the use of its products.

85.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

86.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

87.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

88.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants.

Case ID: 220302606
Control No.: 24081578

Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

89.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

90.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

91.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

92.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### Penn Medicine's Failure to Warn

93.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that

23

human milk decreases the risk of NEC for premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning. Further, the Defendant Hospital created a study putting infants, such as I.H. at great risk by providing them with bovine based formula instead of exclusive human milk-based products.

94.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

95.     Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

96.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

97.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has

24

Case ID: 220302606
Control No.: 24081578

not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

98. Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

99. Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

100. Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

101. These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

102. Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these

25

Case ID: 220302606
Control No.: 24081578

products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

103. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

104. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

105. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

26

Case ID: 220302606
Control No.: 24081578

106. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

**CAUSES OF ACTION**
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

107. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

109. Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

110. Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

111. The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury

Case ID: 220302606
Control No.: 24081578

and death from NEC.

112.   Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

113.   Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

114.   Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

115.   Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

116.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.   For past, present, and future out-of-pocket costs, lost income and/or lost

Case ID: 220302606
Control No.: 24081578

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

**COUNT II: STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

117.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

119.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the

29

products at issue in this litigation unreasonably dangerous.

120.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.     Among other risks, the Defendant Manufacturers:

    a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.  Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.  "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the

Case ID: 220302606
Control No.: 24081578

Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

    h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

121.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

122.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

123.  The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

124.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

Case ID: 220302606
Control No.: 24081578

    b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

125.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

127.  At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

32

Case ID: 220302606
Control No.: 24081578

128. Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

129. Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

   a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

   e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

   f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary

Case ID: 220302606
Control No.: 24081578

to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

130. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

131. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

132. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of

Case ID: 220302606
Control No.: 24081578

life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

136. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

137. Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated

35

Case ID: 220302606
Control No.: 24081578

herein, each of whom were foreseeable and intended recipients of this information.

138.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

Case ID: 220302606
Control No.: 24081578

    i.    That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

    j.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

139.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

140.  In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a.    Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.    Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.    Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302606
Control No.: 24081578

d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons,

Case ID: 220302606
Control No.: 24081578

gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.  Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

Case ID: 220302606
Control No.: 24081578

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

141.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

142.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured

40

Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

143. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

144. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 220302606
Control No.: 24081578

herein.

145.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

146.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

147.  In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

148.  Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.  That cow's milk-based products were safe for premature infants; and/or

Case ID: 220302606
Control No.: 24081578

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

i. Thet their products can be fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

j. That their products were based on up-to-date science, which made them safe for premature infants; and/or

k. Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

149. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

a. Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

Case ID: 220302606
Control No.: 24081578

b. Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c. Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d. Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f. Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

44

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k. Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l. Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

Case ID: 220302606
Control No.: 24081578

m. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o. Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p. Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q. Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r. Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s. Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

Case ID: 220302606
Control No.: 24081578

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

150.  Abbott and Mead were negligent or careless in not determining those representations to be false.

151.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

152.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

153.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

Case ID: 220302606
Control No.: 24081578

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

156. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

157. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their

48

treatment of the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

159. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

160. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

161. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

162. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously,

Case ID: 220302606
Control No.: 24081578

and recklessly, and breached its duty by:

    a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g. Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

163. Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the

Case ID: 220302606
Control No.: 24081578

ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

164.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

165.   Had Penn Medicine and  Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

166.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

167.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained

Case ID: 220302606
Control No.: 24081578

as a result of Penn Medicine's conduct;

    c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

    e.  For interest as permitted by law;

    f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

168.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

169.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

170.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply,

52

Case ID: 220302606
Control No.: 24081578

distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

171.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

172.  Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

173. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

174.  Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

Case ID: 220302606
Control No.: 24081578

175. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

176. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

177. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

178. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

179. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

180. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

181. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a. Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

    b. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

54

Case ID: 220302606
Control No.: 24081578

c. Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a

55

warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o.  Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

182.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based

Case ID: 220302606
Control No.: 24081578

products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

183. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

184. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

185. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

186. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

187. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare

Case ID: 220302606
Control No.: 24081578

professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

188. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

    a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

    d. Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

    e. Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    f. Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method

Case ID: 220302606
Control No.: 24081578

reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

189. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

190. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

191. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

192. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the

Case ID: 220302606
Control No.: 24081578

Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

193.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

Case ID: 220302606
Control No.: 24081578

## DEMAND FOR JURY TRIAL

194.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: <u>July 16, 2024</u>

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:  <u>*/s/ Tobias L. Millrood*</u>
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
John P. O'Neill, Esq.

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502

*Attorneys for Plaintiffs*

61

Case ID: 220302606
Control No.: 24081578

# EXHIBIT A-76

**KLINE & SPECTER, P.C.**

By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com
Jack.oneill@klinespecter.com



Attorney for Plaintiffs

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| GINA WIEGER, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARD OF S.P., A MINOR. | MARCH Term, 2022 |
| Plaintiff, | No. 02601 |
| v. | JURY TRIAL DEMANDED |
| MEAD JOHNSON & COMPANY, LLC, et al. | |
| Defendants. | |

**PRAECIPE TO ATTACH VERIFICATION TO SECOND AMENDED COMPLAINT**

Please attach Plaintiff's Verifications to the Second Amended Complaint filed of record

on July 17, 2024, with regard to the above-captioned matter.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

Dated: September 6, 2024

/s/ Timothy A. Burke
TIMOTHY A. BURKE, ESQ.
Attorneys for Plaintiffs

Case ID: 220302601

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2024, I caused a true and correct copy of the

foregoing document to be served by electronic filing to all counsel of record.


Dated: September 6, 2024     /s/ Timothy A. Burke_____
             TIMOTHY A. BURKE

VERIFICATION

I, <u>Gina Wieger</u>, verify that the statements made in Plaintiff's Second Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: <u>07/23/2024</u>　　　　　　　　By: _____

# EXHIBIT A-77



NOTICE TO PLEAD:

TO PLAINTIFFS: YOU ARE HEREBY NOTIFIED
TO FILE A WRITTEN RESPONSE TO THE
ENCLOSED NEW MATTER WITHIN TWENTY
(TWENTY) DAYS FROM SERVICE HEREOF OR
A JUDGMENT MAY BE ENTERED AGAINST
YOU.

_/s/ Kenneth A. Murphy_____

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esq. (PA Bar No. 58162)
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esq. (PA Bar No. 56813)
Amy B. Carver, Esq. (PA Bar No. 84819)
Richard D. Walk, III, Esq. (PA Bar No. 329420)
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

---

GINA WIEGER, on her own behalf and as Parent
and Natural Guardian of S.P., a Minor,

*Plaintiffs,*

v.

MEAD JOHNSON & COMPANY, LLC, MEAD
JOHNSON NUTRITION COMPANY, ABBOTT
LABORATORIES, THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA d/b/a
PENN MEDICINE, and THE TRUSTEES OF
THE UNIVERSITY OF PENNSYLVANIA d/b/a
PENNSYLVANIA HOSPITAL,

*Defendants.*

**PHILADELPHIA COUNTY
COURT OF COMMON PLEAS**

**MARCH TERM, 2022
No. 02601**

Case ID: 220302601

**ANSWER OF DEFENDANTS, MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY'S, WITH NEW MATTER TO**
<u>**PLAINTIFFS' SECOND AMENDED COMPLAINT**</u>

Defendants Mead Johnson Nutrition Company ("MJNC") and Mead Johnson & Company, LLC, ("MJC") (collectively "Defendants" or "Mead Johnson"), by and through the undersigned counsel, answer Plaintiff's Second Amended Complaint (hereinafter "the Complaint") and assert New Matter as follows:

Mead Johnson denies any allegations or characterizations in headings or the preamble of the Complaint. Any and all allegations not expressly and specifically admitted in this Answer are denied.

## I. <u>INTRODUCTION</u>

1. **ANSWER:** Mead Johnson admits that NEC is a serious, sometimes fatal condition, and that it involves necrosis of the intestinal wall. It admits that Plaintiff Wieger purports to bring this action against Mead Johnson for alleged injuries to S.P. and that Plaintiff Wieger, the mother of the named infant, has also brought her own claims. Mead Johnson expressly declines to adopt Plaintiffs' use of the phrase "cow's-milk-based infant formula products" and will refer to Mead Johnson products as "Enfamil Premature Nutrition Products" unless specifically stated otherwise. Except as expressly admitted, Mead Johnson denies each and every remaining allegation regarding Mead Johnson in Paragraph 1. The remaining allegations of Paragraph 1 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies those allegations.

2. **ANSWER:** Mead Johnson admits that Plaintiff Wieger purports to bring this action to seek recovery against Mead Johnson, Abbott Laboratories, Penn Medicine, and

Case ID: 220302601

Pennsylvania Hospital. Mead Johnson denies each and every remaining allegation of Paragraph 2.

## II.    PARTIES

3.    **ANSWER:** Mead Johnson states that it lacks sufficient knowledge or information to form a belief as to the truth as to the allegations of Paragraph 3 and on that basis denies them.

4.    **ANSWER:** Mead Johnson admits the allegations of the first sentence of Paragraph 4. Mead Johnson denies the allegations of the second sentence of Paragraph 4. Mead Johnson admits the third sentence of Paragraph 4. The fourth sentence of Paragraph 4 is a legal conclusion to which no response is required. To the extent a response is required, Mead Johnson admits that Mead Johnson Nutrition Company is the sole member of Mead Johnson & Company, LLC. Mead Johnson further admits that Mead Johnson & Company, LLC manufactures infant formula, including products marketed under the Enfamil brand name. Mead Johnson denies each and every remaining allegation of Paragraph 4.

5.    **ANSWER:** The allegations of Paragraph 5 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson admits on information and belief that Abbott is a corporation, and has its corporate headquarters in Lake County. It admits that Abbott products are sold under the Similac brand name, and that some of its products contain cow's milk. Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations of Paragraph 5, and on that basis denies them.

6.    **ANSWER:** The allegations of Paragraph 6 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks

Case ID: 220302601

knowledge or information sufficient to form a belief as to the truth as to the allegations, and therefore denies them.

7.     **ANSWER:**     The allegations of Paragraph 7 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required,  Mead Johnson  lacks knowledge or information sufficient to form a belief as to the truth as to the allegations, and therefore denies them.

### III.     JURISDICTION AND VENUE

8.     **ANSWER:**     The allegations of Paragraph 8 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 8, insofar as they relate to Mead Johnson.

9.     **ANSWER:**     The allegations of Paragraph 9 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 9, insofar as they relate to Mead Johnson.

10.     **ANSWER:**     The allegations of Paragraph 10 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 10, insofar as they relate to Mead Johnson.

### IV.     FACTUAL ALLEGATIONS

*A.     S.P.'s NEC Diagnosis*

11.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 11, and on that basis denies the same.

Case ID: 220302601

12.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 12, and on that basis denies the same.

13.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 13, and on that basis denies the same.

14.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 14, and on that basis denies the same.

15.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 15, and on that basis denies the same.

16.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 16, and on that basis denies the same .

17.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 17, and on that basis denies the same.

18.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 18, and on that basis denies the same.

19.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 19, and on that basis denies the same.

20.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 20, and on that basis denies the same.

21.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 21, and on that basis denies the same.

Case ID: 220302601

**B.** *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

22.    **ANSWER:**    Mead Johnson admits that NEC can be a very serious condition, and can lead to morbidity and mortality.  Paragraph 22 purports to summarize the development of necrotizing enterocolitis ("NEC") and how it affects the gastrointestinal track of premature infants. Mead Johnson states that the pathology of NEC is complex, as is the structure, composition and function of a premature infants' gastrointestinal tract. Plaintiff's summary grossly oversimplifies complex anatomical structure and physiological processes, the development of NEC, and its mortality risks, so as to be incomplete and inaccurate, and on that basis the allegations of Paragraph 19 are denied.  Mead Johnson denies the remaining allegations of Paragraph 22.

23.    **ANSWER:**    Mead Johnson admits that preterm and low birthweight infants face risks of developing NEC, with the highest risks in the smallest and most premature infants, and the least risks in those who are closest to term and normal birthweight.  Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 23.

**C.** *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

24.    **ANSWER:**    Mead Johnson admits that preterm and low birthweight infants may receive nutrition including maternal breast milk, donor breast milk, maternal or donor breast milk fortified with a human milk fortifier, specialty formulas and/or other medical foods. The nutritional value and availability of these alternatives varies, and the selection of appropriate nutrition for individual infants is made by expert medical personnel.  Mead Johnson admits that the allegations of Paragraph 24 purport to provide broad, generalized information regarding the sources of nutrition for premature and/or low birthweight infants.  Mead Johnson states that the allegations of Paragraph 24 are grossly oversimplified so as to be misleading, but admits that physicians may,

Case ID: 220302601

in their medical judgment, choose to administer human donor milk to preterm infants whose
mothers do not supply their own breast milk or for whom maternal milk is contraindicated. Mead
Johnson denies the remaining allegations of Paragraph 24.

25. **ANSWER:** Mead Johnson admits that human milk and human milk fortifiers
based on human milk can furnish adequate nutrition in some circumstances. Mead Johnson denies
all remaining allegations and innuendo of Paragraph 25.

26. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of
Paragraph 26.

27. **ANSWER:** Mead Johnson states that breast milk is often unavailable and, even
when available, will not always meet the preterm or low birthweight infant's extraordinary
nutritional needs. Mead Johnson admits that human milk and human milk fortifiers based on
human milk are capable of furnishing adequate nutrition in some circumstances. Mead Johnson
further admits that maternal milk is known to have immunologic properties that protect against the
risk of NEC. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph
27.

28. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 28.

29. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of
Paragraph 29.

30. **ANSWER:** Mead Johnson denies the allegations of Paragraph 30 to the extent
they are directed at Mead Johnson. The remaining allegations of Paragraph 30 are not directed at

Case ID: 220302601

Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 30.

31. **ANSWER:** Mead Johnson denies the allegations of Paragraph 31 to the extent they are directed at Mead Johnson. The remaining allegations of Paragraph 31 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 31.

### D. *Ms. Wieger Discovers Her Claim*

32. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 32.

### E. *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wieger*

33. **ANSWER:** The allegations of Paragraph 33 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies the allegations of Paragraph 33.

34. **ANSWER:** Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 34, and on that basis denies the same.

35. **ANSWER:** Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 35, and on that basis denies the same.

36. **ANSWER:** The allegations of Paragraph 36 are not directed at Mead Johnson, and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 36.

Case ID: 220302601

37.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 37, and on that basis denies the same.

38.    **ANSWER:**    The allegations of Paragraph 38 are not directed at Mead Johnson, and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 38.

39.    **ANSWER:**    Mead Johnson denies each and every allegation of Paragraph 39.

40.    **ANSWER:**    Mead Johnson admits that necrotizing enterocolitis can and does occur in preterm infants regardless of the nutrition they receive. Mead Johnson further admits that its products are safe and do not cause NEC. Mead Johnson and denies each and every remaining allegation of Paragraph 40.

41.    **ANSWER:**    Mead Johnson's website speaks for itself.  Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 41 to the extent they are directed at Mead Johnson. The remaining allegations of Paragraph 41 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 41.

42.    **ANSWER:**    The allegations of Paragraph 42 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 42.

43.    **ANSWER:**    The allegations of Paragraph 43 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 43.

Case ID: 220302601

**F.** ***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

44. __ANSWER:__   Mead Johnson denies each and every allegation of Paragraph 44.

45. __ANSWER:__   The allegations of Paragraph 45 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 45.

46. __ANSWER:__   Mead Johnson denies each and every allegation of Paragraph 46.

47. __ANSWER:__   Mead Johnson denies each and every allegation of Paragraph 47.

48. __ANSWER:__   The allegations of Paragraph 48 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations of Paragraph 48, and on that basis denies the same.

49. __ANSWER:__   The allegations of Paragraph 49 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 49.

50. __ANSWER:__   The allegations of Paragraph 50 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 50.

Case ID: 220302601

51.  **ANSWER:**  The allegations of Paragraph 51 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies the allegations of Paragraph 51.

### G.  *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

52.  **ANSWER:**  Mead Johnson denies each and every allegation of Paragraph 52.

53.  **ANSWER:**  Mead Johnson denies each and every allegation of Paragraph 53.

54.  **ANSWER:**  Mead Johnson & Company, LLC admits that it creates material that it disseminates to hospitals and physicians who then, in their medical judgment, may choose to provide that material to parents of premature infants. Mead Johnson denies each and every allegation of Paragraph 54.

55.  **ANSWER:**  The allegations of Paragraph 55 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 55.

56.  **ANSWER:**  The allegations of Paragraph 56 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 56.

Case ID: 220302601

57.     **ANSWER:**     Mead Johnson & Company, LLC admits that it makes available materials and programs relating to its products to hospitals and the physicians and medical staff who administer Mead Johnson products for the purpose of ensuring proper product use. Mead Johnson denies each and every allegation of Paragraph 57.

58.     **ANSWER:**     Mead Johnson denies each and every allegation of Paragraph 58.

59.     **ANSWER:**     Paragraph 59 purports to summarize information and documents relating to the World Health Assembly ("WHA") described therein. Mead Johnson states that the documents speak for themselves. Mead Johnson denies Plaintiff's characterization of the documents, and denies the relevance of the documents to this case. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 59.

60.     **ANSWER:**     Mead Johnson states that it supports the International Code of Marketing of Breast-milk Substitutes ("Code"). Mead Johnson expressly denies that the medical and scientific community has confirmed any link between NEC and any infant nutritional products containing cow's milk, including but not limited to Enfamil Premature Nutrition Products. Mead Johnson denies each and every allegation and innuendo of Paragraph 60, insofar as they relate to Mead Johnson. The remaining allegations of Paragraph 60 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them.

61.     **ANSWER:**     The allegations of Paragraph 61 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to

Case ID: 220302601

Defendant Abbott, and on that basis denies them. Mead Johnson further states that commercial infant formulas are the only safe alternative to human breast milk. Mead Johnson denies each and every remaining allegation of Paragraph 61.

62. **ANSWER:** The allegations of Paragraph 62 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 62.

63. **ANSWER:** The allegations of Paragraph 63 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 63.

64. **ANSWER:** Mead Johnson admits that MJC sells a number of nutrition products specially designed to meet the nutritional needs of premature infants, including the products listed in Paragraph 64. It states that they are intended to meet their nutritional needs and are to be used under the direction of a physician. Mead Johnson's website speaks for itself. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 64.

65. **ANSWER:** Mead Johnson admits that Enfamil products are designed to meet the nutritional needs of premature infants, including but not limited to Enfamil NeuroPro EnfaCare Infant Formula ("Enfamil NeuroPro"). Mead Johnson admits that Paragraph 62 purports to quote a portion of an advertisement and a webpage for Enfamil NeuroPro, which speak for themselves.

Case ID: 220302601

Mead Johnson & Company, LLC's advertising is truthful, non-misleading, and constitutionally protected speech. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 65.

66.     **ANSWER:**     Mead Johnson admits that Mead Johnson & Company, LLC sells a number of nutrition products designed to meet the nutritional needs of premature infants, including the products listed in Paragraph 66.  It states that they are intended to meet their nutritional needs and are to be used under the direction of a physician. Mead Johnson's website speaks for itself. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 66.

67.     **ANSWER:**     Mead Johnson denies each and every allegation and innuendo of Paragraph 67, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 67 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

68.     **ANSWER:**     Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations of Paragraph 68, and on that basis denies them.

69.     **ANSWER:**     Mead Johnson denies each and every allegation and innuendo of Paragraph 69, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 69 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

Case ID: 220302601

70.   **ANSWER:**   Mead Johnson admits that the images of Enfamil Human Milk Fortifier packaging contained in Paragraph 70 are FDA-reviewed marketing assets that have been employed with Enfamil Human Milk Fortifier.  It admits that Enfamil Premature Nutrition Products, including Enfamil Human Milk Fortifier, are designed to meet the nutritional needs of premature infants.  Paragraph 70 purports to quote and to summarize an unspecified study that Plaintiff has not identified or attached.  Mead Johnson states that the report of the study speaks for itself.  It denies Plaintiff's characterization and interpretation of the study, and denies the relevance of the study to this case.  Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 70, insofar as they relate to Mead Johnson.  The allegations relating to Defendant Abbott of Paragraph 70 are not directed at Mead Johnson and therefore no response is required.  To the extent a response is required, Mead Johnson denies the allegations on information and belief. Except as expressly admitted, Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 70.

71.   **ANSWER:**   Mead Johnson denies each and every allegation of Paragraph 71 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 71 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

72.   **ANSWER:**   Mead Johnson denies each and every allegation of Paragraph 72 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 72 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

Case ID: 220302601

73. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 73 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 73 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

74. **ANSWER:** Mead Johnson admits that it provides samples of some premature infant nutritional products to some NICUs at no-charge, and denies each and every remaining allegation of Paragraph 74 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 74 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

75. **ANSWER:** Mead Johnson admits that it offers a variety of contract options which relate to the amount of product purchased by the hospitals, and denies each and every remaining allegation of Paragraph 75 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 75 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

76. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 76 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 76 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

77. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 77 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 77 are not directed

Case ID: 220302601

at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

78.     **ANSWER:**     The allegations of Paragraph 78 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 78.

79.     **ANSWER:**     Mead Johnson admits that MJC uses a sales team to call on healthcare providers and states that it complies with applicable laws.  Mead Johnson states that it provides information through a variety of media, including those alleged, to healthcare providers, who are also experts in infant nutrition, about the ingredients and indications for use of its premature nutritional products.  Mead Johnson denies that it markets its product as "safe."  It denies that its products cause NEC.  Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegation of Paragraph 79, and on that basis denies them.

80.     **ANSWER:**     Mead Johnson denies each and every allegation of Paragraph 80 to the extent they relate to Mead Johnson. The remaining allegations of Paragraph 80 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies the allegations on information and belief.

### H.     *The Defendant Manufacturers' Inadequate Warnings*

81.     **ANSWER:**     Mead Johnson denies each and every allegation of Paragraph 81.

Case ID: 220302601

82. **ANSWER:** Mead Johnson admits that one product, Enfamil EnfaCare®, can be purchased at retail locations. However, with the exception of EnfaCare, Mead Johnson's premature formula products are not generally available for sale at retail locations in compliance with applicable regulations. There is no market for Enfamil Human Milk Fortifier or Enfamil Premature (in its various calorie counts) outside of a hospital or healthcare system, and Mead Johnson does not market these products to consumers. Selection and administration of these products in NICU settings is mediated by learned intermediaries, and post-discharge, caregivers are instructed to consult with a physician about formula usage. Mead Johnson denies each and every remaining allegation of Paragraph 82.

83. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 83.

84. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 84.

85. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 85.

86. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 86.

87. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 87.

88. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 88.

Case ID: 220302601

89.     **ANSWER:**     The allegations of Paragraph 89 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 89.

90.     **ANSWER:**     The allegations of Paragraph 90 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 90.

91.     **ANSWER:**     The allegations of Paragraph 91 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 91.

92.     **ANSWER:**     The allegations of Paragraph 92 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 92.

### I.     *Penn Medicine's Failure to Warn*

93.     **ANSWER:**     The allegations of Paragraph 93 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 93.

94.     **ANSWER:**     The allegations of Paragraph 94 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to

Case ID: 220302601

Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 94.

95. **ANSWER:** The allegations of Paragraph 95 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 95.

96. **ANSWER:** The allegations of Paragraph 96 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation of Paragraph 96.

97. **ANSWER:** The allegations of Paragraph 97 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 97.

98. **ANSWER:** Mead Johnson denies each and every allegation of Paragraph 98.

99. **ANSWER:** The allegations of Paragraph 99 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 99.

Case ID: 220302601

100.   **ANSWER:**   The allegations of Paragraph 100 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 100.

101.   **ANSWER:**   The allegations of Paragraph 101 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 101.

102.   **ANSWER:**   The allegations of Paragraph 102 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 102.

103.   **ANSWER:**   The allegations of Paragraph 103 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Penn Medicine, and on that basis denies them. Mead Johnson denies each and every remaining allegation of Paragraph 103.

Case ID: 220302601

### J.        *Safer Alternative Designs*

104.        **ANSWER:**        Mead Johnson denies each and every allegation and innuendo of Paragraph 104, insofar as they relate to Mead Johnson. The remaining allegations of Paragraph 104 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the remaining allegations relating to Defendant Abbott, and on that basis denies them.

105.        **ANSWER:**        Mead Johnson admits that Prolacta Bioscience sells infant nutrition products containing breast milk.  Mead Johnson denies each and every remaining allegation of Paragraph 105.

106.        **ANSWER:**        Mead Johnson denies each and every allegation and innuendo of Paragraph 106, insofar as they relate to Mead Johnson.  The remaining allegations of Paragraph 106 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations relating to Defendant Abbott, and on that basis denies them.

## CAUSES OF ACTION

### COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

107.        **ANSWER:**        For its response to Paragraph 107, Mead Johnson incorporates by reference its response to Paragraphs 1 through 106 as though fully set forth herein.

108.        **ANSWER:**        Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products.  Mead Johnson states that the remaining allegations and innuendo

Case ID: 220302601

of Paragraph 108 are a legal conclusion to which no response is required. To the extent a response is required, Mead Johnson complied with any duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 108.

109. **ANSWER:** Mead Johnson states that the allegations and innuendo of Paragraph 109 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, states that Enfamil products were merchantable and reasonably fit for their intended use, and denies each and every remaining allegation and innuendo of Paragraph 109.

110. **ANSWER:** Mead Johnson admits Enfamil Premature Nutrition Products are intended to feed premature infants, and are used by physicians and other medical professionals for that purpose. It denies each and every remaining allegation and innuendo of Paragraph 110.

111. **ANSWER:** Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant ingested Enfamil products "and/or" Abbott's products and on that basis denies such allegations. It denies each and every remaining allegation and innuendo of Paragraph 111.

112. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 112.

113. **ANSWER:** Mead Johnson admits that its Enfamil products contained cow's milk at the time they left the manufacturing facility. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 113.

Case ID: 220302601

114.    **ANSWER:**    Mead Johnson admits that it does not sell human milk containing products.  It denies each and every remaining allegation of Paragraph 114.

115.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant was fed Mead Johnson products. The remaining allegations of Paragraph 115 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 115.

116.    **ANSWER:**    The allegations of Paragraph 116 state a legal conclusion, to which no response is required.  To the extent an answer is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 116.

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

117.    **ANSWER:**    For its response to Paragraph 117, Mead Johnson incorporates by reference its response to Paragraphs 1 through 116 as though fully set forth herein.

118.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo. Mead Johnson states that the remaining allegations of Paragraph 118 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied

Case ID: 220302601

with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 118.

119.  **ANSWER:**   Mead Johnson states that the allegations and innuendo of Paragraph 119 are legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 119.

120.  **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 120, including all subparts.

121.  **ANSWER:**   Mead Johnson admits that its premature Enfamil products contained ingredients derived from cow's milk at the time they left the manufacturing facility. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 121.

122.  **ANSWER:**   The allegations of Paragraph 122 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations that the infant was fed Mead Johnson products. Mead Johnson denies each and every remaining allegation and innuendo of Paragraph 122.

123.  **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 123.

124.  **ANSWER:**   The allegations of Paragraph 124 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 124.

Case ID: 220302601

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

125. **ANSWER:** For its response to Paragraph 125, Mead Johnson incorporates by reference its response to Paragraphs 1 through 124 as though fully set forth herein.

126. **ANSWER:** Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products. Mead Johnson states that the remaining allegations in Paragraph 126 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 126.

127. **ANSWER:** Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 127, and on that basis denies them.

128. **ANSWER:** Mead Johnson admits that MJC manufactures, distributes, and sells Enfamil Premature Nutrition Products. Mead Johnson states that the remaining allegations in Paragraph 128 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 128.

Case ID: 220302601

129.  **ANSWER:**  Mead Johnson denies each and every allegation and innuendo of Paragraph 129, including all subparts.

130.  **ANSWER:**  The allegations in Paragraph 130 are legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with all duties imposed by law, and denies each and every remaining allegation and innuendo in Paragraph 130.

131.  **ANSWER:**  The allegations of Paragraph 131 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 131.

132.  **ANSWER:**  The allegations of Paragraph 132 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson lacks sufficient knowledge or information to form a belief of the truth as to the allegations, and on that basis denies them.

133.  **ANSWER:**  The allegations of Paragraph 133 state a legal conclusion, to which no answer is required.  To the extent an answer is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 133.

**ANSWER TO DEMAND FOR RELIEF:** Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

Case ID: 220302601

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134.    **ANSWER:**    For its response to Paragraph 134, Mead Johnson incorporates by reference its response to Paragraphs 1 through 133 as if fully set forth herein.

135.    **ANSWER:**    Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 135, and on that basis denies them

136.    **ANSWER:**    Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo of Paragraph 136. Mead Johnson states that the remaining allegations of Paragraph 136 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 136.

137.    **ANSWER:**    Mead Johnson states that the allegations of Paragraph 137 state legal conclusions to which no response is required.  To the extent a response is required, Mead Johnson denies that it engaged in misrepresentations, states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 137.

138.    **ANSWER:**    Mead Johnson denies each and every allegation and innuendo of Paragraph 138, including all subparts.

139.    **ANSWER:**    Mead Johnson denies each and every allegation and innuendo of Paragraph 139.

Case ID: 220302601

140.   **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 140, including all subparts

141.   **ANSWER:**   Mead Johnson denies each and every allegation and innuendo of Paragraph 141.

142.   **ANSWER:**   The allegations of Paragraph 142 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 142.

143.   **ANSWER:**   The allegations of Paragraph 143 state a legal conclusion, to which no answer is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 143.

**ANSWER TO DEMAND FOR RELIEF:**  Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

144.   **ANSWER:**   For its response to Paragraph 144, Mead Johnson incorporates by reference its response to Paragraphs 1 through 143 as if fully set forth herein.

145.   **ANSWER:**   Mead Johnson lacks sufficient knowledge or information to form a belief as to the truth as to the allegations in Paragraph 145, and on that basis denies them

146.   **ANSWER:**   Mead Johnson admits that MJC manufactures and sells Enfamil Premature Nutrition Products, and denies each and every remaining allegation and innuendo of

Case ID: 220302601

Paragraph 146. Mead Johnson states that the remaining allegations of Paragraph 146 state legal conclusions to which no response is required. To the extent a response is required, Mead Johnson states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 146.

147. **ANSWER:** Mead Johnson states that the allegations of Paragraph 147 state legal conclusions to which no response is required. To the extent a response is required, Mead Johnson denies that it engaged in misrepresentations, states that it complied with any and all duties imposed by law, and denies each and every remaining allegation and innuendo of Paragraph 147.

148. **ANSWER:** Mead Johnson denies that it engaged in misrepresentations, and denies each and every allegation and innuendo of Paragraph 148, including all subparts.

149. **ANSWER:** Mead Johnson denies that it engaged in misrepresentations, and denies each and every allegation and innuendo of Paragraph 149, including all subparts.

150. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 150.

151. **ANSWER:** Mead Johnson denies each and every allegation and innuendo of Paragraph 151.

152. **ANSWER:** Mead Johnson states that the allegations of Paragraph 152 state a legal conclusion, to which no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 152.

Case ID: 220302601

153.    **ANSWER:**    Mead Johnson states that the allegations of Paragraph 153 state a legal conclusion, to which no response is required.  To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 153.

**ANSWER TO DEMAND FOR RELIEF:**  Mead Johnson denies that Plaintiffs are entitled to the relief requests, or any other relief, and requests that judgment be entered in its favor and against Plaintiffs, as set forth below.

### COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154.    **ANSWER:**    The allegations of Paragraph 154 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 154.

155.    **ANSWER:**    The allegations of Paragraph 155 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 155.

156.    **ANSWER:**    The allegations of Paragraph 156 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 156.

157.    **ANSWER:**    The allegations of Paragraph 157 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 157.

Case ID: 220302601

158.   **ANSWER:**   The allegations of Paragraph 158 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 158.

159.   **ANSWER:**   The allegations of Paragraph 159 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 159.

160.   **ANSWER:**   The allegations of Paragraph 160 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 160.

161.   **ANSWER:**   The allegations of Paragraph 161 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 161.

162.   **ANSWER:**   The allegations of Paragraph 162 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 162, including all subparts.

163.   **ANSWER:**   The allegations of Paragraph 163 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 163.

164.   **ANSWER:**   The allegations of Paragraph 164 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 164.

Case ID: 220302601

165. **ANSWER:** The allegations of Paragraph 165 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 165.

166. **ANSWER:** The allegations of Paragraph 166 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 166.

167. **ANSWER:** The allegations of Paragraph 167 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 167.

**ANSWER TO DEMAND FOR RELIEF:** The allegations of Count VI are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Count VI.

**COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Penn Medicine and Pennsylvania Hospital)**

168. **ANSWER:** The allegations of Paragraph 168 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 168.

169. **ANSWER:** The allegations of Paragraph 169 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 169.

Case ID: 220302601

170. **ANSWER:** The allegations of Paragraph 170 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 170.

171. **ANSWER:** The allegations of Paragraph 171 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 171.

172. **ANSWER:** The allegations of Paragraph 172 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 172.

173. **ANSWER:** The allegations of Paragraph 173 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 173.

174. **ANSWER:** The allegations of Paragraph 174 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 174.

175. **ANSWER:** The allegations of Paragraph 175 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 175.

176. **ANSWER:** The allegations of Paragraph 176 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 176.

Case ID: 220302601

177.   **ANSWER:**   The allegations of Paragraph 177 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 177.

178.   **ANSWER:**   The allegations of Paragraph 178 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 178.

179.   **ANSWER:**   The allegations of Paragraph 179 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 179.

180.   **ANSWER:**   The allegations of Paragraph 180 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 180.

181.   **ANSWER:**   The allegations of Paragraph 181 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 181, including all subparts.

182.   **ANSWER:**   The allegations of Paragraph 182 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 182.

183.   **ANSWER:**   The allegations of Paragraph 183 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 183.

Case ID: 220302601

184. **ANSWER:** The allegations of Paragraph 184 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 184.

185. **ANSWER:** The allegations of Paragraph 185 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 185.

186. **ANSWER:** The allegations of Paragraph 186 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 186.

187. **ANSWER:** The allegations of Paragraph 187 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 187.

188. **ANSWER:** The allegations of Paragraph 188 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 188, including all subparts.

189. **ANSWER:** The allegations of Paragraph 189 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 189.

190. **ANSWER:** The allegations of Paragraph 190 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 190.

Case ID: 220302601

191. **ANSWER:** The allegations of Paragraph 191 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 191.

192. **ANSWER:** The allegations of Paragraph 192 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 192.

193. **ANSWER:** The allegations of Paragraph 193 are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph 193.

**ANSWER TO DEMAND FOR RELIEF:** The allegations of Count VII are not directed at Mead Johnson and therefore no response is required. To the extent a response is required, Mead Johnson denies each and every allegation and innuendo of Paragraph Count VII.

Case ID: 220302601

## NEW MATTER

1.      Mead Johnson hereby incorporates the preceding Paragraphs of the within Answer by reference as if set forth fully herein.

2.      Plaintiffs' claims are barred, in whole or in part, by the learned intermediary doctrine.

3.      If Enfamil products were fed to S.P., Enfamil products fed to S.P. were selected and administered by doctors and other medical professionals, including registered dieticians, in accordance with their clinical judgment as to what feeding regimens would give S.P. the best possible outcome.

4.      These learned intermediaries are knowledgeable about the scientific rationale for the Enfamil products, and about the open medical literature relating to various feeding alternatives.

5.      These intermediaries provide advice to parents and caregivers in accordance with their best judgment, including relevant warnings relating to product risks.

6.      Under such circumstances, Mead Johnson's duty to inform, warn, and educate about the Enfamil products ran to the learned intermediaries, not directly to the parents and infant caregivers.

7.      Mead Johnson provided sufficient information about the Enfamil products, including their cow's milk ingredient, to permit these learned intermediaries to make informed determinations as to the use of the products, and to decide what warnings to convey to parents and caregivers.

8.      On information and belief, Plaintiff Wieger has already recovered for the alleged harm by virtue of payment by the health care providers who cared for S.P., and any recovery in this case would allow double recovery. For any harm, there can be but one recovery. Therefore, Plaintiff Wieger's entitlement to damages, if any, is barred, in whole or part, by virtue of the

Case ID: 220302601

doctrine of res judicata, and/or by virtue of release, and/or by virtue of payment by the health care providers who cared for S.P.

9.      Plaintiffs' claims are barred, in whole or in part, because the injuries allegedly suffered by S.P. may be determined to have resulted from the act, omission, negligence, or fault of other persons or entities for whom Mead Johnson is not responsible.

10.      To the extent the alleged injuries were caused not solely, but in whole or in part by the act, omission, negligence, or fault of other persons or entities for whom Mead Johnson is not responsible, then Mead Johnson is entitled to an apportionment of all such causal fault and a reduction of any award against it.

11.      Plaintiffs' claims are barred, in whole or in part, because the injuries allegedly suffered by S.P. may be caused by several alternative causes. Alternative causes of NEC include the immaturity and under-development of the infant's gastro-intestinal tract; the growth of dangerous bacteria or the growth of bacteria in parts of the intestine in which such dangerous bacteria do not ordinarily live; an inability to properly digest food; inadequate blood supply to the intestines; an inability the immature gastrointestinal tract to secrete its normal biological defenses; and/or the inability of the intestinal tract to provide an adequate structural barrier to bacteria.

12.      Accordingly, all or part of the injuries, damages, and/or losses sustained by Plaintiff Wieger and/or S.P. (which injuries, damages and losses are denied) were a direct, proximate, and sole result of S.P.'s physical and bodily condition on, prior to, and subsequent to events alleged in the Complaint, and Plaintiff Wieger is thus barred from any recovery in this action under the doctrine of no liability for any idiosyncratic reaction.  To the extent any injury alleged by Plaintiff

Case ID: 220302601

Wieger has been caused solely by one or more of these conditions, such serves as a complete bar to Plaintiff Wieger's recovery against Mead Johnson.

13.     Plaintiffs' claims are barred, in whole or in part, because Plaintiff does not affirmatively allege that Mead Johnson products, or any act or omission of Mead Johnson or anyone acting on its behalf, were a substantial factor or proximate cause in bringing about the injuries allegedly sustained by S.P.

14.     Plaintiffs' claims are barred, in whole or in part, because the utility of its products outweighed any alleged risk they posed, by virtue of the lack of a feasible alternative safer design at the time of manufacture.

15.     Plaintiffs' claims are barred, in whole or in part, by the doctrine(s) contained in the Restatement (Second) of Torts § 402A, Comments *j* and *k*; and/or any similarly applicable doctrine contained in the Restatement (Third) of Torts: Products Liability.

16.     Specifically, Mead Johnson products are not "unreasonably dangerous" when put to their reasonably foreseeable use. Indeed, the benefits of the products outweigh their foreseeable risks when used in a reasonably foreseeable manner.

17.     Moreover, the lack of any safer, feasible alternative design for Mead Johnson's products precludes recovery by Plaintiff Wieger for any claim based on allegations that such products are unreasonably dangerous. Each of the Enfamil products intended for premature infants supports growth and development in such infants.

18.     Each of these products has features that allow physicians and hospital dieticians to provide precise calorie counts, and other nutritional components, that enable premature infants to grow and develop commensurately with what premature infants would experience *in utero*.

Case ID: 220302601

19.     Certain Enfamil products can be used to enhance the nutritional profile of breast milk, including donor breast milk, which by itself does not provide sufficient calories, protein, and certain nutrients to meet growth and development objectives.

20.     Liquid human milk fortifiers, such as those manufactured by Prolacta, displace volume of donor and mother's breast milk, are associated with poor growth, and clinicians may have other good reasons not to use them.

21.     The Enfamil products can also be used when breast milk is not available, is too expensive, or is otherwise not warranted in the judgment of the physicians and hospital dieticians.

22.     The Enfamil products thus have many benefits and great utility in managing the growth and development of premature/low birthweight infants in NICU settings.

23.     These benefits outweigh any alleged risks, which risks are denied.

24.     The Enfamil product of which Plaintiff Wieger complains contains derivatives of cow's milk, which has certain unavoidable, inherent characteristics that cannot be altered or obviated under the state of scientific knowledge existing at the time such product(s) were manufactured.

25.     While denying that such characteristics are dangerous or defective, if S.P. sustained any injuries as a result of using or exposure to the product(s) at issue, those injuries were the result of properties necessarily associated with the products that were unavoidable and for which Mead Johnson cannot be held responsible.

26.     Adequate and complete warnings and instructions were provided with the subject product(s) and the subject product(s) were neither defective nor unreasonably dangerous when used according to label instruction.  Accordingly, to the extent that Mead Johnson had any duty

Case ID: 220302601

with respect to the manufacture and/or sale of its product(s), Mead Johnson fully discharged such duty by giving adequate instructions and warnings concerning the product's use.

27.    Mead Johnson alleges that Plaintiff Wieger's claims are expressly and impliedly preempted, in whole or in part, by federal statutes and regulations.  In the alternative, Plaintiff Wieger's claims are barred by the doctrine of primary jurisdiction.  The Enfamil products at issue in this case were either exempt formulas, or medical foods, or routine formulas, and all were regulated by the United States Food and Drug Administration ("FDA").

28.    In fact, infant formulas are the most regulated food products sold in the United States, and comprehensive federal regulations control the content, labeling, and instructions relating to the products.

29.    The conduct of Mead Johnson in all activities with respect to the subject products has been and is under the supervision of the FDA, which has supreme regulatory authority to ensure that products fed to infants are safe, and not adulterated or misbranded.

30.    At no time has FDA disapproved any of the Enfamil products at issue in this case, nor has it endorsed any of the scientific and medical opinions set forth in Plaintiff Wieger's Complaint.

31.    Plaintiff Wieger's claims would thwart and undermine the implementation of important federal policies, including those relating to the availability of safe alternatives to human breast milk.

32.    Moreover, to the extent that Plaintiff Wieger's claims are based on alleged misrepresentations made to the FDA, or upon non-compliance with, or violations of, the Food Drug and Cosmetic Act ("FDCA"), Plaintiff Wieger's claims are preempted, and Plaintiff Wieger

Case ID: 220302601

lacks standing to enforce any alleged violations. *Buckman Co. v. Plaintiff's Legal Comm*, 531 U.S. 341 (2001).

33. Mead Johnson's compliance with applicable regulations is legally sufficient evidence that they complied with all legal duties under the laws of Pennsylvania as applicable to this action.

34. This compliance proves that the products were not unreasonably dangerous, inadequately labeled, negligently designed or manufactured, and were fully merchantable and suitable for their intended use.

35. The compliance is also legally sufficient evidence that Mead Johnson did not mislead physicians or anyone else with respect to these products, and proves lack of "scienter."

36. Plaintiff Wieger's claims are barred, in whole or in part, because Mead Johnson's speech was not false or misleading, and is protected under the First Amendment of the United States Constitution and comparable provisions of applicable Pennsylvania law.

37. Mead Johnson's products offer many benefits, and the types of warnings alleged by Plaintiff Wieger to be required, would be false, misleading, or at best controversial. Moreover, to the extent that Plaintiff Wieger asserts that state law required Mead Johnson to provide additional or different warnings and/or instructions, or additional and/or different product labeling, such construction of state law would violate the First Amendment, including its prohibition against compelled speech.

38. Plaintiff Wieger knowingly and voluntarily assumed any and all risks associated with the matters alleged in the Complaint. Pursuant to the doctrines of assumption of the risk, informed consent, and/or comparative fault, this conduct bars, in whole or in part, the damages

Case ID: 220302601

and other relief that Plaintiff Wieger seeks to recover herein.

39.     In addition, on information and belief, Plaintiff Wieger used the products in contravention of the warnings provided with them, and /or used the products in a manner or for a purpose which was neither intended nor foreseeable by Mead Johnson.

40.     Plaintiff Wieger's claims are barred by the statute of limitations and/or repose set forth under Pennsylvania law.

41.     S.P. allegedly consumed Enfamil products in 2013, beyond the timeframe set forth under Pennsylvania law for the initiation of the claims Plaintiff Wieger has asserted.

42.     Plaintiff Wieger has not pled any basis for tolling or delaying accrual of the statute of limitations and statute of repose. Her claims are therefore barred by the statute of limitations and repose.

43.     Mead Johnson will rely upon any and all other further defenses which become available or appear during discovery proceedings in this action and hereby specifically reserve the right to amend its answer for the purpose of asserting any such additional defenses.

44.     On information and belief, Plaintiff's claims are barred, in whole or in part, by the doctrines of informed consent, release, and waiver.

45.     Plaintiffs' Second Amended Complaint fails to state a claim for punitive damages.

46.     By raising these defenses, Mead Johnson does not concede that it has the burden of proof as to any such defense.

47.     Mead Johnson reserves the right to supplement or amend its defenses as may be proper based on the pleadings filed, the outcome of its pending motion to dismiss, and discovery taken in this action.

Case ID: 220302601

## PRAYER FOR RELIEF

WHEREFORE, Mead Johnson prays for judgment as follows on Plaintiff Wieger's Second Amended Complaint and Mead Johnson's Answer:

A. Plaintiff Wieger's Second Amended Complaint be dismissed with prejudice and that Plaintiff Wieger take nothing;

B. That judgement be entered in favor of Mead Johnson and against Plaintiff Wieger;

C. Awarding Mead Johnson all reasonable expenses, including court costs and attorneys' fees, incurred by it in connection with this action; and

D. Awarding Mead Johnson such other and further relied as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mead Johnson hereby requests a jury on all issues triable by jury.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: September 9, 2024

/s/ Kenneth A. Murphy

Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker

Catherine M. Recker, Esquire

Amy B. Carver, Esquire

Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead  Johnson Nutrition Company**

Case ID: 220302601

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

Dated: September 9, 2024

/s/ *Kenneth A. Murphy*
Kenneth A. Murphy, Esquire

Case ID: 220302601

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, do hereby certify that a true and correct copy of the foregoing document was served via the Philadelphia Courts Civil E-Filing System pursuant to Pa. R.C.P.205.4(g)(2)(ii) upon all counsel of record, and in accordance with Pa. R. Civ. P. 440 on all parties not served electronically.

Dated: September 9, 2024                    /s/ *Kenneth A. Murphy*
                                                                      Kenneth A. Murphy, Esquire

Case ID: 220302601